**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**MICHAEL T. DREHER,**
*Individually and on behalf of a*
*class of similarly situated persons,*

　　　　**Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**CIVIL NO.  3:11-cv-00624-JAG**

**EXPERIAN INFORMATION SOLUTIONS, INC.,
CARDWORKS, INC., and CARDWORKS SERVICING,
LLC.,**

　　　　**Defendants**

### PLAINTIFF'S OPPOSITION TO DEFENDANT, EXPERIAN INFORMATION SOLUTIONS, INC., MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Plaintiff, MICHAEL T. DREHER, by counsel, and for his Memorandum in Opposition to Experian Information Solutions, Inc.'s Motion for Partial Summary Judgment, he states as follows:

### I.　　INTRODUCTION

Every fact established in this case demonstrates that Experian knew the CardWorks Servicing, and not Advanta or any other entity, was the sole source that reported an inaccurate, derogatory account attributed to the Plaintiff.  Despite its firmly established and unquestionable knowledge that it was CardWorks and no one else, Experian allowed and facilitated CardWorks' effort to camouflage its role in the reporting of accounts that had originated as Advanta accounts. When the Plaintiff disputed the derogatory accounts many times over, Experian never disclosed the identity of the source of the negative information, but instead continued to shield the true identity from a consumer who had a right to know.  Experian cannot establish it is entitled to

1

partial summary judgment when the evidence demonstrates its participation in this scheme was willful.

## II.     FACTS

### A.     PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Defendant's Statement of Facts is largely uncontroversial.  Not much is disputed. Further, many of the facts that may be disputed are substantively irrelevant to the present motion and the case generally.  They are not material. There are, however a number of omissions in Defendant's proffered facts that Mr. Dreher supplements herein.  More than a month prior to Defendant's first report of the disputed account, Defendant learned from CardWorks Servicing, LLC ("CardWorks") through a letter dated October 4, 2010, that Advanta Bank Corp. had ceased to exist. (Ex. A-1)(EXPDREH000261, 266-268)(hereinafter, Experian Bates numbered documents will be XP###).  This letter informed Defendant that Advanta Bank Corp. had been shut down by the State of Utah Department of Financial Institutions and the FDIC on March 19, 2010, and subsequently dissolved. It further notified Defendant that CardWorks had been selected to perform all aspects of servicing a designated portfolio of Advanta Bank Corp.'s accounts.  Defendant knew that Advanta Bank Corp. no longer existed as a credit reporting entity.  Every dispute involved in this litigation made by Plaintiff occurred after this date.

**Mr. Dreher's Experience with Experian and the former-Advanta account.**

**1.     Mr. Dreher discovers an unknown "Advanta Bank" tradeline in his credit report.**

In November 2010, Mr. Dreher's security clearance was being processed by the National Security Agency ("NSA"). (Decl. of Michael Dreher ¶ 6)(Ex. A).  During this process, an NSA investigator advised him that it had discovered a delinquent account on Dreher's credit reports

while processing the security clearance. (Dreher Decl. ¶ 6).  The account was a delinquent credit account under the name "Advanta Bank."  Dreher was advised that he would need to prove that he had made payments on the Advanta Bank and Advanta Credit Cards account or it could severely impact his Top Secret Level III clearance. (Dreher Decl. ¶ 7).  Dreher did not fill out any online application, never applied for the Advanta Bank or Advanta Credit Cards accounts and did not authorize anyone to act on my behalf in doing so.  (Dreher Decl. ¶ 8-9, 12).  In fact, he had not even known of the aforementioned account's existence until he received the information from the NSA investigator processing my security clearance.  Dreher had multiple conversations with the investigator trying to explain that the account(s) did not belong to him, to no avail.  (Dreher Decl. ¶ 13*)*.

**2.     Mr. Dreher requests and receives copies of his § 1681g(a) Experian credit file containing the "Advanta Bank" and "Advanta Credit Cards" identified tradelines.**

As a result of the NSA investigation, Mr. Dreher contacted Experian and requested his own copy of his full credit file. (Dreher Decl. ¶ 23).  Over the course of the next year, Mr. Dreher requested and received multiple copies of his Experian report and made multiple (and unsuccessful) disputes to Experian to have the inaccurate account removed. (Dreher Decl. ¶ 23). The (redacted) consumer reports furnished to Mr. Dreher by Experian are dated November 16, 2010, March 16, 2011, June 21, 2011 and November 3, 2011, attached hereto respectively as Exhibits B, C, D and E. (Consumer Reports).

Experian furnished these reports to Plaintiff when he requested a copy of his credit files pursuant to 15 U.S.C. § 1681g(a). All told, Mr. Dreher received at least 4 copies of his § 1681g(a) Experian file from Defendant and multiple other reports in which Experian made a materially false representation: that "Advanta Bank Corp" and "Advanta Credit Cards" were the

"source of the information" in the tradelines actually supplied by CardWorks.

### a.    November 16, 2010 (Exhibit B)

Defendant's November 16, 2010, report was the first disclosure provided to Mr. Dreher that allowed him to discover the credit tradeline of the former-Advanta Bank Corp. account.  It identified the source of the tradeline information as  "Advanta Bank" which is the entity all Parties agree was terminated in March 2010 and which was replaced as the Servicer "effective 8/1/10."  (CWS 1318)(Ex. A-1).  And yet the tradeline disclosed that the credit account had been reported each month through November 2010[1], and with a past due balance and derogatory payment status by Advanta.  The "Date First Reported" was disclosed as "Dec 2008."  A generic post office box was listed in "Spring House, Pennsylvania."

### b.    March 16, 2011 (Exhibit C)

Experian repeated the same tradeline information as it had in November 2010, listing the source as "Advanta Bank" with the same derogatory history and past due balance.  However, it was now disclosing that the "source" had reported the derogatory tradeline every month through March 2011.

### c.    June 21, 2011 (Exhibit D)

In the June 2011 § 1681g(s) disclosure, Experian permitted CardWorks to now report two tradelines for the same Advanta account.  The first tradeline repeated the previous "Advanta Bank" identification of the source, but now showed that it had been continuously reported after the dissolution of Advanta Bank Corp. through May 2011.  Further, the "Advanta Bank" named

---

[1]  Experian does not and cannot argue that any of the relevant "Advanta Bank" or "Advanta Credit Cards" tradeline information was reported by Advanta Bank Corp. before its dissolution in March 2010.  The "Advanta Bank" and "Advanta Credit Cards" tradelines reported after March 2010, and, in fact, began after August 2010 when CardWorks succeeded Advanta as the servicer.  The Defendant's internal dispute documents also confirm that this post-August 2010 reporting was solely accomplished by CardWorks. (XP 296-304)(Ex. M).

tradeline showed a different "Date First Reported" as June 2009.

The new second tradeline was now listed in the name of "Advanta Credit Cards" and showed that it had been continuously reported with a past due balance and derogatory payment status through April 2011. The "Date First Reported" was disclosed as Dec 2008.  Further, a different generic post office box was listed, this one in "Old Bethpage, New York."

### d.      November 3, 2011 (Exhibit E)

The November 3, 2001 § 1681g(a) disclosure repeated the same information as in the June 2011 report, except for one change.  Experian had deleted the second tradeline, previously identified as "Advanta Credit Cards."

### 3.      Mr. Dreher disputes the inaccurate "Advanta Bank" and "Advanta Credit Cards" tradelines with Experian.

Dreher's efforts to dispute and obtain the removal of the inaccurate accounts necessarily began with the limited information Experian had provided. (Dreher Decl. ¶14-15).  Plaintiff had no previous relationship or contact with any entity about the subject accounts – Advanta Corp, Advanta Bank or even CardWorks. (Dreher Decl. ¶ 23).  Over the next year, he made multiple disputes to Experian in which he explained his lack of ownership or knowledge of the "Advanta Bank" and "Advanta Credit Cards" identified tradelines.  (Dreher Decl. ¶ 23-24). The account was never removed until he commenced this litigation.

Throughout this dispute process, Experian continued to represent to Mr. Dreher that (a.) "Advanta Bank" and "Advanta Credit Cards" were the source of the disputed tradelines; (b.) Experian had, as part of its reinvestigation process, contacted the "source of the information" in the tradeline, and (c.) that "Advanta Bank" had "verified" that Mr. Dreher was the person who applied for and owed the subject account.   Because Dreher had no previous experience with

5

such a process and had no direct contact or information about "Advanta Bank" or "Advanta Credit Cards," he followed Experian's instructions and relied on its representations.

Experian's **November 16, 2010**, credit report disclosure to Mr. Dreher included the statement (emphasis added)(Ex. B):

> **If you disagree with an item, you may dispute it. We will contact the source of the information and ask them to check their records**. Because your report is updated often, contact us within 90 days of the date of this report.

By the time of the **March 16, 2011**, § 1681g(a) report, Experian's report (emphasis added)(Ex. C) stated:

> Before contacting us, please review this report carefully. **If you disagree with any of your personal or credit information, you may dispute it**. Because your report is updated often, contact us within 90 days of the date of this report. **We will contact the source of the information and ask them to check their records**.

In the **June 21, 2011**, § 1681g(a) report, the Defendant again modified its forms, and replaced the phrase "source of the information" with what it believed comparable, the "furnisher of the information." Experian's report (emphasis added)(Ex. D) stated:

> Before contacting us, please review this report carefully. If you disagree with an item, you may dispute it. Because your report is updated often, contact us within 90 days of the date of this report. We will process your dispute generally by sending your dispute to the furnisher of the information or to the vendor who collected the information from a public record

After responding to one of Mr. Dreher's disputes, by response dated **July 5, 2011**, (Ex. E-1) Experian summarized its dispute reinvestigation procedure and relevant results as follows:

> Results
>
> We completed investigating any items you disputed with the sources of the information and processed any other requests you made. Here are the results:
> Outcome
>
> ADVANTA BANK CORP                Remains

      ADVANTA CREDIT CARDS      Deleted

Experian summarized its **August 5, 2011**, (Ex. E-2) dispute reinvestigation procedure and

relevant results as follows:

> Results
>
> We completed investigating any items you disputed with the sources of the information and processed any other requests you made. Here are the results:
>
> Outcome
>
> ADVANTA BANK CORP      Remains
> ADVANTA CREDIT CARDS      Deleted

In the **August 5, 2011**, dispute response, Experian stated that the tradeline in the name of

"Advanta Bank" had been continuously reported by the furnisher with a past due balance

and derogatory payment status even through May 2011.  The "Date First Reported" was

disclosed as June 2009.  A generic post office box was listed in "Spring House,

Pennsylvania."

