**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MICHAEL T. DREHER,**
*Individually and on behalf of a*
*class of similarly situated persons,*

        **Plaintiff,**

v.                      **CIVIL NO.  3:11-cv-00624-JAG**

**EXPERIAN INFORMATION SOLUTIONS, INC., et al.,**

        **Defendants**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S, EXPERIAN INFORMATION
SOLUTIONS, INC., MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Plaintiff, MICHAEL T. DREHER, opposes Experian Information Solutions, Inc.'s
Motion for Partial Summary Judgment.

## I.      INTRODUCTION

Every fact established in this case demonstrates that Experian knew that CardWorks Servicing,
and not Advanta or any other entity, was the sole source that reported an inaccurate, derogatory
account attributed to the Plaintiff.  Despite its firmly established and unquestionable knowledge that it
was CardWorks and no one else, Experian allowed and facilitated CardWorks' effort to camouflage its
role in the reporting of accounts that had originated as Advanta accounts. Experian cannot establish it
is entitled to partial summary judgment when the evidence demonstrates its participation in this
scheme was willful.

## II.     FACTS

## A.      PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Defendant's Statement of Facts is largely uncontroversial and many of Defendant's facts are
substantively irrelevant. However, Defendant omits material facts that Plaintiff now supplies.

More than a month prior to Defendant's first report of the disputed account, Defendant learned from CardWorks Servicing, LLC ("CardWorks") through a letter dated October 4, 2010, that Advanta Bank Corp. had ceased to exist. (Ex. A-1)(EXPDREH000261, 266-268) (hereinafter Experian Bates numbered documents will be XP###).  This letter informed Defendant that Advanta Bank Corp. had been shut down by the State of Utah Department of Financial Institutions and the FDIC on March 19, 2010, and subsequently dissolved. Defendant knew that CardWorks had been selected to perform all aspects of servicing a designated portfolio of Advanta Bank Corp.'s accounts and that Advanta Bank Corp. no longer existed as a credit reporting entity.  Every one of Plaintiff's disputes in this litigation occurred after this date.

**Mr. Dreher's Experience with Experian and the former-Advanta account.**

    1.    **Mr. Dreher discovers an unknown "Advanta Bank" tradeline in his credit report.**

In November 2010, Mr. Dreher's security clearance was being processed by the National Security Agency ("NSA"). (Decl. of Michael Dreher ¶ 6)(Ex. A).  During this process, an NSA investigator advised him that it had discovered a delinquent account on Dreher's credit reports. (Dreher Decl. ¶ 6).  The account was a delinquent "Advanta Bank" credit account. Mr. Dreher was advised that he had to prove that he had made payments on the Advanta Bank and Advanta Credit Cards account or it could severely impact his Top Secret Level III clearance. (Dreher Decl. ¶ 7). Dreher never made an online application, never applied for the Advanta Bank or Advanta Credit Cards accounts and never authorized anyone to do so.  (Dreher Decl. ¶ 8-9, 12).  In fact, he never knew of the account's existence until he received the information from the NSA investigator.  Dreher had multiple conversations with the investigator trying to explain that the account(s) did not belong to him, to no avail.  (Dreher Decl. ¶ 13*).*

    2.    **Mr. Dreher's § 1681g(a) Experian credit file identified "Advanta Bank" and "Advanta Credit Cards" tradelines.**

As a result of the NSA investigation, Mr. Dreher contacted Experian to request his own copy of his full credit file – the first of many he disputed over the course of the next year. (Dreher Decl. ¶ 23). The consumer reports furnished to Mr. Dreher by Experian pursuant to 15 U.S.C. § 1681g(a) are dated November 16, 2010, March 16, 2011, June 21, 2011 and November 3, 2011. (Exs. B, C, D and E, redacted)(Consumer Reports). In each and every report, Experian made a materially false representation: that "Advanta Bank Corp" and "Advanta Credit Cards" were the "source of the information" in the tradelines actually supplied by CardWorks Servicing, LLC ("CardWorks"). Experian also reported that the tradeline for the credit account had been reported each month through November 2010[1], through March 2011, and through May 2011 in the respective reports. (Exs. B, C, D and E).  In each instance, the account was reported with a past due balance and derogatory payment status.

> **3.     Mr. Dreher disputes the inaccurate "Advanta Bank" and "Advanta Credit Cards" tradelines with Experian**.

Dreher's efforts to dispute and obtain the removal of the inaccurate accounts began with the limited information Experian had provided. (Dreher Decl. ¶14-15).   Plaintiff had no previous relationship with any entity about the subject accounts – Advanta Corp, Advanta Bank or even CardWorks. (Dreher Decl. ¶ 23). Over a year, he made multiple disputes to Experian in which he explained his lack of ownership or knowledge of the "Advanta Bank" and "Advanta Credit Cards" identified tradelines.  (Dreher Decl. ¶ 23-24). The account was never removed until he commenced this litigation.

Throughout this dispute process, Experian continued to represent to Mr. Dreher that (a.)

---

[1] Experian does not and cannot argue that any of the relevant "Advanta Bank" or "Advanta Credit Cards" tradeline information was reported by Advanta Bank Corp. before dissolution in March 2010.  The "Advanta Bank" and "Advanta Credit Cards" tradelines reported after March 2010, began after August 2010 when CardWorks succeeded Advanta as servicer.  Defendant's internal documents confirm post-August 2010 reporting was solely accomplished by CardWorks. (XP 296-304)(Ex. M).

"Advanta Bank" and "Advanta Credit Cards" were the source of the disputed tradelines; (b.) As part of its reinvestigation process, Experian contacted the "source of the information" in the tradeline, and (c.) that "Advanta Bank" had "verified" that Mr. Dreher was the person who applied for and owed the subject account.   Because Dreher had no previous experience with such a process and had no direct contact or information about "Advanta Bank" or "Advanta Credit Cards," he followed Experian's instructions and relied on its representations.

For example, Experian's **November 16, 2010**, credit report disclosure to Mr. Dreher advised: "**If you disagree with an item, you may dispute it. We will contact the source of the information and ask them to check their records**." (Ex. B)(emphasis added).  The **March 16, 2011**, § 1681g(a) report stated: "**If you disagree with any of your personal or credit information, you may dispute it**. … **We will contact the source of the information and ask them to check their records**." (Ex. C)(emphasis added).  In the **June 21, 2011**, § 1681g(a) report, the Defendant again modified its forms, and replaced the phrase "source of the information" with what it believed comparable, the "furnisher of the information." (Ex. D)(emphasis added).

After responding to Mr. Dreher's disputes, by responses dated **July 5, 2011** (Ex. E-1) and **August 5, 2011** (Ex. E-2) Experian summarized its dispute reinvestigation procedure and relevant results as follows:

> Results
> We completed investigating any items you disputed with the sources of the information and processed any other requests you made. Here are the results:
> Outcome
> ADVANTA BANK CORP          Remains
> ADVANTA CREDIT CARDS       Deleted

In addition, in the **August 5, 2011**, dispute response, Experian stated that the tradeline in the name of "Advanta Bank" had been continuously reported by the furnisher with a past due balance and derogatory payment status even through May 2011.   Finally, a year after starting his effort to correct his Experian credit file, Experian responded on **November 4, 2011**, (Ex. E-

3) to Plaintiff's final pre-litigation dispute, stating:

> Results
> We have completed the processing of your dispute(s). Here are the results:
> Outcome
> ADVANTA BANK CORP               Remains

### 4.    Mr. Dreher also followed Experian's instructions and tried to dispute directly with "Advanta Bank" and "Advanta Credit Cards."

