*Exhibit "J"*

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MICHAEL T. DREHER,
Individually and on
behalf of a class
similarly situated          Civil No.
persons,                    3:11cv00624 (JAG)

       Plaintiff,

  vs.

EXPERIAN INFORMATION
SOLUTIONS, INC.,
CARDWORKS, INC. and
CARDWORKS SERVICING, LLC,

      Defendants.

-------------------------

VIDEOTAPED DEPOSITION OF JAMES KILKA

FRIDAY, AUGUST 24, 2012

PITTSBURGH, PENNSYLVANIA

2:39 p.m. - 4:03 p.m.

REPORTER:

Ann Medis



**MAXENE WEINBERG AGENCY**
*Litigation Support From Opening to Verdict*
800-640-1949 | www.mwadepos.net

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF VIRGINIA
 3                    Richmond Division
 4
 5
 6    MICHAEL T. DREHER,
      Individually and on
 7    behalf of a class
      similarly situated      Civil No.
 8    persons,                3:11cv00624 (JAG)

 9              Plaintiff,

10       vs.

11    EXPERIAN INFORMATION
      SOLUTIONS, INC.,
12    CARDWORKS, INC. and
      CARDWORKS SERVICING, LLC,

13              Defendants.
14    _____
15
16       VIDEOTAPED DEPOSITION OF JAMES KILKA,
17    a witness herein, called for examination by Plaintiff,
18    by and before Ann Medis, Registered Professional
19    Reporter and Notary Public in and for the Commonwealth
20    of Pennsylvania, at the offices of Jones Day, One
21    Mellon Bank Center, 31st Floor, Pittsburgh,
22    Pennsylvania  15219, on Friday, August 24, 2012, at
23    commencing 2:39 p.m.
24
25
```

Page 2

```
 1    APPEARANCES:

 2

               CONSUMER LITIGATION ASSOCIATES
 3             BY:  LEONARD ANTHONY BENNETT, ESQUIRE
               763 J Clyde Morris Boulevard
 4             Suite 1A
               Newport News, Virginia 23601
 5             757.930.3660
               lenbennett@cox.net        (by phone)
 6               Counsel for the Plaintiff

 7             SUROVELL ISAACS PETERSEN & LEVY PLC
               BY:  KRISTI CAHOON KELLY, ESQUIRE
 8             4010 University Drive
               Suite 200
 9             Fairfax, Virginia 22030
               703.277.9774
10             kkelly@siplfirm.com        (by phone)
                 Counsel for the Plaintiff
11
               JONES DAY
12             BY:  BEN KATZ, ESQUIRE
                    JOSEPH WILLIAM CLARK, ESQUIRE
13             51 Louisiana Avenue, N.W.
               Washington, DC 20001
14             202.879.3939
               bkatz@jonesday.com
15             jwclark@jonesday.com        (by phone)

16               Counsel for the Defendant Experian
                 Information Solutions
17
               TROUTMAN SANDERS LLP
18             BY:  ETHAN G. OSTROFF, ESQUIRE
               222 Central Park Avenue
19             Suite 2000
               Virginia Beach, Virginia 23462
20             757.687.7765            (by phone)
               ethan.ostroff@troutmansanders.com
21
                 Counsel for the Defendants CardWorks
22               Servicing LLP and CardWorks, Inc.

23             Also Present:

24               STEVE SIMAK, Videographer
25
```

```
 1                        * I N D E X *
 2    JAMES KILKA                                    PAGE
 3      EXAMINATION BY MR. BENNETT                     6
 4      EXAMINATION BY MR. KATZ                       55
 5      RE-EXAMINATION BY MR. BENNETT                 55
 6
 7              * INDEX OF KILKA EXHIBITS *
 8    NO.                DESCRIPTION               PAGE
 9    1    Experian Consumer Disclosure, Page 3      5
           EXPDREH 000017
10
      2    Experian Consumer Disclosure, Page 3      5
11         EXPDREH 000037

12    3    Experian Consumer Disclosure, Pages 4-5   5
           EXPDREH 000061 - 62
13
      4    Experian Dispute Results, Page 1          5
14         EXPDREH 000089

15    5    Experian Dispute Results, Pages 1-4       5
           EXPDREH 000093 - 96
16
      6    Experian Consumer Disclosure, Page 3      5
17         EXPDREH 000117

18    7    Experian Dispute Results, Page 1          5
           EXPDREH 000137
19
      8    Email exchanges with James Kilka          5
20         EXPDREH 000143 - 257
21
22            *  KILKA EXHIBITS REFERRED TO *
23    3    Experian Consumer Disclosure, Pages 4-5  53
24    8    Email exchanges with James Kilka         10
25
```

Page 4

1          (Kilka Exhibits 1-8 were marked.)

2          THE VIDEOGRAPHER:   My name is Steve

3    Simak of Maxene Weinberg Agency.   The date today

4    is August 24, 2012, and the time is 2:39:06 in the

5    afternoon here Eastern Standard Time.   This

6    deposition is being held in the office of Jones

7    Day located at 500 Grant Street, Suite 4500,

8    Pittsburgh, Pennsylvania 15219.

9        The caption of this case is Michael T. Dreher

10   versus Experian Information Solutions,

11   Incorporated, et al., in the United States

12   District Court for the Eastern District of

13   Virginia, the Richmond Division.   The name of the

14   witness is James Kilka.

15       At this time the attorneys will identify

16   themselves and the parties they represent after

17   which our court reporter, Ann Medis, of Maxene

18   Weinberg Agency, will swear in the witness, and we

19   can proceed.

20          MR. BENNETT:   For the plaintiff, I'm on

21   the telephone, this is Leonard Bennett.   My

22   co-counsel up in Fairfax, Virginia, Ms. Kristi

23   Kelly, is also on the phone in the background.

24          MR. KATZ:   For Experian Information

25   Solutions, this is Ben Katz appearing in person.

Page 5

1                  MR. CLARK:   Joseph Clark, counsel for

2       Experian, appearing by way of telephone.

3                  MR. OSTROFF:   Ethan Ostroff on behalf of

4       CardWorks Servicing LLP and CardWorks, Inc.,

5       Troutman Sanders, appearing by phone.

6                        JAMES KILKA,

7            having been first duly sworn, was examined

8                      and testified as follows:

9                          EXAMINATION

10      BY MR. BENNETT:

11           Q.   Sir, will you please state your full

12      name for the record court reporter.

13           A.   James Kilka.

14           Q.   And by whom are you employed?

15           A.   Experian Information Solutions.

16           Q.   Where is your office or from where do

17      you work?

18           A.   Cranberry Township, Pennsylvania.

19           Q.   And do you work -- do you telecommute,

20      work out of your home, or do you have an actual

21      office away from home?

22           A.   Telecommute.   I have a home office.

23           Q.   And how long have you worked for

24      Experian?

25           A.   Seven years in October.   In October it

Page 6

1    will be seven years.

2        Q.    How long have you been able to

3    telecommute?

4        A.    The last four.

5        Q.    Prior to that, where did you work?

6        A.    Parsippany, New Jersey.

7        Q.    And what precipitated the change in

8    your, I guess I'll just say, work structure or

9    work location structure?

10       A.    I would call it a promotion and then a

11   relocation.

12       Q.    What's your current job position with

13   Experian?

14       A.    I'm an account executive for our

15   information services group.

16       Q.    And what was your job four years ago?

17       A.    I was -- the title then was called sales

18   support representative, and it's an equivalent to

19   a sales associate today.

20       Q.    All right.  And I'm not going to get --

21   we're going -- we're going to move through this

22   deposition much more quickly than I usually do.

23   So I don't need tons of detail, but I've never met

24   you before; right?

25       A.    Correct.

1        Q.    Have you ever had your deposition taken

2    before?

3        A.    No.

4        Q.    Can you explain to me generally what you

5    do for Experian, what your job entails?

6        A.    Sure.   I'm a -- essentially I manage a

7    book of business, a book of accounts, and my job

8    is to manage the existing business and to, you

9    know, upsell or cross-sell or sell new business

10   into those places I support and also look for new

11   business as well outside that book of business.

12       Q.    And when you say look for a book of

13   business, what are the customers that you would be

14   focusing on?

15       A.    Predominantly banks.   There are a few

16   exceptions, a few finance companies.

17       Q.    Generally where does Experian make its

18   money or at least the money from the segments that

19   you're responsible for selling to?   How does it

20   make its money?

21       A.    The core of the business would be the

22   credit report data.

23       Q.    Experian sells credit reports to its

24   subscribers in various forms; correct?

25       A.    Yeah.   That would be the meat of what we

1    do.

2        Q.   And it sells other products, like it

3    might sell different statistical or

4    scoring-related products; right?

5        A.   Yeah.  We call that like decision

6    analytics solutions.

7        Q.   And would that be -- when you say upsell

8    or that type of thing, would that be the kind of

9    additional product line you would offer your

10   customers?

11       A.   That's a good -- yeah.  That would be an

12   example of it, yes.  It could be -- yeah.  That's

13   a good example.

14       Q.   But you do not focus on I think it's

15   called consumer direct or the products that are

16   sold to the consumers whose data actually make up

17   a credit report; right?

18       A.   Consumer direct is solutions that we --

19   Experian sells directly to the consumer.  So it

20   could be versions -- like a version of their

21   credit report for the consumer to read.  It's

22   different than what I sell.  That's a different

23   division of Experian.

24       Q.   Okay.  And then your -- even four years

25   ago when you were in New Jersey, you were in what

Page 9

1    is now a sales associate position.  The focus of

2    your job would have been the same basic focus as

3    it is today, it's just different tasks, but

4    selling to banks and other subscribers credit

5    reporting data and related products; right?

6         A.    The sales associate position was more of

7    a support role than the role I'm in today and had

8    some different focus around training and some

9    light cross-selling, trying to secure people to

10   report the data to Experian.  The role I have

11   today is more about nurturing relationships to

12   grow, you know, the customer spend and ensure that

13   they're happy and that they're -- you know, that

14   things are going well.

15        Q.    Okay.  Now, it should be in front of

16   you.  There should be a stack of exhibits, and I

17   don't know if they're -- if it's just all in one

18   big stack or if they've been separated at all.

19        A.    I've got a big stack of paper, and some

20   of them are stapled, and one big stack in a binder

21   clip.

22        Q.    Okay.  All right.  Well, the big stack

23   in the binder clip I'm sure, I'm guessing, is the

24   one I'd like to start with.  And I think it should

25   say Exhibit 8.

1     A.   It does.

2     Q.   All right.  All right.  Always good to

3 have people that work for you that do their job

4 really well.

5     So Exhibit 8, your Exhibit 8 I'm certain

6 looks a lot like mine.  It's a stack of emails

7 that Experian in this case has provided; right?

8     A.   Yeah, fanning through, yes.

9     Q.   All right.  The way -- if you look at

10 the bottom right, the way that lawyers and law

11 firms deal with papers in litigation is when we

12 get documents, before we turn them over to the

13 other side, we label them so that they can be

14 referenced and they can be tracked and they can be

15 sorted.  We call the numbering, if you look at the

16 bottom right, we call -- where it says EXPDREH and

17 then has a number --

18     A.   Yeah.

19     Q.   -- do you see that?  That's a Bates

20 number just for your knowledge.  If anyone was

21 looking at this, they would -- EXP typically would

22 mean that it was Experian produced that these.

23 Experian is using DREH probably because our

24 client, the one that's suing your client for

25 ridiculous amounts of money or whatever, any

1    consumer that might be suing, in this case the

2    plaintiff is named Dreher, and that's in there.

3    And so that's where that -- so I would refer to

4    this typically -- if I was looking at the bottom

5    right, I would refer to this as Bates number 143.

6        A.    Okay.

7        Q.    All right.  And then the next pages

8    typically are in order, and in this case, they

9    are.  These documents were -- and Ben and Joe can

10   interrupt if I'm misstating the record, but these

11   documents, I believe, were produced by Experian as

12   emails that they gathered in response to requests

13   that we made.  Do you understand that?

14       A.    Yes.

15       Q.    And the emails, unfortunately for you,

16   heavily feature your communications with various

17   individuals from CardWorks.  Do you see that?

18       A.    Yes.

19       Q.    Have you had an opportunity, by the way,

20   to go back and -- I don't mean study them like

21   this is your final exam you need to pass, but

22   you're generally familiar with the subjects and

23   contents of your emails related to the CardWorks

24   matter?

25       A.    I had an opportunity to review them.

Page 12

