*Exhibit "U"*

Michael Dreher, et al.

v.

Experian Information Solutions, Inc., et al.

In the United States District Court
Eastern District of Virginia
Richmond Division

Case No. 3:11-cv-624

---

Expert Report and Declaration of

Elizabeth De Armond

November 29, 2012

---

## I.   Introduction and Qualifications

I, Elizabeth De Armond, hereby declare as follows:

1.      My name is Elizabeth De Armond.  I am over 21 years of age, of sound mind, capable of executing this declaration, and have personal knowledge of the facts stated herein, and they are all true and correct.

2.      I have been engaged by Consumer Litigation Associates, P.C., which represents Michael Dreher and other plaintiffs in the case of *Dreher v. Experian Information Solutions, Inc.*, pending in the United States District Court for the Northern District of Virginia, Richmond Division, as case number 3:11-cv-624.

3.      I have the title of Professor, Legal Research and Writing, at Chicago-Kent College of Law, where I have taught since 2003.  I have studied and written about the Fair Credit Reporting Act (the "FCRA") since 1998.  Prior to joining Chicago-Kent I researched and wrote about consumer law issues, including analyses of the FCRA, for the National Consumer Law Center ("NCLC"), and I have continued that work. In my capacity as a professor at Chicago-Kent I teach about the FCRA in my Law of Privacy course, which I have taught repeatedly over the last several years. In addition, I teach statutory construction in my Legal Writing I course, which I have taught for nine consecutive years.

4.      I am a co-author of NCLC's book FAIR CREDIT REPORTING, and have continued to contribute to the annual supplements for that volume.  In that capacity I have researched, written, and edited hundreds of pages of material pertaining to the FCRA. I am also the author of *Frothy Chaos: Modern Data Warehousing and Old-Fashioned Defamation*, 41 VAL. U. L. REV. 1059 (2007), a law review article that analyzes the FCRA and certain decisions interpreting it. I have also thoroughly analyzed the FCRA in two additional articles: *A Dearth of Remedies*, 113 PENN. ST. L. REV. 1 (2008), and *To Cloak the Within: Protecting Employees from Personality Testing*, 61 DEPAUL L. REV. 1129  (2012).

5.      I have given presentations regarding the FCRA at several professional conferences.  I estimate that from 1998 to the present I have spent approximately 15% of my professional time on the FCRA and related issues.  I have been retained as an expert witness on FCRA issues in the following cases: *Williams v. LexisNexis Risk Management, Inc.*, Case No. 3:06cv241 (E.D. Va. 2008); *Ryals v. Hireright Solutions, Inc.*, Case No. 3:09cv625 (E.D. Va. 2011); *Henderson v. Verifications Inc.*, Case No. 3:11cv514 (E.D. Va. 2011); and *Teagle v. LexisNexis Screening Solutions, Inc.*, Case No. 1:11cv1280 (N.D. Ga. 2011).

6.    I received my J.D., *magna cum laude*, from Notre Dame Law School in 1987, and my LL.M. from Harvard Law School in 1994. I have attached my complete *curriculum vitae* to this report; it lists my publications for the last ten years. I have not testified as an expert in any trial or deposition in the last four years. I am being compensated for my services at the rate of $450 per hour.

7.    I understand that fact discovery in this matter continues to proceed and certain documents and information relevant to my analyses may not yet have been provided. As additional data, information, or testimony become available I will consider it. I may modify or supplement this report or the opinions it contains if I find it appropriate to do so in light of any additional information that becomes available.

## II.    Factual Background

The origin of the dispute in this case is a debt, identified by Experian Information Solutions, Inc. ("Defendant"), a consumer reporting agency,[1] as an account issued by Advanta Bank Corp. d/b/a Advanta Credit Cards and having an account number ending in 9883.[2] Defendant reported this account as belonging to Michael Dreher ("Plaintiff") on various credit reports issued over the span of November 2010 to November 2011.[3] Believing that an identity thief had opened the account in his name, but with someone else's address, Plaintiff notified Defendant that the debt was not his.[4]

More than a month prior to Defendant's first report of the disputed account, Defendant learned from CardWorks Servicing, LLC ("CardWorks") through a letter dated October 4, 2010 that Advanta Bank Corp. had ceased to exist.[5] This letter informed Defendant that Advanta Bank Corp. had been shut down by the State of Utah Department of Financial Institutions and the FDIC on March 19, 2010 and subsequently been dissolved.[6] It further notified Defendant that CardWorks had been selected to perform all aspects of servicing a designated portfolio of Advanta Bank Corp.'s accounts. In that letter, CardWorks sought to have Defendant "modify the trade line descriptor from Advanta Bank Corp. to display as Advanta Credit

---

[1] Pl.'s Second Am. Compl. ¶ 8.

[2] Pl.'s Second Am. Compl. ¶ 12.

[3] Defendant's Statement of Undisputed Material Facts ¶ 2 (contained in Defendant's Memorandum in Support of Its Motion for Partial Summary Judgment) [hereinafter Defendant's Facts] (report dated Nov. 16, 2010); Experian's Prod. of Documents 35, 37 (report dated Mar. 16, 2011), 59, 61 (report dated June 21, 2011), and 115, 117 (report dated Nov. 3, 2011).

[4] Pl.'s Second Am. Compl. ¶ 14; Experian's Prod. of Documents 1.

[5] CardWorks Servicing, LLC's Prod. of Documents  128.

[6] *Id.*; Pl.'s Second Am. Compl. ¶ 12.

