*Exhibit "F"*

Page 5

09:40    1    Virginia.

         2         MR. CLARK:  Good morning.  My name is Joseph

         3    Clark.  I'm joining by way of telephone, counsel for

         4    Experian.

         5         MS. CRUZ:  My name is Patricia Cruz.  I'm here

09:40    6    in person in Chicago, at Jones Day, for the

         7    defendant, Experian Information Solutions.

         8         VIDEO TECHNICIAN:  And will the court reporter

         9    please identify herself and swear in the witness,

        10    please.

        11                   (Witness sworn.)

        12         VIDEO TECHNICIAN:  Please proceed.

        13    WHEREUPON:

        14                        PETER HENKE,

        15    called as a witness herein, having been first duly

09:40   16    sworn, was examined and testified as follows:

        17                        EXAMINATION

        18    BY MR. BENNETT:

        19         Q.    Good morning.  Mr. Henke, you and I have

        20    never met or spoken before today; is that correct?

09:40   21         A.    That's correct.

        22         Q.    And you work for Experian, I understand?

        23         A.    That's correct.

        24         Q.    You actually work for the -- for Experian

        25    Information Solutions, Inc.  That is -- is that the

Page 6

09:41  1     entity that's on your paycheck?

       2        A.    Yes.  I believe so.  I haven't actually

       3     seen a paycheck in a long time.  It's all electronic

       4     now; but, yes.

       5        Q.    Right.  Well, of course you know that

09:41  6     there are multiple Experian entities, including an

       7     operations entity, right?

       8        A.    Correct.

       9        Q.    And your belief is that you are --

      10     technically, that you are employed by Experian

09:41 11     Information Solutions, Inc.?

      12        A.    Yes, that is my understanding.

      13        Q.    All right.  Could you take a look at

      14     Exhibit 1, which is the declaration that has been

      15     provided and filed by Experian in this case?

09:41 16        A.    Sure.  Is it in here?

      17        MS. CRUZ:  For the record, the witness is

      18     turning to Exhibit 1 in the binder provided by

      19     plaintiff's counsel.

      20     BY MR. BENNETT:

09:42 21        Q.    How long -- roughly, how long did it take

      22     you to type this?

      23        A.    I don't have an estimate of the time it

      24     take -- it took to type this document.

      25        Q.    Why not?

09:42   1          A.      Because there is a lot that went into it.

        2          Q.      I understand.  Let me -- my questions

        3    will get complicated and there will be that time for

        4    us to worry about those complications, but I think

        5    it's just pretty simple right now.  I'm just saying,

09:42   6    how long did it take Peter Henke to type this

        7    document?

        8          A.      Again, I don't have an estimate on the

        9    time.  I wasn't tracking time, but I personally

        10   didn't write the entire document.

09:42   11         Q.      Approximately how much of it did you

        12   type?

        13         A.      I'm not --

        14         Q.      Type.  I'll get into the substance, but

        15   how much of this did you type?

09:43   16         A.      I'm not sure what the percentage would

        17   be.

        18         Q.      Was it more than 10 percent?

        19         A.      Roughly, in that neighborhood.

        20         Q.      It was roughly 10 percent of this that

09:43   21   you actually typed?

        22         A.      That I physically typed, correct.

        23         Q.      Yes.  And, of course, there were lawyers

        24   for Jones Day that worked with you on this.  And I'm

        25   not seeking to discover the conversations, written

09:43 1   or oral, between you and Jones Day.  You understand

2   that, right?

3       A.    Okay.

4       Q.    So besides the lawyers from Jones Day and

5   the 10 percent that you participated in putting

09:43 6   together in typing, who else, if anybody,

7   participated in typing this document?

8       A.    I'm not aware of any other parties.

9       Q.    Okay.  And how -- besides -- you know,

10   I've just used the word typing now.  In terms of its

09:44 11   content, other than the Jones Day lawyers in this

12   case, who else did you speak with in putting

13   together this declaration?

14       A.    I only spoke with the Jones Day lawyers

15   with regards to this declaration.

09:44 16       Q.    And as well as the content or the facts

17   that you outline in the declaration, who else did

18   you speak with besides the Jones Day lawyers to

19   obtain knowledge regarding the substance of the

20   facts that are the substance of this declaration?

09:44 21       A.    I would say I spoke with April Turner.

22       Q.    And she, of course, is an in-house lawyer

23   for Experian that handles litigation like this one,

24   right?

25       A.    That's correct.

09:45   1        Q.     Okay.  So besides the lawyers that

         2   handled this -- are handling the litigation of this

         3   case, who did you speak with to obtain the factual

         4   knowledge that form the basis of this declaration?

         5        A.     That was it.  To the best of my

09:45   6   knowledge, I didn't speak to anybody else regarding

         7   the content of this declaration.

         8        Q.     Okay.  And what documents did you review

         9   in creating this declaration?

        10        A.     In creating it?

09:45  11        Q.     Well, by the substance, in order to

        12   obtain what you believe -- what you have sworn under

        13   oath is your own personal knowledge, what documents

        14   did you review --

        15        A.     See --

09:46  16        Q.     -- for this declaration?

        17        A.     I reviewed agreements.

        18        Q.     What agreements?

        19        A.     Between Experian and Advanta.  I'm not

        20   sure if this counts as documentation, but I reviewed

09:46  21   content within our Siebel system, which is our

        22   tracking system.

        23        Q.     What tracking system is that?

        24        A.     It's our internal tracking system.

        25        Q.     What is it called?

Page 10

09:46   1        A.     Siebel.

        2        Q.     How do you spell that?

        3        A.     S-I-E-B-E-L.

        4        Q.     And what is the purpose of that tracking

        5   system?  What is it used for?

09:46   6        A.     It's used for tracking our performance

        7   with regards to customer service and retaining

        8   contracts and things along those lines.

        9        Q.     And what information relevant to your

       10   declaration was in that Siebel?

09:47  11        A.     Well, it's a system that has the account

       12   in question within this declaration.

       13        Q.     Okay.  So what type of -- let me --

       14   sorry, Jennifer.  Withdraw that.