      Finally, a year after starting his effort to correct his Experian credit file, Experian

responded on **November 4, 2011**, (Ex. E-3) to Plaintiff's final pre-litigation dispute, stating:

> Results
>
> We have completed the processing of your dispute(s). Here are the results:
>
> Outcome
>
> ADVANTA BANK CORP      Remains

      **4.      Mr. Dreher also followed Experian's instructions and tried to dispute
directly with "Advanta Bank" and "Advanta Credit Cards."**

      In March 2011, Mr. Dreher wrote to "Advanta Credit Cards" at the generic post office

box address Defendant had provided. (Dreher Decl. ¶ 11, 14).  He disputed owning the Advanta

accounts, requested some verification that he owed this debt and documentation that indicated that he had applied for credit with Advanta Bank or Advanta Credit Cards. (Dreher Decl. ¶ 8-12; 15).   He also informed Advanta Credit Cards that Experian was reporting the inaccurate information in his credit file.   Mr. Dreher never received a response to such correspondence. (Dreher Decl. ¶ 16).

In April 2011, sending the same correspondence to "Advanta Credit Card", Mr. Dreher actually received a short response. (Dreher Decl. ¶ 18). That response was unsigned and on letterhead labeled, "Advanta Credit Cards."  No physical address or employee name or contact was provided.  And the "Letter" included a one page computer printout of what the sender claimed to be an (unsigned) copy of an internet credit application and a billing statement, again only in the name of Advanta, for March 2011.   That billing statement and online application printout showed that the account was owned by "Arnie's Bowling Rec." in the State of Indiana. Mr. Dreher never lived or worked in the state of Indiana, and was never employed by or an owner of "Arnie's Bowling Rec."   (Dreher Decl. ¶ 23).

On May 23, 2011, Mr. Dreher wrote again and followed up with "Advanta Credit cards" at the post office box Experian provided.  He never received a response.  (Dreher Decl. ¶ 22).

Until discovery had commenced in this litigation, Mr. Dreher never knew that "Advanta Bank" and "Advanta Credit Cards" did not exist. (Dreher Decl. ¶ 26).

**Experian's knowledge as to the FCRA use of the term "source of the information"**

**5.     Experian believes and understands that the "source of the information" is the entity that actively controls the reporting of a credit tradeline and to whom Experian will forward a consumer's credit reporting dispute**.

In this litigation, Experian has tried to manufacture confusion and uncertainty where in

real life it has expressed neither.  Experian has always understood that the "source" of credit information is the "furnisher" who actually reported that information to the reporting agency. (Dep. of Peter Henke Tr. 71:7-17, Nov. 8, 2012)(Ex. F).[2]

    **a.**    **Experian represented to Mr. Dreher that it considers the "source of the information" to be the entity to which it must forward the consumer's dispute pursuant to 15 U.S.C. § 1681i**.

In each credit report, reinvestigation results and related disclosure Experian provided to Mr. Dreher, Experian explained its understanding that the "source of information" was the actual entity to whom it would forward the consumer's dispute.  For example, in its November 16, 2010 (Ex. B), and March 16, 2011 (Ex. C), credit reports, Experian advised that if Mr. Dreher disputed the tradeline, "**We will contact the source of the information and ask them to check their records**."  In a separate July 5, 2011, disclosure form, Experian explained its view of the FCRA to Mr. Dreher:

> According to the Fair Credit Reporting Act (FCRA), a national consumer credit reporting company's role in the dispute process is to investigate information to determine the accuracy and completeness of any disputed item **by contacting the source of the disputed information and informing them of all relevant information regarding the consumer's dispute**.

Thereafter, in Defendant's July 5, 2011, and August 5, 2011, reinvestigation results and dispute response, Experian advised that, "We completed investigating any items you disputed with the sources of the information and processed any other requests you made."

    **b.**    **Experian has repeatedly confirmed its knowledge that the "source of the information" is the furnisher to whom Experian forwards a credit reporting dispute**.

---

[2] The Henke deposition was taken on November 8, 2012, and as of the date of this filing, the certified transcript had not yet been provided to counsel by the court reporter.  However, the court reporter made a "rough" transcript available, which Plaintiff has relied on in support of his opposition.

Kimberly Hughes, Experian's employee and most frequent litigation witness testified that Experian "essentially relies" on its furnisher source to investigate the consumer's dispute. (Deposition of Kimberly Hughes Tr. 110:6-12 Jan. 28, 2008, in *Gorman v. Experian Info. Sols. Inc.* 1:07cv1846 RPP (S.D.N.Y. 2007)(Dkt #42-5))(Ex. G).   When asked if Defendant conducts its own investigation, she testified, "we do go to the reporting source" and explained that that is the company that has the subscriber relationship with Experian, which is the company who has the relationship with Experian, the data furnisher.  She described the furnisher as "the reporting source for the investigation." (Hughes Dep. Tr. 110:7-111:12).

Similarly, in litigation before both District and Circuit Courts, Experian (always represented by the same defense firm as in the case *sub judice*) has uniformly stated its knowledge and belief that the "source" of a tradeline is the entity that actually reported that credit data and to which Experian must send its dispute document, the ACDV (or CDV).   The "source" is the "furnisher"[3] as governed by the FCRA.   **On October 30, 2012**, Experian explained to the Seventh Circuit:

> To meet the needs of the economy, the **CRAs regularly receive information from various sources** around the country including banks, credit unions, automobile dealers, student loan providers, and others (**these sources are known as "Furnishers" within the credit reporting industry and under the FCRA**), assemble that information into credit reports, and make the reports available within seconds upon request to clients ("Subscribers") who are engaged in credit-related transactions. (Dkts. 121, ¶ 9; 140, ¶ 7; 147, ¶¶ 5-6.)
>
> **Furnishers report credit information to the CRAs via electronic transmission on a monthly basis**. (Dkt. 121, ¶ 3.) **Credit information reported by a furnisher to a CRA is sometimes referred to as a "tradeline,"** which usually includes a consumer's account number, account status, and payment and balance information. (Dkt. 140, ¶ 8.) The CRAs contractually require that their Furnishers, among other things, report only accurate information. (Dkts. 121, ¶ 14; 140, ¶ 9;

---

[3]  "Furnisher means an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report."  12 C.F.R. § 222.41

147, ¶ 14.)

*Johnson v. Trans Union, LLC, Experian Info. Sols., Inc., & Equifax Info. Servs. LLC*, Brief of

Defendant-Appellee Experian Information Solutions, Inc., 2012 WL 5396280 at 13-14 (7th Cir.

Oct. 30 2012)(Emphasis added)(Ex. Q); *See also Dennis, v. BEH-1, LLC & Experian Info. Sols.,*

*Inc.*, Brief of Defendant-Appellee Experian Information Solutions, Inc., 2004 WL 3155937 at

*20 (9th Cir. 2004)(Ex. R)(relying on *Boothe* v. *TRW Credit Data*, 768 F. Supp. 434, 438

(S.D.N.Y. 1991), "A credit reporting agency complies with the FCRA's reinvestigation

requirements by reinvestigating disputed information with the source of the information to verify

its accuracy."). Here, Experian complied with its reinvestigation obligations imposed by using

the "consumer dispute verification" ("CDV") process. A CDV is generated and sent by Experian

to notify directly the furnisher of disputed information of the consumer's dispute and obligates

the furnisher to re-check its records to ensure the account information is being reported correctly

by Experian. [Vol. 1, ER at 48 [¶ 5).]")

Experian has also formally asserted in appellate briefing its knowledge of FTC guidance

that the "information source" is the entity to which it sends the dispute ACDV. *Sarver v.*

*Experian Info. Sols., Inc.*, Brief of Defendant-Appellee Experian Information Solutions, Inc.,

2004 WL 3760682, at 20-21(7th Cir. 2004)("[S]*ee also* FTC Commentary to the FCRA, 16

C.F.R. Pt. 601, App. at 516 (2003)('If you tell a [credit reporting agency] that your file contains

inaccurate information, the [credit reporting agency] must investigate the items (usually within

30 days) by presenting to its information source all relevant evidence you submit, *unless your*

*dispute is frivolous.*')(emphasis added).")(Ex. S).

Evan Hendricks, an established FCRA and Privacy Rights expert provided his

explanation by attached declaration.  (Decl. of Evan Hendricks ¶¶ 3-5, 7-8)(Ex. H).  Hendricks

was invited by Experian to serve on its Consumer Advisory Council offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.  He has testified and been found qualified by multiple Federal courts, including several in this District. Hendricks has also been FCRA certified by industry standards, writes and regularly covers industry and FCRA developments, including litigation developments.  And he has been invited to testify before the U.S. House and Senate, and various administrative agencies on multiple occasions.

> "When the phrase "source of the information" has been used to describe the information in a credit report, in the credit industry and in regular use before Congress, the Federal Trade Commission, in testimony [and …] in seminars … the "source" has always meant the "furnisher" who actually submitted the credit tradeline to the consumer reporting agency." (Hendricks Decl. ¶ 8).

> "[T]his is the way that Experian has always used the term and phrase.  In representing how it builds consumers' files, and how it responds to consumers' disputes, Experian for decades has referred to the actual furnisher – the entity that provided credit tradelines to Experian and the entity that was to receive the Experian "ACDV" – as the "source," and emphasized the importance of consumer contact directly with the "source."" (Hendricks Decl. ¶ 9).