In March 2011, Mr. Dreher wrote to "Advanta Credit Cards" at the generic post office box address Defendant had provided. (Dreher Decl. ¶ 11, 14).  He disputed owning the Advanta accounts, requested some verification that he owed this debt and documentation that indicated that he had applied for credit with Advanta Bank or Advanta Credit Cards. (Dreher Decl. ¶ 8-12; 15).  He also informed Advanta Credit Cards that Experian was reporting the inaccurate information in his credit file.  Mr. Dreher never received a response. (Dreher Decl. ¶ 16).

In April 2011, sending the same correspondence to "Advanta Credit Card," Mr. Dreher actually received a short response. (Dreher Decl. ¶ 18). That response was unsigned and on letterhead labeled, "Advanta Credit Cards."  No physical address or employee name or contact was provided. The "Letter" included a one-page computer printout of what the sender claimed to be an internet credit application (unsigned) and a billing statement, only in the name of Advanta, for March 2011.   That billing statement and online application printout showed that the account owner was "Arnie's Bowling Rec." in Indiana.  Mr. Dreher never lived or worked in Indiana and was never employed by or an owner of "Arnie's Bowling Rec."   (Dreher Decl. ¶ 23).

On May 23, 2011, Mr. Dreher wrote again and followed up with "Advanta Credit cards" at the post office box Experian provided.  He never received a response.  (Dreher Decl. ¶ 22).  Until discovery had commenced in this litigation, Mr. Dreher never knew that "Advanta Bank" and "Advanta Credit Cards" did not exist. (Dreher Decl. ¶ 26).

### Experian's knowledge as to the FCRA use of the term "source of the information"

### 5.    Experian believes and understands that the "source of the information" is the

**entity that actively controls the reporting of a credit tradeline and to whom Experian will forward a consumer's credit reporting dispute**.

In this litigation, Experian has tried to manufacture confusion and uncertainty where in real life it has expressed neither.  Experian has always understood that the "source" of credit information is the "furnisher" who actually reported that information to the reporting agency.

(Dep. of Peter Henke Tr. 71:7-17, Nov. 8, 2012)(Ex. F).

> **a.**   **Experian represented to Mr. Dreher that it considers the "source of the information" to be the entity to which it must forward the consumer's dispute pursuant to 15 U.S.C. § 1681i**.

In each §1681g(a) credit report, reinvestigation results and related disclosure Experian provided to Mr. Dreher, Experian explained its understanding that the "source of information" was the actual entity to whom it would forward the consumer's dispute.  For example, in its November 16, 2010 (Ex. B), and March 16, 2011 (Ex. C), credit reports, Experian advised that if Mr. Dreher disputed the tradeline, "**We will contact the source of the information and ask them to check their records**."  In a separate July 5, 2011, disclosure form, Experian explained its view of the FCRA to Mr. Dreher:

> According to the Fair Credit Reporting Act (FCRA), a national consumer credit reporting company's role in the dispute process is to investigate information to determine the accuracy and completeness of any disputed item **by contacting the source of the disputed information and informing them of all relevant information regarding the consumer's dispute**.

Then, in the July 5, 2011, and August 5, 2011, reinvestigation results and dispute response, Experian wrote, "We completed investigating any items you disputed with the sources of the information and processed any other requests you made."

> **b.**   **Experian has repeatedly confirmed its knowledge that the "source of the information" is the furnisher to whom Experian forwards a credit reporting dispute**.

Kimberly Hughes, Experian's most frequent litigation employee-witness, testified that Experian "essentially relies" on its furnisher source to investigate the consumer's dispute.  (Deposition

6

of Kimberly Hughes Tr. 110:6-12 Jan. 28, 2008, in *Gorman v. Experian Info. Sols. Inc.* 1:07cv1846 RPP (S.D.N.Y. 2007)(Dkt #42-5))(Ex. G). Regarding the Experian investigation, she testified, "we do go to the reporting source," which is the data furnisher "the reporting source for the investigation" that has the subscriber relationship with Experian. (Hughes Dep. Tr. 110:7-111:12).

In litigation, Experian (always represented by the same defense firm as in the case *sub judice*) has uniformly stated its knowledge and belief that the "source" of a tradeline is the entity that actually reported that credit data and to which Experian must send its dispute document, the ACDV (or CDV). The "source" is the "furnisher"[2] as governed by the FCRA.  **On October 30, 2012**, Experian explained in an appellate brief: "**CRAs regularly receive information from various sources** around the country including banks, credit unions, automobile dealers, student loan providers, and others **(these sources are known as "Furnishers" within the credit reporting industry and under the FCRA)**[.] … **Furnishers report credit information to the CRAs via electronic transmission on a monthly basis**. *Johnson v. Trans Union, LLC, Experian Info. Sols., Inc., & Equifax Info. Servs. LLC*, Brief of Defendant-Appellee Experian Information Solutions, Inc., 2012 WL 5396280 at 13-14 (7th Cir. Oct. 30 2012)(Emphasis added)(Ex. Q); *See also Dennis, v. BEH-1, LLC & Experian Info. Sols., Inc.*, Brief of Defendant-Appellee Experian Information Solutions, Inc., 2004 WL 3155937 at *20 (9th Cir. 2004)(Ex. R)(" 'A credit reporting agency complies with the FCRA's reinvestigation requirements by reinvestigating disputed information with the source of the information to verify its accuracy.' ")

Experian has also briefed for the court that it knows of FTC guidance that the "information source" is the entity to which it sends the ACDV.  *Sarver v. Experian Info. Sols., Inc.*, Brief of Defendant-Appellee Experian Information Solutions, Inc., 2004 WL 3760682, at 20-21(7th Cir. 2004)("[S]*ee also* FTC Commentary to the FCRA, 16 C.F.R. Pt. 601, App. at 516 (2003)('If you tell a

---

[2] "Furnisher means an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report."  12 C.F.R. § 222.41

[credit reporting agency] that your file contains inaccurate information, the [credit reporting agency] must investigate the items (usually within 30 days) by presenting to its information source all relevant evidence you submit[.]")(Ex. S).

Evan Hendricks, an FCRA and Privacy Rights expert, explained, "When the phrase 'source of the information' has been used to describe the information in a credit report, in the credit industry and in regular use before Congress, the Federal Trade Commission, in testimony [and …] in seminars … the 'source' has always meant the "furnisher" who actually submitted the credit tradeline to the consumer reporting agency." ((Decl. of Evan Hendricks ¶¶ 3-5, 7-8)(Ex. H). Hendricks served on Experian's Consumer Advisory Council to offer non-binding advice and discuss credit reporting, marketing and other privacy-related topics. He stated that, "[T]his is the way that Experian has always used the term and phrase."  (Hendricks Decl. ¶ 9).

Even during the pendency of this, Experian admits knowing the source of the information. On Experian's website instructions explaining, "How to Dispute Credit Report Information," represents that upon receipt of a consumer's dispute "A Notice is Immediately Sent" – not to the originator creditor - but instead "to the Source of the Information." *See* Frequently Asked Questions, Lean More About the Dispute Process, http://www.experian.com/disputes/how-to-dispute.html (last viewed November 29, 2012) (Ex. I). *See also,* Dispute Information on your Credit Report, http://www.experian.com/disputes/faq.html (last viewed November 29, 2012) (Ex. I)("What happens after I complete the credit dispute form? When you question information on your personal credit report . . . we contact the source of the information directly . . . We ask the source to check their records to verify all of the information regarding the item you questioned and report back . . .") (Hendricks Decl. ¶ 10-11, 14).