```
 1        Q.    Okay.  Now, first of all, what is
 2   CardWorks Servicing as you understand it?
 3        A.    That particular part of their business
 4   is servicing -- they have outside clients that
 5   they service their portfolios of accounts.
 6        Q.    Okay.  And in this case, is the first --
 7   I think these emails are supposed to be in
 8   roughly, if not exactly, chronological order.  So
 9   this one starts September 2010.
10        Prior to this, the events that are in these
11   emails and that we're to talk about, had you
12   already sold some products or services to
13   CardWorks?
14        A.    I had not sold to them.  One of my
15   colleagues had sold them business credit solutions
16   at one point.  But, no, I hadn't had any
17   particular sales wins of my own.
18        Q.    So for you they were a new customer?
19        A.    Right.
20        Q.    And starting with the first of these
21   emails -- and some of them are going to be -- I'm
22   just going to roll right through them.  And I
23   apologize.  We just wanted to have a complete set
24   for the integrity of the exhibit.
25        A.    Yeah.
```

1         Q.   But the top part, the top document, 143

2    at the bottom, you were contacted by the woman

3    named Maria Costa, director of credit at CardWorks

4    Servicing; correct?

5         A.   Correct.

6         Q.   And had you ever spoken with Maria Costa

7    before this contact?

8         A.   Yes.

9         Q.   And how did that come about?  How did

10   that business communication occur?

11        A.   I couldn't give you specifics just

12   because I don't recall, but it would have been

13   probably around trying to make new contacts at

14   CardWorks to sell to them.  So I probably came

15   across her name at some point, and that would have

16   been my past contact with her.

17        Q.   All right.  And then she said she needs

18   to be able to pull Bulls Eyes reports on the

19   following subscriber code.  Do you see that?

20        A.   Yeah.

21        Q.   So you received this email.  And now I'm

22   on -- the same chain is in the next several pages.

23        A.   Right.

24        Q.   And you -- so the very next page has

25   your response.  It says, "I am sorry I missed your

1     call today."  Do you see that email?

2          A.    Yeah.

3          Q.    It says, "I am sending your request for

4     help to out" -- you mean our; right?

5          A.    Yeah.

6          Q.    -- "our in-house E-OSCAR experts."

7          A.    Correct.

8          Q.    Right?

9          A.    Yeah.

10         Q.    What does that mean?

11         A.    E-OSCAR is a -- which you probably know,

12    but is an outside company, but we have people in

13    Experian that we go to whenever we have or need

14    support around any sort of E-OSCAR issues.  So

15    they -- if somebody would go to -- if we needed

16    help to get a subcode set up so that their

17    disputes would come through electronically through

18    E-OSCAR as opposed to the old -- I think they

19    called them CDV forms.  It's a department of I

20    don't know how many people that we can go to for

21    help with this kind of stuff.

22         Q.    This is more footnote.  It's not

23    according to the case.  You know that Experian,

24    Equifax and TransUnion and Innovis are each

25    one-quarter owners in Online Data Exchange, the

Maxene Weinberg Agency
(800) 640-1949

1    for-profit data entity that runs E-OSCAR.  So I

2    didn't know if you knew that, but...

3        A.    No, I didn't know that.  I didn't know

4    that.

5        Q.    They make money selling ACDs.  Whenever

6    they send ACDs to furnishers, furnishers pay

7    Online Data Exchange money which is an actual

8    profit center for each of the bureaus.

9        A.    I was not aware.

10       Q.    Joe Clark would have never let that

11   evidence come out, but fortunately Equifax's

12   lawyers are nice.  So in this -- the actual point

13   of the deposition and this particular email, you

14   would have contacted a particular person at

15   E-OSCAR.  Do you recall who specifically you spoke

16   with?

17       A.    I don't.  We have a general mailbox for

18   that group though.

19       Q.    Okay.  And do you know what a Bulls Eye

20   is, by the way?

21       A.    I do.

22       Q.    What is a Bulls Eye?

23       A.    A Bulls Eye is a product that we offer

24   at no cost to our customers to allow them to see

25   what a person's trade line looks like, a

Page 16

1    consumer's trade line looks like at that exact

2    moment in time.

3         Q.   Okay.  And then the next email says

4    that -- I guess it asks you if Experian offers

5    this service.  Of course, all three bureaus offer

6    the service; right?  I mean at least you know

7    Experian offers it?

8         A.   Right.  I know Experian offers it.

9         Q.   So now I'm skipping ahead to -- at the

10   bottom it should say 163.  It's that email chain,

11   the top page which is 163.

12        A.   163 you said?

13        Q.   Yes.

14        A.   Okay.

15        Q.   Just several pages in.

16        A.   Yeah.

17        Q.   This is a continuation of the same

18   chain.

19        A.   Um-hum.

20        Q.   And the second page, which is actually

21   164, says -- there's an email at 8:29 a.m. right

22   in the middle of the page when you say you're

23   going to work on it in the morning.  And then

24   Maria Costa on the response to that says, "Can you

25   tell me what functions" -- I'm sorry.

Page 17

1        You respond and you say, "Maria can you tell

2    me what functions CardWorks will perform for

3    Advanta?  I'm getting help from our membership

4    area, and I want to be sure that we set you guys

5    up right.  Will you be reporting data on their

6    behalf as part of the services you provide?"

7        That was your email to CardWorks; right?

8        A.    Yep.

9        Q.    Let me step aside, see if I can shorten

10   this.  What is your understanding of what this

11   litigation is about, if you have one?  Why are we

12   suing your employer?

13       A.    Because -- well, I don't know.  Maybe it

14   would be best if you tell me.

15       Q.    We're alleging that the Fair Credit

16   Reporting Act requires a consumer reporting agency

17   to -- when a consumer asks for a copy of their

18   credit report, requires the reporting agency to

19   disclose to the consumer the source of the trade

20   line.  And in this instance we're alleging that

21   it's Experian's policy, not a policy that you

22   deviated from, but one that's uniform to allow the

23   subscriber to determine the name or the identity

24   of the trade line that is disclosed to consumers.

25       So in this case, instead of saying CardWorks,

1    disclosing CardWorks as the source of the credit

2    reporting, Experian disclosed Advanta, either

3    Advanta Bank or Advanta Credit Card as the source

4    of the reporting.

5         Is that in any way consistent with any

6    understanding you have of the subject of this

7    lawsuit?

8         A.    Yes.

9         Q.    And these emails, we can go through

10   them, but these emails are going to show us that

11   you worked with CardWorks to -- first to open new

12   subscriber codes in CardWorks' own name; right?

13   I'm not saying the credit reporting in CardWorks'

14   name, but the subscriber accounts were actually

15   CardWorks subscriber accounts; correct?

16        A.    Just say that one more time, that last

17   part.

18        Q.    Sure.  Experian entered into a contract

19   with CardWorks by which CardWorks was provided its

20   own subscriber code or codes?

21        A.    That's correct.

22        Q.    The credit reporting that then CardWorks

23   did subsequent to that contract was made on the

24   CardWorks subscriber codes, not on the old Advanta

25   Bank subscriber code; correct?

Page 19

1          A.    Yes.

2          Q.    And in order for that to occur,

3    CardWorks had to enter into its own contract with

4    Experian, its own subscriber agreement?

5          A.    If what you're asking is are they a

6    client, yes.  I think -- I'm not really sure where

7    you're going with this.

8          Q.    Well, actually the remarkable thing,

9    James, a lot of these depositions, I have to --

10   you know, I know what -- the one I just finished,

11   I know where Ms. Hughes is going to go, and I got

12   to keep her from going there.

13         A.    Okay.

14         Q.    This is -- your deposition in this case

15   is not -- I don't think anybody here will think it

16   was controversial.  And I'm not intending to use

17   it to learn more about Experian's business,

18   particularly in the late day and late part of the

19   week.  I'm just sitting here wondering why I

20   scheduled a deposition instead of just getting a

21   stipulation from Joe to this, but I'm here now.

22         So we have in the communications with

23   CardWorks, CardWorks and Experian communicated as

24   to how the trade lines that CardWorks was

25   reporting or was to report would be displayed to

Page 20

1    consumers; correct?

2        A.   Are you speaking specifically about the

3    Advanta trade lines or just CardWorks' trade lines

4    in general?

5        Q.   Well, CardWorks' trade lines in general

6    first, and then we'll speak about Advanta.

7        A.   Yes.   We would have worked with

8    CardWorks to determine what name would appear to

9    consumers and creditors on that subject.

10       Q.   All right.   Well, let me take a

11   hypothetical example here.   What if Bank of

12   America was your subscriber.   Certainly if you

13   brought Bank of America in as a strategic

14   customer, that would be great I'm sure.   But

15   assume Bank of America was your client, Experian's

16   customer.   And Bank of America said to Experian we

17   want all of our Bank of America credit cards to

18   display as Chase Bank credit card.

19       What procedure is in place, to your

20   knowledge, at Experian to determine whether that

21   would be permitted, whether Bank of America's

22   statement that it wanted its credit cards reported

23   as Chase Bank credit card would be allowed?

24       A.   I don't know what procedure is

25   documented.   There may be a procedure documented.

Page 21

```
 1    If I were to receive that request I would question

 2    Bank of America as to why they'd want to do that

 3    and let them know that the name is supposed to be

 4    reflective of who owns the trade line.  And if

 5    they persisted and pushed that there was some

 6    grand reason or good reason why, then I would have

 7    escalated it to either -- well, I may have gone to

 8    a few different places to make sure I find the

 9    right answer.  But it could have been compliance

10    or membership, one of those types of areas.  That

11    kind of stuff isn't something that is in my area

12    of expertise.  That's why we have support areas to

13    help us with those things.