Cards,"[7] and Defendant created a new subscriber code for CardWorks to use in its communications with Defendant.[8] So, as of the date Defendant received this letter, Defendant knew that Advanta Bank Corp. no longer existed as a functioning bank. Every dispute involved in this litigation made by Plaintiff occurred after this date.

Defendant had a number of communications with CardWorks about the disputed debt. Defendant issued at least three automated consumer dispute verification ("ACDV") forms to CardWorks about the Advanta Bank Corp. account after Plaintiff disputed the debt. The first was dated July 19, 2011.[9] The next one, dated July 27, 2011, identified the "Dispute Reason" as "Consumer claims true identity fraud – account fraudulently opened. Provide complete ID. NEVER LIVED IN INDIANA."[10] Later that year, Defendant issued yet another ACDV form dated November 4, 2011 that identified the "Dispute Reason" as "Account involved in litigation. Provide or confirm complete ID and verify all account information."[11] CardWorks responded to each of these forms.[12]

Subsequent to Advanta Bank Corp.'s dissolution, Defendant provided Plaintiff with one credit report in 2010 and at least three credit reports in 2011, each of which identified the disputed Advanta Bank Corp. debt, but did not identify the entity that supplied the information about that debt, CardWorks.[13] Defendant also reported the results of a reinvestigation to Plaintiff in an additional report dated August 21, 2011, identifying the outcome of the reinvestigation of the Advanta Bank Corp. account as "Remains," but not identifying CardWorks as the supplier of the information about it.[14] It does not appear that Defendant ever notified Plaintiff that it had received its information about the Advanta Bank Corp. debt that it listed in these reports from CardWorks, rather than Advanta Bank Corp.

### III.   Summary of Opinion

Count Three of the Second Amended Complaint alleges that Defendant violated 15 U.S.C. § 1681g(a)(2). I have been asked to offer an opinion as to

---

[7] CardWorks Servicing, LLC's Prod. of Documents  128.

[8] Decl. of Peter Henke ¶ 13.

[9] Experian's Prod. of Documents 12.

[10] *Id.* 14.

[11] *Id.* 139.

[12] *Id.* 12, 14, 139.

[13] *Id.* 35, 37 (report dated Mar. 16, 2011), 59, 61 (report dated June 21, 2011), and 115, 117 (report dated Nov. 3, 2011).

[14] *Id.* 93.

whether the facts revealed thus far indicate that Experian complied with that provision of the FCRA, which provides as follows:

> (a) Information on file; sources; report recipients
> Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title [proper identification], *clearly and accurately disclose* to the consumer:
>
> \*   \*   \*
>
> (2) *The sources of the information*; except that the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed: *Provided,* That in the event an action is brought under this subchapter, such sources shall be available to the plaintiff under appropriate discovery procedures in the court in which the action is brought.[15]

Plaintiff has alleged that Defendant failed to clearly and accurately disclose to Plaintiff the source of the information about the account Defendant labeled with Advanta Bank Corp.'s name.[16] In my judgment, Defendant's withholding of the identity of CardWorks from Plaintiff violated its obligation pursuant to 15 U.S.C. § 1681g(a)(2) to clearly and accurately disclose the source of the information regarding the disputed debt. Furthermore, it would be objectively unreasonable to construe 15 U.S.C. § 1681g(a)(2) as permitting such withholding.

## IV.   **Documents Reviewed**

I have listed below the documents that I reviewed to prepare this report. In addition, in the course of my work I have read many articles about and cases arising under the FCRA and privacy law generally. I may modify or supplement this report or the opinions it contains if I find it appropriate to do so in light of any additional information made available to me.

1. Plaintiff's F.R.C.P. 26(a)(1) Disclosures, dated Apr. 17, 2011.
2. Plaintiff's Second Amended Complaint (Class Action), dated December 11, 2011.
3. Defendant Experian Information Solutions, Inc.'s Answer and Affirmative Defenses to Plaintiff's Amended Complaint, dated November 10, 2011.
4. Experian Information Solutions, Inc.'s Financial Interest Disclosure Statement, dated November 10, 2011.

---

[15] 15 U.S.C. § 1681g(a) (first and second emphases added.)
[16] Pl. Compl. ¶ 35.

5

5. Documents of Defendant Experian Information Solutions, Inc., dated September 13, 2011.
6. Documents of Defendant Experian Information Solutions, Inc., dated September 12, 2011.
7. Defendant Experian Information Solutions, Inc.'s Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint (Class Action), dated February 2, 2011 (in original; likely 2012).
8. Defendants Cardworks Servicing, LLC and Cardworks, Inc.'s Rule 26(a)(1) Disclosures, dated April 20, 2012.
9. Joint Proposed Scheduling Order dated June 1, 2012.
10. Documents produced by Defendant Experian Information Solutions, Inc., dated June 22, 2012.
11. Defendants Cardworks Servicing, LLC and Cardworks, Inc.'s Supplemental Rule 26(a)(1) Initial Disclosures, dated June 25, 2012.
12. Protective Order dated July 9, 2012.
13. Exhibits of Defendant Experian Information Solutions, Inc. numbered 1-138.
14. Documents of Defendants Cardworks Servicing, LLC and Cardworks, Inc. numbered 007-136.
15. National Consumer Law Center, FAIR CREDIT REPORTING (7th ed. 2010 & Supp.).
16. *Johnson v. Zimmer*, 686 F.3d 224 (4th Cir. 2012).
17. *U.S. v. Lehman*, 225 F.3d 426 (4th Cir. 2000).
18. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (2000).
19. *Bryant v. TRW, Inc.*, 689 F.2d 72 (6th Cir. 1982).
20. *Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997).
21. *Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994).
22. *Dalton v. Capital Associated Indus.*, 257 F.3d 409 (4th Cir. 2001).
23. FEDERAL TRADE COMMISSION, REPORT TO CONGRESS: UNDER SECTIONS 318 AND 319 OF THE FAIR AND ACCURATE CREDIT TRANSACTIONS ACT OF 2003 (2004).
24. 115 Cong. Rec. 2411-15 (1969).
25. Videotaped Deposition of James Kilka, dated Aug. 24, 2012.
26. Declaration of Peter Henke, dated Oct. 3, 2012.
27. Defendant Experian Information Solutions, Inc.'s Memorandum in Support of Its Motion for Partial Summary Judgment, dated Oct. 5, 2012.
28. Declaration of Joseph W. Clark in Support of Defendant's Motion for Partial Summary Judgment, dated Oct. 5, 2012.
29. Deposition of Peter Henke, dated Nov. 8, 2012.