       15               Who were the parties -- or, rather,

09:47  16   who was the subscriber for the account in

       17   question?

       18        A.     The client, is that what you mean by

       19   "subscriber"?

       20        Q.     Sure.  I mean -- no.  Let me withdraw

09:48  21   that.  I mean subscriber -- subscriber the way that

       22   Experian uses it, subscriber the way that the CDIA

       23   uses it, subscriber the way that it's used in the

       24   credit reporting industry.  Who was the subscriber

       25   for the account in question?

Page 11

09:48   1      A.    That would be Advanta.

       2      Q.    Advanta.  What is the actual business

       3   name of Advanta?

       4      A.   I believe there's multiple business names

       5   under the Advanta umbrella.  There is Advanta

09:48   6   Corp. and there's Advanta Bank Corp.  Those are two

       7   that I know for sure.

       8      Q.    Okay.  And did you look at the Siebel

       9   records for any other subscribers besides Advanta

     10   Corp. or Advanta Bank Corp.?

09:49 11      A.    Not with regards to this declaration.

     12      Q.    Mm-hmm.  And what types of -- or

     13   categories of information are contained within this

     14   tracking database with respect to this account as

     15   you've described it?

09:49 16      A.    Well, like I said, it's a repository for

     17   documents; so contracts, letters.

     18      Q.    All right.  Now, does CardWorks also have

     19   a separate -- CardWorks or CardWorks Servicing have

     20   a separate Siebel record or file?

09:49 21      A.    Yes.  I believe CardWorks would have an

     22   account with -- within Siebel.

     23      Q.    And did you review that in preparing your

     24   declaration?

     25      A.    I've reviewed the CardWorks account, but

09:50    1    I don't recall reviewing it for the purpose of this

2    declaration.

3         Q.    Well, then why would you have reviewed

4    the CardWorks account?

5         A.    I would have been on the account for

09:50    6    other purposes, such as if we received a request for

7    contracts or so on.

8         Q.    Do you know that I have a Sears credit

9    card?  Do you know that?

10        A.    I did not know that.

09:50   11        Q.    I do.  I got it to purchase a

12    refrigerator for -- a freezer, actually, for an

13    older couple that watches our child.  Did you know

14    that?

15        A.    I was unaware.

09:50   16        Q.    Do you have a Sears credit card?

17        A.    No, not that I'm aware of.

18        Q.    You are the director of management for

19    Experian, right?

20        A.    I'm sorry.  Did you say director of

09:51   21    membership or director of management?

22        Q.    I'm sorry, membership.

23        A.    Yes.  I'm the director of membership.

24        Q.    Are you the only director of membership?

25        A.    Yes.

Page 13

09:51  1      Q.    To whom do you report?

       2      A.    I report to Sandy Anderson.

       3      Q.    What is Sandy Anderson's job?

       4      A.    I believe her specific title is president

       5   of sales operations.

09:51  6      Q.    And you believe she works for Experian

       7   Information Solutions, Inc., also?

       8      A.    That is correct.

       9      Q.    And do you know what she does, what her

      10   function is?

09:51 11      A.    She's the president that oversees the

      12   various support areas that help to support our

      13   clients.

      14      Q.    Okay.  And then what's your job as

      15   director of membership?

09:51 16      A.    I oversee the membership department.

      17      Q.    Okay.  And who do you directly supervise?

      18      A.    I supervise a number of employees.  Are

      19   you requesting their names or --

      20      Q.    Well, let's start with number.

09:52 21   Approximately how many?

      22      A.    15.

      23      Q.    All right.  What are their names and what

      24   are their jobs?

      25      A.    Let's see.  Chris Maieritsch, who is an

09:52 1    associate manager; Katie Muzik, who is a senior

2    specialist; Lisa Van Brunt, a Membership Analyst

3    Level 2; Megan Brody, a Membership Analyst Level 2;

4    Elizabeth Barcynski, also a Membership Analyst

5    Level 2; Marianne Trejo, an Analyst Level 1;

09:53 6    Jessica -- Jessica Podmokly, an Analyst Level 1.

7              And, actually, those are under direct

8    supervision that indirectly supervise the remaining

9    employees.  They directly report to Chris

10   Maieritsch.

09:53 11        Q.    Okay.  What is the job of an analyst?

12        A.    An analyst?

13        Q.    Yes.

14        A.    Their job is to review new client

15   applications and determine the client's eligibility

09:54 16   for an Experian account.

17        Q.    Okay.  Which of those individuals would

18   have been responsible for overseeing, either

19   directly or indirectly, the CardWorks Servicing

20   client?

09:54 21        A.    I do not recall specifically which

22   analyst would have reviewed that.  That may not have

23   been any of those analysts depending on when they

24   were on boarded and employment.

25        Q.    Now, again, back on track, if we just

09:54  1    clarify that I had a Sears credit and I bought a

2    freezer using that Sears credit card, do you have

3    any knowledge about Sears as a client?

4         A.    No.  I'm not familiar with Sears as a

5    client.

09:54  6    Q.    How about JCPenney?

7         A.    I'm also not familiar with their account

8    as a client.

9         Q.    Why aren't you familiar with Sears as a

10   client?

09:55 11    A.    In our membership role, we determine

12   eligibility for new clients.  Once they become

13   clients, we don't manage the relationship on an

14   ongoing basis.

15        Q.    Okay.  Well, I'll let you in on another

09:55 16   secret here.  It turns out when I applied for a

17   Sears credit card, it wasn't Sears that gave me

18   credit.  It was a bank.  It was a credit card

19   company.  Would that surprise you?

20        A.    No.

09:55 21    Q.    Why not?

22        A.    I don't think that's uncommon for a bank

23   to fund a private label credit card.

24        Q.    And when banks do that, when they fund a

25   private label credit card, in what name is the trade

09:56  1    line published to consumers?  So, for example, if

2    you have a Citibank or a Chase account -- my Best

3    Buy card is through -- jeez, I think it's either

4    through Chase or through Barclay.  They might have

5    changed.  But in whose name does that show up in a

09:56  6    credit report?