Even today with this litigation pending, Experian admits such knowledge.  Under Experian's website instructions explaining, "How to Dispute Credit Report Information," Experian represents that upon receipt of a consumer's dispute "A Notice is Immediately Sent" – not to the originator creditor - but instead "to the Source of the Information."  According to Experian, thereafter, "the source must verify your account data." (Hendricks Decl. ¶10).  *See*, Frequently Asked Questions, Lean More About the Dispute Process, http://www.experian.com/disputes/how-to-dispute.html (last viewed November 29, 2012) (Ex. I). *See also,* Dispute Information on your Credit Report, http://www.experian.com/disputes/faq.html (last viewed November 29, 2012) (Ex. I)("What happens after I complete the credit dispute form? When you question information on your personal credit report and tell us specifically why

you believe the information is inaccurate or incomplete, we contact the source of the information directly by telephone, by letter or through an automated verification system. We ask the source to check their records to verify all of the information regarding the item you questioned and report back within 30 days of the date that we received your request[.]") (Hendricks Decl. ¶ 10-11, 14).

In an April 2012 presentation to a Federal Reserve Board conference for "National Consumer Protection Week," Experian provided two descriptions of the dispute process that used the terms "data furnisher" and "source" interchangeably.

> The first slide, page 22, stated, "If we cannot resolve dispute, request for dispute is sent to data furnisher for investigation … Data furnisher researches and responds to Experian, resulting in either no change, update or deletion …. Review data furnisher's response …. Consumer's file updated per agent review or data furnisher's instructions." The second slide, page 71, stated, "**Found evidence of fraud in your credit report? …** Next steps …Consumer initiates investigation through Experian with the information source …  Consumer reporting company provides source contact information Consumer should contact *source* directly as well … *Source* may require completion of fraud affidavit or other documentation as part of investigation.  (See presentation by Maxine Sweet, Experian Vice President of Public Education, Federal Reserve Board of Boston 22nd Annual National Consumer Protection Week April 25, 2012. (www.bos.frb.org/consumer/conf/ncpw/2012/maxine-sweet.pdf)

(Hendricks Decl. ¶ 15).

### Experian's knowledge that Advanta was not the "Furnisher" or the "Source"

6.    **Experian had actual knowledge and understood that "Advanta Bank" and "Advanta Credit cards" could not be the furnisher, subscriber and "source of information" for the tradeline because Advanta Bank was dissolved before Mr. Dreher had discovered CardWork's inaccurate reporting and began requesting and disputing the tradeline.**

Defendant also suggest in its motion that there was uncertainty and confusion as to which entity was the actual reporting entity and source.  It offers a complex history of Advanta Corp.

and its dissolved Advanta Bank Corp.  It claims that the FDIC played some role in determining how or what Experian would report as the subject tradeline identity.  All of these arguments are red herrings manufactured solely for this litigation.  (Ex. A-1). And as they apply to Experian's understanding and knowledge, they are not simply immaterial, but also untrue. (Henke Dep. Tr. 76-80)(Deposition of James Kilka, Tr. 45:21-49:23, August 24, 2012)(Ex. J).

Experian has understood since at least July 2010 that "Advanta Bank" was terminated and no longer an actual business entity. (Henke Dep. Tr. 27:13-28:1). The contrast between Experian's motion argument and its internal records is surreal.   As will be discussed momentarily, in August 2010, CardWorks succeeded Advanta Bank as the servicer for Deustche Bank's master trust.  (Deutsche Bank Notice of Termination of Advanta Bank Corp. As Servicer and Appointment of Successor Servicer)(CWS 1366)(Ex. L)(Henke Dep. Tr. 27:13).   Experian knows that.   But still, it implies some continuing involvement or relationship between "Advanta Bank" and CardWorks in which CardWorks is acting as Advanta's agent.   Such a suggestion would not be truthful.   Experian has maintained separate client accounts for Advanta and CardWorks. (*See e.g*. XP 294-304)(Ex. M). In fact, Defendant's internal client account system tracked the fact that Advanta has ceased operation and even ceased paying any of Experian's bills. (XP 294-304)(Ex. M)

Its internal account notes for July 8, 2010, documented from a business/client account "follow-up" on Friday, March 19, 2010, that "Advanta Bank Corp., Draper, UT was closed by the Utah Department of Financial Institutions, and the FDIC was named Receiver." (XP 299)(Ex. M).  Also, October 27, 2010, correspondence demonstrates that Experian received a letter from FDIC stating Advanta Bank was closed by the Utah Department of Financial Institutions, ("Another bank did not take over this company. FDIC letter attached at SR and company level.")

14

(XP 296)(Ex. M).   *See*  http//www.fdic.gov/bank/individual/failed/advanta-ut.html.  When

Defendant's employees remained unsuccessful in collecting payment from Advanta, they tried to

contact the FDIC and on July 25, 2011, Experian noted internally,

> Phone In cancellation.
> Had Mike Pascal call and inform me that he received an invoice
> but this company has been shut down and is no longer in existence,
> verified online that the company was shut down 3-9-2010.  Will
> close account.

(XP 296)(Ex. M).

> **7.      Experian had actual knowledge and fully understood that CardWorks was
> the servicer and source of credit reporting as of August 2010 and was doing so for the new
> "owner" of the accounts, Vion Holdings, II, LLC.**

On August 20, 2010, CWS executed a series of Experian contracts and forms to create a

new direct subscriber relationship.  (XP 296)(Ex. M).  Then, in September 2010, CardWorks, by

its Director of Credit, Maria Costa, contacted Experian management to try and obtain use of the

"subscriber code" of the now defunct Advanta Bank.  (E-mail September 10, 2010, 3:41 PM)(Ex.

T)[4]. CardWorks wanted to obtain "Bullseye" reports[5] on the former-Advanta accounts in order to

see what its predecessor had reported (if anything). *Id*. Experian asked of CardWorks,

> Can you tell me what functions CardWorks will perform  for ADVANTA? I am
> getting help from our Membership area and I want to be sure that we set you guys
> up right.  Will you be reporting data on their behalf as part of the services you
> provide?

---

[4] Exhibit T contains all the email quoted in this section unless otherwise indicated.

[5] Bullseye® is a feature marketed by Experian to its customers as a product that, "saves you the
time an trouble of researching account histories." (Ex. X).  Among other things, Bullseye®
reports allow a simple inquiry to display the current status of an account as stored in Experian's
database, displays the entire tradeline with actual account status, verifies whether previously
requested changes were applied, may indicate no change is needed at all, eliminates the need for
researching account histories, and has a built-in security feature that guarantees subscribers
access only their own tradelines.

(E-mail September 13, 2010  10:29 AM).  Experian then advised CardWorks that it could not

have access to Advanta's information unless a new agreement was executed between Advanta,

CardWorks and Experian establishing CardWorks as the agent or third-party processor of

Advanta Bank.  (E-mail September 13, 2010 2:56:00 PM)("Experian has updated policies around

who we allow this sort of access to.  We have two agreements attached to this email.  One needs

to be signed by CardWorks and ADVANTA and one needs to be completed by you.")  This of

course was impossible, as Advanta Bank was months earlier dissolved.

CardWorks then tried to figure out a solution by asking the FDIC, then in control of the

Advanta Bank Corp. assets, to sign such an agreement.  That was not possible because the FDIC

no longer controlled the former-Advanta accounts.  Advanta Bank was only the account servicer

and these accounts were not Advanta Bank or FDIC-controlled assets.   The FDIC remained

tangentially involved because under federal law when a bank is dissolved, contracts with that

bank cannot be terminated for ninety days without FDIC approval. (Notice of Termination)(Ex.

J).  The credit card portfolio trustee, Deutsche Bank, could not fire Advanta Bank (and the

FDIC) as servicer and replace it with CardWorks until three months after the March 2010

dissolution. *Id.*  Thus, CardWorks had been told that, "[T]he FDIC will not be signing any

additional paperwork in regards to the transfer of servicing[.]"  (E-mail October 04, 2010 1:52

PM).  CardWorks then instead forwarded a CardWorks letterhead document (Ex. A-1)

explaining the dissolution of Advanta Bank and the Deutsche Bank Termination Notice. (E-mail

October 19, 2010 3:47:05 PM).  Experian was expressly told, "The attached PDF is the

notification that was send [sic] to ABC cardholders advising them of the termination of ABC as

the servicer of their accounts and notifying them of CWS assuming servicing of their accounts."

*Id*.  CardWorks then told Experian that the accounts were "owned by an Advanta trust."  (E-mail

October 29, 2010 10:58 AM)

For every meaningful purpose in this case, Vion Holdings, II, LLC. was the "owner" of the credit card accounts.  It served as "creditor" and the principal to whom the servicer, CardWorks, was responsible. Experian's representative asked CardWorks for further information as to its role in the credit reporting of the subject account information, asking,

> Are these trades still going to be updated by someone on an ongoing basis? Is the Advanta trust going to be the ones to handle reporting? It seems that you will act as an agent, a servicing agent. That ties us back to the form that I provided to Marla at the beginning of this all.

(E-mail October 29, 2010 12:07 PM) (referencing Ex.V, the contract used when a reporting source is acting solely as the agent of another entity).  Experian asked, "[W]ho is the current owner of the ADVANTA accounts? You mentioned a "Trust".  Do we have a contact at whomever that truly is?"  (E-mail November 01, 2010 1:50 PM).  On November 4, 2010, CardWorks expressly told Experian, by e-mail with the subject line, "Experian-ADVANTA Trade Reporting,"

**The owner of the Advanta accounts is Vion Holdings II LLC.**

(E-mail November 04, 2010 10:35 AM).