In an April 2012 presentation to a Federal Reserve Board conference for "National Consumer Protection Week," Experian gave two descriptions of the dispute process that used "data furnisher"

and "source" interchangeably. (Maxine Sweet, Experian Vice Pres. of Public Ed., Fed. Reserve Bd. of Boston 22nd Annual Nat'l Consumer Protection Week, April 25, 2012) (www.bos.frb.org/consumer/conf/ncpw/2012/maxine-sweet.pdf) (Hendricks Decl. ¶ 15).

**Experian's knowledge that Advanta was not the "Furnisher" or the "Source"**

6.     Experian knew that "Advanta Bank" and "Advanta Credit cards" could not be the furnisher, subscriber and "source of information" for the tradeline because Advanta Bank was dissolved before Mr. Dreher had discovered CardWork's inaccurate reporting and began disputing the tradeline.

Defendant also suggests in its motion that there was uncertainty and confusion as to which entity was the actual reporting entity and source. It offers a complex history of Advanta Corp. and its dissolved Advanta Bank Corp. It claims that the FDIC played some role in determining how or what Experian would report as the subject tradeline identity. All of these arguments are red herrings manufactured solely for this litigation. (Ex. A-1). As to Experian's understanding and knowledge, the assertion is not only immaterial, but also untrue. (Henke Dep. Tr. 76-80)(Deposition of James Kilka, Tr. 45:21-49:23, August 24, 2012)(Ex. J).

Experian has understood since at least July 2010 that "Advanta Bank" was terminated and no longer an actual business entity. (Henke Dep. Tr. 27:13-28:1). The contrast between Experian's argument and its internal records is discordant. In August 2010, CardWorks succeeded Advanta Bank as the servicer for Deustche Bank's master trust. (Deutsche Bank Notice of Termination of Advanta Bank Corp. As Servicer and Appointment of Successor Servicer)(CWS 1366)(Ex. L)(Henke Dep. Tr. 27:13). Experian knows that. But still, it implies some continuing involvement or relationship between "Advanta Bank" and CardWorks in which CardWorks is acting as Advanta's agent, which Experian knows to be untrue. Experian has maintained separate client accounts for Advanta and CardWorks. (*See e.g.* XP 294-304)(Ex. M). In fact, Defendant's internal client account system tracked the fact that Advanta has ceased operation and even ceased paying any of Experian's bills. (XP 294-304)(Ex. M)

Its internal account notes for July 8, 2010, documented from a business/client account "follow-up" on Friday, March 19, 2010, that "Advanta Bank Corp., Draper, UT was closed by the Utah Department of Financial Institutions, and the FDIC was named Receiver." (XP 299)(Ex. M). Also, October 27, 2010, correspondence demonstrates that Experian received a letter from FDIC stating Advanta Bank was closed by the Utah Department of Financial Institutions, ("Another bank did not take over this company. FDIC letter attached at  SR and company level.")  (XP  296)(Ex.  M). *See*  http//www.fdic.gov/bank/individual/failed/advanta-ut.html.   When   Defendant's   employees remained unsuccessful in collecting payment from Advanta, they tried to contact the FDIC and on July 25, 2011, Experian noted internally,

> Phone In cancellation. Had Mike Pascal call and inform me that he received an invoice but this company has been shut down and is no longer in existence, verified online that the company was shut down 3-9-2010.  Will close account.

(XP 296)(Ex. M).

### 7.  Experian had actual knowledge and fully understood that CardWorks was the servicer and source of credit reporting as of August 2010 and was doing so for the new "owner" of the accounts, Vion Holdings, II, LLC.

On August 20, 2010, CWS executed a series of Experian contracts to create a new direct subscriber relationship. *Id*. In September 2010, CardWorks' Director of Credit, Maria Costa, contacted Experian to try and obtain use of the "subscriber code" of the now-defunct Advanta Bank.  (E-mail Sept. 10, 2010, 3:41 PM)(Ex. T)[3]. CardWorks wanted "Bullseye" reports[4] on the former-Advanta accounts to see what its predecessor had reported. *Id*. Experian requested

> Can you tell me what functions CardWorks will perform for ADVANTA? I am getting help from our Membership area and I want to be sure that we set you guys up right. Will you be reporting data on their behalf as part of the services you provide?

---

[3] Exhibit T contains all the email quoted in this section unless otherwise indicated.
[4] Bullseye® is a feature marketed by Experian. (Ex. X).  Among other things, Bullseye® reports allow a simple inquiry to display the current status of an account as stored in Experian's database and has a built-in security feature that guarantees subscribers access only their own tradelines.

(E-mail Sept. 13, 2010  10:29 AM).   Experian advised CardWorks that it could not have access to Advanta's information unless a new agent agreement was executed among Advanta, CardWorks and Experian establishing CardWorks as third-party processor for Advanta Bank.  (E-mail Sept. 13, 2010 2:56:00 PM).  This was impossible because Advanta Bank had been dissolved for many months.

CardWorks then asked the FDIC, which had controlled the Advanta Bank Corp. assets, to sign the agreement. By that time, the FDIC no longer controlled the former-Advanta accounts.  Advanta Bank was only the account servicer and these accounts were not Advanta Bank or FDIC-controlled assets.   The FDIC remained tangentially involved because under federal law when a bank is dissolved, contracts with that bank cannot be terminated for ninety days without FDIC approval. (Notice of Termination)(Ex. J).  The credit card portfolio trustee, Deutsche Bank, could not fire Advanta Bank (and the FDIC) as servicer and replace it with CardWorks until three months after the March 2010 dissolution. *Id.*  Thus, CardWorks had been told that, "[T]he FDIC will not be signing any additional paperwork in regards to the transfer of servicing[.]"  (E-mail Oct. 04, 2010 1:52 PM).  CardWorks sent Experian a document on its letterhead (Ex. A-1) explaining the dissolution of Advanta Bank and the Deutsche Bank Termination Notice. (E-mail Oct. 19, 2010 3:47:05 PM)(Ex. O).  It expressly stated, "The attached PDF is the notification that was send [sic] to ABC cardholders advising them of the termination of ABC as the servicer of their accounts and notifying them of CWS assuming servicing of their accounts." *Id.*  CardWorks then told Experian that the accounts were "owned by an Advanta trust."  (E-mail Oct. 29, 2010 10:58 AM) (Ex. O).

For every meaningful purpose in this case, Vion Holdings, II, LLC. was the "owner" of the credit card accounts.  It served as "creditor" and the principal to whom the servicer, CardWorks, was responsible. Experian asked CardWorks for further information as to its role in the credit reporting of the subject account information (E-mail Oct. 29, 2010 12:07 PM) (referencing Ex.V, the contract used when a reporting source is acting solely as the agent of another entity).  Experian asked, "[W]ho is the

current owner of the ADVANTA accounts? You mentioned a "Trust".  Do we have a contact at whomever that truly is?"  (E-mail Nov. 01, 2010 1:50 PM).  On November 4, 2010, CardWorks informed Experian, **The owner of the Advanta accounts is Vion Holdings II LLC.** (E-mail Nov. 04, 2010 10:35 AM)(emphasis added)(Ex. O).

Once Experian knew that Vion Holdings, II, LLC, and not Advanta, was the owner of the accounts, it obtained from Vion Holdings as principal and CardWorks as agent, a signed contract for credit reporting.  (E-mails Nov. 11, 2010 5:05 PM; Nov. 16, 2010 12:20 PM; Jan. 7, 2011 5:20:37 PM)(Ex. O) & (Ex. V). Advanta was never again mentioned in CardWorks-Experian exchanges.