14         Q.   Okay.  All right.  So I want to go back

15    to Exhibit 8.  And now I'm looking at page 163.

16    Do you have it in front of you?

17         A.   I do.

18         Q.   All right.  The email at the time is

19    your response to Maria's email in this chain.  And

20    can you read the paragraph for me?

21         A.   Sure.  "Since your last client addition,

22    Experian has updated policies around who we allow

23    this sort of access to.  We have two agreements

24    attached to this email.  One needs to be signed by

25    CardWorks and Advanta, and one needs to be
```

Page 22

1    completed by you."

2        Q.    And this particular email, I'm sure

3    that I actually have a copy of the document

4    somewhere, but this particular email didn't

5    have -- I don't have the agreement in this

6    exhibit.  Can you tell me what those two

7    agreements were, if you recall?

8        A.    Yeah.  One was a third-party processor

9    application, and the other one was a third-party

10   processor addendum.

11       Q.    And what are those documents?  What is

12   their purpose?

13       A.    The one is -- well, the one -- the

14   application is a brief version of our longer

15   membership application, and the addendum,

16   essentially it's to give permission to somebody

17   like CardWorks to act on behalf of a third

18   party -- I guess CardWorks would be a third

19   party -- but to act on behalf of one of our

20   clients to service their accounts or to perform

21   some function like that.

22       Q.    Okay.  If I continue into the email

23   stack, I'm looking now at 189 on the bottom.  169.

24   I'm sorry.  And you have 170 and then you have

25   151.

Page 23

1       A.    They're it looks like meeting invites.

2       Q.    Yes.

3       A.    Okay.

4       Q.    Can you tell me what this was about?

5       A.    I don't recall the meeting.  I mean, I

6    don't -- this is a couple years back.  I don't

7    recall the specifics of what this meeting -- what

8    we talked about.  Obviously there's the heading,

9    but I don't know -- outside of that, I couldn't

10   tell you.

11      Q.    But it wouldn't have been an in-person

12   meeting; right?  It would have been maybe a

13   conference call?

14      A.    Yeah.  This would have been a conference

15   call.  I was out in Pittsburgh at this point.  I

16   didn't go out to CardWorks in New York.

17      Q.    Have you ever been to CardWorks in New

18   York?

19      A.    Not in New York, no.

20      Q.    They have an office in Pittsburgh that

21   does collection work; right?

22      A.    Yes.

23      Q.    Have you been to that office?

24      A.    Yes.

25      Q.    When was the last time you were there?

Maxene Weinberg Agency
(800) 640-1949

```
1         A.    Earlier this week.

2         Q.    For what?  For what reason?

3         A.    To meet with Carson Smithfield which

4    was -- which is a third-party collections company

5    that used to be part of CardWorks Servicing.

6    They -- if I understand it right, they're now a

7    separate company.

8         Q.    But it was not related to this case at

9    all?

10        A.    No, no, not at all.  This was a sales

11   call.

12        Q.    Okay.  Then continuing in the email

13   stack, and I'm skipping ahead to 222.

14        A.    Give me one second to get there.

15        Q.    Sure.

16        A.    Okay.  I have it in front of me.

17        Q.    All right.  So I'm now -- if you look at

18   222 and 223, and actually you can push both --

19   discard those and move to 239.

20        A.    Okay.

21        Q.    Same email chain as immediately behind

22   it.

23        A.    Okay.

24        Q.    All right.  So if you look at -- two

25   pages in is 241 --
```

Page 25

```
 1        A.    Okay.

 2        Q.    -- in this chain.  And it begins -- it's

 3   an email from Brian to a woman named Mabel.  Have

 4   you ever spoken to someone named Mabel --

 5        A.    No.

 6        Q.    -- associated with CardWorks?  No?

 7        A.    No, I don't believe so.

 8        Q.    She says, "I had sent Mike N" -- and by

 9   the way, have you ever spoken to Mike N for

10   CardWorks?

11        A.    I don't believe so.  It doesn't sound

12   familiar.

13        Q.    I think we took his deposition.  He was

14   a third-party consultant that CardWorks used.  But

15   he says, Mabel, I had sent Mike N a letter last

16   week which contained the information that TU had

17   requested from us on the background of the ABC --

18   are you aware that ABC stood for Advanta Bank

19   Corporation?

20        A.    I am, yes.

21        Q.    -- on the background of the Advanta Bank

22   Corporation dissolution and why CWS, CardWorks

23   Servicing, needs access to ABC's bureaus/trade

24   lines and that the FDIC will not be signing any

25   additional papers with regard to the transfer.
```

1    The document issued by the FDIC should be

2    sufficient.

3         You were copied or received this forwarded

4    email; right?

5         A.    Yeah.   I don't recall it, but, I mean, I

6    see it here in this stack, and I see my name on

7    it.   So, yeah.   I mean, I don't really remember

8    getting it, but I'm sure I did.

9         Q.    In this time period or when -- when did

10   you learn -- roughly when did you learn about the

11   basic Advanta history, that is in this email,

12   Advanta Bank Corporation had been dissolved and

13   the FDIC -- or that CWS was trying to get access

14   to ABC's bureaus and trade lines?

15        A.    The first time I would have learned

16   about any of this or what happened to Advanta

17   would have been when I was first contacted by

18   CardWorks.

19        Q.    Okay.   But there was no mystery or

20   CardWorks wasn't hiding the fact that Advanta Bank

21   was gone; right?

22        A.    No.

23        Q.    So then now I'm at the front page of

24   this email.

25        A.    Okay.

```
1          Q.    After you say that you're going to send
2     it out -- by the way, who would you have sent this
3     out to?
4          A.    This letter?
5          Q.    On page 240 at the bottom, the second
6     page, you tell Maria Costa, "I will try this out.
7     I am on the phone and will be until 4:30.  As soon
8     as I'm off, I will send this over."
9          A.    I'd only be speculating, but it probably
10    would have been membership or compliance, one of
11    those two areas, because those are two sweet spots
12    for getting this kind of support.
13         Q.    Now, I'm looking in the top of this
14    email chain, at the bottom Bates numbered 239.
15    You have a substantive email response that you're
16    sending to Maria?
17         A.    Yeah.
18         Q.    Can you explain what you were
19    communicating in this email?
20         A.    Give me one second just to read through
21    it quickly, and I will answer that.  Sure.  So
22    what I was telling her is that we want to create
23    new subcode for these trade lines to report under
24    and explaining how we would transfer the accounts
25    that those -- the Advanta accounts onto the new
```

Page 28

1    subcode and show them as being properly

2    transferred on the subcode they came from, the old

3    Advanta subcode, and making sure that they, you

4    know, started reporting correctly on the new

5    subcode.  That's what this email is about, yeah.

6         Q.    And then you say, do you know Gina

7    Bennett?  She has been working with Kathy Cosier,

8    C-O-S-I-E-R, at Experian.

9         A.    Yes.  Yeah.  I know Gina, not

10   intimately.  You know, I mean, I've spoken to her

11   the phone in the past.

12        Q.    Okay.  Do you know Kathy?

13        A.    Yes.

14        Q.    Who is she?

15        A.    Kathy works -- well, I think she still

16   works for Experian.  I'm not a hundred percent

17   sure.  But she at this point was in our data

18   reporting group.

19        Q.    Okay.  Have you spoken to her about this

20   case at all?

21        A.    No.  In fact, like I said, I'm not even

22   sure she still works with us.

23        Q.    And now I'm moving into the Bates number

24   174.

25        A.    Okay.

1        Q.    By the way, when you say subcode, is

2   that short for subscriber code?

3        A.    Yes.   Sorry.   Yes.

4        Q.    And can you tell me what subscriber code

5   is?

6        A.    Yeah.   The way I would describe it, it's

7   like a footprint or a fingerprint.   Every bank or

8   anybody, any subscriber, anybody who contributes

9   data to Experian has a special subcode just for

10  them and it ties back to them.   There's also

11  subcodes for pulling credit reports.   And those

12  subcodes, like I said, they're unique to each

13  business, and they will appear on credit reports

14  so you know exactly -- it's kind of like a unique

15  identifier.   Is that clear?

16       Q.    It is.

17       A.    Okay.   I wasn't sure.

18       Q.    Now, the second page of this email, so

19  now we're at 175, it references or it comes from

20  Experian employee Zoe Zevan, Z-E-V-A-N?

21       A.    Yes.

22       Q.    Who is Zoe?

23       A.    Zoe works in our client -- our sales

24  support area.

25       Q.    Okay.   She would -- you would handle

Page 30

1    sort of the macro stuff, and then she would

2    forward correspondence or in this case subscriber

3    code details?

4         A.    That group is -- they're an internal

5    resource.  And so I would put in a request for the

6    subcode to be created, and she passes that to me.

7    And then you'll see her emails to me with that

8    information.  They don't generally -- they're not

9    generally client facing.

10        Q.    Okay.  Now, at the top of 176, do you

11   see that?

12        A.    Okay.

13        Q.    You have an email, the second from the

14   top.  It says, "Hi, Maria.  Any news from your end

15   how to move the trades and how to report them?"

16   What does that mean?

17        A.    Allow me a chance to read down the

18   string because I'll probably get some context if I

19   read down.  Give me one second, please.

20             So in reading down the string and seeing this

21   part of it, essentially I was trying to schedule a

22   call that would include Brian Bennett and some of

23   the other folks at CardWorks so we could discuss

24   when we were going to move the accounts from one

25   subcode to the next and just those kind of -- the