## V.   Basis of Opinion

### A. Background of the Fair Credit Reporting Act

Michael T. Dreher's case embodies many of the very concerns that motivated Congress to pass the original Fair Credit Reporting Act in 1970. In urging passage of S. 823, the bill that became the FCRA, Senator Proxmire spoke of correcting "certain abuses which have occurred within the industry and . . . insur[ing] that the credit information system is responsive to the needs of consumers as well as creditors."[17] He identified "the problem of inaccurate or misleading information" as one of the primary problems in the credit reporting system,[18] and worried that "[e]veryone is a potential victim of an inaccurate credit report. If not today, then perhaps tomorrow."[19]

The sort of misidentification that occurred to Mr. Dreher, Plaintiff in this action, when Defendant reported the debt of another as belonging to him concerned Senator Proxmire back then. He identified as errors of particular concern "[c]onfusion with other persons: Each year, millions of Americans get married, get divorced, change their name, their job or their residence. Millions of people have the same or similar name. Therefore, it is no wonder that credit bureaus frequently confuse one individual with another, sometimes with tragic results."[20] Another legislator noted the impact of such errors on a consumer's ability to obtain employment: "with the trend toward . . . the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal `blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable . . . ."[21]

The FCRA's history also reveals that Congress was motivated by concerns with consumers' inability to correct false information, an issue in this case. Senator Proxmire noted that "many consumers simply are unaware of the existence of credit reporting agencies or of the fact that their file contains inaccurate information."[22] He relayed the story of one assemblyman victimized by name confusion, and noted that "[a] person less persistent might still have a falsely blemished record, particularly if he did not happen to be an assemblyman."[23] He linked this sort of

---

[17] 115 Cong. Rec. 2411 (Jan. 31, 1969).

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] 116 Cong. Rec. 36570 (1970) (remarks of Rep. Sullivan).

[22] 115 Cong. Rec. 2411 (Jan. 31, 1969).

[23] *Id.*

7

error with "the growing trend toward computerization."[24] He elaborated on why consumers had such difficulties clearing up inaccuracies:

> A second reason why consumers have difficulty in correcting inaccurate information is that such procedures are costly to credit reporting agencies. Most credit reporting agencies operate on a high-volume basis. The typical investigation by the Retail Credit Co. takes 30 minutes. Since a credit reporting agency earns its income from creditors or its other business customers, time spent with consumers going over individual reports reduces the agency's profits.[25]

Exacerbating the problem, Senator Proxmire noted, was the behavior of certain members of the industry itself, members that sought to discourage consumers from seeking to have an agency correct its false records:

> Some credit reporting agencies set up artificial roadblocks to discourage consumer attempts to correct their files. For example, the manager of the Fort Smith, Ark., credit bureau has written in a credit bureau trade publication that—
>
> "If the declined applicant is interested enough in his or her record to visit the bureau, and feels strongly enough that an error has been made, we should take the time to investigate. In checking with other bureau managers, I find most of them are willing to investigate. However, some bureaus discourage this by placing a nuisance charge on the investigation, or merely by placing the date of the interview as much as two weeks away."[26]

The senator criticized "the needs of business taking precedence over consumer rights."[27] The solution, he argued, was the bill: "In order to protect consumer interests . . . [c]redit reporting agencies would have to provide, upon request, *a reasonable opportunity for an individual to correct inaccurate or misleading information in his file . . . .*"[28]

With this background in mind, the following material addresses Defendant's actions that are at issue in this case and the FCRA's provisions that govern them.

---

[24] *Id.*

[25] *Id.* at 2412.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 2413-14 (emphasis added).