7         A.    Well, that could vary.

8         Q.    What do you mean it could vary?

9         A.    It could vary depending on the

10    circumstances of that particular account.

09:56  11         Q.    Can you tell me what circumstances would

12    determine whether it was furnished in one name

13    versus another?

14         A.    A circumstance could be, if the lender

15    feels that a particular name might be more or less

09:57  16    confusing to a consumer if they were to see it on

17    their consumer report, so they would recommend a

18    recognizable name.

19         Q.    You say "they," who do you mean by they,

20    they would recommend a recognizable name?

21         A.    They would be the client.

22         Q.    So assume that I had -- for a long time,

23    Sears accounts were through Citibank, okay.  Now,

24    I'll just refer to it as Citi, C-I-T-I.

25         A.    Okay.

09:58 1      Q.    And so if I had a Sears account with

2      Citi, which of those do you -- does Experian believe

3      would be more recognizable to me who applied at

4      Sears for such a card, Sears or Citi?  What should

5      be in my credit report?

09:58 6      A.    It could be either or both, because --

7      Q.    I understand.  I'm talking about in

8      accordance with Experian's procedures.

9      A.    Okay.

10     Q.    Your policy, which should it be?

09:58 11     A.    And your -- in your scenario, you are

12     Citi requesting this account?

13     Q.    I applied at Sears.  I fill out the

14     application.  The Sears salesman puts it in his

15     antiquated computer, by the way, and calls it on the

09:58 16     telephone.  In whose name should that account be

17     reported in my Experian consumer disclosure -- Citi,

18     Sears or both -- if you were following Experian's

19     procedures and policies?

20     A.    Right.  Well, that's why I was asking who

09:59 21     is reporting the account to Experian.  If it was

22     Sears -- I'm sorry.

23         If it was Citi requesting the account to

24     report your data under, we would initially put it

25     under Citi unless Citi were to advise us that the

Page 18

09:59   1   credit card that you were using has the name Sears

2   all over it.  And so Sears would need to be

3   reflected on that trade line so that you wouldn't be

4   confused if you saw it on your credit report.

5      Q.    Okay.  And but -- so let's assume,

09:59   6   because it does, by the way, have Sears all over it,

7   it doesn't have Citi on the front anywhere.  You've

8   got to look on the really back print to see

9   whether -- I can't remember whether it's Chase or

10  Citi now, but you have to look on the back strip of

09:59  11  it.

12          Under such a circumstance, where there is

13  Sears all over my credit card, then are you saying

14  that Experian's policy would put it under Sears and

15  not under Citi, or are you saying it should be, if

10:00  16  they were following your procedures, both?

17      A.    I would say our standard practice would

18  be -- would be to list the name as the -- our

19  client, who, in this case, it sounds like would be

20  Citi, and we would only alter that at the request of

10:00  21  the client if they suggested that it would alleviate

22  confusion to the consumer.

23          So, initially, it would be Citi and then

24  upon request we could alter it to accommodate the

25  requester in, you know, with the purpose of

Page 19

10:01  1    alleviating confusion.

       2        Q.    So my analogy in this case -- well,

       3    before we get to that analogy, you said that you

       4    were asking a necessary fact, which is, which

       5    entity, Sears versus Citi, would actually be doing

10:01  6    the credit reporting to Experian, right?  Is that

       7    what you were asking me?

       8        A.    That's correct.

       9        Q.    And why is that important?

      10        A.    Because we would need to know who our

10:01 11    contract was with and where the data was coming in

      12    from.

      13        Q.    And why is that important?

      14        A.    Well, it's mostly important for the

      15    contractual purposes because that's going to be the

10:01 16    entity that is responsible for providing us with

      17    accurate data.

      18        Q.    And so, in that circumstance, between

      19    Sears and Citi, who was the source of the

      20    information that had been provided to Experian in my

10:02 21    credit report account or trade line?

      22        A.    Could you define source for me?  I don't

      23    think I follow the question.

      24        Q.    Mm-hmm.  Is that -- do you think source

      25    is a complex word?

Page 20

10:02  1        A.      I think it could be.

       2        Q.      Why could it be?

       3        A.      Well, because in your scenario you stated

       4    you initiated an account with Sears.

       5        Q.      Mm-hmm.

10:02  6        A.      And --

       7        Q.      How about this?

       8        A.      And the funder of the account was Citi,

       9    and you didn't exactly outline who was going to

      10    contract with Experian.  I made an assumption it

10:03 11    would be Citi.

      12        Q.      Well, right.  So in that circumstance,

      13    the subscriber -- the entity that had the contract

      14    with Experian -- would be Citi and Citi would be the

      15    entity that was submitting monthly metro credit

10:03 16    reporting data to Experian about my trade line.  So

      17    under that circumstance, which is the source or who

      18    was the source of the information?

      19        A.      Again, it sounds like the account

      20    originated with Citi as well.  I would describe them

10:03 21    more as a furnisher.

      22        Q.      So what is the furnisher?

      23        A.      The furnisher would be the entity that --

      24    that has the account to provide data to Experian.

      25        Q.      Can you turn to Exhibit 17?

10:04    1          A.    Yes.  I'm here.

         2          Q.    Sorry.  All right.  You know, I'm taking

         3    us too off track here, so you can close Exhibit 17

         4    and go back to Exhibit 1.  I'm just overly

         5    exuberant.

10:05    6                I'm back to Exhibit 1 now --

         7          A.    All right.  I'm there.

         8          Q.    -- the declaration.  And, again, I'm at

         9    the first page.  And in the first paragraph, you

        10    state, "The facts stated in this declaration are

10:05   11    true of my own personal knowledge, including

        12    knowledge acquired in the course and scope of my job

        13    responsibilities and through the review of pertinent

        14    documents maintained as business records by Experian

        15    in its course and scope of Experian's business."

10:05   16                I'm going to go through the declaration

        17    and I would ask -- at certain points I'm going to

        18    ask you where you get this knowledge from.  Do you

        19    see where it says, "personal knowledge"?  Personal

        20    knowledge would be -- and this is just me talking

10:06   21    because I can.  I'm running up my tab with Mike and

        22    with Jennifer.