Once Experian knew that Vion Holdings, II, LLC, and not Advanta , was the owner of the subject accounts, it solicited and obtained from Vion Holdings and from CardWorks a signed contract for credit reporting with Vion Holdings as Principal and CardWorks as agent.  (E-mail November 11, 2010 5:05 PM)(Email November 16, 2010 12:20 PM]("Here is the signed letter from both Vion and CWS.")(Ex. V) (E-mail January 7, 2011 5:20:37 PM)("CWS would be the only party servicing the accounts owned by Vion.").  Advanta was never again mentioned in such CardWorks-Experian exchanges.

**8.     Experian treated CardWorks as its sole "source" and furnisher.**

Experian understands that the term "source of the information" as used the FCRA is used to describe the entity to whom consumer disputes are to be directed and who is thus responsible as a "furnisher" for participating in the dispute process.   The way in which Experian transmits a consumer dispute to its source is by "ACDV," its Automated Consumer Dispute Verification request.  (Hendricks Decl. ¶ 9, n.1). In every instance in which Experian forwarded Mr. Dreher's disputes of the tradeline to its "Source," it sent them to CardWorks.  Each ACDV, not disclosed to Mr. Dreher until produced in the litigation, identifies only CardWorks and does not mention "Advanta" (or any derivation of it). (XP 12-15)(Ex. W).

> As Professor De Armond explained,
>
> Given that Defendant directed its ACDVs to CardWorks, and not Advanta Bank Corp., and that nothing disclosed thus far indicates that Defendant sent any information about Plaintiff's dispute to Advanta Bank Corp., the now-defunct historical creator of the account, Defendant clearly treated CardWorks as the source of the information that Plaintiff disputed.  This treatment is consistent with Defendant's description of its dispute investigation process that it provides to consumers on its website.

(Declaration of Elizabeth De Armond at 15)(November 28, 2012)(Ex. U).

**Experian's Policy is to Defer Entirely to its Paying Customer (in this case, CardWorks)**

**9.      Experian allowed CardWorks to dictate whether the credit reporting agency would disclose the "source" to consumers.**

During the setup up by Experian of CardWorks as the new credit reporting servicer, Defendant delegated total control over what furnisher was identified in the subject tradelines as the "source."  In some of the accounts that CardWorks had previously serviced, it instructed Experian to report the "source" as both the originator and with "CWS" for CardWorks Servicing. Thus, Experian dutifully asked its customer, "Do you want the CWS on the end of the "ADVANTA Credit Cards"?"  (E-mail October 21, 2010 11:58 AM). To which, CardWorks

demanded, "No, we would not want CWS or CardWorks mentioned in the trade line, just

Advanta Credit Cards."  (E-mail October 21, 2010 12:38:45 PM).

**10.  Experian standard policy is to defer totally to its furnisher customers.**

Experian's standard practice is to defer entirely to CardWorks, the tradeline furnisher, to

decide what to place within the credit report tradeline and how to report it.   Experian has

followed this policy in all credit reporting matters for at least a decade.  (Hendricks Decl. ¶ 20;

Henke Dep. Tr. 42-46).  For example, this total deference to its paying customer is the hallmark

of its policy for retaining information disputed by consumers when its customer wants it to do so:

> This policy of full deference to the Experian client, the furnisher, is followed
> when determining whether to accept a tradeline for reporting and throughout the
> consumer dispute process in which a consumer's ACDV credit dispute will be
> rejected if the tradeline furnisher instructs Experian that the tradeline information
> has been "verified" by the furnisher.

(Hendricks Decl. ¶ 20).  This has also been Experian's practice in determining whether or not to

reveal the actual source of a tradeline.  It is left up to Experian's customer to decide.  (Henke

Dep. Tr. 42:7-43:8).  This is Experian's ordinary practice.  (Henke Dep. 43:15 - 44:3; 44:9-21;

445:10-14).  Experian's conduct in this case was conscious and intended.  (Henke Dep. Tr.

45:22-46:11).

**11.     If following Industry standards, Experian could have reported and disclosed
CardWorks as the source, while also identifying Advanta as the previous servicer.**

Despite Experian's feigned interest in avoiding consumer "confusion," it did not report

the tradeline in the manner that industry standards required.   It could have identified the actual

source, CardWorks, while also disclosing that the previous servicer was Advanta.  (Henke Dep.

Tr. 41:24-42:6)(Q"[I]f requested this, Experian following its procedures could have furnished the

trade line as Advanta Credit Cards/Cardworks Servicing, right? … A. That's correct."). (E-mail

October 21, 2010 11:59 AM). (Hendricks Decl. ¶29)("If Experian wanted to do as it claims, its system is already set up to identify in the tradeline both entities – Advanta and CardWorks.").

The Industry standard "Metro2" format even provides a field to identify the previous servicer or creditor.  (Hendricks Decl. ¶¶ 28-29).  It also permits the disclosure of both the "source" and any related name or entity.  For example, this fact was evident in a number of Mr. Dreher's legitimate tradelines in the June 21, 2011, Report: Citibank/Citgo; GE Capital/Home Design; HSBC/Yamaha Music; Dell Computer/Web Bank (XP 69-75)(Ex. D).

**Experian's failure to disclose the actual name of the "source" makes it more difficult for consumers to identify and dispute inaccurate information.**

12.     **Most consumers disputing credit reporting information do so because they do not recognize or "own" the account.**

The majority of disputes made by consumers to consumer reporting agencies relate to a claim that the consumer does not "own" or is not responsible for the account, such as by identity theft.  (Hendricks Decl. ¶¶ 21-22). ("An 'ownership' dispute is a dispute in which the consumer claims that he or she is not the person who opened or applied for a credit account.  It includes a number of credit reporting accuracy disputes including identity theft, as well as instances in which a credit tradeline has been innocently, but inaccurately attributed to a person who did not apply for an account.")

This is true for CardWorks. In 2011, roughly 38% of the disputes it received regarding the former Advanta accounts were based on a consumer claim of identity theft or that the account was not his or hers. (CWS 396, 500)(Ex. Y).

13.     **The failure to identify the actual "source" of a tradeline is a substantial obstacle for consumers making credit reporting disputes.**

As Mr. Hendricks explained:

> In cases like Plaintiff's, which involve identity theft or otherwise involve an
> "ownership" dispute, accurately disclosing the source of Experian's information is
> all the more important because the consumer does not actually have a relationship
> with the tradeline furnisher.  Without knowledge of the actual identity of the
> entity that reported the disputed credit information, there is often no practical way
> to obtain further information about a tradeline or to make effective efforts to have
> the tradeline removed.

(Hendricks Decl. ¶23).  It impairs the ability of a consumer to force the removal of inaccurate

information:

> In short, by withholding the identity of a source of information in the consumer's
> file, a consumer reporting agency disables an array of remediation rights that
> Congress provided to consumers whose reports contain inaccurate information.

(De Armond Decl. at 14).  This is especially true for the "Advanta" tradelines.  (De Armond

Decl. at 13-14; Hendricks Decl. ¶ 24).  More specifically, this was a problem for Mr. Dreher,

who was an apparent identity theft victim and did not recognize the account.  (Dreher Decl. ¶¶

10-13; 16-21).

    While Experian's summary judgment declarant, Mr. Henke, signed Defendant's

declaration claiming an interest in helping consumers make disputes, he actually has no

knowledge or understanding in those regards.  In fact, he candidly admitted:

> Q.    So given that he had no previous relationship with Advanta, how would
> including the name Advanta have helped a consumer, an identity theft victim,
> such as my client?
> A.   Yeah.  I'm not sure.  Not having been an identity theft victim, I don't know
> how it would help him.

(Henke Dep. Tr. 70:22-71:6).

    **14.    The lone expert in this case agrees that Experian's litigation interpretation of**

**Section 1681g(a) is not objectively reasonable.**

    Professor De Armond testified:

> In my judgment, Defendant's withholding of the identity of CardWorks from
> Plaintiff violated its obligation pursuant to 15 U.S.C. § 1681g(a)(2) to clearly and
> accurately disclose the source of the information regarding the disputed debt.

> Furthermore, it would be objectively unreasonable to construe 15 U.S.C. § 1681g(a)(2) as permitting such withholding.
>
> …
>
> Nothing in the FCRA supports a construction of section 1681g(a)(2) that would allow the consumer reporting agency's subscriber, rather than the statute itself, to control the designation of the information's supplier.

(De Armond Decl. at 14).

## B.    DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant's short mention of the core of Plaintiff's case is revealing.   Contrary to Experian's implied suggestion that it furnished to Mr. Dreher one report that mentions one tradeline as "Advanta Bank," its pattern of misconduct extended for a longer period of time, over several attempts by Mr. Dreher to obtain his full credit file and did not merely list one tradeline and one version of the "Advanta" misnomer. In response to Experian's statement of alleged undisputed material facts, the Plaintiff addresses each fact not only whether undisputed or disputed, but also whether Defendant's allegations of fact are truly material, complete or misleading.

*1. Undisputed*.

*2. Undisputed, but incomplete*. *See supra* section 2.

*"B. (Advanta Bank Corp. Had A Complicated Business Model)." Disputed*. Defendant's characterization as a securitized lending structure as one Experian would consider a "complicated business model" must be tongue in cheek.   Experian, one of the "Big-3" credit repositories is certainly unsurprised by the concept of securitization, the primary basis for nearly all mortgage, auto loan and credit card lending in modern America. For general background, http://en.wikipedia.org/wiki/Securitization last visited November 27, 2012.  Further, as detailed in sections 4 and 5(a)-(b), above, Experian was not confused as to which entity was the "source of the information" in the "Advanta Bank" tradeline or Experian's characterization of the facts

alleged in paragraphs 3-9 and 11-12, as "material" is incorrect.  (Def.'s Mem. in Support of Motion Partial Summ. J.)(Def.'s Mem.)(Dkt. #55).  How it came to be that CardWorks was, in fact, the entity that actually supplied the tradeline information to Experian displayed in Mr. Dreher's credit reports does not change the fact that CardWorks was the entity that supplied that information.  Advanta Bank Corp., the entity Experian now after the fact claims as the source of its 2011 credit information, was completely, totally and permanently dissolved and terminated in March 2010.  (CWS 1366)(Ex. L).  Experian's position, a textbook red-herring fallacy, attempts to drive the Court's attention away from what is a very simple case.  Regardless of whether Advanta Corp., Advanta Bank Corp, Advanta Receivables, or Advanta Master Trust were ever a creditor, furnisher or even a source of credit tradeline information, after the dissolution of Advanta Bank Corp. in March 2010 and the termination of any Advanta role in the servicing of the former-Advanta tradelines in August 2010, no "Advanta" entity supplied any information to Experian.  Not one tradeline.  Experian knew this then and knows this now.