**8.      Experian treated CardWorks as its sole "source" and furnisher.**

Experian understands that the term "source of the information" under the FCRA describes the entity to whom consumer disputes are to be directed and who is responsible as a "furnisher" in the dispute process.    The way in which Experian transmits a consumer dispute to its source is by Automated Consumer Dispute Verification, "ACDV."   (Hendricks Decl. ¶ 9, n.1). Every time Experian forwarded Mr. Dreher's disputes to its "source," it sent them to CardWorks.  Each ACDV, not disclosed to Mr. Dreher until produced in the litigation, identifies only CardWorks, and never "Advanta." (XP 12-15)(Ex. W). Professor De Armond explained: "Defendant clearly treated CardWorks as the source of the information that Plaintiff disputed."

(Declaration of Elizabeth De Armond at 15)(November 28, 2012)(Ex. U).

**Experian's Policy is to Defer Entirely to its Paying Customer (in this case, CardWorks)**

**9.      Experian allowed CardWorks to dictate whether the credit reporting agency
would disclose the "source" to consumers.**

During the setup up by Experian of CardWorks as the new credit reporting servicer, Defendant delegated total control over what furnisher was identified in the subject tradelines as the "source."  In some of the accounts that CardWorks had previously serviced, it instructed Experian to report the "source" as both the originator and with "CWS" for CardWorks Servicing.  Thus, Experian dutifully

asked its customer, "Do you want the CWS on the end of the "ADVANTA Credit Cards"?" (E-mail October 21, 2010 11:58 AM)(Ex. O). To which, CardWorks demanded, "No, we would not want CWS or CardWorks mentioned in the trade line, just Advanta Credit Cards." (E-mail October 21, 2010 12:38:45 PM)(Ex. O).

**10. Experian standard policy is to defer totally to its furnisher customers.**

Experian's standard practice is to defer entirely to CardWorks, the tradeline furnisher, to decide what to place within the credit report tradeline and how to report it. Experian has followed this policy in all credit reporting matters for at least a decade. (Hendricks Decl. ¶ 20; Henke Dep. Tr. 42-46). For example, this total deference to its paying customer is the hallmark of its policy for retaining information disputed by consumers when its customer wants it to do so.

(Hendricks Decl. ¶ 20). This has also been Experian's practice in determining whether or not to reveal the actual source of a tradeline. It is left up to Experian's customer to decide. (Henke Dep. Tr. 42:7-43:8). This is Experian's ordinary practice. (Henke Dep. 43:15 - 44:3; 44:9-21; 445:10-14). Experian's conduct in this case was conscious and intended. (Henke Dep. Tr. 45:22-46:11).

**11. If following Industry standards, Experian could have reported and disclosed CardWorks as the source, while identifying Advanta as the previous servicer.**

Despite Experian's feigned interest in avoiding consumer "confusion," it did not report the tradeline in the manner that industry standards required. It could have identified the actual source, CardWorks, while also disclosing that the previous servicer was Advanta. (Henke Dep. Tr. 41:24-42:6)(Q"[I]f requested this, Experian following its procedures could have furnished the trade line as Advanta Credit Cards/Cardworks Servicing, right? … A. That's correct."). (E-mail October 21, 2010 11:59 AM)(Ex. O),(Hendricks Decl. ¶29)("If Experian wanted to do as it claims, its system is already set up to identify in the tradeline both entities – Advanta and CardWorks.").

The Industry standard "Metro2" format even provides a field to identify the previous servicer or creditor. (Hendricks Decl. ¶¶ 28-29). It also permits the disclosure of both the "source" and any

13

related name or entity.  For example, this fact was evident in a number of Mr. Dreher's legitimate tradelines in the June 21, 2011, Report: Citibank/Citgo; GE Capital/Home Design; HSBC/Yamaha Music; Dell Computer/Web Bank (XP 69-75)(Ex. D).

**Experian's failure to disclose the actual name of the "source" makes it more difficult for consumers to identify and dispute inaccurate information.**

     **12.**     **Most consumers disputing credit reporting information do so because they do not recognize or "own" the account.**

The majority of disputes made by consumers to consumer reporting agencies relate to a claim that the consumer does not "own" or is not responsible for the account, such as by identity theft. (Hendricks Decl. ¶¶ 21-22). ("An 'ownership' dispute is a dispute in which the consumer claims that he or she is not the person who opened or applied for a credit account.  It includes a number of credit reporting accuracy disputes including identity theft, as well as instances in which a credit tradeline has been innocently, but inaccurately attributed to a person who did not apply for an account.")

This is true for CardWorks. In 2011, roughly 38% of the disputes it received regarding the former Advanta accounts were based on a consumer claim of identity theft or that the account was not his or hers. (CWS 396, 500)(Ex. Y).

     **13.**     **The failure to identify the actual "source" of a tradeline is a substantial obstacle for consumers making credit reporting disputes.**

It impairs the ability of a consumer to force the removal of inaccurate information.  (Hendricks Decl. ¶23). (De Armond Decl. at 14) This is especially true for the "Advanta" tradelines.  (De Armond Decl. at 13-14; Hendricks Decl. ¶ 24).  More specifically, this was a problem for Mr. Dreher, who was an apparent identity theft victim and did not recognize the account.  (Dreher Decl. ¶¶ 10-13; 16-21).

While Experian's summary judgment declarant, Mr. Henke, signed Defendant's declaration claiming an interest in helping consumers make disputes, he actually has no knowledge or understanding in those regards.  In fact, he candidly admitted:

> Q.      So given that he had no previous relationship with Advanta, how would
> including the name Advanta have helped a consumer, an identity theft victim, such as
> my client?
> A.   Yeah.  I'm not sure.  Not having been an identity theft victim, I don't know how it
> would help him.

(Henke Dep. Tr. 70:22-71:6).

### B.    DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Contrary to Experian's implied suggestion that it furnished to Mr. Dreher one report that mentions one tradeline as "Advanta Bank," its pattern of misconduct extended for a long period of time, over several attempts by Mr. Dreher to obtain his full credit. In response to Experian's statement of alleged undisputed material facts, the Plaintiff addresses each fact not only whether undisputed or disputed, but also whether the allegations of fact are truly material, complete or misleading.

*1.*      ***Undisputed Facts:***  Defendant's paragraphs 1; 3-10; 13-17; 19; 21-27; 30-31.

*2.*      ***Undisputed Facts, but immaterial or incomplete***. Defendant's paragraph 2 (*See supra* section 2); 12; 19; 21-22; 23; 24-29; 33.[5]

---

[5] Though undisputed, it is important to explain the reason these facts do not support summary judgment.

***19. Undisputed, incomplete***.  FDR is a credit industry vendor that sells software and related data processing services.  CardWorks uses First Data Corporation's "FDR" accounting software. (Deposition of Maria Costa, Tr. 189:1-190:9)(Ex. K).

***21. Undisputed, incomplete***.  FDR electronically delivers the data sent by thousands of financial institutions. (First Data Corp., Form 10-K, at 7 (Mar. 5, 2012)(attached to Clark Decl., Ex. D).

***22. Undisputed, incomplete***.  FIS controls the generic post office box provided by Experian to Mr. Dreher, thus assuring that he would have absolutely no means to make direct contact with CardWorks, which had all authority and responsibility to correct identity theft credit disputes.

***24-27.  Undisputed, incomplete***. When Deutsche Bank hired CardWorks to replace Advanta Bank Corp. as servicer, the FDIC continued to play a role because it was attempting to dispose of the remaining assets of dissolved Advanta Bank Corp., and not because it continued a role in the ownership or servicing of the former-Advanta accounts.  (CWS 1360-1366)(Ex. L). A creditor or contracting party opposite a dissolved bank with assets now controlled by the FDIC may not simply end contracts or collect debts. (Notice of Termination of Advanta Bank Corp. As Servicer and Appointment of Successor Servicer)(CWS 1366-1369)(Ex. L).  Experian received this Notice together with the letter referenced in Defendant's ¶ 28, by e-mail on Oct. 19, 2010.  (XP 148)(Ex. P).