```
 1    minutia, the nuts and bolts that would be involved
 2    to make sure that it's as seamless as possible.
 3         Q.   Okay.  And what do you mean by moving
 4    the subcodes, or can you provide some explanation
 5    of what that meant?
 6         A.   Yeah.  I shouldn't say -- maybe I
 7    misspoke saying moving subcodes.  It's really
 8    moving the accounts from one subcode to the next.
 9         Q.   Tell me what that means and generally
10    you're referring to.
11         A.   In general terms, it would be if ABC
12    Bank acquired a portfolio of accounts from XYZ
13    Bank, they would need to essentially start
14    reporting those trades under a different subcode.
15    And so we would, like, mark the ones from XYZ, the
16    portfolio exiting, we'd mark those as maybe
17    purchased and transferred or something to indicate
18    that they were transferred.
19         And then the new subcode would show -- you
20    know, start reporting the data, picking up where
21    that one left off.  So you want to make those,
22    like, occur in the same month so you don't end up
23    having one trade line appearing twice, you know,
24    the same data appearing twice on the credit
25    report.
```

Page 32

1     Q.    Okay.  So the example I gave -- let's

2     assume Bank of America had credit cards that were

3     Bank of America credit cards that had been

4     reporting these credit cards and all of a sudden

5     Bank of America got out of the credit card

6     business and sold all those accounts to Chase

7     Bank.

8        A.    Right.

9        Q.    What would the process, the proper

10    process be to Experian following Experian's

11    procedures for handling that change?

12       A.    Right, so at a high level, because this

13    isn't something that I do, right -- this would be

14    handled by our data reps -- but at a high level,

15    as I understand it, they would -- we'd coordinate

16    with both banks, and we would schedule calls and

17    essentially coordinate the transfer, right.  We

18    would have whether it was a new subcode created to

19    handle just that portfolio, maybe to keep them

20    separated, or maybe they'd be integrated into

21    other Chase accounts, but one way or the other, we

22    would close and mark transferred all the Chase

23    trade lines.

24       And then on Bank of America these trades

25    would then become brand new trades, and they would

Page 33

1    say, like, that this was acquired or transferred

2    from, and it would kind of give some indication of

3    the history.  And this way, again, so that it kind

4    of maintains the full history, the true history of

5    the trade line.  That's how I understand it.

6        Q.  Now, I'm skipping ahead to --- at the

7    bottom it says 243, which is an email from Brian

8    Bennett to you, but it also has a letter from

9    CardWorks attached.

10       A.  Okay.  I'm getting there.  Hang on one

11   second.  Okay.

12       Q.  If you want to take a minute and read

13   the email and read the letter.

14       A.  Sure.  Give me one second, please.

15   Okay.

16       Q.  Now, does this -- you refreshed your

17   recollection at least somewhat?

18       A.  Well, so, I don't recall the letter per

19   se, but if I had received this, I probably would

20   not have read through the entire thing and

21   probably would have passed it to Kathy and allowed

22   Kathy to sort of respond to it.  Because this is

23   really like in the data reps wheelhouse, like this

24   kind of a notice.

25       Q.  Okay.  And I want to at least talk about

```
 1    some of the substance of it though.  It says, this
 2    the letter will formally -- I'm reading the
 3    letter this letter will formally document the
 4    dissolution of Advanta Bank Corp. and the
 5    assumption of all servicing duties for the ABC
 6    originated accounts by CardWorks Servicing
 7    effective August 1, 2010.
 8         That was your understanding when you were
 9    going through this September, October 2010
10    subscriber and trade line change; right?
11         A.   Yes.
12         Q.   And there was no doubt, I mean, or at
13    least you didn't have any belief that Advanta Bank
14    Corp. or Advanta at all would be involved in any
15    of the future credit reporting?
16         A.   Correct.
17         Q.   Correct?
18         A.   Correct.
19         Q.   And that -- but this letter says that
20    CardWorks, and I know this is not -- this would
21    have been data's department, but I'm looking at
22    the second paragraph.
23         A.   Um-hum.
24         Q.   The last sentence says, "We would like
25    for this new code to report on the consumers'
```

Page 35

1    trade line as Advanta Credit Cards."

2        A.    Okay.

3        Q.    And you understood that this was --

4    Experian was being asked by CardWorks to report

5    the former Advanta Bank Corp. account or trade

6    lines as Advanta Credit Cards instead of

7    CardWorks; right?

8        A.    Right.

9        Q.    Now, let me ask you -- and again, this

10   isn't your department, but I'm assuming that

11   everything that you're aware of that was done in

12   this instance was consistent with Experian's

13   normal policies and procedures.  Am I correct in

14   my assumption as far as you know?

15       A.    Yeah.  As far as I know, I would say

16   that we were -- we were doing everything we could

17   to address the client's need.  So, yes, I think we

18   were trying to follow policy and procedure.

19       Q.    The client being CardWorks?

20       A.    Right.

21       Q.    Now, I continue down the email chain.

22   Now I'm looking at 144, an email from you to

23   CardWorks.

24       A.    Yeah.

25       Q.    "Still working on my follow-up.  Today

Page 36

1     your other subcodes show as Spiegel/CWF..."  Do

2     you see that?

3          A.   Yep.

4          Q.   What does that mean?

5          A.   I assume Spiegel is a client that they

6     service for and the CWS represents CardWorks

7     Servicing.  So it's sort of a shared, like, naming

8     on the subcode.

9          Q.   And it says that's what shows up to

10    consumers and creditors.  You mean Spiegel

11    accounts that CardWorks services report to

12    consumers, credit reports and to creditor or

13    credit reports as Spiegel/CWS?

14         A.   Correct, at that time.  I mean, I don't

15    know what it is today.  But per that email, yes,

16    that's what it was.

17         Q.   And so you were asking CardWorks if they

18    wanted to also add CWS to the trade line when

19    Experian reported to them as Advanta credit cards;

20    right?

21         A.   Correct.

22         Q.   Now I'm at 179.

23         A.   Okay.

24         Q.   And I have your email that I'm looking

25    at --

1       A.    Sure.

2       Q.    -- the second paragraph, and it says, "I

3   have submitted a request to have the name changed

4   to Advanta Credit Cards."

5       A.    Right.

6       Q.    Right.  And so what you're saying is you

7   had submitted to the Experian department

8   responsible to make those decisions or those

9   changes the request from CardWorks that it report

10  this portfolio as Advanta credit cards on consumer

11  and credit -- trade line credit reports?

12      A.    Yes.

13      Q.    By the way, who would you have submitted

14  that request to?

15      A.    Sales support, not Kathy Cosier's group,

16  sort of the group that Zoe is in.

17      Q.    Okay.  And why would that request have

18  gone to sales support instead of to Kathy's

19  department?

20      A.    Because that's the area that makes

21  adjustments to the subcodes as far as that

22  particular type of request, like how a name

23  appears.

24      Q.    Who -- I mean, didn't you have to -- if

25  you're following Experian's procedures, didn't you

Page 38

1    have to receive approval to report the CardWorks

2    accounts as Advanta Credit Cards the way that you

3    would have Bank of America to Chase?

4         A.   So the sales support group actually

5    would be the ones to call us on that and say hey,

6    you can't do that.  So they kind of -- like a

7    check and balance kind of thing.

8         Q.   One second.

9         A.   No problem.

10             MR. CLARK:  Do you think now would be

11   good to take maybe a ten-minute break?

12             MR. BENNETT:  If you want to.  I mean,

13   I'm not going to -- you know, we don't have a lot.

14             MR. CLARK:  Mr. Kilka, how do you feel?

15   Would you like a brief break?

16             THE WITNESS:  I'm fine, Joe.

17             THE VIDEOGRAPHER:  It would be a good

18   time to switch tapes.  We have 14 minutes left on

19   our videotape.

20             MR. BENNETT:  Yeah.  That's fine.  I

21   probably have 30 minutes total.

22             THE VIDEOGRAPHER:  Is it okay to go off

23   the record?

24             MR. BENNETT:  Sure.  Joe, do you need a

25   break?

```
 1                    THE VIDEOGRAPHER:  The time is now --

 2                    MR. CLARK:  I'm going to go use the rest

 3     room and get some water.

 4                    MR. BENNETT:  All right.  I'll be in the

 5     room.  I'll have the phone on, but it will be

 6     muted.

 7                    THE VIDEOGRAPHER:  The time is 3:26 p.m.

 8     Eastern Standard and we are now off the record.

 9                    (There was a recess in the proceedings.)

10                    THE VIDEOGRAPHER:  The time is now

11     3:36 p.m., and this is the start of the second

12     tape in the deposition of James Kilka, and we are

13     now back on the record.

14     BY MR. BENNETT:

15        Q.   All right, James.  We were -- the

16     videographer is on the edge of his seat of

17     excitement as we plow our way through these email

18     chains.  I'm now moving up to 198.  And we can --

19        A.   Almost there.  Hang on.  Okay.  I'm

20     there.

21        Q.   All right.  On 198, and if you could

22     take a look this email chain and look at your

23     email in the middle, the October 27, 2010 at 3:06,

24     can you tell me what this exchange was about and

25     what you were communicating?
```

Page 40

1        A.    Yeah.   Give me one second.   Len, are you

2    asking me about just this one piece or the whole

3    string?

4        Q.    Well, I guess the whole string, but

5    mainly this piece.   Actually let me step back and

6    ask you this:   To this point in these emails as

7    we've gone through them, there really were several

8    different needs that CardWorks had expressed it

9    seems.   The initial emails discuss CardWorks'

10   desire to be able to pull Bulls Eyes, and they

11   were asking how do we get permission to pull Bulls

12   Eyes on Advanta's subscriber code; right?   That

13   was the initial topic; correct?

14       A.    Yes.

15       Q.    And then at a later time it seems as if

16   they were attempting to take Advanta's existing

17   subscriber code, but change how the data in the

18   Advanta subscriber code trade lines would display.

19   Am I also understanding you correctly?   And then

20   I'll follow up before you say yes or no.

21       Now, in this stage, the discussion is focused

22   on the need for entirely new subscriber codes for

23   CardWorks.   And if you can let me know if I'm off

24   track or on track.

25       A.    That is sort of the path it went down.

```
 1    I don't know if -- looking at these emails, I

 2    don't know if we're all the way there yet, but, I

 3    mean, the first one in the string is where I

 4    created them a new subcode.  And then -- hold on

 5    one second here.  Let me just read this, too.

 6         Then they started questioning me about

 7    whether there was already an existing subcode they

 8    could use and just have their name put -- laid

 9    over top o f it or that they could have it put

10    under them rather, like put under their company

11    ID, and I was telling them that's not possible.

12         Q.   Okay.  And if you want to skip to 202,

13    which is the --

14         A.   Okay.

15         Q.   -- the continuation of that chain but

16    with the later emails.  And on 202 you have your

17    email to Gina that says, "The subcode you provided

18    is still under Advanta's company ID."

19         Can you tell me -- I'm now asking you, James,

20    why is that significant?