### B. The FCRA's Treatment of Agency Disclosures to Consumers and of Identity Theft Debt, and Defendant's Actions

#### 1. *Agency disclosures to consumers*

The FCRA specifies that a consumer reporting agency must provide consumers with a broad range of information that the agency holds on them.  15 U.S.C. § 1681g(a) provides as follows:

> (a) Information on file; sources; report recipients
> Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title [proper identification], *clearly and accurately* disclose to the consumer:
>
> (1) *All information in the consumer's file at the time of the request,*
>       \*   \*   \*
> (2) *The sources of the information;* except that the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed: Provided, that in the event an action is brought under this subchapter, such sources shall be available to the plaintiff under appropriate discovery procedures in the court in which the action is brought.[29]

Thus, in addition to clearly and accurately disclosing all information in the consumer's file, the agency must specifically disclose to the consumer, clearly and accurately, "[t]he sources of the information."[30]

Although the FCRA does not define the term "source," in construing a statute courts, including those in the Fourth Circuit, typically interpret words that the statute does not define "'as taking their ordinary, contemporary common meaning.'"[31] In determining such ordinary, contemporary common meaning, a court typically refers to a dictionary. For example, in *U.S. v. Lehman*, the Fourth Circuit relied on Webster's Third New International Dictionary to determine the common meaning of the word "introduce."[32]

---

[29] (Emphasis added.)
[30] 15 U.S.C. § 1681g(a)(2).
[31] Johnson v. Zimmer, 686 F.3d 224, 232-33 (4th Cir. 2012) (quoting U.S. v. Lehman, 225 F.3d 426, 429 (4th Cir. 2000)).
[32] 225 F.3d at 429.

That same Webster's dictionary defines "source" in part as "the point of origin of a stream of water : FOUNTAINHEAD . . . a generative force or stimulus : CAUSE, INSTIGATOR . . . a point of origin or procurement : FOUNTAIN SUPPLIER . . . ."[33]

Thus, it appears that Congress intended "source" to mean the information's generator, its supplier.  The purpose of this provision seems clear: if the agency withholds the identity of the entity that supplied the information to the agency, it in effect maintains the entity's anonymity, which can leave the consumer in a hopeless situation of suffering inaccurate, damaging information in his or her credit report, information provided by a nameless, faceless entity that the consumer cannot contact, question, or reason with.

Congress, notably, did not state that the agency must provide the consumer with the identity of the creditor that originally opened the account, however long ago that might have happened.  Rather, the agency must provide the consumer with the source of the information that the agency has in its file at the time the consumer requests that information.

The consumer's need for the identity of the inaccurate information supplier is made apparent by Congress's addition, in 1996, of a mechanism by which consumers can notify furnishers directly of inaccurate information in their reports.[34]  If the agency withholds the identity of the entity whose communications with the agency have injured the consumer's credit reputation, then the notification right becomes worthless, for the consumer will likely have no way to know whom they should notify about the inaccurate information.

Furthermore, another section of the FCRA makes clear that Congress equated an information item's "source" with the item's provider, its furnisher.  For example, section 1681i(a)(2), entitled "Prompt notice of dispute to furnisher of information," states that once a consumer has disputed the completeness or accuracy of an item of information, the agency reporting that information must "provide notification of the dispute to any person who provided any item of information in dispute . . . .  The notice shall include all relevant information regarding the dispute that the agency has received from the consumer . . . ."[35]  Courts have interpreted this duty to reinvestigate as requiring the agency to communicate with the "source" of the disputed information, identified as the entity that provided the disputed information to the consumer reporting agency.[36]

---

[33] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2177 (2000).

[34] 15 U.S.C. § 1681s-2(a)(8).

[35] 15 U.S.C. § 1681i(a)(2)(A).

[36] *See, e.g.,* Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) ("'a credit reporting agency may be required, in certain circumstances, to verify the

The Fourth Circuit has itself specifically used the word "source" to describe the communicator of an item of disputed criminal history information. In *Dalton v. Capital Associated Industries*, a county clerk inaccurately described a criminal conviction as a felony, a description that the defendant, a consumer reporting agency, placed in the plaintiff's credit report.[37]  In vacating summary judgment for the defendant on the plaintiff's FCRA claims, the Fourth Circuit clearly identified the "source" of the disputed information as the clerk, and not the creator of the original underlying record: "[the consumer reporting agency] had no procedures governing the sources that a subvendor could rely upon in collecting information for a criminal background report. A jury could properly conclude that it was an unreasonable procedure to rely on a clerk's informal opinion . . . ."[38]

Similarly, the Federal Trade Commission has also identified an information item's furnisher as the "source" of the information. In a 2004 report to Congress, the Commission described the FCRA's reinvestigation requirements as "recogniz[ing] that furnishers – the original *source* of the information – have a critical role to play in the overall accuracy of consumer report information."[39]

### 2.  The FCRA's identity theft-related provisions for furnishers

The importance of an agency's duty to disclose to a consumer the sources of the information it places in reports becomes even clearer in light of the identity theft-related provisions that Congress put into the FCRA in its 2003 revisions.[40] Among these,[41] Congress created specific mechanisms by which a consumer can limit the destructive effects of an identity thief's use of the consumer's identity. For instance, in section 1681s-2(a)(6)(B), Congress provided as follows:

Information alleged to result from identity theft

---

accuracy of its initial *source* of information'") (quoting Henson v. CSC Credit Servs., 29 F.3d 280, 287 (7th Cir. 1994)) (emphasis added).

[37] 257 F.3d 409, 416-17 (4th Cir. 2001) (using "source" to describe a county clerk who inaccurately described a particular conviction as a felony, a description that the consumer reporting agency entered into the plaintiff's credit report).

[38] *Id.* at 417.

[39] FED. TRADE COMM'N, REPORT TO CONGRESS: UNDER SECTIONS 318 AND 319 OF THE FAIR AND ACCURATE CREDIT TRANSACTIONS ACT OF 2003 18 (2004), *available at* http://www.ftc.gov/reports/facta/041209factarpt.pdf (emphasis added); *see also* 16 C.F.R. § 660.2(c) (a regulation issued by the FTC stating that a "[*f*]*urnisher* means an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report") (emphasis in original).