        23                But personal knowledge does not mean

        24    knowledge that isn't your own.  And so I'm going to

        25    ask, as we go through, whether you got the knowledge

Page 22

10:06  1    because it is your personal knowledge or whether you

2    obtained it from documents you reviewed to prepare

3    this declaration.  Okay?

4         A.    Okay.

5         Q.    So, now, I want to go to the second

10:06  6    paragraph -- no, skip to the third.  The third

7    paragraph, it says, "There are five primary roles in

8    the modern credit reporting system," and then you

9    list five.  Did you type this sentence?

10         A.    I did not.

10:07 11         Q.    And what's your background in

12    understanding the Fair Credit Reporting Act?

13         A.    My background in understanding it?  I'm

14    familiar with the Fair Credit Reporting Act.  Most

15    specifically, I would say the sections regarding

10:07 16    permissible purpose on which clients -- which helps

17    to outline which clients might be eligible to

18    inquire on credit reports.

19         Q.    Okay.  And under the Fair Credit

20    Reporting Act, there is a -- you use the word

10:07 21    subscriber, but the Fair Credit Reporting Act uses

22    the word user.

23              Have you ever used the word user to

24    describe the role of a party in the modern consumer

25    credit reporting system?

10:08  1        A.     Not generally, but I probably have with

2      regards to the discloser for users.

3        Q.     Okay.  So when it says "furnisher" --

4      and, again, in your sentence, you have furnisher --

5      there is a separate section of the Fair Credit

10:08  6      Reporting Act that governs the obligations of a

7      furnisher.  Have you reviewed or read that section?

8        A.     I don't recall that section at this

9      moment.

10        Q.     There is also a section that governs what

10:08 11      a credit reporting agency or consumer reporting

12      agency, such as Experian, has to do when a consumer

13      makes the dispute.  Have you reviewed that section?

14        A.     No, I have not.

15        Q.     And then there is a section regarding

10:09 16      what information has to be provided in a consumer's

17      consumer disclosure.  When a consumer wants to see a

18      copy of their file at Experian, there is a section

19      that governs the contents of that.  Have you

20      reviewed that section?

10:09 21        A.     I have not.

22        Q.     So I can help you a little bit.

23        A.     Okay.

24        Q.     I won't even charge you for this

25      knowledge.  I wouldn't call it legal advice.  But if

Page 24

10:10  1    you want to turn to Exhibit 15 -- Exhibit 15,

       2    please.

       3         A.    I'm here.

       4         Q.    And where did you go to college,

       5    Mr. Henke?

10:10  6         A.    I went to Roosevelt University.

       7         Q.    And did you get a degree?

       8         A.    I did.

       9         Q.    What is the degree in?

       10        A.    A bachelor's of science in business

10:10  11   management.

       12        Q.    And did you take any postgraduate

       13   education?

       14        A.    I have not.

       15        Q.    When did you obtain your degree?

10:10  16        A.    I believe that was in 2001 -- I'm sorry.

       17   Excuse me.  In '91.

       18        Q.    How old are you now?

       19        A.    I'm 43.

       20        Q.    And what city -- what city and state do

10:11  21   you reside?

       22        A.    I reside in Cary, Illinois.

       23        Q.    Do you work out of your home or is there

       24   an Experian office in Cary, Illinois?

       25        A.    I work out of the Experian Schaumburg

Page 25

10:11  1   office mostly.

       2       Q.    And how many other people work there

       3   besides you, roughly?

       4       A.    It would just be a guess, but it would --

       5   I would guess, maybe, 500.

10:11  6       Q.    And what is the purpose or function or

       7   primary purposes or functions of that Experian

       8   location?

       9       A.    I would not say that it has a designated

      10   function other than as a credit bureau, and it also

10:12 11   houses some of the other Experian entities you spoke

      12   of.  For instance, Experian Marketing Solutions is

      13   out of that office to some degree.

      14       Q.    Now, back at Exhibit 15 -- you're not a

      15   lawyer, right?

10:12 16       A.    That's correct.

      17       Q.    Have you ever read the Fair Credit

      18   Reporting Act?

      19       A.    I've read sections, not the act in its

      20   entirety.

10:12 21       Q.    So this is the text of a section that --

      22   what's been codified or the way that it's in the law

      23   books now -- sometimes you refer to sections

      24   differently at Experian.  But in this instance, the

      25   code section is -- the way lawyers would say it to

10:13   1     courts -- 15 U.S. Code Section 1681g.  So I'm going

        2     to refer to this as 1681g.  And, it says, 1681g --

        3     and the title of this section is, "Disclosures to

        4     Consumers."  Do you see that?

        5          A.    I do.

10:13   6          Q.    Have you read this section before today?

        7          A.    Not that I recall, no.

        8          Q.    All right.  And then, if you look below

        9     that box, there is -- it starts with the little

        10    letter "a," subsection "a," do you see that?

10:13  11          A.    Yes.

        12         Q.    All right.  And, it says, "Every consumer

        13    reporting agency shall upon request" -- and I'll

        14    skip the material part -- "so every consumer

        15    reporting agency shall, upon request, clearly and

10:13  16    accurately disclose to the consumer, one, all

        17    information in the consumer's file at the time of

        18    the request, and, two, the sources of the

        19    information."

        20              And Joe and Patricia can interrupt if

10:14  21    I've mischaracterized this, but I think the

        22    additional text that I've skipped over is not part

        23    of what we're litigating in this case.

        24              So simplifying it to the material

        25    language, every consumer reporting agency shall,

10:14   1    upon request, clearly and accurately disclose to the

        2    consumer all information in the consumer's file at

        3    the time of the request and the sources of the

        4    information.  Do you follow me?

        5         A.    I believe so.

10:15   6         Q.    So, in this case, CardWorks opened a new

        7    subscriber relationship related to the Advanta

        8    portfolio with Experian, correct?

        9         A.    I'm sorry.  Can you repeat that?

        10        Q.    Sure.  In this case, CardWorks Servicing

10:15   11   opened a new subscriber relationship related to the

        12   Advanta accounts with Experian, correct?

        13        A.    I believe, in this case, the new account

        14   was opened under Advanta with CardWorks Servicing as

        15   their servicer.