The pre-CardWorks history of Advanta Bank Corp. was never considered or even known by Experian prior to this litigation.  In fact, it says quite a lot that the "evidence" regarding the Advanta family history necessarily came from Defendant's litigation counsel, who after searching the Internet in preparation for this motion downloaded a set of corporate documents attached to an attorney declaration. (Decl. J. Clark, filed separately in support of Def.'s Mem., Exs. A, B and D)(Dkt. #56). In contrast, the employee Experian offers to support its motion, Peter Henke, testified that he knew little of Advanta, almost nothing of Cardworks and absolutely nothing about the substantive claim in this case. (Henke Dep. Tr. 10:1-13; 69-71).[6]

---

[6] In response to the question "who was the subscriber for the account in question?" Mr. Henke responded, "That would be Advanta."  (Henke Dep. Tr. 9:5-7).  Mr. Henke knew that there were a number of Advanta business names, but not the one claimed to be associated with Mr. Dreher's

And the Experian employee who actually was involved in the Experian-CardWorks relationship believed that CardWorks was the furnisher and agent of the "owner" of the old-Advanta accounts, Vion Holdings II.  (Kilka Dep. Tr. 45:21-49:23). By November 16, 2010, the date of the first full credit report Experian provided to Mr. Dreher identifying "Advanta Bank Corp. as the source of a credit tradeline **reported for every month after March 2010**, the Defendant had received in writing actual knowledge of the status of the portfolio of accounts originated by Advanta but now-owned by Vion and serviced by CardWorks.

*3. through 10. are undisputed, but immaterial because they chronicle Advanta's demise.*

*11. Disputed, misleading and immaterial*.  Defendant asserts that Advanta Bank Corp. remained more than a servicer after the establishment and transfer of the accounts to the Trust. And thus implies that such role was similar to that it held as the originator of the accounts.  The basis for this statement of "fact" is a citation to a court decision in a securities fraud class action. *Underland v. Alter*, CIV.A. 10-3621, 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011).  First, the reference to such a remaining interest was as to Advanta Corp., the parent of Advanta Bank Corp.  Second, the "interest" to which the Pennsylvania Federal Court refers is a "residual interest" in which "[t]he residual interest holder is entitled to receive the overcollateralization in the trust (the principal balance of the loans in the trust that exceeds the principal amount of the certificates issued by the trust) and the excess spread (the difference between the average interest rate of the loans in the trust and the average interest rate of the certificates offered by the trust) in the securitization, to the extent those amounts are not required to pay the expenses of the trust

---

account.  He also knew that CardWorks or Cardworks Servicing had a subscriber account, "but I don't recall reviewing it for the purpose of this declaration," and that he may "have been on the account for other purposes, such as if we received a request for contracts or so on."  (Henke Dep. Tr. 10:2-13).

and the certificateholders the amounts they are due." *Id., at* n.17.

**12. Undisputed, but immaterial.**

**13. through 17.  Undisputed.**

**"D. Credit Reporting For Advanta Bank Corp. Originated Accounts Involves**

**Many Players."  Disputed, to the extent that the section heading states a purported fact.**

As detailed above, there were only two "players" involved in the credit reporting that is the subject of this lawsuit – Experian and CardWorks.  All Advanta entities were out of the picture (and mostly out of existence) before any of the subject reporting occurred.  The FDIC played almost no role, simply exercising its right upon dissolution of Advanta Bank to make Deutsche bank wait 90 days to replace Advanta with CardWorks.  And while Vion Holdings II, LLC was the owner of the debts and Deutsche Bank the Master Trust Trustee, neither of these entities participated in any of the credit reporting.  (Kilka Dep. Tr. 45:21-49:4).  Credit reporting was done solely by CardWorks.

**18. Disputed.**  Experian's characterization of CardWorks as the mere "manager" of the credit reporting for the former-Advanta accounts is not accurate.  CardWorks was the "furnisher" the "subscriber" the Experian "client" and certainly the "source of information" for all of the credit account tradelines CardWorks reported to Experian after it replaced Advanta Bank Corp. as the account servicer. *See supra* Plaintiff's Statement of Facts *passim*.  *See also* CardWorks Answer to Am. Compl¶ 19. (Dkt. # 29)("CWS admits it reported the account that forms the basis of this litigation to one or more credit reporting bureaus.").

**19. Undisputed**.  FDR is a credit industry vendor that sells software and related data processing services.  Like many credit industry participants, CardWorks uses First Data Corporation's "FDR" accounting software. (Deposition of Maria Costa, Tr. 189:1-190:9)(Ex. K).

**20. Disputed**.  FDR is nothing other than a computer processing service that transmits the data supplied by its many customers to the national credit bureaus.  It converts the credit account data maintained by CardWorks into the "Metro 2" format required by Experian.  Defendant explains this process on its business-to-business side of its website:

> Once you have been approved by Experian's membership department for reporting access, you must get set up with a software vendor that will report in a Metro 2 format. There are costs associated with Metro 2 credit reporting software, therefore, it is important that you do not purchase the software until you are fully approved by Experian's membership department for reporting access. Please contact a Metro 2 software vendor for more details about costs.

http://www.experian.com/consumer-information/reporting-to-credit-agencies.html   last   visited November 29, 2012.  Experian refers to a FDR as a "Third Party Processor."  (Henke Dep. Tr. 76:24-77:25)(Ex. V).  It does not "supply" the credit tradeline information to Experian; it merely transmits it.  (Def.'s Mem. at 14).  Just as the Postal Service is not the source of a mailed letter, but instead it is just the transmitter.   Regardless, this "Fact" as with those in the several paragraphs to follow, more damns Defendant's argument than helps it.  If FDR could somehow be construed as the "source" of the credit reporting information, the Experian would be required to identify it as a source.  It did and does not do so. *See supra* Plaintiff's Statement of Facts, *passim*. (XP 207-208)(explaining Experian's view that an agent handles disputes and updates the tradelines)(Ex. N).

**21. Undisputed**.   FDR electronically delivers the electronic data sent by thousands of financial institutions across the nation. (First Data Corporation, Form 10-K, at 7 (Mar. 5, 2012)(attached to Clark Decl., Ex. D).

**22. Undisputed**.   FIS controls the generic post office box provided by Experian to Mr. Dreher, thus assuring that he would have absolutely no means to make direct contact with CardWorks, the entity with all of the furnisher authority and responsibility for correcting identity

theft credit disputes.

**23. Undisputed.**

**"E. Like The FDIC And CardWorks, Experian Used The Name Consumers**

**Would Likely Recognize." Disputed.** There is no evidence that any of these entities used the

name "Advanta Bank" or "Advanta Credit Cards" because this was a name the consumer may

have recognized, nor is there evidence that consumers such as Mr. Dreher would have been able

to benefit from the use of the name "Advanta". See Plaintiff's Statement of Facts, *supra*, *in*

*passim*.

**24-27. Undisputed**. When Deutsche Bank hired CardWorks to replace Advanta Bank

Corp. as servicer, the FDIC continued to play a role because it was attempting to dispose of the

remaining assets of dissolved Advanta Bank Corp., and not because it continued to play some

ongoing role in the ownership or servicing of the former-Advanta accounts. (CWS 1360-

1366)(Ex. L). Much like a Bankruptcy stay, a creditor or contracting party opposite a dissolved

bank with assets now controlled by the FDIC may not simply proceed to end such contracts or

collect such debts. As Deutsche Bank explained, in its July 20, 2010 Notice:

> As the Indenture Trustee previously informed you in a notice dated March
> 23, 2010 (the "Notice"), the Federal Insurance Deposit Corporation
> ("FDIC") was appointed as receiver for the Servicer . . . as stated in the
> Notice, the Indenture Trustee was restricted by applicable provisions of
> the Federal Deposit Insurance Act in exercising any rights related to the
> termination of the Servicer without the consent of the FDIC for 90 days
> following the FDIC appointment.

(Notice of Termination of Advanta Bank Corp. As Servicer and Appointment of Successor

Servicer)(CWS 1366-1369)(Ex. L). Experian received this Notice together with the letter

referenced in Defendant's ¶ 28, by e-mail on October 19, 2010. (XP 148)(Ex. P).

**28. Undisputed, but incomplete**. Experian did not simply "receive" such a letter.

Instead, it required it in order to document that Advanta Bank Corp. was no longer involved in the subject credit reporting and as necessary to permit CardWorks to begin its own subscriber and tradeline reporting relationship. (Kilka Dep. Tr. 33-36; 42:15-46:24)(XP 144, 146; 172; 176-177; 202; 207-208; 213; 235; 243; 248; 252, 280) (email traffic between CardWorks Servicing and Experian demonstrate Experian's knowledge and effort to create a subscriber tradeline for CardWorks that did not disclose CardWorks identity as the source of the information).

*29. Undisputed, but misleading*.   Experian did not have a "discussion" with any party other than CardWorks.  It never met or spoke with Vion, II, LLC, the new owner of the former-Advanta accounts.  It never met or spoke with anyone from the FDIC.  And it certainly never met or spoke with anyone from Advanta Bank Corp., the entity that was dissolved in March 2010. Its only contact was with CardWorks. (Kilka Dep. Tr. 33-36; 42:15-46:24)(XP 144, 146; 172; 176-177; 202; 207-208; 213; 235; 243; 248; 252, 280) (email traffic between CardWorks Servicing and Experian demonstrate Experian's knowledge).