***28. Undisputed, incomplete***.  Experian did not simply "receive" but required such a letter to document that Advanta Bank Corp. was no longer involved in the credit reporting and to permit

### 3.     *Disputed Facts:*

"*B. (Advanta Bank Corp. Had A Complicated Business Model)." Disputed*.   Defendant's characterization that Experian would consider a securitized trust to be a "complicated business model" must be tongue in cheek. Securitization is the primary basis for nearly all mortgage, auto loan and credit card lending in modern America.   As detailed in sections 4 and 5(a)-(b), above, Experian was not confused about the "source of the information" in the "Advanta Bank" tradeline.  The facts alleged in paragraphs 3-9 and 11-12, are incorrectly labeled "material" when they are not.  (Def.'s Mem. in Support of Motion Partial Summ. J.)(Def.'s Mem.)(Dkt. #55).  How CardWorks became the source of tradeline information does not change the fact that CardWorks was the entity that supplied that information.

The pre-CardWorks history of Advanta Bank Corp. was never considered or known by Experian prior to this litigation, and some "facts" were gleaned by counsel from the internet. (Decl. J. Clark, filed separately in support of Def.'s Mem., Exs. A, B and D)(Dkt. #56). Experian's employee-witness, Peter Henke, testified that he knew almost nothing about Advanta or Cardworks and absolutely nothing about the substantive claim in this case. (Henke Dep. Tr. 10:1-13; 69-71).[6] The Experian employee who actually was involved in the Experian-CardWorks relationship believed that CardWorks was the furnisher and agent of the "owner" of the old-Advanta accounts, Vion Holdings II.

---

CardWorks to begin its own subscriber and tradeline reporting relationship. (Kilka Dep. Tr. 33-36; 42:15-46:24)(XP 144, 146; 172; 176-177; 202; 207-208; 213; 235; 243; 248; 252, 280) (emails between CardWorks and Experian demonstrate Experian's knowledge and effort to create a subscriber tradeline that did not disclose CardWorks' identity as the information source).

**29. *Undisputed, misleading*.**  Experian did not have a "discussion" with any party other than CardWorks.  It never met or spoke with Vion, II, LLC, the FDIC or Advanta Bank Corp.  Its only contact was with CardWorks. (Kilka Dep. Tr. 33-36; 42:15-46:24)(XP 144, 146; 172; 176-177; 202; 207-208; 213; 235; 243; 248; 252, 280).

**33. *Undisputed, but incomplete*.**  Plaintiff made multiple disputes to Experian and wrote multiple letters to the "Advanta Bank" addresses Experian provided. He received only one unsigned, perfunctory response on "Advanta Credit Cards" letterhead, while all other Advanta disputes were ignored. *See supra* Plaintiff's Statement of Facts.

[6] Mr. Henke knew that CardWorks had a subscriber account, "but I don't recall reviewing it for the purpose of this declaration."  (Henke Dep. Tr. 10:2-13).

(Kilka Dep. Tr. 45:21-49:23). By November 16, 2010, the date of the first full credit report Experian provided to Mr. Dreher identifying "Advanta Bank Corp." as the source who **reported for every month after March 2010**, the Defendant had received in writing and had actual knowledge of its defunct status.

**11. *Disputed, misleading and immaterial*.** Defendant asserts that Advanta Bank Corp. remained more than a servicer after the accounts were assigned to the Trust, implying that Advanta still had an interest in the accounts. The basis for this "fact" is a citation to a decision in a securities fraud class action. *Underland v. Alter*, CIV.A. 10-3621, 2011 WL 4017908 (E.D. Pa. Sept. 9, 2011). First, the reference to any interest was as to Advanta Corp., the parent of Advanta Bank Corp. Second, the "interest" to which the Pennsylvania Federal Court refers is a "residual interest" in the securitization, "to the extent those amounts are not required to pay the expenses of the trust and the certificateholders the amounts they are due." *Id., at* n.17.

> **"D. Credit Reporting For Advanta Bank Corp. Originated Accounts Involves**
> **Many Players."** **Disputed, to the extent that the section heading states a purported fact.**

Experian and CardWorks were the only two entities involved in the consumer reporting at issue. All Advanta entities were either non-existent or non-participating prior to the derogatory reporting. The FDIC had no relevant role: upon dissolution of Advanta Bank, the FDIC made Deutsche bank wait 90 days to replace Advanta with CardWorks. Vion Holdings II, LLC was the owner of the debts and Deutsche Bank the Master Trust Trustee, neither of these entities participated in any of the credit reporting. (Kilka Dep. Tr. 45:21-49:4).

**18. *Disputed*.** CardWorks was not a mere manager, but the "furnisher," the "subscriber," the Experian "client," and certainly the "source of information" for all of the credit account tradelines CardWorks reported to Experian after it replaced Advanta Bank Corp. as the account servicer. *See supra* Plaintiff's Statement of Facts *passim*. *See also* CardWorks Answer to Am. Compl ¶ 19. (Dkt. # 29)("CWS admits it reported the account that forms the basis of this litigation to one or more credit

reporting bureaus.").

**20. *Disputed***.   FDR is nothing other than a computer processing service that transmits the data supplied by its many customers to the national credit bureaus.   It converts the credit account data from CardWorks into the "Metro 2" format, which Experian explains on its website:

> Once you have been approved by Experian's membership department for reporting access, you must get set up with a software vendor that will report in a Metro 2 format.

http://www.experian.com/consumer-information/reporting-to-credit-agencies.html      last      visited November 29, 2012.   Experian refers to a FDR as a "Third Party Processor."   (Henke Dep. Tr. 76:24-77:25)(Ex. V).   FDR does not "supply" the credit tradeline information to Experian; it merely transmits it.   (Def.'s Mem. at 14). The Postal Service is not the source of a mailed letter, just the transmitter.   Regardless, this "Fact" as with those in the several paragraphs to follow, damns Defendant's argument rather than helps it.   If FDR could be construed as the "source" of the credit reporting information, then Experian would be required to identify FDR as a source.   It did and does not do so. *See supra* Plaintiff's Statement of Facts, *passim*. (XP 207-208)(explaining Experian's view that an agent handles disputes and updates tradelines)(Ex. N).

**"E. Like The FDIC And CardWorks, Experian Used The Name Consumers**

**Would Likely Recognize."     Disputed.**   There is no evidence that anyone used the name "Advanta Bank" or "Advanta Credit Cards" because the consumer would recognize or benefit from it. See Plaintiff's Statement of Facts, *supra*, *in passim*.

**32. *Disputed.***   The deposition of Mr. Henke functionally eliminates the Declaration Experian had him sign to support its motion. *See supra* note 6.   Mr. Henke's testimony demonstrated that that he did not create the substance of his declaration or prepare for his deposition.   (Henke Dep. Tr. 6-7; 8:1-15; 8:23).   He was not knowledgeable about CardWorks and its relationship to the account in question or the substance of CardWorks involvement in the allegations of the Complaint.   (Henke Dep. Tr. 10:1-13).   He worked as a director in the membership department, but doesn't "manage the

18

relationship on an ongoing basis." (Henke Dep. Tr. 13:16-25). Mr. Henke's only FCRA experience is in permissible purposes for accessing a consumer report, but he has never even read the FCRA or any section regarding consumer disputes. (Henke Dep. Tr. 20:11-24; 11:9-25; 12:1-2; 24:6-14).