21         A.   Because we -- essentially the company

22    ID -- well, I'll try to think of the best way to

23    answer this, Len.  The subcodes are -- they reside

24    under the company IDs, and why this was so

25    important is because we can't move a subcode from
```

Page 42

1    one company ID to another where it changes the --
2    like the owner of the subcode. If you were to do
3    that, you'd actually change the history. And so
4    that's why we didn't want to -- we couldn't move a
5    subcode like that. Does that make sense? Does
6    that answer your question?
7         Q.   It does. And then I'm now at the top of
8    202. It says, "James, we want the subscriber code
9    to remain in the Advanta company ID. CardWorks
10   does not own the accounts, they're owned by
11   Advanta trust." Do you see that?
12        A.   Yes.
13        Q.   Have you inspected or had an opportunity
14   to review the original Advanta subscriber
15   agreement?
16        A.   No.
17        Q.   But if there's an Advanta company ID,
18   that would have been assigned to the customer in
19   the -- in a specific subscriber agreement; right?
20        A.   Yeah. The company ID is more of an
21   internal number, but they might not know it. They
22   probably wouldn't know what their company ID is,
23   but essentially -- they wouldn't know what it is.
24   We don't cross --
25        Q.   Now I'm at 207.

```
 1          A.    Okay.

 2          Q.    All right.  And so 208, you've now been

 3     told for the first time, I think at least in these

 4     emails, that CardWorks does not own the accounts.

 5     They are owned by an Advanta trust.  Do you see

 6     that?

 7          A.    Yes, I do.

 8          Q.    All right.  And then you -- in the email

 9     above that, you were responding; correct?

10          A.    The email above it, yes.

11          Q.    You say, are these trade lines still

12     going to be updated by someone on an ongoing

13     basis?  Is the Advanta Trust going to be the one

14     to handle the reporting.  You asked those

15     questions; right?

16          A.    Right.

17          Q.    Why are those questions relevant or

18     important?  Why were you asking them?

19          A.    I wasn't sure if they were closed

20     accounts and it was just -- they were going to be,

21     like, handling just the disputes because they

22     asked about Bulls Eye only originally.  So I

23     think I'm trying -- obviously this is two years

24     ago, right?  So I'm telling you where I think my

25     mind was.
```

```
 1            And then as far as who is going to be
 2      reporting them, I was trying to get a sense of the
 3      full scope of the relationship so I could report
 4      it back to, you know, like the membership area and
 5      the data reporting folks.  Most of the time I have
 6      to get this information and bring it back, and
 7      then I can come back with what the next steps are.
 8            Q.   Okay.  And continuing, and now I'm back
 9      up on 207, you have an email November 1, 2010.  Do
10      you see that?
11            A.   Yeah.
12            Q.   And can you read that for me?
13            A.   Yeah.  "Gina, I'm engaged with
14      membership area trying to ensure that you guys get
15      the access to the accounts that you need to and
16      one question that came up is who is the current
17      owner of the Advanta accounts?  You mentioned a
18      'Trust'...do we have a contact at whomever that
19      truly is?  James."
20            Q.   And then they told you it was -- the
21      owner of the Advanta account is Vion Holdings II
22      LLC; correct?
23            A.   Yes.
24            Q.   And would you have provided that
25      information to the membership or the necessary
```

Page 45

1     departments at Experian?

2         A.    Yes.

3         Q.    Now I'm at 213, five or six pages deep.

4         A.    Yep.  I'm there.

5         Q.    After you were told that this is -- the

6     owner of the Advanta accounts is now Vion

7     Holdings, you said, can you have Brian sign the

8     agent agreement and have Vion Holdings sign the

9     open area for client; correct?

10        A.    Yes.

11        Q.    By the way, I've seen that document

12    again.  I don't know that it's in this stack here,

13    but -- it's not in this stack.  But can you tell

14    me what that email was about and what that

15    agreement was?

16        A.    Sure.  For CardWorks Servicing to handle

17    those disputes on behalf of Vion Holdings who

18    owned the accounts, we would have had to have made

19    CardWorks an agent of the client.  In this case,

20    Vion Holdings would be the client, and CardWorks

21    Servicing would have been considered the agent.

22        Q.    And under that relationship, who would

23    Experian have considered the source of the credit

24    reporting information?

25        A.    I'm not sure I can answer that.  I'm

Page 46

```
 1    not -- can you try asking it a different way?

 2         Q.   Well, this agreement -- ultimately there

 3    was such a signed agreement with Vion Holdings

 4    signing the contract with Experian as client and

 5    CardWorks as agent; right?

 6         A.   Yeah, one that was never countersigned

 7    by Experian.

 8         Q.   Okay.  Is there a subscriber agreement

 9    under which CardWorks is making credit reporting

10    of these accounts, the ones that had been serviced

11    by Advanta Bank Corp.?

12         A.   Not that I'm aware of.  Not that I'm

13    aware of.

14         Q.   So they're operating without any

15    subscriber agreement at all or without one signed

16    by Experian?

17         A.   I can only tell you what I know, and I'm

18    not aware of any agreement being there.

19         Q.   Well, other than this -- these exchanges

20    here and this -- well, first of all, why was it

21    never countersigned by Experian?

22         A.   We didn't approve the red lines.

23    Essentially it came back to us.  Brian returned it

24    to us with red lines from Vion Holdings' outside

25    counsel, and they were not things that we were
```

Page 47

1    prepared to agree to.  And so it led to contract

2    negotiations.

3         Q.   Okay.  In this email and the agreement

4    that had been proposed or forwarded by you for

5    Experian, Vion Holdings was to be identified or

6    was identified to Experian as the client, as the

7    owner of the accounts; right?

8         A.   Correct.

9         Q.   And CWS or CardWorks Servicing was the

10   agent of the accounts; right?

11        A.   Correct.

12        Q.   And what was CardWorks Servicing's role

13   in this three-party relationship that was to be

14   created with Experian, Vion and CardWorks?

15        A.   I can tell you what I -- how I -- what I

16   understood their role to be.

17        Q.   Okay.  I'll take that.

18        A.   So they were going to be managing any

19   payments coming in for these cards, that they

20   would be handling any disputes that came in for

21   those cards and any -- any other request from the

22   consumer, like around address changes or, you

23   know, essentially servicing the accounts on their

24   behalf, on behalf of Vion.

25        Q.   Okay.  And has -- to your knowledge, has

1     Vion Holdings ever provided or made any credit

2     reporting to Experian for these accounts, Vion

3     itself?

4          A.   I wouldn't know the answer to that.

5     Vion is not --

6          Q.   Under the terms of this agreement, what

7     I'm calling the three-party agreement, the agent,

8     client and Experian agreement, Vion Holdings was

9     not going to be the entity that was making the

10    credit reporting to Experian though, right, under

11    that agreement?

12         A.   Again, this is my opinion -- how I

13    understood it.  I would have assumed that data

14    reporting would have come from CardWorks.

15         Q.   Now, left out of this discussion is

16    Advanta.  Are you aware of any contract with

17    Experian, either countersigned or not

18    countersigned, that remains in effect with Advanta

19    Bank or any credit reporting source named Advanta?

20         A.   Advanta wasn't an account that I

21    supported, so I wouldn't have access to any of

22    their account information or contracts.  So I

23    can't -- I couldn't answer that for you.

24         Q.   Okay.  All right.  I'm skipping now to

25    256.

```
 1          A.    Okay.

 2                MR. KATZ:   I'm sorry, Len.

 3     BY MR. BENNETT:

 4          Q.    It says, James, here is the signed

 5     letter from both Vion and CWS.

 6                MR. KATZ:   Len, I'm sorry.  I got to get

 7     it.  Mr. Kilka was ahead of me.   256?

 8                MR. BENNETT:   Yes.

 9                MR. KATZ:   Sorry about that.  Go ahead,

10     Len.

11     BY MR. BENNETT:

12          Q.    It's not attached in this exhibit we

13     sent you, but when it says signed a letter, that

14     would actually be subscriber agreement, the

15     client, agent subscriber agreement that Vion had

16     marked up; right?

17          A.    Len, I couldn't be sure based on

18     description of the attachment.

19          Q.    That's fair.  Take a look at 249.

20          A.    Okay.

21          Q.    And continuing the email, now this email

22     chain on the next page, 250, has the conveyance

23     email where James, here is the signed letter.

24     Above it you say, I submitted the form.  Thanks

25     for the help.  And then on 249, in the middle is
```

Page 50

1    your email to Brian.  "Brian, I sent the agreement

2    that you sent back to me to our membership area

3    without looking at it.  I did not realize that

4    Vion crossed out information and changed text.  We

5    cannot accept the changes without our contracts

6    area vetting the requested changes."

7         Do you see that?

8         A.    Yes, I do.

9         Q.    All right.  And this is what you just

10   were referring to in terms of why there is not an

11   official countersigned document; right?

12        A.    Exactly.

13        Q.    And then 252.

14        A.    Okay.

15        Q.    Again, this is regarding the feedback,

16   the middle part of that page, the email from you

17   at 11:09 a.m., this is the feedback you received

18   from your contracts department; right?

19        A.    I'm reading it right now.  Yeah, it is.

20        Q.    Now, I'm trying to -- I admit your

21   challenge of not having the document in front of

22   you, the full document in front of you, but I want

23   to the start with paragraph one.  The question you

24   asked was, Will clients affiliate be the party

25   solely providing these services?  And then you say

Page 51

1    something similar in that same email bracketed in

2    italics, "In the first question, is CardWorks is

3    the only affiliate that will work this portfolio

4    or will there be other businesses?"

5         Do you see that?  Do you know what you would

6    have meant by that?

7         A.   Give me one second, Len, to look at it.

8    Then I'll respond.

9         I couldn't say definitively what I was

10   driving at there.  I may have been asking if there

11   was going to be other situations like this where

12   there would be other businesses like CardWorks

13   participating in other portfolios.  But I'm kind

14   of saying this portfolio.  So, no, I couldn't say

15   definitely without having the agreement or --

16   and/or the attorney that I worked with, you know.

17   Essentially I was regurgitating what the attorney

18   had given me as feedback, so...

19        Q.   Okay.  Who was that attorney?

20        A.   Michael Cordova from our contracts

21   group.

22        Q.   That's it for your emails.

23        A.   Okay.

24        Q.   You've broken the case wide open after

25   that exchange.  Sarcasm.  Now I'm going to take a

```
 1      look at the other six emails.  If you take a look
 2      at what's Exhibit 3.
 3          A.    Okay.
 4          Q.    These are excerpts of my client's
 5      Experian credit disclosures that show Advanta, and
 6      I picked three because it shows two Advanta trade
 7      lines.
 8          A.    Are you looking at page 4 of 24 when you
 9      or is there --
10          Q.    I'm looking at 3, 3 of 24.
11          A.    Okay.
12          Q.    By the way, I know this is not your
13      department.
14          A.    Right.
15          Q.    But you're able to read an Experian
16      credit disclosure; right?
17          A.    Yeah.  It looks a lot different than the
18      reports I'm used to looking at because I'm used to
19      the client facing ones, but I should be able to
20      make my way through this.
21          Q.    Now, in this instance, I will tell you,
22      no one will argue that these are different
23      accounts, but there's two trade lines showing, and
24      both of them showing the same recent balance, date
25      opened and, you know, status dates off by a month.
```

Page 53

```
 1    But the top says Advanta Bank.  It has a

 2    Springhouse, Pennsylvania address.  And the bottom

 3    says Advanta Credit Cards and has CardWorks,

 4    Bethpage, New York, PO Box.

 5         Do you have any idea why there would be two

 6    trade lines reported?