[40] Pub. L. No. 108-159 (Dec. 4, 2003).

[41] *See, e.g.*, 15 U.S.C. §§ 1681c-1, 1681c-2.

11

> If a consumer submits an identity theft report to a person who
> furnishes information to a consumer reporting agency at the address
> specified by that person for receiving such reports stating that
> information maintained by such person that purports to relate to the
> consumer resulted from identity theft, the person may not furnish such
> information that purports to relate to the consumer to any consumer
> reporting agency, unless the person subsequently knows or is informed
> by the consumer that the information is correct.

However, if the agency withholds from the consumer the identity of the entity that supplied the negative and inaccurate information resulting from the theft, the consumer may very well be left without any ability to exercise this valuable, and potentially credit reputation-saving right. One obvious aspect of an identity theft debt distinguishes it from accurate debts: the thief, not the consumer, chooses the creditor, and thus the consumer will likely have had no contact of his or her own with the creditor. Accordingly the creditor, the source of the information in the report (to use a section 1681g(a) term), will be completely anonymous unless the consumer learns of the creditor's identity through some other means. These means, clearly, are the section 1681g(a) disclosures that Congress provided for.

The information supplier's identity is crucial to helping consumers stanch the damage of an identity thief for another reason. In 2003 Congress added section 1681g(e)(1), which gives identity theft victims a right to obtain information from those who did business with a thief in the victim's name:

> For the purpose of documenting fraudulent transactions resulting from
> identity theft, not later than 30 days after the date of receipt of a
> request from a victim in accordance with paragraph (3), and subject to
> verification of the identity of the victim and the claim of identity theft
> in accordance with paragraph (2), a business entity that has provided
> credit to, provided for consideration products, goods, or services to,
> accepted payment from, or otherwise entered into a commercial
> transaction for consideration with, a person who has allegedly made
> unauthorized use of the means of identification of the victim, shall
> provide a copy of application and business transaction records in the
> control of the business entity, whether maintained by the business
> entity or by another person on behalf of the business entity, evidencing
> any transaction alleged to be a result of identity theft to—
>> (A) the victim;
>> (B) any Federal, State, or local government law enforcement
>> agency or officer specified by the victim in such a request; or
>> (C) any law enforcement agency investigating the identity theft
>> and authorized by the victim to take receipt of records provided
>> under this subsection.

This allows a consumer to pursue the thief's identity, which could lead to the consumer halting the thief's use of the consumer's identity, criminally prosecuting the thief, and perhaps even obtaining restitution. Here, too, a consumer is unlikely to be able to ascertain the name and contact information for the business entity if the consumer reporting agency that reports the debt as belonging to the consumer withholds the name of the source of the information about the debt.

### 3. Defendant's actions

As detailed above in Section II of this report, discovery documents disclosed thus far reveal at least three ACDV forms that Defendant issued to CardWorks in 2011 concerning the Advanta Bank Corp. debt, though Advanta Bank Corp. had dissolved in March 2010. At the time it issued each of these ACDVs, Defendant must have been aware that the source of the information about that account was CardWorks, and not Advanta Bank Corporation, as the subscriber on each ACDV was identified as "CardWorks Servicing." Furthermore, Defendant was aware that CardWorks was not another name for Advanta Bank Corp., but rather a servicer for certain credit card accounts formerly issued by Advanta Bank Corp.[42]

The source of the information about the status of the Advanta Bank Corp. debt that appeared in Plaintiff's consumer reports over the course of 2010-2011 seems almost certainly to have been CardWorks. Defendant reported to Plaintiff the results of one of its reinvestigation in a report dated August 5, 2011; this report identified the outcome of the reinvestigation of the Advanta Bank Corp. account as "Remains."[43] Nearly three months later, on November 3, 2011, Experian issued yet another report that identified the Advanta Bank Corp. debt as being Plaintiff's.[44] However, Advanta Bank had ceased to exist the previous year.[45] Accordingly, the entity from which Defendant purported to obtain verification of the Advanta Bank Corp. debt could not have been Advanta Bank Corp. CardWorks was the entity that had received the task of servicing many of Advanta Bank Corp.'s accounts, the entity for which Defendant had created a new subscriber code,[46] and the entity to which Defendant directed its ACDVs. Furthermore, Defendant's director of membership, Mr. Peter Henke, testified that he understood the source of the information that Plaintiff was disputing "to be Cardworks Servicing acting on

---

[42] CardWorks Servicing, LLC's Prod. of Documents 128.

[43] Experian's Prod. of Documents 93.

[44] *Id.* at 115.

[45] CardWorks Servicing, LLC's Prod. of Documents 128.

[46] Decl. of Peter Henke ¶ 13.

13

behalf of Advanta."[47]  15 U.S.C. § 1681g(a)(2) required Defendant to provide Plaintiff with the "source[s] of the information" in the consumer's file.   The reports issued to Plaintiff, however, do not identify CardWorks or anyone other than Advanta Bank Corp. as the source of the information about the Advanta Bank Corp. debt.

In my judgment, Defendant's withholding of the identity of CardWorks violated its obligation to clearly and accurately disclose the source of information regarding the disputed debt pursuant to 15 U.S.C. § 1681g(a)(2).  Furthermore, it would be objectively unreasonable to construe 15 U.S.C. § 1681g(a)(2) as permitting such withholding.