10:16   16        Q.    Well -- so which subscriber agreement

        17   governs the relationship -- well, let me step back.

        18              You obtained subscriber agreements with

        19   each of your clients, correct?

        20        A.    We do.

10:16   21        Q.    Yes.  And those subscriber agreements

        22   govern what I'll characterize as two types of

        23   relationships.  One, they govern the relationship

        24   that you have said you're familiar with, the

        25   impermissible pool section, the relationship by

Page 28

10:16   1   which a client of Experian's is permitted to buy a

        2   credit report or a score or related product from

        3   Experian, right?

        4       A.    That's correct.

        5       Q.    All right.  And then -- and that, in

10:17   6   fact, is where Experian makes most of its money,

        7   right?

        8       A.    Yes.

        9       Q.    But these subscriber or client

     10   agreements, they also govern the relationship with

10:17 11   the client and the client's role as a furnisher and

     12   the client's role furnishing credit information

     13   about consumer's trade lines to Experian, right?

     14       A.    Correct.

     15       Q.    So in this case, there was an account

10:17 16   that had originated, in however fashion -- through

     17   trust, through servicing, whatever -- from Advanta

     18   Bank.  You understand that, right?

     19       A.    I'm sorry.  Could you repeat that again?

     20   I'm sorry.

10:18 21       Q.    Sure.  There was an account regarding

     22   Mr. Dreher that, at some point, had originated prior

     23   to Advanta shutting down, had originated through

     24   Advanta Bank -- through the trust, or through

     25   Advanta Bank, or whatever, right?

Page 40

10:37 1    that mortgage loans or mortgage lending is

2    structured?

3         A.    Yes.

4         Q.    Let me try it a little differently.  Do

5    you know -- does the word securitization mean

10:37 6    anything for you other than it's not in Jennifer's

7    dictionary or database?

8         A.    Yes.  I'm familiar with that.

9         Q.    What is your understanding of that?

10        A.    Securitization, it would be that mortgage

10:37 11   loans are packaged up and sold as investments,

12   securitized.

13        Q.    So my loans, I should just stop and make

14   my credit report an exhibit for you.  But I have a

15   loan, a small loan, still left with Wells Fargo

10:38 16   Bank.  Wells Fargo is my -- is shown in my trade

17   line, and Wells Fargo is the entity to whom I write

18   a check -- or Wells Fargo is simply a mortgage

19   servicer.  They don't own my loan.

20             I've just described how my loan is set

10:38 21   up.  Do you have any experience, as an Experian

22   membership director, that would inform us as to the

23   mortgage industry, more generally, this way of

24   structuring with servicers and investors and the

25   transfers of mortgages?

Page 41

10:39 1          A.    Yes.  What you've described I was

2     familiar with.

3          VIDEO TECHNICIAN:  Pardon me, Counsel.  This

4     is the videographer.  We're going to need to take

5     just a moment to change tapes.

10:39 6          MR. BENNETT:  Thank you.

7          MS. CRUZ:  Would this be a good time for a

8     break?  It's been over an hour.

9          MR. BENNETT:  Sure, whenever you want.

10          VIDEO TECHNICIAN:  We're going to go off the

10:49 11    record.  The time is 10:39 a.m.  This is the end of

12    Tape No. 1.

13                    (A recess was had.)

14          VIDEO TECHNICIAN:  Okay.  We're going back on

15    the record.  This will be the beginning of Tape

10:50 16    No. 2.  The time is 10:49 a.m.  Counsel.

17    BY MR. BENNETT:

18          Q.    Thank you.  If you could turn to

19    Exhibit 4.

20          A.    Yes.  I'm there.

10:50 21          Q.    Actually, you know what?  I'm going to

22    skip ahead to Exhibit 9.

23          A.    I'm there.

24          Q.    And I'm disappointing you, Mr. Henke,

25    because I'm not -- I'm going to skip back to 4.

Page 42

10:50  1      A.    4?

       2      Q.    I'm testing you.

       3      A.    Did he say 4?

       4      Q.    Back at 4, it's a small e-mail chain.

       5    All of the substance is on Bates No. 172.  If you

10:51  6    want to read that page and let me know when you've

       7    done so on Exhibit 4.

       8      A.    Okay.  I've read it.

       9      Q.    Now, the uses -- these e-mails --

      10    Mr. Kilka's e-mail uses the word sub code.  What is

10:51 11    sub code?

      12      A.    Sub code, that was the number you

      13    referred to earlier.  It's short for a subscriber

      14    code.  Essentially it's an account number for a

      15    client.

10:52 16      Q.    And each client will have their own

      17    account number, right?

      18      A.    A client can have multiple subscriber

      19    codes.

      20      Q.    Okay.  But, I guess, the point is that

10:52 21    the account number is attributed to a specific

      22    client of Experian's as opposed to a portfolio or

      23    where an account is originated?

      24      A.    That's correct.  It indicates the client.

      25      Q.    And so, in this instance, there was a

Page 43

10:53   1   discussion where Mr. Kilka is asking CardWorks,

2   Experian is asking CardWorks, how CardWorks wants

3   the trade lines for their new subscriber code to

4   show, right?

5        A.    They're asking CardWorks how they want

10:53   6   the subscriber name to display on this account,

7   that's correct.

8        Q.    That's right.  And Exhibit 172 on page --

9   I'm sorry.  Exhibit 42, on page 172, Mr. Kilka asks,

10   "Today your other subscriber codes show as

10:53  11   Siebel/CWS to consumers and creditors.  Do you want

12   CWS on the end of Advanta credit cards."  Do you see

13   that?

14        A.    I do.

15        Q.    So, I mean, in theory, if CardWorks

10:54  16   requested this, Experian, following its procedures,

17   could have furnished the trade line as Advanta

18   Credit Cards/Cardworks Servicing, right?

19        A.    Are you saying we could have displayed it

20   that way?

10:54  21        Q.    Yes, you could have.

22        A.    That's correct.

23        Q.    Why didn't you?

24        A.    Because we relied on the -- this

25   individual at CardWorks to provide us with the best

Page 44

10:54  1   name.