*30. Undisputed.*

*31. Undisputed*

*32. Disputed*.   The deposition of Mr. Henke should functionally eliminate the Declaration Experian had him sign to support its motion. *See supra* note 6.  Mr. Henke's testimony demonstrated that that he did not create the substance of his declaration or prepare for his deposition.  (Henke Dep. Tr. 6-7).  He "reviewed agreements . . . between Experian and Advanta" on the Siebel System, a system that is "our internal tracking system," but which system Experian never informed or provided any "documents, so contracts, letters" from that system that were responsive to Plaintiff's discovery requests.  (Henke Dep. Tr. 7:24; 8:1-15; 8:23).  He was not knowledgeable about CardWorks and its relationship to the account in question or the

substance of CardWorks involvement in the allegations of the Complaint.  (Henke Dep. Tr. 10:1-13).  He worked as a director in the membership department, but "we don't manage the relationship on an ongoing basis."  (Henke Dep. Tr. 13:16-25).  He testified that the name of the entity that appeared on a given credit report as the source of the reporting "could vary depending on the circumstances of that particular account."  (Henke Dep. Tr. 14:14-16).  Among the reasons for the variance in the source named, he testified that "if the lender feels that a particular name might be more or less confusing to a consumer if they were to see it on their consumer report, so they would recommend a recognizable name."  (Henke Dep. Tr. 14:19-23).  In such a case, the "client" would determine the name of the source reporting on the consumer report, according to Henke, while the standard practice would be to list the client.  (Henke Dep. Tr. 15:1; 16:22-25).  The only background in FCRA Mr. Henke has is through his experience with permissible purposes for accessing a consumer report, otherwise, he has never even read the FCRA or reviewed any section regarding consumer disputes.  (Henke Dep. Tr. 20:11-24; 11:9-25; 12:1-2; 24:6-14).   Henke testified Experian has a policy that prevents entities from viewing each others' data tied to subscriber numbers.  (Henke Dep. Tr. 33:6-19).  He also testified that if Experian were following its procedures, it could have reported the tradeline as Advanta Credit Cards/Cardworks Servicing.  (Henke Dep. Tr. 42:1-9).

*33. **Undisputed, but incomplete.** * Plaintiff made multiple disputes to Experian and wrote multiple letters to the "Advanta Bank" addresses Experian provided, all to no avail.  In fact, he received only one unsigned and perfunctory response on "Advanta Credit Cards" letterhead, while most of his Advanta letters were ignored. *See supra* Plaintiff's Statement of Facts.

## II.    ARGUMENT

### EXPERIAN WILLFULLY VIOLATED 15 U.S.C. § 1681g(a).

The FCRA's notice provisions, including § 1681g(a), are the foundation of consumer oversight on which Congress built FCRA compliance.  The notices that Congress included in the FCRA provide consumers with the information necessary to inform and then perform their self-help functions.  The indispensable first step in the process is to access to the contents of your credit file pursuant to § 1681g.  National Consumer Law Center, Fair Credit Reporting, at 73 (7th ed. 2010) ("Consumers can review a report of the file contents to determine if there is inaccurate or incomplete information.  Understanding the nature of negative information in the file also is an aid to improving the consumer's credit profile.  Disclosure of the consumer's file is an essential first step to handling almost any problem relating to a consumer's credit file and consumer reports related to the file"); *Gillespie v. Equifax Info. Servs., L.L.C.*  484 F.3d 938, 941 (7th Cir. 2007) ("A primary purposes of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under § 1681i"); *see also Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 364 (1973) ("[B]lind economic activity is inconsistent with the efficient functioning of a free economic system such as ours").  Only Defendant's compliance with § 1681g(a) would provide Mr. Dreher and all other such consumers with that indispensable information as Congress has directed.

### A.    SUMMARY JUDGMENT IS RARELY APPROPRIATE FOR FCRA "WILLFULNESS."

Section 1681n(a) of the FCRA provides for the recovery of statutory and punitive damages as to "[a]ny person who willfully fails to comply with any requirement imposed under"

under the statute.  15 U.S.C. § 1681n.  Experian asks the Court to enter judgment that Plaintiff's "willfulness" case fails as a matter of law, an inappropriate and extraordinary outcome.  As the Fourth Circuit has noted, "[S]ummary judgment is 'seldom appropriate'"  as to whether a consumer reporting agency willfully violated the FCRA.  *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001).  *See also Whitfield v. Radian Guaranty, Inc.*, 501 F.3d 262, 271 (3d Cir. 2007) *vacated as moot*, 2008 WL 2329934 (U.S. 2008) ("We do not suggest that a factfinder could not or would not determine that [the defendant] did not act willfully.  Instead, we hold that whether it did so is a factual issue, not a question of law, and it therefore cannot be decided either on appeal or by the District Court as a matter of law.") "Willfulness under the FCRA is generally a question of fact for the jury." *Holmes v. Telecheck Int'l, Inc.*, 556 F.Supp.2d 819, 847 (M.D.TN. 2008); *Lenox v. Equifax Info. Servs. LLC*, 2007 WL 1406914, *6 (D. Or. May 7, 2007)("the determination as to whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Cairns v. GMAC Mortg. Corp.*, 2007 WL 735564 (D. Ariz. Mar. 5, 2007) ("The standard now is whether Equifax's alleged conduct rose to the level of willfulness or reckless disregard. It is clear that the evidence is conflicting. Consequently, it is the Court's decision that in this case, like in the overwhelming number of cases in which state of mind is dispositive, the issue of punitive damages is best left for the trier of fact to determine.")

## B.     EXPERIAN "RECKLESSLY" VIOLATED § 1681g(a).

Defendant's understanding of the FCRA's standard for "willfulness" is at best incomplete.  Experian asserts, "For claims of a willful FCRA violation, *Safeco* imposes a stringent threshold hurdle, to be applied by the court at summary judgment as a pure question of law without reference to the defendant's intent or other subjective factors."  This is largely

inaccurate.  As discussed below, *Safeco* considered only a subset of "willfulness" measures and established a willfulness threshold that was "less stringent than the standard" that previously existed in the Fourth Circuit.  *Mullins v. Equifax Info. Serv., LLC*, 2007 WL 2471080, *2 (E.D. Va. Aug. 27, 2007)(Payne).  Nevertheless, and irrespective of whether Mr. Dreher establishes a claim for willfulness under the conscious disregard standard, Defendant cannot establish its reckless disregard defense as a matter of law to show that its misinterpretation of § 1681g(a) is not "objectively unreasonable."  The FCRA's use of the phrase "source of the information" is on its face manifestly pellucid.  Accordingly, Defendants' motion on *Safeco* grounds must be denied.

    **1.**    **The phrase "source of the information" is not "less than pellucid."**

The Court has plenty of bases to find that the meaning of the FCRA phrase "source of the information" was readily and intuitively accessible.   "Unlike in *Safeco,* where the FCRA provision at issue was "less-than-pellucid," 551 U.S. at 70, the text at issue here appears to have "a plain and clearly ascertainable meaning[.]" *Singleton v. Domino's Pizza, LLC*, 2012 WL 245965 (D. Md. Jan. 25, 2012) (citations omitted).  "Where 'the text of [the] statute is clear and open to only one reasonable interpretation ... a dearth of guidance does not render [a] defendant's readings plausible.' " Id. (citations omitted). See also *Smith v. HireRight Solutions, Inc.*, 711 F. Supp. 2d 426, 436 (E.D. Pa. 2010) ("[Q]uite unlike *Safeco,* where the statute at issue was "less-than-pellucid" and there was a "dearth of guidance," *id.* at 70, the statutory text at issue here has a plain and clearly ascertainable meaning."); *Gillespie v. Equifax Info. Servs. LLC,* 2008 WL 4316950, at *6 (N.D.Ill. Sep. 15, 2008) (holding that where statutory language is clear, mere absence of appellate or regulatory authority does not justify an objectively unreasonable interpretation of statute); *Edwards v. Toys ""R" Us*, 527 F. Supp. 2d 1197, 1209 (C.D. Cal. 2007)

("This case presents a different situation than *Safeco* because § 1681c(g) is not ambiguous or susceptible of conflicting interpretations.")

In interpreting a statute, the Court first determines "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. … The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) (citations omitted). In *Johnson*, the Fourth Circuit considered the meaning of the FCRA word "investigation" and found **that** word to have a plain and common meaning.  Id.  The phrase "source of the information", in the context used in the statute itself, is certainly at least as clear.  Section 1681g(a) provides, in relevant part:

> (a) Information on file; sources; report recipients
> Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title [proper identification], *clearly and accurately disclose* to the consumer:
>
> \*   \*   \*
>
> (2) *The sources of the information*; except that the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed: *Provided*, That in the event an action is brought under this subchapter, such sources shall be available to the plaintiff under appropriate discovery procedures in the court in which the action is brought.

15 U.S.C. § 1681g(a) (emphasis added).  Simply, when a consumer such as Mr. Dreher requests and receives a copy of his credit report from a consumer reporting agency, the agency must "clearly and accurately" disclose the "sources of the information" in his credit report.

It is unclear exactly what meaning Experian claims could be an alternate "objectively reasonable" interpretation of the FCRA phrase "source of the information."  It has not in this litigation offered such an explanation.  Its witnesses did not suggest such a meaning in their

depositions.  And Defendant's brief and supporting declaration also avoid such an undertaking.  It appears to contend that in its view, a long list of actors could be a "source."  Def. Mem. at 13-14.  But this view is objectively unreasonable.  In common usage, the "source of the information" is the "supplier" of the information.   (De Armond Decl.  at 8-9) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2177 (2000)).  See also *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) (Using dictionary definition for FCRA term).