## II.     ARGUMENT

### EXPERIAN WILLFULLY VIOLATED 15 U.S.C. § 1681g(a).

The FCRA's notice provisions, including § 1681g(a), are the foundation of consumer oversight on which FCRA compliance is built. The notices that Congress included in the FCRA provide consumers with the information necessary to inform and then engage in self-help. The indispensable first step in the process is to access to the contents of your credit file pursuant to § 1681g. National Consumer Law Center, Fair Credit Reporting, at 73 (7th ed. 2010) ("Consumers can review a report of the file contents to determine if there is inaccurate or incomplete information. Understanding the nature of negative information in the file also is an aid to improving the consumer's credit profile. Disclosure of the consumer's file is an essential first step to handling almost any problem relating to a consumer's credit file and consumer reports related to the file"); *Gillespie v. Equifax Info. Servs., L.L.C.* 484 F.3d 938, 941 (7th Cir. 2007) ("A primary purposes of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under § 1681i"); *see also Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 364 (1973) ("[B]lind economic activity is inconsistent with the efficient functioning of a free economic system such as ours"). Only Defendant's compliance with § 1681g(a) would provide Mr. Dreher and all other such consumers with that indispensable information as Congress has directed.

### A.     SUMMARY JUDGMENT IS RARELY APPROPRIATE FOR FCRA "WILLFULNESS."

Section 1681n(a) of the FCRA provides for the recovery of statutory and punitive damages as to "[a]ny person who willfully fails to comply with any requirement imposed under" under the statute.

15 U.S.C. § 1681n. "[S]ummary judgment is 'seldom appropriate'" as to whether a consumer reporting agency willfully violated the FCRA. *Dalton,* 257 F.3d 409, 418 (4th Cir. 2001). *See also Whitfield v. Radian Guaranty, Inc.,* 501 F.3d 262, 271 (3d Cir. 2007) *vacated as moot,* 2008 WL 2329934 (U.S. 2008) ("We do not suggest that a factfinder could not or would not determine that [the defendant] did not act willfully. Instead, we hold that whether it did so is a factual issue, not a question of law, and it therefore cannot be decided either on appeal or by the District Court as a matter of law.") "Willfulness under the FCRA is generally a question of fact for the jury." *Holmes v. Telecheck Int'l, Inc.,* 556 F.Supp.2d 819, 847 (M.D.TN. 2008); *Lenox v. Equifax Info. Servs. LLC,* 2007 WL 1406914, *6 (D. Or. May 7, 2007)("the determination as to whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Cairns v. GMAC Mortg. Corp.,* 2007 WL 735564 (D. Ariz. Mar. 5, 2007).

## B.     EXPERIAN "RECKLESSLY" VIOLATED § 1681g(a).

Defendant's explanation of the FCRA's "willfulness" standard is incomplete. Experian asserts, "For claims of a willful FCRA violation, *Safeco* imposes a stringent threshold hurdle, to be applied by the court at summary judgment as a pure question of law without reference to the defendant's intent or other subjective factors." This is inaccurate. *Safeco* considered only a subset of "willfulness" measures and established a willfulness threshold that was "less stringent than the standard" that previously existed in the Fourth Circuit. *Mullins v. Equifax Info. Serv., LLC,* 2007 WL 2471080, *2 (E.D. Va. Aug. 27, 2007)(Payne). Nevertheless, and irrespective of whether Mr. Dreher establishes a claim for willfulness under the conscious disregard standard, Defendant cannot establish a reckless disregard defense as a matter of law to show that its misinterpretation of § 1681g(a) is not "objectively unreasonable." The FCRA's phrase "source of the information" is facially pellucid. Defendants' motion on *Safeco* grounds must be denied.

### 1.     The phrase "source of the information" is not "less than pellucid."

There is ample authority on the meaning of the FCRA phrase "source of the information" that was readily and intuitively clear.  "Unlike in *Safeco,* where the FCRA provision at issue was "less-than-pellucid," 551 U.S. at 70, the text at issue here appears to have "a plain and clearly ascertainable meaning[.]" *Singleton v. Domino's Pizza, LLC*, 2012 WL 245965 (D. Md. Jan. 25, 2012) (citations omitted).  "Where 'the text of [the] statute is clear and open to only one reasonable interpretation ... a dearth of guidance does not render [a] defendant's readings plausible.' " *Id*. (citations omitted). *See also Smith v. HireRight Sols., Inc.*, 711 F. Supp. 2d 426, 436 (E.D. Pa. 2010) ("[Q]uite unlike *Safeco*, where the statute at issue was "less-than-pellucid" and there was a "dearth of guidance," *id.* at 70, the statutory text at issue here has a plain and clearly ascertainable meaning."); *Gillespie v. Equifax Info. Servs. LLC,* 2008 WL 4316950, at *6 (N.D.Ill. Sep. 15, 2008) (holding that where statutory language is clear, mere absence of appellate or regulatory authority does not justify an objectively unreasonable interpretation of statute); *Edwards v. Toys ""R" Us*, 527 F. Supp. 2d 1197, 1209 (C.D. Cal. 2007) ("This case presents a different situation than *Safeco* because § 1681c(g) is not ambiguous or susceptible of conflicting interpretations.")

In interpreting a statute, the Court first determines "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) (citations omitted). In *Johnson*, the Fourth Circuit considered the meaning of the FCRA word "investigation" and found **that** word to have a plain and common meaning.  *Id*.  The phrase "source of the information," in the context used in the statute itself, is certainly at least as clear.  Section 1681g(a) provides, in relevant part:

(a) Information on file; sources; report recipients
Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title [proper identification], *clearly and accurately disclose* to the consumer:
*   *   *
 (2) *The sources of the information*; except that the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed: *Provided*, That in the event an action is brought

> under this subchapter, such sources shall be available to the plaintiff under appropriate
> discovery procedures in the court in which the action is brought.

15 U.S.C. § 1681g(a) (emphasis added).  Simply, when a consumer such as Mr. Dreher requests and receives a copy of his credit report from a consumer reporting agency, the agency must "clearly and accurately" disclose the "sources of the information" in his credit report.  In this case, it is undisputed that the only source of the information was CardWorks.

Experian has offered no alternate "objectively reasonable" interpretation of the FCRA phrase "source of the information." None of its witnesses, its brief or supporting evidence offers a different interpretation. In Experian's view, a long list of actors could be a "source." (Def.'s Mem. at 13-14). This view is objectively unreasonable. The "source of the information" is the "supplier" of the information. (De Armond Decl. at 8-9); *Johnson,* 357 F.3d at 430.

Despite Defendant's obfuscation, the evidence in the case is uncontroverted:  only CardWorks reported credit information to Mr. Dreher's Experian credit report.  Experian communicated Mr. Dreher's disputes directly to CardWorks.  Experian sent ACDVs that listed the source subscriber as CardWorks and never mentioned "Advanta" anywhere in the communication. Experian's every action in this case (other than summary judgment brief) acknowledged Defendant's understanding that CardWorks was the supplier, the furnisher and the source.  Experian's real-world interpretation uniformly treated its furnisher as the "source of information."  Defendant advised consumers of such interpretation on its website and stated that very interpretation to numerous Appellate and District courts, as well as the Federal Reserve and Mr. Dreher.  Until the day this case was filed, Defendant never believed the phrase "source of the information" in a credit report meant anything other than the entity that reported the information to Experian.  *See* Plaintiff's Statement of Facts, *in passim*. According to Plaintiff's experts, in the credit industry, the term "source of the information" in a credit report universally means the entity that actively reported that information to the credit reporting agency.