 7         A.   I'm looking.  I'm not ignoring you.

 8         Q.   No, no.  I understand.  While you're

 9    looking, the next question I'm going to ask you is

10    and then you can answer it first is:  Are you

11    familiar with the address that is listed under the

12    Advanta Bank?  Do you know whose PO Box that had

13    been?

14         A.   I don't recognize that address for the

15    Advanta Bank, and I really couldn't say looking at

16    this why that's appearing twice.  It seems like

17    it's almost the same trade with very slight

18    variation, but I can't -- I couldn't say.

19         Q.   Okay.  I don't have any other questions

20    for you, James.  I appreciate your courtesy.

21    Sorry about you having to wait on me.

22         A.   No problem.  Thanks.

23              MR. KATZ:  Give me one second.  Sorry

24    guys.

25              MR. CLARK:  Ethan, are you still on the
```

Page 54

```
 1    line?

 2              MR. OSTROFF:  I am.

 3              MR. CLARK:  Ethan, do you have any

 4    questions for Mr. Kilka?

 5              MR. OSTROFF:  Not today, no.

 6                        EXAMINATION

 7    BY MR. KATZ:

 8         Q.   I just have one.  In your four years as

 9    an account executive, how many times have you,

10    prior to this, had you dealt with accounts --

11    transferring accounts following an FDIC takeover

12    of a bank?

13         A.   Never.

14              MR. KATZ:  That's it for me, too.

15              MR. BENNETT:  I have one other

16    follow-up.  Another hour.

17                      RE-EXAMINATION

18    BY MR. BENNETT:

19         Q.   In responding to that question from Ben,

20    roughly, if you know, how many times have you

21    worked with one of Experian's customers when a

22    credit card portfolio was sold from one entity to

23    an entirely different entity?

24         A.   I couldn't give you a firm number.  But

25    I would say it may happen a couple times a year
```

Page 55

1    tops.

2           MR. BENNETT:   All right.   I don't have

3    any other questions.

4           MR. KATZ:   Thanks, all.

5           THE VIDEOGRAPHER:   The time is now

6    4:01 p.m., and this concludes the deposition of

7    James Kilka, and we are now off the record.

8           MR. BENNETT:   It's standard buy

9    everything.   So we don't need anything expedited.

10   I'm not sure if Joe is going to suggest or Ben

11   going to suggest is that their client read and

12   review.   We have a stipulation that was in place

13   with CardWorks, I hope that Experian would honor

14   as well, if the witness wants to read and review,

15   then that time period starts when the court

16   reporter delivers a copy of the transcript to

17   Experian's lawyer so you don't have to track down

18   James yourself.   And Experian I'm assuming is

19   buying a copy, is that right?   We'll buy the

20   original.

21          MR. CLARK:   We'll buy a copy, and our

22   client will read and review.

23          MR. BENNETT:   We'll buy an original, a

24   mini and a PDF and then, of course, the video as

25   well.   We'd like them synced.   We're going to play

```
 1    this as the core part of the jury trial, and

 2    everybody starts to cry.

 3              MR. CLARK:  We will order a copy of the

 4    video as well.  We'd like to have it synced, and I

 5    don't think we'll need a mini.

 6        Ben, do you think we should get an original

 7    and mini.

 8              MR. KATZ:  I'm fine with just an

 9    original.

10              MR. CLARK:  That's what we'll do.

11              MR. OSTROFF:  Ethan Ostroff, can I just

12    get a copy, one copy condensed version.

13              (Whereupon, at 4:03 p.m., the taking of

14    the instant deposition ceased.)