Withholding the name of the supplier of a piece of negative information hinders a consumer in several ways.  It keeps the consumer from being able to dispute the debt directly with the furnisher, a valuable right consumers obtained from the 1996 Consumer Credit Reform Act and codified at 15 U.S.C. § 1681s-2(a)(8).  Withholding the supplier's name prevents a consumer from exercising the right that section 1681s-2(a)(6) provides to notify a furnisher that the debt furnished was the result of identity theft, a notification that can prevent the furnisher from continuing to report a theft-related debt as belonging to the plaintiff rather than to the thief.  And such withholding prevents a consumer from being able to exercise the right that section 1681g(e) provides to contact an entity that has done business with an identity thief to learn helpful information about the thief's own identity.  In short, by withholding the identity of a source of information in the consumer's file, a consumer reporting agency disables an array of remediation rights that Congress provided to consumers whose reports contain inaccurate information.

Furthermore, withholding such information could confuse a consumer, especially one who was the victim of identity theft and thus likely knew nothing about any entity that had opened a fraudulent account in the victim's name beyond a consumer reporting agency's identification of that entity on the consumer's report. It would be natural to search for the identified entity on the Internet; however, an Internet search for Advanta Bank Corp., the entity that Defendant identified with the debt Plaintiff disputes, leads to the website advantabankcorp.com, which in turn states that the bank was closed on March 19, 2010.  This statement could bewilder a consumer: how can a defunct institution continue to communicate information about a consumer's debt to a consumer reporting agency?  Such a consumer would be left with the knowledge that some anonymous, hidden being is communicating to a consumer reporting agency information the consumer may know to be false.  By requiring consumer reporting agencies to provide consumers

---

[47] Dep. of Peter Henke 91.

14

with the source of the current information about a debt, section 1681g(a)(2) prevents such confusion.

Additionally, Defendant itself has repeatedly identified the provider of an item of information as the "source" of that information, as opposed to the historical creator of the original account, which emphasizes the unreasonableness of Defendant's identification of Advanta Bank Corp., rather than CardWorks, as the source of the disputed information in Plaintiff's report. For instance, on its website, Defendant assures consumers who seek to dispute information in a credit report that "A Notice is Immediately Sent to the Source of the Information."[49] Elsewhere on its site, Defendant assures consumers who submit a dispute that "[u]pon receiving your dispute, Experian will contact the source of the information, such as a lender, on your behalf. The source of the information is required by the federal Fair Credit Reporting Act (FCRA) to review its records and respond to the dispute."[50]

Given that Defendant directed its ACDVs to CardWorks, and not Advanta Bank Corp., and that nothing disclosed thus far indicates that Defendant sent any information about Plaintiff's dispute to Advanta Bank Corp., the now-defunct historical creator of the account, Defendant clearly treated CardWorks as the source of the information that Plaintiff disputed. This treatment is consistent with Defendant's description of its dispute investigation process that it provides to consumers on its website.

However, rather than naming CardWorks as the entity supplying Defendant with information about the disputed debt, Defendant permitted CardWorks to control the manner in which Defendant identified that entity to Plaintiff.[51]

---

[49] http://www.experian.com/disputes/how-to-dispute.html.

[50] http://www.experian.com/blogs/news/2012/07/25/credit-dispute-process/; *see also* http://www.experian.com/disputes/faq.html (stating that "When you question information on your personal credit report and tell us specifically why you believe the information is inaccurate or incomplete, we contact the *source* of the information directly by telephone, by letter or through an automated verification system [and] ask the *source* to check their records to verify all of the information regarding the item you questioned and report back within 30 days of the date that we received your request . . . ) (emphasis added); Maxine Sweet, *Experian: Federal Reserve Board of Boston 22nd Annual National Consumer Protection Week* 71 (Apr. 25, 2012), *available at* http://www.bos.frb.org/consumer/conf/ncpw/2012/maxine-sweet.pdf (in describing the fraud investigation process, stating that the "[c]onsumer reporting company provides source contact information" and that the [c]onsumer should contact source directly as well").

[51] Dep. of Peter Henke 83 ("[t]o a large degree, we rely on our client to understand that trade line relationship with the consumer").

15

Although apparently Defendant could have identified the information supplier as both Advanta Credit Cards and CardWorks, it did not because CardWorks directed it not to.[52] Nothing in the FCRA supports a construction of section 1681g(a)(2) that would allow the consumer reporting agency's subscriber, rather than the statute itself, to control the designation of the information's supplier.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 29th day of November, 2012, at Chicago, Illinois.

*Elizabeth De Armond*

**Elizabeth De Armond**
565 West Adams Street
Chicago, Illinois 60661

---

[52] Dep. of Peter Henke 42.