2      Q.    So, in your declaration, you have -- you

3   referenced the procedure, the general unwritten

4   policy, about -- you know, that governs the way a

5   trade line is displayed.

10:55  6           Would it be a fair description of that

7   policy to state that Experian's policy for how a

8   trade line is to be displayed is to defer to the

9   furnisher's, the subscriber client's, decision as to

10  how to display that trade line?

10:55 11      A.    I wouldn't refer to it as a policy.  I

12  would say, as a practice, we would enter the

13  entity's name unless the client has reason to alter

14  it or to have a different name posted.

15      Q.    That's right.  But it is not a policy of

10:55 16  Experian's that the client state the reason or

17  provide the explanation for why it wants a

18  particular name displayed as the trade line, right?

19      A.    It is not a policy.

20      Q.    And so, in this instance, it appears --

10:56 21  from this e-mail, in fact -- Experian never even

22  asked why CardWorks didn't want its own name shown

23  anywhere in the trade line, right?

24      A.    It doesn't appear that we asked that

25  question in this e-mail chain.

10:56 1      Q.    And that is not -- that manner of

2       determining the trade line that would be displayed

3       to consumers, that is the ordinary process by which

4       Experian would make that determination, right?

5           A.    I'm sorry.  Could you repeat that

10:57 6      question?

7           Q.    Sure.  In this e-mail chain, it

8       demonstrates a process that Experian used to

9       determine what it would list in the trade line as

10      the identity of the subscriber or the furnisher,

10:57 11     right?

12          A.    In this e-mail?  Yes.

13          Q.    Yes.

14          A.    Yes.

15          Q.    And the -- there is nothing in here that

10:58 16     is particularly out of the ordinary or surprising to

17      you as the way in which that trade line identity

18      would be determined, right?

19          A.    I would say, no, there is nothing

20      surprising in this e-mail.

10:58 21     Q.    And this is the manner in which -- this

22      is fairly typical of the manner in which Experian

23      would determine what the name of the furnisher or

24      how the name of the furnisher or subscriber would be

25      displayed in a trade line, correct?

Page 46

10:58  1       A.    I don't know if I would say this was

       2    typical.  In my practice, I would typically have a

       3    conversation and explain the intent of that name to

       4    be recognizable to the consumer.  I don't know if

       5    James did that outside of the e-mail or if that was

10:59  6    just assumed within the e-mail, so...

       7       Q.    But if the subscriber still wanted it

       8    displayed to -- if a servicer subscriber still

       9    wanted it displayed to omit any mention of the

      10    identity of the servicer, Experian's practice would

10:59 11    be to allow that subscriber to make that decision,

      12    right?

      13       A.    We could accommodate such a request, yes.

      14       Q.    Are you aware of any circumstance in

      15    which a subscriber told Experian how it wanted a

10:59 16    trade line displayed and then Experian would not

      17    agree to that subscriber request?

      18       A.    I do recall that happening, but I cannot

      19    recall the name of an entity specifically that

      20    that -- the scenario you described -- occurred with.

11:00 21       Q.    Approximately how many -- well, let me

      22    say this.

      23          Approximately how many times -- you just

      24    said you recall it happening.  You recall it

      25    happening once or more than once?

Page 47

11:00   1          A.      More than once.

        2          Q.      How often does it occur that Experian

        3      would not agree to display the trade line, however

        4      it is that the servicer/subscriber wanted?

        5          A.      Well, it would -- how often?  It would

11:01   6      not be frequent.

        7          Q.      In looking at this process in this case,

        8      which is -- I think this e-mail is a focus on how

        9      that trade line display occurred, is there anything,

        10     any mistake of which you're aware, that Experian

11:01  11      made in determining what or how the trade line for

        12     these accounts for Mr. Dreher would be displayed?

        13         A.      Are you pointing to this e-mail again?

        14         Q.      Well, I'm using the e-mail.  But in this

        15     instance, the relevant trade lines in this case for

11:02  16      Mr. Dreher did not display CardWorks, CardWorks

        17     Servicing, CWS, or anything other than Advanta Bank

        18     or Advanta Credit Cards, correct?

        19         A.      That's my understanding, yes.

        20         Q.      And that is the way that Experian

11:02  21      intended, correct?

        22         A.      I would say we did accommodate this

        23     request.

        24         Q.      That's right.  But it wasn't a mistake?

        25         A.      Yes.

11:44   1    your additional due diligence and I appreciate that.

        2    BY MR. BENNETT:

        3        Q.    Now, Mr. Henke, if we could now turn to

        4    Exhibit 5.  And this is a little bit of a longer

        5    e-mail chain, so I'm actually going to start at

11:44   6    page 217 -- Bates No. 217, rather, on the bottom

        7    right.  This is about five pages in, four pages in.

        8        A.    Yeah.  I'm there.

        9        Q.    And you've now had a chance to read

        10   these.  In this break, you've read these e-mails,

11:45   11   right?

        12       A.    That's correct.

        13       Q.    So I'm now starting with the James Kilka

        14   to Brian Bennett e-mail, October 21, 2010, at

        15   1:30 p.m.  And, it says, "I spoke to our client

11:45   16   support area."  That is not membership, right?  It's

        17   a different department?

        18       A.    That's correct.

        19       Q.    It's not your department, right?

        20       A.    Yes.

11:45   21       Q.    And then there is this description that

        22   says, "You will essentially close the trade lines or

        23   the trades on the old sub code and mark them

        24   transferred and then begin to report them under a

        25   new sub code."  Do you see that?

```
11:45   1        A.    I do.

        2        Q.    Now -- now that you've had an

        3    opportunity, by the way, to review these e-mails and

        4    additional exhibits, do you still believe that this

        5    new subscriber code was reported to Experian under

11:46   6    the governance of the subscriber agreement executed

        7    by Advanta Bank Corp.?

        8        A.    I would have to give that more thought.

        9    The subscriber code was set up under the Advanta

       10    Bank Corp. Company ID, which would imply that it

11:46  11    falls under the Advanta Bank Corp. contract.

       12        Q.    But if you'll take a look at 217,

       13    Mr. Kilka explains --

       14        A.    Mm-hmm.

       15        Q.    -- "I've spoken to our client support

11:46  16    area, and the information I shared around not being

       17    able to move the sub code under your company ID was

       18    accurate.  You will essentially close the trades on

       19    the old sub code, mark them as transferred, and then

       20    begin to report them under a new sub code."

11:47  21        A.    Correct.

       22        Q.    And is that what happened?

       23        A.    I don't -- it doesn't appear that it was

       24    executed as he described here; but with regards to

       25    the company ID, they did remain under the Advanta
```

11:47  1    Company ID.