Despite Defendant's obfuscation, the evidence in the case is uncontroverted:  only CardWorks reported credit information to Mr. Dreher's Experian credit report.  But the evidence is clearer still.  Experian actually communicated directly with CardWorks to communicate Mr. Dreher's disputes.  It sent its form ACDV's that listed the source subscriber as CardWorks and never mentioned "Advanta" anywhere in the communication.   In fact, every action taken by Experian in this case (other than drafting its summary judgment brief) acknowledged Defendant's understanding that CardWorks was the supplier, the furnisher and the source.  Experian's real world interpretation uniformly treated its furnisher, the entity that furnished and supplied the credit information and to whom all consumer disputes were sent, as the "source of information."  Defendant advised consumers of such interpretation on its website.  It stated that interpretation to numerous Appellate and District courts.  It represented such view to the Federal Reserve.  And on numerous occasions, it stated such interpretation to Mr. Dreher.  Until the day this case was filed, Defendant never believed the phrase "source of the information" in a credit report meant anything other than the entity that reported the information to Experian.  See Plaintiff's Statement of Facts, *in passim*.  As both of Plaintiff's experts explain in their

Declarations, in the credit industry, the term "source of the information" in a credit report universally means the entity that actively reported that information to the credit reporting agency.

Section 1681g(a) is pellucid for several other material reasons. Experian's argument is that possibly "Advanta Bank" or "Advanta Credit Cards" was a source if Advanta was an "originating creditor." First of course, Advanta Banks was never an originating creditor. And CardWorks was never Advanta's agent. Not one day. Not for one task. Advanta Bank was a servicer, and only a servicer. And when it was terminated in March 2010, CardWorks was not even in the picture. Secondly, Defendant's argument confuses the phrase "source of the information" with "source of the credit." Even if "Advanta Bank" were somehow an originating creditor, it was never the source of the Experian credit information. All credit reporting information at issue in this case – the information received by Experian after August 2010 - was supplied by CardWorks.

Stepping back further to read the full text of § 1681g(a), the FCRA actually requires that Experian report the "sources of the information" and do so completely and clearly. Plaintiff believes the statute unambiguously requires the reporting of the entity that provides and investigates the actual credit data – the codes that are reported through the Experian credit reporting process. Outside of its brief, as detailed *supra*, Experian believes that as well. And as it should. Because if its new interpretation were correct – that there are multiple "sources" of the information (Def, Mem. at 12-13), it would somehow be required to disclose.

Experian's creative argument also fails as its reporting of CardWorks as the tradeline source would not mutually exclusive with inclusion of the name of the originating creditor or previous servicer in the consumer's credit report. As is obvious from the manner that many credit accounts are reported, and as Plaintiff's expert explains, the industry standards permit or

require, Experian could have reported both CardWorks and Advanta.  In fact, its employee suggested that it could report both Advanta and CardWorks, but Defendant's paying customer did not want its name disclosed.

**2.      Experian had substantial guidance by which to know that the FCRA phrase "source of the information" meant the entity which furnished the credit data and to whom Experian would forward consumer disputes.**

The question in the case is whether Experian had reason to know that the "source of the information" in its credit tradelines was the entity that actually reported that information to Experian.  Defendant cannot win that argument.  Instead, it manufactures an alternate measure, "[H]ow a CRA should report the source of information regarding accounts originated by banks that subsequently went into receivership with the FDIC[.]"  Def. Mem. at 10.  This strawman argument is immaterial to this exchange.  The issue is simply, who supplied the information to Experian.   Defendant does not and cannot contend that it had a mistaken belief that any entity, including the FDIC, was the supplier of its credit reporting.  As another District Court explained, in rejecting a similar "willfulness" defense contrivance:

> I reject this argument because it employs the fallacy of diversion, also known as the "straw man" fallacy. *See* Edward Damer, *Attacking Faulty Reasoning* 157 (3d ed.1995). Under this fallacy, Equifax avoids disputed factual issues by minimizing or distorting Plaintiff's claim for punitive damages so that it is limited to a facial attack on the legality of the company's "partial matching logic" and the CDV procedure. Having minimized or distorted Plaintiff's claim in this manner, Equifax then proceeds to refute it by showing that the use of partial matching logic and the CDV procedure is not illegal *per se* in every case.

*Apodaca v. Discover Fin. Services*, 417 F. Supp. 2d 1220, 1229 (D.N.M. 2006).  In fact, there is nothing meaningful regarding the structure of the "source of information" entity in this case. There is nothing that makes this any different than any of many others.  Mortgage companies sell, transfer and assign consumer loans every day.  Mortgage servicers are replaced every hour.

Credit card portfolios are transferred.  Debts are sold to debt buyers.  And debts bounce between debt collectors.   In this case, the evidence is that Advanta Bank itself was merely a servicer.  It lost the contract when it was dissolved in March 2010 (not merely placed into receivership).  And the role of the FDIC was to make certain Advanta Bank did not lose any advantage or assets by Deutsche Bank's replacement of Advanta Bank with the successor servicer, CardWorks.

The question upon which Experian claims to have needed guidance would be infinitely regressive.  Even if there were such ridiculously precise guidance as to the application of the term "source" for credit information furnished by a successor trustee after FDIC dissolution of the previous servicer, Experian would simply argue something else, infinitely regressing itself out of FCRA enforcement.   In the next case, Defendant would argue that shut down of a Utah servicer may be different than shutdown of a California servicer.  Given the "very high legal duties of care" imposed on consumer reporting agencies by the statute, the "critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information," the Court should not view Defendant's excuses with a patience, passive or casual eye.  *Burke v. Experian Info. Solutions, Inc.*, 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011).

As to the real question in the case – whether the "source of the information" in a credit report means something other than the supplier of that credit information, there is plenty of guidance.  First of course, as argued above, Experian had the benefit of "the guidance provided within the statutory provision itself." *Singleton v. Domino's Pizza, LLC*, 2012 WL 245965 (D. Md. Jan. 25, 2012).  And it had the guidance of its own positions taken before consumers, courts and regulators.  But Defendant also had both regulatory and appellate guidance beyond its own advocacy.

The Federal Trade Commission, the FCRA's overseer, has interpreted "source of the information" to mean the entity that was the credit furnisher governed by 15 U.S.C. § 1681s-2(b).  The FCRA amendments that became § 1681s-2( the section that governs credit "furnishers") were based on the "**recogni[tion] that furnishers [were] the original source of the information** [and] have a critical role to play in the overall accuracy of consumer report information. Thus, Section 623 of the FCRA now requires furnishers to investigate disputes received from CRAs and to correct and update information provided to CRAs that they later learn is inaccurate."  ("Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003," FTC, October 2004. [http://www.ftc.gov/reports/facta/041209factarpt.pdf]).

Furthermore, while there has been little need given its clarity for judicial examination of § 1681g(a) itself, numerous appellate court have interpreted the phrase "source of the information" in a credit report to mean the entity that furnished and supplied that data and to whom a CRA must forward a consumer's dispute.  *See, e.g.*, *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial *source* of information'"); (emphasis added); *Dalton v. Capital Associated Industries*, 257 F.3d 409, 416-17 (4th Cir. 2001) (the Fourth Circuit clearly identified the "source" of the disputed information as the clerk, and not the creator of the original underlying record); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009) ("In addition, to ensure that credit reports are accurate, the FCRA imposes some duties on the sources that provide credit information to CRAs, called "furnishers" in the statute.").  These of course are only quickly assembled examples.  Appellate courts uniformly use the term "source of information" in a credit report in the manner herein described.  Including

38

those decisions in which Experian assisted in the court's path to that interpretation. *Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006, 1011-12 (10th Cir. 2011) ("Experian's procedures for ensuring the accuracy of credit entries were described in affidavits from two employees: Kimberly Hughes, a Consumer Affairs Specialist Consultant, and Kathleen M. Centanni, a Compliance Manager. Both stated that … If a consumer requests an investigation into an item listed on his report … Experian contacts the source of the disputed information and describes the dispute. The source must research the information reported and respond regarding the accuracy of the information. Depending on the answer, Experian leaves the item as is, deletes it, or changes it in a manner specified by the source.").

It is certainly this uniformity of guidance that forms the basis for Professor De Armond's expert opinion that,

> In my judgment, Defendant's withholding of the identity of CardWorks violated its obligation to clearly and accurately disclose the source of information regarding the disputed debt pursuant to 15 U.S.C. § 1681g(a)(2).  Furthermore, it would be objectively unreasonable to construe 15 U.S.C. § 1681g(a)(2) as permitting such withholding.

(De Armond Decl. at 12).  As Professor De Armond concluded, Experian found before this litigation, every court known to consider the term has understood, and as regulators understand, a fact finder could similarly conclude that Experian's newly crafted defense interpretation of its § 1681g(a) duties and the phrase "source of the information" is not "objectively reasonable."

**3.**     **Experian had substantial guidance that it cannot lawfully delegate and defer its own FCRA duties to its customer and furnisher-source.**

Aside from the more micro discussion regarding terms of the statute, the bigger issue in the case is Experian's unreasonable deference to its customer-subscribers.  This issue is separate and apart from the utility meaning of "source of the information."  As Mr. Hendricks testified,

this has been a long and recurring problem for Experian and the other reporting agencies.  As the

Third Circuit explained in the seminal case governing credit reporting agencies:

> The FCRA evinces Congress's intent that consumer reporting agencies, having the
> opportunity to reap profits through the collection and dissemination of credit
> information, bear "grave responsibilities," 15 U.S.C. § 1681(a)(4), to ensure the
> accuracy of that information. The "grave responsibilit[y]" imposed by § 1681i(a)
> must consist of something more than merely parroting information received from
> other sources.

*Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).  Experian had guidance

certainly that its blind deference to CardWorks and its other reporting sources to permit their

unilaterally decision to disguise or withhold their identities was unlawful.

### C.    EXPERIAN "KNOWINGLY" VIOLATED § 1681g(a).

**1.    A FCRA Plaintiff proves "willfulness" by either the *Safeco* recklessness**

**standard or the "knowing" and/or "conscious disregard" standard.**

*Safeco* considered and resolved a then-Circuit split as to the question of whether or not

FCRA "willfulness" could include "reckless" violations, or instead solely those that were made

"knowingly" and/or with "conscious disregard."  The Supreme Court held in *Safeco* that § 1681n

willfulness "cover[s] not only knowing violations…but reckless ones as well."  551 U.S. at 48.