22

Section 1681g(a) is pellucid for several other material reasons.  Experian's argues "Advanta Bank" or "Advanta Credit Cards" was a source if Advanta was an "originating creditor."  First, Advanta Bank was never an originating creditor.  CardWorks was never Advanta's agent.   Advanta Bank was a servicer, and only a servicer. When it was terminated in March 2010, CardWorks was not even in the picture. Next, Defendant's argument confuses the phrase "source of the information" with "source of the credit."  Even if "Advanta Bank" were an originating creditor, it was never the source of the Experian credit information.  All credit reporting information at issue in this case was supplied by CardWorks.

The full text of § 1681g(a) actually requires that Experian report the "sources of the information" and do so completely and clearly. The statute unambiguously requires the reporting of the entity that provides and investigates the actual credit data – the codes that are reported through the Experian credit reporting process. Experian cannot deny this fact because even if its new, novel interpretation were correct – that there are multiple "sources" of information, then under the plain language of § 1681g(a)(1), it would be required to report them all. (Def.'s Mem. at 12-13).

Experian's creative argument also fails because it could report both CardWorks and Advanta on the tradeline as "sources," there is no exclusivity. In fact, Experian admitted that it could report a tradeline as both Advanta Credit Cards/Cardworks Servicing.   (Henke Dep. Tr. 42:1-9; *See also* Hendricks Decl. ¶¶ 12, 17, 20, 24-25.).

2. **Experian had substantial guidance by which to know that the FCRA phrase "source of the information" meant the entity which furnished the credit data and to whom Experian would forward consumer disputes.**

Experian has created the classic straw man argument.[7]  Experian knew the "source of the information" in its credit tradelines was the entity that actually reported that.   However, it

_____

[7] In rejecting a similar "willfulness" defense contrivance on FCRA willfulness, the court reasoned: "I reject this argument because it employs the fallacy of diversion, also known as the "straw man" fallacy." *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1229 (D.N.M. 2006).

manufactures an alternate reality, "[H]ow a CRA should report the source of information regarding accounts originated by banks that subsequently went into receivership with the FDIC[.]" Def.'s Mem. at 10. However, the actual issue is simply: who supplied the information to Experian.    Defendant doesn't contend that it had a mistaken belief that any entity, including the FDIC, was the supplier of its credit reporting.  There is nothing material about the corporate structure of the "source of information." Mortgage companies sell, transfer and assign consumer loans every day.  Mortgage servicers are replaced every hour.  Credit card portfolios are transferred.  Debts are sold to debt buyers, and then bounce among debt collectors.   In this case, the evidence is that Advanta Bank itself was merely a servicer that lost the contract when it was dissolved in March 2010.  The FDIC's role was to ensure Advanta Bank did not lose any advantage or assets by Deutsche Bank's appointment of a successor servicer.

The question upon which Experian claims to have needed guidance would be infinitely regressive.  Even if there were such ridiculously precise guidance as to the term "source" for credit information furnished by a successor trustee after FDIC dissolution of the previous servicer, Experian would argue something else to regress itself out of FCRA enforcement.  Given the "very high legal duties of care" imposed on consumer reporting agencies by the statute, the "critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information," the Court should not view Defendant's excuses with a patient, passive or casual eye. *Burke v. Experian Info. Sols., Inc.*, 1:10-CV-1064, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011).

As to the real question in the case – whether the "source of the information" in a credit report means something other than the supplier of that credit information, there is plenty of guidance.  First of course, as argued above, Experian had the benefit of "the guidance provided within the statutory provision itself." *Singleton v. Domino's Pizza, LLC*, 2012 WL 245965 (D. Md. Jan. 25, 2012).  And it

had the guidance of its own positions taken before consumers, courts and regulators.  But Defendant also had both regulatory and appellate guidance beyond its own advocacy.

The Federal Trade Commission, the FCRA's overseer, has interpreted "source of the information" to mean the entity that was the credit furnisher governed by 15 U.S.C. § 1681s-2(b). FCRA amendments that govern credit "furnishers" were based on the "**recogni[tion] that furnishers [were] the original source of the information** [and] have a critical role to play in the overall accuracy of consumer report information." ("Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003," FTC, October 2004. http://www.ftc.gov/reports/facta/041209factarpt.pdf].

Furthermore, while there has been little need for judicial examination of § 1681g(a) itself, given its clarity, numerous appellate court have interpreted the phrase "source of the information" in a credit report to mean the entity that furnished and supplied that data and to whom a CRA must forward a consumer's dispute.  *See, e.g., Cushman,* 115 F.3d at 225 (holding "'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial *source* of information'"); (emphasis added); *Dalton,* 257 F.3d 409, 416-17 (4th Cir. 2001) (the Fourth Circuit clearly identified the "source" of the disputed information as the clerk, and not the creator of the original underlying record); *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1153 (9th Cir. 2009) ("In addition, to ensure that credit reports are accurate, the FCRA imposes some duties on the sources that provide credit information to CRAs, called "furnishers" in the statute.").  These of course are only quickly assembled examples.  Appellate courts uniformly use the term "source of information" in a credit report in the manner herein described.  *Birmingham v. Experian Info. Solutions, Inc.,* 633 F.3d 1006, 1011-12 (10th Cir. 2011) ("Experian's procedures for ensuring the accuracy of credit entries were described in affidavits from two employees: Kimberly Hughes, a Consumer Affairs Specialist Consultant, and Kathleen M. Centanni, a Compliance Manager. Both stated that … If a consumer

requests an investigation into an item listed on his report … Experian contacts the source of the disputed information and describes the dispute. The source must research the information reported and respond regarding the accuracy of the information. Depending on the answer, Experian leaves the item as is, deletes it, or changes it in a manner specified by the source.").

Uniformity of guidance certainly forms the basis for Professor De Armond's opinion:

In my judgment, Defendant's withholding of the identity of CardWorks violated its obligation to clearly and accurately disclose the source of information regarding the disputed debt pursuant to 15 U.S.C. § 1681g(a)(2). Furthermore, it would be objectively unreasonable to construe 15 U.S.C. § 1681g(a)(2) as permitting such withholding.

(De Armond Decl. at 12).  As Professor De Armond concluded, prior to this case, Experian, the courts, the regulators all agree on the meaning of "source." A fact finder could conclude that Experian's newly-crafted interpretation of its § 1681g(a) duties and the phrase "source of the information" are not "objectively reasonable."

> **3.  Experian had substantial guidance that it cannot lawfully delegate and defer its own FCRA duties to its customer and furnisher-source.**

Independent of the question of was it reasonable to interpret source as other than supplier", a factfinder could also determine Experian's violation of § 1681g willful as its policy of allowing the furnisher to determine what to identify in a tradeline was based on a practice that has long been held unlawful – deferring to the furnisher source instead of exercising independent responsibility.  Mr. Hendricks testified, this has been a long and recurring problem for Experian and the other reporting agencies.  As the Third Circuit explained in the seminal case governing credit reporting agencies: "The "grave responsibilit[y]" imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources." *Cushman*, 115 F.3d at 225.  Experian knew that its blind deference to CardWorks permitted its unilateral decision to unlawfully disguise its identity.

> **C.  EXPERIAN "KNOWINGLY" VIOLATED § 1681g(a).**
> **1.  A FCRA Plaintiff proves "willfulness" by either the *Safeco* recklessness standard or the "knowing" and/or "conscious disregard" standard.**

*Safeco* considered and resolved a then-Circuit split as to the question of whether or not FCRA "willfulness" could include "reckless" violations, or instead solely those that were made "knowingly" and/or with "conscious disregard." The Supreme Court held in *Safeco* that § 1681n willfulness "cover[s] not only knowing violations…but reckless ones as well." 551 U.S. at 48. Defendants ignore this portion of the *Safeco* opinion, and as a result their willfulness argument misquotes and certainly misunderstands the import of *Safeco*.