15

16

17

18

19

20

21

22

23

24

25
```

Page 57

1    COMMONWEALTH OF PENNSYLVANIA  )       CERTIFICATE

2    COUNTY OF ALLEGHENY           )       SS:

3        I, Ann Medis, RPR, a Court Reporter and

4    Notary Public in and for the Commonwealth of

5    Pennsylvania, hereby certify the witness, JAMES

6    KILKA, was by me first duly sworn to testify to

7    the truth; the foregoing deposition was taken at

8    the time and place stated herein; and the said

9    deposition was recorded stenographically by me and

10   then reduced to printing under my direction, and

11   constitutes a true record of the testimony given

12   by said witness.

13       I certify the inspection, reading and signing

14   of said deposition were NOT waived by counsel for

15   the respective parties and by the witness.

16       I certify I am not a relative or employee of

17   any of the parties, or a relative or employee of

18   either counsel, and I am in no way interested

19   directly or indirectly in this action.

20       IN WITNESS WHEREOF, I have hereunto set my

21   hand and affixed my seal of office this 6th day of

22   September, 2012.

23

24

25   _____
                 Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Ann Medis, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Jan. 7, 2013
Member, Pennsylvania Association of Notaries

Page 59

1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A

2   COUNTY OF ALLEGHENY            )   S H E E T

3

4   I, JAMES KILKA, have read the foregoing pages of

5   my deposition given on August 24, 2012, and wish

6   to make the following, if any, amendments,

7   additions, deletions or corrections:

8

9   Page   Line      Change and reason for change:

10   49     5      "Vion is not" should read "Vionn is
                    not my Client" Reason: Either I was
11   ___   ___     cut off or the reporter misheard my
                   answer."
12   ___   ___     _____

13   ___   ___     _____

14   ___   ___     _____

15   ___   ___     _____

16        In all other respects, the transcript is

17   true and correct.

18

19                  _____

20                  JAMES KILKA

21

22   3rd day of October          , 2012.

23                                COMMONWEALTH OF PENNSYLVANIA
                                  Notarial Seal
24                                Megan A. Leese, Notary Public
                                  Cranberry Twp., Butler County
                                  My Commission Expires June 25, 2013
25            Notary Public       MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**A**

ABC 26:17,18 32:11
35:5
ABC's 26:23 27:14
able 7:2 14:18 41:10
53:15,19
accept 51:5
access 22:23 26:23
27:13 45:15 49:21
account 7:14 36:5
45:21 49:20,22 55:9
accounts 8:7 13:5
19:14,15 23:20 28:24
28:25 31:24 32:8,12
33:6,21 35:6 37:11
39:2 43:10 44:4,20
45:15,17 46:6,18
47:10 48:7,10,23 49:2
53:23 55:10,11
ACDs 16:5,6
acquired 32:12 34:1
act 18:16 23:17,19
action 58:19
actual 6:20 16:7,12
add 37:18
addendum 23:10,15
addition 22:21
additional 9:9 26:25
additions 59:7
address 36:17 48:22
54:2,11,14
adjustments 38:21
admit 51:20
Advanta 18:3 19:2,3,3
19:24 21:3,6 22:25
26:18,21 27:11,12,16
27:20 28:25 29:3
35:4,13,14 36:1,5,6
37:19 38:4,19 39:2
41:18 43:9,11,14,17
44:5,13 45:17,21 46:6
47:11 49:16,18,19,20
53:5,6 54:1,3,12,15
Advanta's 41:12,16
42:18
affiliate 51:24 52:3
affixed 58:21
afternoon 5:5
agency 5:3,18 18:16,18
agent 46:8,19,21 47:5
48:10 49:7 50:15
ago 7:16 9:25 44:24
agree 48:1
agreement 20:4 23:5
43:15,19 46:8,15 47:2
47:3,8,15,18 48:3
49:6,7,8,11 50:14,15

agreements 22:23 23:7
ahead 17:9 25:13 34:6
50:7,9
al 5:11
ALLEGHENY 58:2
59:2
alleging 18:15,20
allow 16:24 18:22
22:22 31:17
allowed 21:23 34:21
amendments 59:6
America 21:12,13,15
21:16,17 22:2 33:2,3
33:5,24 39:3
America's 21:21
amounts 11:25
analytics 9:6
and/or 52:16
Ann 1:25 2:18 5:17
58:3
answer 22:9 28:21
42:23 43:6 46:25
49:4,23 54:10
ANTHONY 3:3
anybody 20:15 30:8,8
apologize 13:23
appear 21:8 30:13
APPEARANCES 3:1
appearing 5:25 6:2,5
32:23,24 54:16
appears 38:23
application 39:3,14,15
appreciate 54:20
approval 39:1
approve 47:22
area 18:4 22:11 30:24
38:20 45:4,14 46:9
51:2,6
areas 22:10,12 28:11
argue 53:22
aside 18:9
asked 36:4 44:14,22
51:24
asking 20:5 37:17 41:2
41:11 42:19 44:18
47:1 52:10
asks 17:4 18:17
assigned 43:18
associate 7:19 10:1,6
associated 26:6
ASSOCIATES 3:2
assume 21:15 33:2 37:5
assumed 49:13
assuming 36:10 56:18
assumption 35:5 36:14
attached 22:24 34:9
50:12

attachment 50:18
attempting 41:16
attorney 52:16,17,19
attorneys 5:15
August 1:18 2:22 5:4
35:7 59:5
Avenue 3:13,18
aware 16:9 26:18 36:11
47:12,13,18 49:16
a.m 17:21 51:17

**B**

back 12:20 22:14 24:6
30:10 40:13 41:5
45:4,6,7,8 47:23 51:2
background 5:23 26:17
26:21
balance 39:7 53:24
bank 2:21 19:3,25
21:11,13,15,16,17,18
21:21,23 22:2 26:18
26:21 27:12,20 30:7
32:12,13 33:2,3,5,7
33:24 35:4,13 36:5
39:3 47:11 49:19
54:1,12,15 55:12
banks 8:15 10:4 33:16
based 50:17
basic 10:2 27:11
basis 44:13
Bates 11:19 12:5 28:14
29:23
Beach 3:19
begins 26:2
behalf 1:7 2:7 6:3 18:6
23:17,19 46:17 48:24
48:24
belief 35:13
believe 12:11 26:7,11
Ben 3:12 5:25 12:9
55:19 56:10 57:6
Bennett 3:3 4:3,5 5:20
5:21 6:10 29:7 31:22
34:8 39:12,20,24 40:4
40:14 50:3,8,11 55:15
55:18 56:2,8,23
best 18:14 42:22
Bethpage 54:4
big 10:18,19,20,22
binder 10:20,23
bkatz@jonesday.com
3:14
bolts 32:1
book 8:7,7,11,12
bottom 11:10,16 12:4
14:2 17:10 23:23
28:5,14 34:7 54:2
Boulevard 3:3

Box 54:4,12
bracketed 52:1
brand 33:25
break 39:11,15,25
46:7 47:23 51:1,1
brief 23:14 39:15
bring 45:6
broken 52:24
brought 21:13
Bulls 14:18 16:19,22,23
41:10,11 44:22
bureaus 16:8 17:5
27:14
bureaus/trade 26:23
business 8:7,8,9,11,11
8:13,21 13:3,15 14:10
20:17 30:13 33:6
businesses 52:4,12
buy 56:8,19,21,23
buying 56:19

**C**

CAHOON 3:7
call 7:10 9:5 11:15,16
15:1 24:13,15 25:11
31:22 39:5
called 2:17 7:17 9:15
15:19
calling 49:7
calls 33:16
caption 5:9
card 19:3 21:18,23 33:5
55:22
cards 21:17,22 33:2,3,4
36:1,6 37:19 38:4,10
39:2 48:19,21 54:3
CardWorks 1:12,12
2:12,12 3:21,22 6:4,4
12:17,23 13:2,13 14:3
14:14 18:2,7,25 19:1
19:11,12,13,15,19,19
19:22,24 20:3,23,23
20:24 21:3,5,8 22:25
23:17,18 24:16,17
25:5 26:6,10,14,22
27:18,20 31:23 34:9
35:6,20 36:4,7,19,23
37:6,11,17 38:9 39:1
41:8,9,23 43:9 44:4
46:16,19,20 47:5,9
48:9,12,14 49:14 52:2
52:12 54:3 56:13
Carson 25:3
case 5:9 11:7 12:1,8
13:6 15:23 18:25
20:14 25:8 29:20
31:2 46:19 52:24

CDV 15:19
ceased 57:14
center 2:21 16:8
Central 3:18
certain 11:5
Certainly 21:17
CERTIFICATE 58:1
certify 58:5,13,16
chain 14:22 17:10,18
22:19 25:21 26:2
28:14 36:21 40:22
42:15 50:22
chains 40:18
challenge 51:21
chance 31:17
change 7:7 33:11 35:10
41:17 43:3 59:9,9
changed 38:3 51:4
changes 38:9 43:1
48:22 51:5,6
Chase 21:18,23 33:6,21
33:22 39:3
check 39:7
chronological 13:8
Civil 1:7 2:7
Clark 3:12 6:1,1 16:10
39:10,14 40:2 54:25
55:3 56:21 57:3,10
class 1:7 2:7
clear 30:15
client 11:24,24 20:6
21:15 22:21 30:23
31:9 36:19 37:5 46:9
46:19,20 47:4 48:6
49:8 50:15 53:19
56:11,22
clients 13:4 23:20
51:24
client's 36:17 53:4
clip 10:21,23
close 33:22
closed 44:19
Clyde 3:3
code 14:19 19:20,25
30:2,4 31:3 35:25
41:12,17,18 43:8
codes 19:12,20,24
41:22
colleagues 13:15
collection 24:21
collections 25:4
come 14:9 15:17 16:11
45:7 49:14
comes 30:19
coming 48:19
commencing 2:23
Commonwealth 2:19
58:1,4 59:1

21:20 22:22 29:8,16
30:9,20 33:10 36:4
37:19 38:7 46:1,23
47:4,7,16,21 48:5,6
48:14 49:2,8,10,17
53:5,15 56:13,18
**Experian's** 18:21 20:17
21:15 33:10 36:12
38:25 55:21 56:17
**expertise** 22:12
**experts** 15:6
**explain** 8:4 28:18
**explaining** 28:24
**explanation** 32:4
**expressed** 41:8
**Eye** 16:19,22,23 44:22
**Eyes** 16:14 41:10,12
15:18 16:1,15

**F**

**f** 42:9
**facing** 31:9 53:19
**fact** 27:20 29:21
**fair** 18:15 50:19
**Fairfax** 3:9 5:22
**familiar** 12:22 26:12
54:11
**fanning** 11:8
**far** 36:14,15 38:21 45:1
**FDIC** 26:24 27:1,13
55:11
**feature** 12:16
**feedback** 51:15,17
52:18
**feel** 39:14
**final** 12:21
**finance** 8:16
**find** 22:8
**fine** 39:16,20 57:8
**fingerprint** 30:7
**finished** 20:10
**firm** 55:24
**firms** 11:11
**first** 6:7 13:1,6,20
19:11 21:6 27:15,17
42:3 44:3 47:20 52:2
54:10 58:6
**five** 46:3
**Floor** 2:21
**focus** 9:14 10:1,2,8
**focused** 41:21
**focusing** 8:14
**folks** 31:23 45:5
**follow** 36:18 41:20
**following** 14:19 33:10
38:25 55:11 59:6
**follows** 6:8

**follow-up** 36:25 55:16
**footnote** 15:22
**footprint** 30:7
**foregoing** 58:7 59:4
**form** 50:24
**formally** 35:2,3
**former** 36:5
**forms** 8:24 15:19
**fortunately** 16:11
**forward** 31:2
**forwarded** 27:3 48:4
**for-profit** 16:1
**four** 7:4,16 9:24 55:8
**Friday** 1:18 2:22
**front** 10:15 22:16 25:16
27:23 51:21,22
**full** 6:11 34:4 45:3
51:22
**function** 23:21
**functions** 17:25 18:2
**furnishers** 16:6,6
**future** 35:15

**G**

**G** 3:18
**gathered** 12:12
**general** 16:17 21:4,5
32:11
**generally** 8:4,17 12:22
31:8,9 32:9
**getting** 18:3 20:20 27:8
28:12 34:10
**Gina** 29:6,9 42:17
45:13
**give** 14:11 23:16 25:14
28:20 31:19 34:2,14
41:1 52:7 54:23
55:24
**given** 52:18 58:11 59:5
**go** 12:20 15:13,15,20
19:9 20:11 22:14
24:16 39:22 40:2
50:9
**going** 7:20,21,21 10:14
13:21,22 17:23 19:10
20:7,11,12 28:1 31:24
35:9 39:13 40:2
44:12,13,20 45:1
48:18 49:9 52:11,25
54:9 56:10,11,25
**good** 9:11,13 11:2 22:6
39:11,17
**grand** 22:6
**Grant** 5:7
**great** 21:14
**group** 7:15 16:18 29:18
31:4 38:15,16 39:4
52:21