16

*Curriculum Vitae*

**Elizabeth De Armond**
565 West Adams Street
Chicago, Illinois 60661
312-906-5172
edearmond@kentlaw.iit.edu

## CURRENT POSITIONS

**Chicago-Kent College of Law, Chicago, Illinois**
Professor of Law, Legal Research and Writing, 2012-present

**National Consumer Law Center, Boston, Massachusetts**
Researcher and author, 1998-present

## EDUCATION

**Harvard Law School, Cambridge, Massachusetts**
Master of Laws, 1994

**University of Notre Dame School of Law, Notre Dame, Indiana**
Juris Doctor (*magna cum laude*), 1987

> *Honors and Awards*
>
> Colonel William J. Hoynes Award (awarded to the student with the top academic record)
>
> Articles Editor, NOTRE DAME LAW REVIEW, 1986-87
>
> Staff Member, NOTRE DAME LAW REVIEW, 1985-86
>
> American Jurisprudence Awards in Civil Procedure I, Torts II, and Antitrust

**Georgia Institute of Technology, Atlanta, Georgia**
Bachelor of Science (Information and Computer Science), 1984

## PAST POSITIONS

**Chicago-Kent College of Law, Chicago, Illinois**
Associate Professor of Law, Legal Research and Writing, 2009-2012
Assistant Professor of Law, Legal Research and Writing, 2006-2009
Visiting Assistant Professor of Law, 2003-2006

**Stutzman & Bromberg, Dallas, Texas**
Attorney, 1992-1993

**Carrington, Coleman, Sloman & Blumenthal, Dallas, Texas**
Associate, 1988-1991

**Honorable Cornelia G. Kennedy, United States Court of Appeals
for the Sixth Circuit**
Law Clerk, 1987-1988

**Professor Joseph Bauer, University of Notre Dame School of Law**
Research Assistant, 1985-1987

**Carrington, Coleman, Sloman & Blumenthal, Dallas, Texas**
Summer Associate, 1986

**Baker & Botts, Dallas, Texas**
Summer Associate, 1986

## PUBLICATIONS

### _Books and Manuals_

National Consumer Law Center, FAIR CREDIT REPORTING (7th ed. 2010) (with Chi Chi Wu and Joanne S. Faulkner)

National Consumer Law Center, FAIR CREDIT REPORTING (7th ed. Supps. 2011 and 2012) (contributing author)

National Consumer Law Center, FAIR CREDIT REPORTING (6th ed. 2006 and Supps. 2007, 2008, 2009) (with Chi Chi Wu and Joanne S. Faulkner)

_Manufactured Housing Community Tenants: Shifting the Balance of Power_ (AARP Public Policy Inst. 2004) (with Carolyn L. Carter, Odette Williamson, and Jon Sheldon)

## Contributions to Books and Manuals

*New Home Sales*, in National Consumer Law Center, CONSUMER WARRANTY LAW (4th ed. 2010 & Supps. 2011, 2012)

*Common Law Deceit, Misrepresentation, and Fraud*, in National Consumer Law Center, CONSUMER WARRANTY LAW (4th ed. 2010 & Supps. 2011, 2012)

*Negligence and Strict Liability in Tort*, in National Consumer Law Center, CONSUMER WARRANTY LAW (4th ed. 2010 & Supps. 2011, 2012)

*Extortionate Collection Methods and Other RICO Violations*, in National Consumer Law Center, FAIR DEBT COLLECTION (7th ed. 2011)

*Extortionate Collection Methods and Other RICO Violations*, in National Consumer Law Center, FAIR DEBT COLLECTION (6th ed. Supp. 2010)

*The Racketeer Influenced & Corrupt Organizations Act (RICO)*, in National Consumer Law Center, UNFAIR & DECEPTIVE ACTS & PRACTICES (7th ed. 2008 and Supps. 2009-2011)

*Unjust Enrichment, Restitution, and Similar Equitable Theories*, in National Consumer Law Center, UNFAIR & DECEPTIVE ACTS & PRACTICES (6th ed. 2004, 7th ed. 2008, and Supps. 2009, 2010)

*New Home Sales*, in National Consumer Law Center, CONSUMER WARRANTY LAW (3d ed. 2006 & Supps. 2007-2009)

*Common Law Deceit, Misrepresentation, and Fraud*, in National Consumer Law Center, CONSUMER WARRANTY LAW (3d ed. 2006 & Supps. 2007-2009)

*Negligence and Strict Liability in Tort*, in National Consumer Law Center, CONSUMER WARRANTY LAW (3d ed. 2006 & Supps. 2007-2009)

*Raising Lender-Related Defenses against the FDIC, RTC, and Subsequent Note Holders*, UNFAIR & DECEPTIVE ACTS & PRACTICES (7th ed. 2008)

*Raising Lender-Related Defenses against the FDIC, RTC, and Subsequent Note Holders*, in National Consumer Law Center, UNFAIR & DECEPTIVE ACTS & PRACTICES (6th ed. 2004 & Supps. 2005-2007)

*The Racketeer Influenced and Corrupt Organizations Act*, in National Consumer Law Center, COST OF CREDIT (3d ed. 2005 & Supps. 2006-2009)

19

*Special Defenses of Federal Receivers:* D'Oench *and Related Doctrines,* in National Consumer Law Center, COST OF CREDIT (3d ed. 2005 & Supps. 2006 and 2007)

*Effect of the McCarran-Ferguson Act on Antitrust Challenges to Credit Insurance Practices,* in National Consumer Law Center, COST OF CREDIT (3d ed. 2005 & Supps. 2006 and 2007)

*The Racketeer Influenced & Corrupt Organizations Act (RICO),* in National Consumer Law Center, UNFAIR & DECEPTIVE ACTS & PRACTICES (6th ed. 2004 & Supps. 2005- 2007)

*Privacy Protection,* in National Consumer Law Center, FAIR CREDIT REPORTING (5th ed. 2002 & Supps. 2003-2005)

*Common Law Fraud, Deceit, and Misrepresentation,* in National Consumer Law Center, AUTOMOBILE FRAUD (2d ed. 2003 & Supps. 2003, 2004, and 2005)

*Misrepresentation or Fraud,* in National Consumer Law Center, UNFAIR & DECEPTIVE ACTS & PRACTICES (6th ed. 2004)