       2        Q.    Now, you require -- Experian requires a

       3    subscriber agreement to govern the ability or right

       4    to pull or obtain some consumer's credit file,

       5    right?

11:48  6        A.    Correct.

       7        Q.    And, in fact, the one area of the SCA

       8    that you recall reading or knowing was impermissible

       9    pulls; that is, when Experian is allowed to sell a

      10    report to a particular client, right?

11:48 11        A.    Yes.

      12        Q.    So if, in this instance -- and, also, by

      13    the way, recall that we know now that with

      14    bull's-eyes you can only pull a bull's-eye for your

      15    own trade lines, right?

11:48 16        A.    For trade lines that you reported, yes.

      17        Q.    So, in this circumstance, there certainly

      18    would have had to be a client or subscriber

      19    relationship between CardWorks and Experian, right?

      20        A.    When you say "this particular

11:49 21    relationship," you mean the subscriber code?

      22        Q.    Yes.

      23        A.    172?  I would say, yes, either directly

      24    or indirectly.  Meaning, it could be an agent

      25    agreement.

11:49  1        Q.    And are you aware of any agency

2   relationship agreement, rather, between Advanta Bank

3   Corp. and CardWorks Servicing?

4        A.    I don't recall that agreement.

5        Q.    Are you aware that Advanta Bank was,

11:49  6   itself, only a servicer of this credit card

7   portfolio?

8        A.    I was aware they serviced.  I didn't know

9   they were only a servicer.

10        Q.    Only a servicer.  Well, you discuss,

11:50  11   don't you, the trust in your declaration?

12        A.    I'm sorry?

13        Q.    Well -- well, so I'm looking at your

14   declaration now.  You actually -- you don't have any

15   personal knowledge as to whether Advanta Bank Corp.

11:50  16   actually was an original credit grantor as opposed

17   to a servicer, do you?

18        A.    No.

19        Q.    And you don't actually know who the

20   actual owner of these accounts that Experian labeled

11:51  21   as Advanta credit card accounts, you don't actually

22   know who the owner of those accounts is, do you;

23   you, personally?

24        A.    I was under the understanding that

25   Advanta was.

11:51    1          Q.      And where did you get that understanding

         2    from?

         3          A.      Because we engaged with Advanta for our

         4    agreements.

         5          Q.      Okay.  Now, if Advanta Bank Corp. was not

11:51    6    the owner of the accounts and was, instead, only a

         7    servicer, when servicing was transferred to

         8    CardWorks Servicing, what should the trade line have

         9    stated?

        10          A.      That would depend on what the client felt

11:52   11    was -- would cause less confusion to the consumer.

        12          Q.      Right.  Well -- all right.  Do you know

        13    that my client was an identity theft victim who

        14    never actually applied for any account with Advanta?

        15    Are you aware of that?

11:52   16          A.      I was told that, yes.

        17          Q.      Mm-hmm.  So given that he had no previous

        18    relationship with Advanta, how would including the

        19    name Advanta have helped a consumer, an identity

        20    theft victim, such as my client?

11:52   21          MS. CRUZ:  You should answer the question if

        22    you have knowledge of the information.

        23    BY THE WITNESS:

        24          A.      Yeah.  I'm not sure.  Not having been an

        25    identity theft victim, I don't know how it would

Page 75

11:56    1    ID, right?

         2         MR. CLARK:  Len, I want to object to form.

         3    You said the phrase understood again.  This is

         4    Henke, not Kilka.

         5         MR. BENNETT:  I'm talking about Experian as a

11:57    6    managing agent, even if he's not a 30(b)(6)

         7    designee.

         8    BY MR. BENNETT:

         9         Q.   Mr. Henke, so if you were reading these

        10    e-mails and trying to discern, as an Experian

11:57   11    membership director, the -- Experian's intent, you

        12    would agree that it appears, from these e-mails,

        13    that Experian had intended to create the new

        14    subscriber code connected to CardWorks Servicing's

        15    company ID, not Advanta's company ID, correct?

11:57   16         A.   Actually, my understanding is that that

        17    was the request, but that Experian was leaving the

        18    new subscriber code under the Advanta company ID but

        19    attempting to find a way for the servicer, being

        20    CardWorks, to have access to it.

11:58   21         VIDEO TECHNICIAN:  You know, pardon me,

        22    Counsel.  Counsel --

        23    BY MR. BENNETT:

        24         Q.   Advance then to --

        25         MS. CRUZ:  Len, the videographer is trying to

11:58  1    make a statement.

       2        VIDEO TECHNICIAN:  Yeah.  I'm sorry, Counsel.

       3    We'll need to take just a moment to change tapes.

       4        MR. BENNETT:  All right.  Thank you.

       5        VIDEO TECHNICIAN:  This will be the end of

11:59  6    Tape No. 2.  We're going off the record at

       7    11:58 a.m.

       8               (A recess was had.)

       9        VIDEO TECHNICIAN:  This is the beginning of

      10    Tape No. 3.  The time is 11:58 a.m.  Please proceed.

11:59 11    BY MR. BENNETT:

      12        Q.    So, Mr. Henke, I think you're right.  I'm

      13    now continuing on Exhibit 5.  And if I could take

      14    you to page 214, which is the second from the top --

      15        A.    I'm sorry.  214, did you say?

11:59 16        Q.    That's right.