Defendants ignore this portion of the *Safeco* opinion, and as a result their willfulness argument

misquotes and certainly misunderstands the import of *Safeco*.

The pre-*Safeco* majority rule, adopted in the Fourth Circuit, required evidence a plaintiff

to "show that the defendant knowingly and intentionally committed an act in conscious disregard

for the rights of the consumer."  *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409,

418 (4th Cir. 2001) (citations and internal quotation omitted).  On the other hand, at least two

Circuits allowed proof that a violation was merely "reckless."  As one pre-*Safeco* District Court

framed this disagreement:

> The parties appear to agree that, in the context of civil liability, the FCRA's use of the word "willfully" does not necessarily connote an evil motive or actual malice. They disagree, however, as to whether the term "willfully" extends to acts or omissions that are knowingly and intentionally committed in *reckless disregard* of consumer rights, or whether this term is limited to acts or omissions that are intentionally committed with actual knowledge that they violate the law. [Doc. 183, at 3.] Plaintiff advocates the "reckless disregard" standard articulated by the Third Circuit in *Cushman v. Trans Union Corp.,* 115 F.3d 220, 227 (3d Cir.1997), and recently adopted by the Ninth Circuit in *Reynolds v. Hartford Financial Servs. Group, Inc.,* 435 F.3d 1081, 1098–99 (9th Cir.2006). Equifax advocates the "actual knowledge" standard articulated by the Eighth Circuit in *Phillips v. Grendahl,* 312 F.3d 357, 368–70 (8th Cir.2002).

*Apodaca v. Discover Fin. Services*, 417 F. Supp. 2d 1220, 1228 (D.N.M. 2006).    Shortly after

*Safeco* was decided, the Fourth Circuit confirmed that an FCRA plaintiff may prevail under

either the pre-*Safeco* knowing or "conscious disregard" standard or its lower-threshold "reckless

disregard" test.  This confirmation occurred when the Fourth Circuit affirmed in *Saunders v.*

*Branch Banking and Trust Co.* the FCRA punitive damages awarded in this courthouse by the

jury under the "conscious disregard" instruction prevailing at the time of trial in the face of

similar *Safeco* arguments made by one of the same defense firms now in this case:

> The Supreme Court has since held that willful violations of FCRA include violations committed in reckless disregard of a company's obligations under FCRA. *Safeco Ins. Co.,* 127 S.Ct. at 2208–10. Thus, the jury instructions placed an even greater burden on Saunders than current Supreme Court precedent would require.

526 F.3d 142, 151 n.4 (4th Cir. 2008).  See also *Stillmock v. Weis Markets, Inc.*, 385 F. App'x

267, 271 (4th Cir. 2010).  Judge Payne reached the same conclusion in affirming the jury verdict

in *Mullins v. Equifax Information Services, LLC,* 2007 WL 2471080, *2 (E.D. Va. Aug. 27,

2007):

> The case was tried on, and the jury was instructed pursuant to, the law of this circuit at the time of trial in the issue of willfulness. See *e.g., Dalton v. Capital Associated Industries, Inc.,* 257 F.3d 409 (4th Cir.2001). Thereafter, the Supreme Court of the United States decided *Safeco Ins. Co. of America v. Burr,* 127 S.Ct.

> 2201 (2007), which actually articulated a standard for willfulness that was less stringent than the standard which controlled the trial and the jury verdict.
>
> Viewed as a whole, the record here supports a finding of willfulness under either standard. The plaintiff presented evidence from which the jury reasonably found [the defendant CRA] deliberately and consciously committed the violations of the FCRA found by the jury. Certainly, the evidence supports a finding under the rule of *Safeco*.

See also *Fuges. V. Southwest Financial Services, Ltd*., --Fed. Appx. – , n.13 (3rd Cir. Dec. 6, 2012) ("Evidence of knowing violations of FCRA is relevant to a claim of willfulness, … but then Safeco's recklessness analysis would not apply.  *See Safeco*, 551 U.S. at 56-57 (noting that knowing violations of FCRA are willful by definition.)"); *Vidoni v. Acadia Corp*., 2012 WL 1565128, *2-4 (D. Me. Apr. 27, 2012) ("Although Safeco was concerned with establishing the "reckless disregard" prong of willfulness, it did not discard or undermine the Court's earlier explanations of the term "willful.").

## 2.      Experian "knowingly" violated § 1681g(a).

This case presents the remarkably easy (and maybe rare) instance in which there is direct evidence that the Defendant knew what the law was and what it meant, and still did the opposite. As detailed in Plaintiff's Statement of Facts, and summarized *supra*, Defendant has represented to Mr. Dreher, to consumers, to courts and to regulators its view and interpretation that the "source of the information" was the entity that furnished credit data and to whom Experian would forward consumer disputes.  There certainly is no evidence that Advanta Bank reported the subject credit information months to a year after it was dissolved.  And the documents produced in this case show that the disputes were all send by Experian to CardWorks.  Further, Experian had actual knowledge that Advanta Bank was dissolved and out of business.  It had actual knowledge that the owner of the accounts was Vion Holdings, II, LLC.  It had actual

knowledge that the subscriber agreement solicited from CardWorks identified Vion Holdings as the client and CardWorks as the reporting agent.

Beyond the direct evidence, there is limitless circumstantial evidence. As industry standards required the reporting of the actual source and furnisher, with the previous servicer or debt owner in the transferee field.  And as Experian is more than familiar with the numerous District and appellate decisions in which the court interpreted the phrase "source of the information" to mean the credit data furnisher, many in which it advocated for such position. *Apodaca v. Discover Fin. Services*, 417 F. Supp. 2d 1220, 1229 (D.N.M. 2006) ("For the reasons articulated below, however, I also conclude that even under an "actual knowledge" standard, there are genuine issues of material fact which preclude summary judgment as to whether Equifax acted willfully in this case. ... Circumstantial evidence of the company's "experience in dealing with credit reports" and knowledge of the FCRA also "can support an inference that the defendants knew that their actions were impermissible.").  Experian's systemic violation of this provision in each and every consumer report it furnished to Mr. Dreher would similarly require denial of this motion.  *Moreno v. DHI Mortg. Co. GP, Inc.*, 1:09CV315 LMB/TRJ, 2010 WL 3430816 (E.D. Va. Aug. 27, 2010) ("DHI, relying on inapposite case law, argues that neither a single violation of the statute nor a lack of any policy to ensure compliance constitutes willfulness. The Court disagrees. … DHI's failure to send any FCRA notice to Moreno because she applied orally indicates a systemic practice that violates the FCRA.")

Experian's willfulness culpability would even satisfy the most rigorous of the thresholds considered in FCRA jurisprudence – whether or not a defendant made a misrepresentation to the consumer.  In the most limiting FCRA decision, pre-*Safeco*, the Fifth Circuit had stated:

> Generally, courts have allowed a willful noncompliance claim to proceed where a
> defendant's conduct involves willful misrepresentations or concealments. *See*

*Pinner,* 805 F.2d at 1263. In those cases, a consumer reporting agency has typically misrepresented or concealed some or all of a credit report from a consumer. *See id.* (discussing *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829 (8th Cir.1976)); *see also Stevenson,* 987 F.2d at 294.

*Cousin v. Trans Union Corp.*, 246 F.3d 359, 372 (5th Cir. 2001). See also *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226-27 (3d Cir. 1997) ("The Fifth Circuit has held that "[o]nly defendants who have engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under § 1681n." *Stevenson,* 987 F.2d at 294 (quoting *Pinner,* 805 F.2d at 1263). Other courts have allowed punitive damages in cases involving concealments or misrepresentations without necessarily limiting the availability of punitive damages to such cases. *See, e.g., Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834 (8th Cir.1976); *Collins v. Retail *227 Credit Co.,* 410 F.Supp. 924, 931–32 (E.D.Mich.1976).")

In this case, the Plaintiff has established that Experian misrepresented the source of the credit information. It was not the long before dissolved "Advanta Bank" or the fictitiously named "Advanta Credit Cards." (Ironically, Experian does not deny that it made multiple misrepresentations to Mr. Dreher; it just denies the one upon which this litigation is based. If its new interpretation is correct, then all of the many communications to Mr. Dreher on which Defendant stated that it had forwarded his dispute to the "source of the information" would be materially false since CardWorks would not be its information source.)

D.     **EXPERIAN'S PRACTICE WAS NOT FOR THE BENEFIT OF THE CONSUMER.**

In support of its motion, Experian weaves an assertion that it used the name "Advanta Bank" or "Advanta Credit Cards" instead of CardWorks, because it wanted to avoid confusion for consumers. The obvious response is that such well-intentioned efforts cannot excuse an

44

otherwise willful violation of a pellucid statute.  But the better response is simpler – Experian's claim is just factually untrue.  It is not simply disputed or in contention.  It is just patently false.

As detailed in Plaintiff's refutation of Defendant's asserted facts and in Plaintiff's separate statements, Mr. Hencke testified at his deposition that there really is no policy or procedure to avoid consumer confusion.  Instead, Experian defers entirely to its customer sources.  It does not even ask or inquire as to the basis for a source's selection of a tradeline label.

Experian's claim is also false because its disguise of the actual reporting source is harmful to consumers with the most prevalent type of dispute – that in which the consumer is unfamiliar with the debt because they did not open such an account, whether by innocent creditor error or identity theft.

## IV.     CONCLUSION

For these reasons, the court should deny the Motion for Partial Summary Judgment.

Respectfully submitted,


**MICHAELT. DREHER ,**

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2012,  I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David Neal Anthony
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23219
Email: david.anthony@troutmansanders.com


Benjamin J. Katz
E-mail:  bjkatz@jonesday.com
Joseph William Clark
E-mail:  jwclark@jonesday.com
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001


_____/s/_____
Leonard A. Bennett, Esq.