The pre-*Safeco* majority rule, adopted in the Fourth Circuit, required evidence a plaintiff to "show that the defendant knowingly and intentionally committed an act in conscious disregard for the rights of the consumer." *Dalton*, 257 F.3d at 418 (citations and internal quotation omitted). On the other hand, at least two Circuits allowed proof that a violation was merely "reckless."[8] Shortly after *Safeco* was decided, the Fourth Circuit held an FCRA plaintiff may prevail under either the pre-*Safeco* knowing or "conscious disregard" standard or the lower-threshold "reckless disregard" test. *Saunders v. Branch Banking & Trust Co.* 526 F.3d 142, 151 (4th Cir. 2008).[9] *See also Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 271 (4th Cir. 2010). Affirming a jury verdict in *Mullins v. Equifax Info. Servs., LLC*, this court reached the same conclusion.

> The case was tried on, and the jury was instructed pursuant to, the law of this circuit at the time of trial in the issue of willfulness. Thereafter, the Supreme Court of the United States decided *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007), which actually articulated a standard for willfulness that was less stringent than the standard which controlled the trial and the jury verdict.

2007 WL 2471080, *2 (E.D. Va. Aug. 27, 2007)(citations omitted); *see also Fuges. v. Southwest Fin. Servs., Ltd.*, 2012 WL 6051966, *8 at n.13 (3rd Cir. Dec. 6, 2012) (holding "evidence of knowing violations of FCRA is relevant to a claim of willfulness, … but then Safeco's recklessness analysis

---

[8] A pre-*Safeco* District Court best framed this disagreement with a summary of the law in most circuits. *Apodaca v. Discover Fin. Servs*, 417 F. Supp. 2d 1220, 1228 (D.N.M. 2006).

[9] Experian's Virginia defense firm made the same *Safeco* argument on behalf of B.B. ¶ T. before the court of Appeals in *Saunders*. *It was summarily rejected n a simple footnote. Id.* at n.4.

would not apply. *See Safeco*, 551 U.S. at 56-57 (noting that knowing violations of FCRA are willful by definition.)"); *Vidoni v. Acadia Corp.*, 2012 WL 1565128, *2-4 (D. Me. Apr. 27, 2012) ("Although Safeco was concerned with establishing the "reckless disregard" prong of willfulness, it did not discard or undermine the Court's earlier explanations of the term "willful.").

## 2.    Experian "knowingly" violated § 1681g(a).

This case presents the remarkably easy (and maybe rare) instance in which there is direct evidence that the Defendant knew what the law was and what it meant, and still did the opposite.  As detailed in Plaintiff's Statement of Facts, and summarized *supra*, Defendant has represented to Mr. Dreher, to consumers, to courts and to regulators its view and interpretation that the "source of the information" was the entity that furnished credit data and to whom Experian would forward consumer disputes.  There certainly is no evidence that Advanta Bank reported the subject credit information months to a year after it was dissolved.  And the documents produced in this case show that the disputes were all send by Experian to CardWorks.  Further, Experian had actual knowledge that Advanta Bank was dissolved and out of business.  It had actual knowledge that the owner of the accounts was Vion Holdings, II, LLC.  It had actual knowledge that the subscriber agreement solicited from CardWorks identified Vion Holdings as the client and CardWorks as the reporting agent.

Beyond the direct evidence, there is substantial circumstantial evidence. Industry standards required the reporting of the actual source and furnisher, with the previous servicer or debt owner in the transferee field.  And Experian is more than familiar with the numerous District and appellate decisions in which the court interpreted the phrase "source of the information" to mean the credit data furnisher, many in which it advocated for such position. *Apodaca,* 417 F. Supp. 2d at 1229 ("For the reasons articulated below, however, I also conclude that even under an "actual knowledge" standard, there are genuine issues of material fact which preclude summary judgment as to whether Equifax acted willfully in this case. ... Circumstantial evidence of the company's "experience in dealing with

credit reports" and knowledge of the FCRA also "can support an inference that the defendants knew that their actions were impermissible."). Experian's systemic violation of this provision in each and every consumer report it furnished to Mr. Dreher would similarly require denial of this motion. *Moreno v. DHI Mortg. Co. GP, Inc.*, 1:09CV315 LMB/TRJ, 2010 WL 3430816 (E.D. Va. Aug. 27, 2010) ("DHI, relying on inapposite case law, argues that neither a single violation of the statute nor a lack of any policy to ensure compliance constitutes willfulness. The Court disagrees. … DHI's failure to send any FCRA notice to Moreno because she applied orally indicates a systemic practice that violates the FCRA.")

Experian's willfulness culpability would even satisfy the most rigorous of the thresholds considered in FCRA jurisprudence – whether or not a defendant made a misrepresentation to the consumer. In the most limiting FCRA decision, pre-*Safeco*, the Fifth Circuit had stated: "Generally, courts have allowed a willful noncompliance claim to proceed where a defendant's conduct involves willful misrepresentations or concealments. *Cousin v. Trans Union Corp.*, 246 F.3d 359, 372 (5th Cir. 2001). *See also Cushman*, 115 F.3d at 226-27 ("The Fifth Circuit has held that '[o]nly defendants who have engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under § 1681n.'") In this case, the Plaintiff has established that Experian misrepresented the source of the credit information. It was not the long before dissolved "Advanta Bank" or the fictitiously named "Advanta Credit Cards." Ironically, Experian does not deny that it made multiple misrepresentations to Mr. Dreher; it just denies the one upon which this litigation is based. If its new interpretation is correct, then all of the many communications to Mr. Dreher on which Defendant stated that it had forwarded his dispute to the "source of the information" would be materially false since CardWorks would not be its information source.

### D.   EXPERIAN'S PRACTICE WAS NOT FOR THE BENEFIT OF THE CONSUMER.

In support of its motion, Experian weaves an assertion that it used the name "Advanta Bank" or "Advanta Credit Cards" instead of CardWorks, because it wanted to avoid confusion for consumers. The obvious response is that such well-intentioned efforts cannot excuse an otherwise willful violation of a pellucid statute. But the better response is simpler – Experian's claim is just factually untrue. It is not simply disputed or in contention. It is just patently false.

As detailed in Plaintiff's refutation of Defendant's asserted facts and in Plaintiff's separate statements, Mr. Henke testified at his deposition that there really is no policy or procedure to avoid consumer confusion. Instead, Experian defers entirely to its customer sources. It does not even ask or inquire as to the basis for a source's selection of a tradeline label. Experian's claim is also false because its disguise of the actual reporting source is harmful to consumers with the most prevalent type of dispute – that in which the consumer is unfamiliar with the debt because they did not open such an account, whether by innocent creditor error or identity theft.

## IV.    CONCLUSION

For these reasons, the court should deny Experian's  Motion for Partial Summary Judgment.

Respectfully submitted,

**MICHAELT. DREHER ,**

_____/s/_____
Leonard A. Bennett, Esq., VSB #37523
Susan M. Rotkis, VSB #40693
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| David Neal Anthony | Benjamin J. Katz |
|---|---|
| Troutman Sanders LLP | E-mail: bjkatz@jonesday.com |
| | Joseph William Clark |
| PO Box 1122 | E-mail: jwclark@jonesday.com |
| Richmond, VA 23219 | Jones Day |
| Email: david.anthony@troutmansanders.com | 51 Louisiana Avenue NW |
| | Washington, DC 20001 |

_____/s/_____
Leonard A. Bennett, Esq., VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net