**grow** 10:12
**guess** 7:8 17:4 23:18
41:4
**guessing** 10:23
**guys** 18:4 45:14 54:24

**H**

**H** 59:2
**hand** 58:21
**handle** 30:25 33:19
44:14 46:16
**handled** 33:14
**handling** 33:11 44:21
48:20
**Hang** 34:10 40:19
**happen** 55:25
**happened** 27:16
**happy** 10:13
**heading** 24:8
**heavily** 12:16
**held** 5:6
**help** 15:4,16,21 18:3
22:13 50:25
**hereunto** 58:20
**hey** 39:5
**Hi** 31:14
**hiding** 27:20
**high** 33:12,14
**history** 27:11 34:3,4,4
43:3
**hold** 42:4
**Holdings** 45:21 46:7,8
46:17,20 47:3,24 48:5
49:1,8
**home** 6:20,21,22
**honor** 56:13
**hope** 56:13
**hour** 55:16
**Hughes** 20:11
**hundred** 29:16
**hypothetical** 21:11

**I**

**ID** 42:11,18,22 43:1,9
43:17,20,22
**idea** 54:5
**identified** 48:5,6
**identifier** 30:15
**identify** 5:15
**identity** 18:23
**IDs** 42:24
**ignoring** 54:7
**II** 45:21
**immediately** 25:21
**important** 42:25 44:18
**include** 31:22
**Incorporated** 5:11
**INDEX** 4:7

**indicate** 32:17
**indication** 34:2
**indirectly** 58:19
**Individually** 1:6 2:6
**individuals** 12:17
**information** 1:11 2:11
3:16 5:10,24 6:15
7:15 26:16 31:8 45:6
45:25 46:24 49:22
51:4
**initial** 41:9,13
**Innovis** 15:24
**inspected** 43:13
**inspection** 58:13
**instance** 18:20 36:12
53:21
**instant** 57:14
**integrated** 33:20
**integrity** 13:24
**intending** 20:16
**interested** 58:18
**internal** 31:4 43:21
**interrupt** 12:10
**intimately** 29:10
**invites** 24:1
**involved** 32:1 35:14
**in-house** 15:6
**in-person** 24:11
**ISAACS** 3:7
**issued** 27:1
**issues** 15:14
**italics** 52:2

**J**

**J** 3:3
**JAG** 1:8 2:8
**James** 1:17 2:16 4:2,19
4:24 5:14 6:6,13 20:9
40:12,15 42:19 43:8
45:19 50:4,23 54:20
56:7,18 58:5 59:4,20
**Jersey** 7:6 9:25
**job** 7:12,16 8:5,7 10:2
11:3
**Joe** 12:9 16:10 20:21
39:16,24 56:10
**Jones** 2:20 3:11 5:6
**Joseph** 3:12 6:1
**jury** 57:1
**jwclark@jonesday.c...**
3:15

**K**

**Kathy** 29:7,12,15 34:21
34:22 38:15
**Kathy's** 38:18
**Katz** 3:12 4:4 5:24,25
50:2,6,9 54:23 55:7

**55:14 56:4 57:8
**keep** 20:12 33:19
**Kelly** 3:7 5:23
**Kilka** 1:17 2:16 4:2,7
4:19,22,24 5:1,14 6:6
6:13 39:14 40:12
50:7 55:4 56:7 58:6
59:4,20
**kind** 9:8 15:21 22:11
28:12 30:14 31:25
34:2,3,24 39:6,7
52:13
**kkelly@siplfirm.com**
3:10
**knew** 16:2
**know** 8:9 10:12,13,17
15:11,20,23 16:2,3,3
16:19 17:6,8 18:13
20:10,10,11 21:24
22:3 24:9 29:4,6,9,10
29:12 30:14 32:20,23
35:20 36:14,15 37:15
39:13 41:23 42:1,2
43:21,22,23 45:4
46:12 47:17 48:23
49:4 52:5,16 53:12,25
54:12 55:20
**knowledge** 11:20 21:20
48:25
**Kristi** 3:7 5:22

**L**

**label** 11:13
**laid** 42:8
**late** 20:18,18
**law** 11:10
**lawsuit** 19:7
**lawyer** 56:17
**lawyers** 11:10 16:12
**learn** 20:17 27:10,10
**learned** 27:15
**led** 48:1
**left** 32:21 39:18 49:15
**Len** 41:1 42:23 50:2,6
50:10,17 52:7
**lenbennett@cox.net**
3:5
**Leonard** 3:3 5:21
**letter** 26:15 28:4 34:8
34:13,18 35:2,3,3,19
50:5,13,23
**let's** 33:1
**level** 33:12,14
**LEVY** 3:7
**light** 10:9
**line** 9:9 16:25 17:1
18:20,24 22:4 32:23
34:5 35:10 36:1

proposed 48:4
provide 18:6 32:4
provided 11:7 19:19
    42:17 45:24 49:1
providing 51:25
Public 2:19 58:4,25
    59:25
pull 14:18 41:10,11
pulling 30:11
purchased 32:17
purpose 23:12
push 25:18
pushed 22:5
put 31:5 42:8,9,10
p.m 1:20,20 2:23 40:7
    40:11 56:6 57:13

_____ Q _____

question 22:1 43:6
    45:16 51:23 52:2
    54:9 55:19
questioning 42:6
questions 44:15,17
    54:19 55:4 56:3
quickly 7:22 28:21

_____ R _____

R 59:1,1
read 9:21 22:20 28:20
    31:17,19 34:12,13,20
    42:5 45:12 53:15
    56:11,14,22 59:4
reading 31:20 35:2
    51:19 58:13
realize 51:3
really 11:4 20:6 27:7
    32:7 34:23 41:7
    54:15
reason 22:6,6 25:2 59:9
recall 14:12 16:15 23:7
    24:5,7 27:5 34:18
receive 22:1 39:1
received 14:21 27:3
    34:19 51:17
recess 40:9
recognize 54:14
recollection 34:17
record 6:12 12:10
    39:23 40:8,13 56:7
    58:11
recorded 58:9
red 47:22,24
reduced 58:10
refer 12:3,5
referenced 11:14
references 30:19
REFERRED 4:22
referring 32:10 51:10

reflective 22:4
refreshed 34:16
regard 26:25
regarding 51:15
Registered 2:18
regurgitating 52:17
related 10:5 12:23 25:8
relationship 45:3 46:22
    48:13
relationships 10:11
relative 58:16,17
relevant 44:17
relocation 7:11
remain 43:9
remains 49:18
remarkable 20:8
remember 27:7
report 8:22 9:17,21
    10:10 18:18 20:25
    28:23 31:15 32:25
    35:25 36:4 37:11
    38:9 39:1 45:3
reported 21:22 37:19
    54:6
reporter 1:24 2:19 5:17
    6:12 56:16 58:3
reporting 10:5 18:5,16
    18:16,18 19:2,4,13,22
    20:25 29:4,18 32:14
    32:20 33:4 35:15
    44:14 45:2,5 46:24
    47:9 49:2,10,14,19
reports 8:23 14:18
    30:11,13 37:12,13
    38:11 53:18
represent 5:16
representative 7:18
represents 37:6
reps 33:14 34:23
request 15:3 22:1 31:5
    38:3,9,14,17,22 48:21
requested 26:17 51:6
requests 12:12
requires 18:16,18
reside 42:23
resource 31:5
respective 58:15
respects 59:16
respond 18:1 34:22
    52:8
responding 44:9 55:19
response 12:12 14:25
    17:24 22:19 28:15
responsible 8:19 38:8
rest 40:2
Results 4:13,15,18
returned 47:23
review 12:25 43:14

56:12,14,22
RE-EXAMINATION
    4:5 55:17
Richmond 1:3 2:3 5:13
ridiculous 11:25
right 7:20,24 9:4,17
    10:5,22 11:2,2,7,9,10
    11:16 12:5,7 13:19,22
    14:17,23 15:4,8 17:6
    17:8,21 18:5,7 19:12
    21:10 22:9,14,18
    24:12,21 25:6,17,24
    27:4,21 33:8,12,13,17
    35:10 36:7,8,20 37:20
    38:5,6 40:4,15,21
    41:12 43:19 44:2,8,15
    44:16,24 47:5 48:7,10
    49:10,24 50:16 51:9
    51:11,18,19 53:14,16
    56:2,19
role 10:7,7,10 48:12,16
roll 13:22
room 40:3,5
roughly 13:8 27:10
    55:20
RPR 58:3
runs 16:1

_____ S _____

S 59:2
sales 7:17,19 10:1,6
    13:17 25:10 30:23
    38:15,18 39:4
Sanders 3:17 6:5
Sarcasm 52:25
saying 18:25 19:13
    32:7 38:6 52:14
says 11:16 14:25 15:3
    17:3,21,24 26:8,15
    31:14 34:7 35:1,19,24
    37:9 38:2 42:17 43:8
    50:4,13 54:1,3
schedule 31:21 33:16
scheduled 20:20
scope 45:3
scoring-related 9:4
se 34:19
seal 58:21
seamless 32:2
seat 40:16
second 17:20 25:14
    28:5,20 30:18 31:13
    31:19 34:11,14 35:22
    38:2 39:8 40:11 41:1
    42:5 52:7 54:23
secure 10:9
see 11:19 12:17 14:19
    15:1 16:24 18:9 27:6

27:6 31:7,11 37:2
    43:11 44:5 45:10
    51:7 52:5
seeing 31:20
seen 46:11
segments 8:18
sell 8:9 9:3,22 14:14
selling 8:19 10:4 16:5
sells 8:23 9:2,19
send 16:6 28:1,8
sending 15:3 28:16
sense 43:5 45:2
sent 26:8,15 28:2 50:13
    51:1,2
sentence 35:24
separate 25:7
separated 10:18 33:20
September 13:9 35:9
    58:22
service 13:5 17:5,6
    23:20 37:6
serviced 47:10
services 7:15 13:12
    18:6 37:11 51:25
servicing 1:12 2:12
    3:22 6:4 13:2,4 14:4
    25:5 26:23 35:5,6
    37:7 46:16,21 48:9,23
Servicing's 48:12
set 13:23 15:16 18:4
    58:20
seven 6:25 7:1
shared 37:7
short 30:2
shorten 18:9
show 19:10 29:1 32:19
    37:1 53:5
showing 53:23,24
shows 37:9 53:6
side 11:13
sign 46:7,8
signed 22:24 47:3,15
    50:4,13,23
significant 42:20
signing 26:24 47:4
    58:13
Simak 3:24 5:3
similar 52:1
similarly 1:7 2:7
Sir 6:11
sitting 20:19
situated 1:7 2:7
situations 52:11
six 46:3 53:1
skip 42:12
skipping 17:9 25:13
    34:6 49:24
slight 54:17

Smithfield 25:3
sold 9:16 13:12,14,15
    33:6 55:22
solely 51:25
solutions 1:11 2:11
    3:16 5:10,25 6:15 9:6
    9:18 13:15
somebody 15:15 23:16
somewhat 34:17
soon 28:7
sorry 14:25 17:25
    23:24 30:3 50:2,6,9
    54:21,23
sort 15:14 22:23 31:1
    34:22 37:7 38:16
    41:25
sorted 11:15
sound 26:11
source 18:19 19:1,3
    46:23 49:19
speak 21:6
speaking 21:2
special 30:9
specific 43:19
specifically 16:15 21:2
specifics 14:11 24:7
speculating 28:9
spend 10:12
Spiegel 37:5,10
Spiegel/CWF 37:1
Spiegel/CWS 37:13
spoke 16:15
spoken 14:6 26:4,9
    29:10,19
spots 28:11
Springhouse 54:2
SS 58:2
stack 10:16,18,19,20,22
    11:6 23:23 25:13
    27:6 46:12,13
stage 41:21
standard 5:5 40:8 56:8
stapled 10:20
start 10:24 32:13,20
    40:11 51:23
started 29:4 42:6
starting 13:20
starts 13:9 56:15 57:2
state 6:11
stated 58:8
statement 21:22
States 1:1 2:1 5:11
statistical 9:3
status 53:25
stenographically 58:9
step 18:9 41:5
steps 45:7
Steve 3:24 5:2

**1-4** 4:15
**1-8** 5:1
**10** 4:24
**11:09** 51:17
**14** 39:18
**143** 12:5 14:1
**144** 36:22
**151** 23:25
**15219** 2:22 5:8
**163** 17:10,11,12 22:15
**164** 17:21
**169** 23:23
**170** 23:24
**174** 29:24
**175** 30:19
**176** 31:10
**179** 37:22
**189** 23:23
**198** 40:18,21

— **2** —
**2** 4:10
**2:39** 1:20 2:23
**2:39:06** 5:4
**200** 3:8
**2000** 3:19
**20001** 3:13
**2010** 13:9 35:7,9 40:23
   45:9
**2012** 1:18 2:22 5:4
   58:22 59:5,22
**202** 42:12,16 43:8
**202.879.3939** 3:14
**207** 43:25 45:9
**208** 44:2
**213** 46:3
**22030** 3:9
**222** 3:18 25:13,18
**223** 25:18
**23462** 3:19
**23601** 3:4
**239** 25:19 28:14
**24** 1:18 2:22 5:4 53:8
   53:10 59:5
**240** 28:5
**241** 25:25
**243** 34:7
**249** 50:19,25
**250** 50:22
**252** 51:13
**256** 49:25 50:7
**257** 4:20
**27** 40:23

— **3** —
**3** 4:9,10,12,16,23 53:2
   53:10,10
**3:06** 40:23

**3:11cv00624** 1:8 2:8
**3:26** 40:7
**3:36** 40:11
**30** 39:21
**31st** 2:21

— **4** —
**4** 4:13 53:8
**4-5** 4:12,23
**4:01** 56:6
**4:03** 1:20 57:13
**4:30** 28:7
**4010** 3:8
**4500** 5:7

— **5** —
**5** 4:9,10,12,13,15,15,16
   4:18,19
**500** 5:7
**51** 3:13
**53** 4:23
**55** 4:4,5

— **6** —
**6** 4:3,16
**6th** 58:21
**62** 4:12

— **7** —
**7** 4:18
**703.277.9774** 3:9
**757.687.7765** 3:20
**757.930.3660** 3:5
**763** 3:3

— **8** —
**8** 4:19,24 10:25 11:5,5
   22:15
**8:29** 17:21

— **9** —
**96** 4:15

Maxene Weinberg Agency
(800) 640-1949