*New Home Sales,* in National Consumer Law Center, CONSUMER WARRANTY LAW (2d ed. 2001 & Supps. 2002, 2003, and 2004)

*Common Law Deceit, Misrepresentation, and Fraud,* in National Consumer Law Center, CONSUMER WARRANTY LAW (2d ed. 2001 & Supps. 2002, 2003, and 2004)

*Negligence and Strict Liability in Tort,* in National Consumer Law Center, CONSUMER WARRANTY LAW (2d ed. 2001 & Supps. 2002, 2003, and 2004)

## *Articles*

*To Cloak the Within: Protecting Employees from Personality Testing,* 61 DEPAUL L. REV. 1129 (2012)

*A Dearth of Remedies,* 113 PENN. ST. L. REV. 1 (2008)

*Frothy Chaos: Modern Data Warehousing and Old-Fashioned Defamation,* 41 VAL. U. L. REV. 1061 (2007)

*It Takes Two: Remodeling the Management and Control Provisions of Community Property Law,* 30 GONZAGA L. REV. 235 (1995)

Note, *A Uniform Limitations Period for Civil RICO*, 61 NOTRE DAME L. REV. 495 (1986)

Comment, *Constitutional Law - In re Grand Jury Matter, Gronowicz: Qualified Newsperson's Privilege Does Not Extend to Authors*, 61 NOTRE DAME L. REV. 245 (1986) (with Lee Cameron, Patrick Corbett, and Todd Gale)


## PROFESSIONAL PRESENTATIONS AND ACTIVITIES

Panelist, "FCRA Updates," at the National Consumer Law Center's Consumer Rights Litigation Conference, November 2011

Panelist, "Teaching Legal Research and Citation," at the Legal Writing Institute's One-Day Workshop, John Marshall Law School, Chicago, Illinois, December 2010

Co-Presenter, "Ethical Issues in Consumer Law Practices," at the National Consumer Law Center's Consumer Rights Litigation Conference, October 2009

Teleconference Presenter, "Credit Reporting Accuracy and Representation for Survivors," Consumer Rights for Domestic Violence Survivors Initiative, March 3, 2009

Presenter, "Claims under FACTA and Recent 7th Circuit Developments," to the Chicago Bar Association's Consumer Law Committee, January 2009

Co-author, brief *amici curiae, Harris v. Mexican Specialty Foods, Inc.*, 2009 WL 944201 (11th Cir. Apr. 9, 2009)

"Claims under FACTA," at the National Consumer Law Center's Consumer Rights Litigation Conference, October 2008

Co-author, brief *amici curiae, Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201 (2007)

"FCRA Basics," at the National Consumer Law Center's Consumer Rights Litigation Conference, November 2007

"FCRA/FACTA: Update," at the National Consumer Law Center's Consumer Rights Litigation Conference, November 2006

"FCRA/FACTA: New Regulations and Claims," at the National Consumer Law Center's Consumer Rights Litigation Conference, October 2005

"FACTA: What's New to Sue," at the National Association of Consumer Advocates' Fair Credit Reporting Act Conference, June 2005

"The FACT Act: Changes to the Fair Credit Reporting Act," at the National Consumer Law Center's Consumer Rights Litigation Conference, November 2004

"Identity Theft," at the National Consumer Law Center's Consumer Rights Litigation Conference, October 2003

Expert Witness, *Williams v. LexisNexis Risk Management, Inc.*, Case No. 3:06cv241 (E.D. Va. 2008)

Expert Witness, *Ryals v. Hireright Solutions, Inc.*, Case No. 3:09cv625 (E.D. Va. 2009)

Expert Witness, *Henderson v. Verifications Inc.*, Case No. 3:11cv514 (E.D. Va. 2011)

Expert Witness, *Teagle v. LexisNexis Screening Solutions, Inc.*, Case No. 1:11cv1280 (N.D. Ga. 2011).

## LAW SCHOOL SERVICE

### *Courses*

Legal Writing II (spring 2004-spring 2012)

Legal Writing I (fall 2003-fall 2012)

Law of Privacy (spring 2005, 2007-2012)

Advanced Property: Real Estate Transactions (spring 2004 and 2006)

### *Programs & Committees*

Member, Library Committee (2009-2011); Appellate Advocacy Committee (2004-2009), Curriculum Committee (2005-2007), and Legal Skills Committee (2005-2006).

Contributor, Continuing Legal Education Program, "Effective Transactional Writing," June 2004 and June 2005.

Coach, a Chicago-Kent team, Chicago Bar Association's Moot Court Competition, November 2005.

Coach, Chicago-Kent's team, 23rd Annual John Marshall Law School International Moot Court Competition in Information & Privacy Law, October 2004.

Coach, Chicago-Kent's team, First Amendment Center and Vanderbilt University School of Law's 15th Annual National First Amendment Moot Court Competition, February 2005.

## PUBLIC SERVICE

Contributor to multiple publications of the National Consumer Law Center, a national organization dedicated to protecting vulnerable consumers and promoting marketplace justice, Boston, Massachusetts (1998-present).

Member of the Board of Directors, Trevian Girls Softball Association (2005-2006).

*Pro bono* attorney, Lawyers Against Domestic Violence (in conjunction with North Texas Legal Services), Dallas, Texas (1988-1991).

## BAR MEMBERSHIPS

Illinois (2002), Massachusetts (1995) (inactive), and Texas (1988) (inactive).