      17        A.    And which paragraph?

      18        Q.    Well, Mr. Kilka, our experienced

      19    employee, is now in the 1207 e-mail, October 29,

      20    communicating with CardWorks and saying -- asking,

12:00 21    "Are these trades still going to be updated by

      22    somebody on an ongoing basis?  Is the Advanta trust

      23    going to be the one to handle the reporting.  It

      24    seems that you will act as an agent to servicing

      25    agent.  And this ties us back to the form I've

12:00    1    provided to Maria at the beginning of this all."

         2                And then right above it, Mr. Kilka

         3    then -- Experian, then says, "You mentioned a trust.

         4    Do you have a contact at whomever -- whomever that

         5    truly is?"  And you understand that, right, those

12:01    6    exchanges?

         7        A.    I see them, yes.

         8        Q.    Now, if you'll turn to the very top page

         9    with that context, Bates No. 217 of Exhibit 5, can

        10    you read the e-mail from CardWorks back to

12:01   11    Experian's employee, James Kilka, at the bottom?

        12        MS. CRUZ:  To clarify, Len, are you referring

        13    to Bates No. 213 or 217?

        14        MR. BENNETT:  213, sorry.

        15        MS. CRUZ:  Okay.

12:01   16    BY THE WITNESS:

        17        A.    The November 4th e-mail.

        18        Q.    Yes.

        19        A.    It says, "James, the owner of the Advanta

        20    accounts is Vion Holdings II, LLC.  Thanks.  Gina."

12:01   21        Q.    So with that knowledge, how would that be

        22    material to Experian's existing practice or

        23    procedure for reporting the source of information of

        24    the trade line?

        25        A.    Based on this content?

Page 78

12:02   1       Q.      Yes.

        2       A.      I would say we would try to obtain an

        3   agreement with Vion Holdings and move -- or obtain

        4   an agency addendum for CardWorks as an agent for

        5   Vion Holdings.

12:02   6       Q.      And, in fact, you've seen the subsequent

        7   exhibit, Exhibit 7, which you can turn to now, two

        8   exhibits later.

        9       A.      I'm on 7.

       10       Q.      And, apparently, there was now an

12:03  11   agreement that Vion was asked to sign but then had

       12   edited a separate membership agreement, right?

       13       A.      It appears that way, yes.

       14       Q.      Now, if you could then turn to Exhibit 8,

       15   there is a document attached to this e-mail, a

12:03  16   couple of documents.  Can you explain these to me?

       17       A.      The first document is --

       18       Q.      Sure.

       19       A.      -- an application for an authorized agent

       20   or third-party processor, and it's completed by

12:03  21   CardWorks Servicing.

       22       Q.      What is this document used for?

       23       A.      This would be used for an agent or a

       24   third-party processor that wants to apply to become

       25   an authorized agent or third-party processor.

12:04  1        Q.    What is the third-party processor as

2      opposed to an agent?  What's the difference?

3        A.    Typically, a third-party processor would

4      look more like a software vendor or a pass-through,

5      whereas an agent would handle the data with regards

12:04  6      to reporting.  For instance, a processor, a data

7      processor, may pass the data to Experian, but would

8      not handle disputes, whereas an agent would handle a

9      dispute on behalf of the client.

10        Q.    And then there are two more pages that

12:04 11      follow.

12        A.    Let's see.  59 is an agency addendum to

13      the standard terms and conditions, and 260 is also

14      an agency addendum to the standard terms and

15      conditions.

12:05 16        Q.    And the second one was provided by Vion

17      Holdings apparently?

18        A.    That's correct.  260 appears to have been

19      completed by Vion Holdings as the client with

20      CardWorks, I believe, as the agent.

12:05 21        Q.    If you could take a look at Exhibit 10 --

22        A.    Okay.

23        Q.    -- what is this document?

24        A.    Pages 271 and 272 are the business

25      information services schedule, and then pages 273

Page 80

12:06 1    and 274 are the Experian standard terms and

2    conditions.

3         Q.    And this governs your relationship with

4    CardWorks, correct?

5         A.    This would govern the sale of business

12:06 6    information to CardWorks.

7         Q.    And then what is Exhibit 11?

8         A.    The pages 140 and 141 are the standard

9    terms and conditions with Advanta Corp.; and the

10   consumer services schedule is page 142, also with

12:06 11   Advanta Corp.

12        Q.    And this says, "Effective date,

13   10/12/10."  Do you see that?

14        A.    I do.

15        Q.    Do you know who signed this document

12:07 16   supposedly for Advanta?

17        A.    It appears Jodi Plavner.

18        Q.    Do you know who that is?

19        A.    I do not know Jodi.

20        Q.    Was Experian even in the business -- I'm

12:07 21   sorry -- Advanta Bank Corp. of signing documents in

22   that time period?

23        A.    I'm not sure I understand.  Is Advanta

24   Bank Corp. signing which documents?  And by time

25   period, do you mean on this date?

Page 81

| | | | |
|--|--|--|--|
|12:07|1|Q.|Yes.|
| |2|A.|I'm not aware --|
| |3|Q.|October 12, 2010.|
| |4|A.|I'm not familiar with an agreement that|
| |5|they signed on that date.| |
|12:08|6|Q.|And if you'll take a look at|
| |7|Exhibit 12 -- I'm sorry.  Let's go straight to 15.| |
| |8|A.|Okay.  I'm at 15.|
| |9|Q.|We went through this before.  This is the|
| |10|code 1681g, the U.S. code.  And the requirement, if| |
|12:09|11|you'll recall, simplified is that Experian shall,| |
| |12|upon request, clearly and accurately disclose to the| |
| |13|consumer all information in the consumer's file at| |
| |14|the time of the request and the sources of that| |
| |15|information.  And you now understand that's what| |
|12:09|16|this section says, right?| |
| |17|A.|I do.|
| |18|Q.|You have not been a victim of identity|
| |19|theft yourself, right?| |
| |20|A.|I have not, not that I'm aware of.|
|12:10|21|Q.|You believe -- and I'm now flipping back|
| |22|and forth.  You don't have to follow me here, but| |
| |23|I'm going to go to your declaration.  And you or| |
| |24|whoever did your declaration says, "Experian's| |
| |25|ultimate goal with regard to the manner in which it| |