# Exhibit A

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 11-4504

———————————

MARIE ANN FUGES,
on behalf of herself and all others similarly situated

v.

SOUTHWEST FINANCIAL SERVICES, LTD.

Marie Ann Fuges,
                                        Appellant

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 09-cv-00699)
District Judge:  Hon. Legrome D. Davis

———————————

Argued
September 25, 2012

Before:  McKEE, *Chief Judge*, JORDAN, and VANASKIE,
*Circuit Judges*.

(Filed: December 6, 2012)

———————————

James A. Francis   [ARGUED]
Erin A. Novak
John Soumilas
Francis & Mailman
100 S. Broad Street – 19th Fl.
Philadelphia, PA   19110
     *Counsel for Appellant*

Darryl J. May    [ARGUED]
Mark J. Furletti
Ballard Spahr
1735 Market Street – 51st Fl.
Philadelphia, PA   19103
     *Counsel for Appellee*

Thomas M. Hanson
Dykema Gossett PLLC
1717 Main Street – Ste. 4000
Dallas, TX   75201
     *Counsel for Not Party Amicus Consumer Data Industry
Association*

————————

OPINION OF THE COURT

————————

JORDAN, *Circuit Judge*.

Marie Ann Fuges appeals from an order of the United States District Court for the Eastern District of Pennsylvania entering summary judgment in favor of Southwest Financial Services, Ltd. ("Southwest") with respect to Fuges's claim that Southwest willfully violated the Fair Credit Reporting

Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.  Fuges claims that Southwest willfully violated FCRA when it included inaccurate information in a report to Fuges's lender concerning potential encumbrances on her home.  Southwest argues in response that it is not a "consumer reporting agency" ("CRA") governed by FCRA, and that the statute does not apply to the report that it provided to Fuges's lender. The District Court held that no reasonable jury could find that Southwest had willfully violated FCRA, because Southwest reasonably interpreted the statute as inapplicable to its activities and so, under the standard set forth in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), Southwest could not be liable as claimed.  For the following reasons, we will affirm.

## I.    Background

### A.    *Facts*

Southwest sells current owner title reports, otherwise known as property search or limited property reports ("property reports" or "reports") to consumer lenders.  The purpose of those reports is to confirm the identity of the current holder of title to the property and to determine whether the property is encumbered.  All of the information that Southwest collects is available in public records.

Southwest's reports include the name and address of the property owner, the marital status of the property owner (if it appears on the deed), the amounts of any outstanding mortgages, and the amounts of any outstanding liens or

judgments against the property.[1]  The property reports do not include the owner's social security number, payment history, previous addresses, employment information, date of birth, or outstanding account balances all of which would typically be included in a consumer credit report prepared by one of the "Big Three" credit reporting agencies (Equifax, Experian, and Trans Union).  Another point of distinction is that Southwest endeavors to include in its property reports only those judgment liens that remain unsatisfied at the time of the report, because only those liens encumber the property.  A typical credit report, by contrast, shows judgment liens that have been satisfied, because they are part of a consumer's payment history.

Marie Ann Fuges had a $35,000 line of credit from PNC Bank ("PNC"), which she secured with the home she owned in Philadelphia.  In 2008, she applied to PNC for payment protection insurance that would repay her line of credit in the event that she died or became disabled.  PNC told Fuges that, in order to obtain the insurance, she needed to reapply for her line of credit.[2]  She did so, and, after she

---

[1] Because the purpose of Southwest's property reports is to determine whether property to be used as collateral for a loan is encumbered, if a consumer seeks to secure a loan with collateral owned by a third party, the property report would only include information on that third party, not the consumer.  For approximately 80 percent of Southwest's Pennsylvania property reports, however, the loan applicant is also the owner of the subject property.

[2] Fuges also applied for a $5000 increase in the line of credit, even though that increase was not required in order for her to obtain the credit insurance.

4

submitted her loan application, PNC ordered a credit report generated by a credit reporting agency, as well as a property report on the home that she owned.  Southwest prepared the latter and provided information concerning the ownership of the home that Fuges put up as collateral, as well as information on whether the property was subject to mortgages, judgment liens, unpaid taxes, or other encumbrances.

More specifically, that property report contained the following information:  (1) Fuges's name and address; (2) a note concerning her marital status; (3) the amount of her mortgage ($35,000.00); (4) a reference to a $111.11 property tax delinquency; and (5) a reference to a $2,923.63 judgment lien filed by a merchant for a delinquency on the part of her son, Robert W. Fuges.  The report was inaccurate in two respects.  First, Fuges's property tax payments were arguably not delinquent because she had an agreement with the City of Philadelphia to pay her taxes in monthly installments.  Second, the property report should not have reflected the judgment lien because inclusion of the lien wrongly assumed that the debt was owed by Fuges's deceased husband, Robert E. Fuges, who had been an owner of the property at one time.

After PNC received the Fuges property report, it informed Fuges that it could not approve her loan application without proof that she had paid her property taxes.  Later, however, PNC provided Fuges with the credit insurance, leaving her existing line of credit in place.[3]

----

[3] It is unclear from the record when PNC changed its mind about the credit insurance, or for what reason.  Fuges testified that she found out "by accident" (App. at 427) that

B.    *Procedural History*

On February 18, 2009, Fuges filed a putative class action against Southwest, alleging that Southwest failed to comply with FCRA in preparing the property report that it had provided to PNC in connection with her credit application.  She initially claimed damages for both willful and negligent violations of the statute under 15 U.S.C. §§ 1681n and 1681o, respectively.

On April 22, 2009, Southwest filed a motion to dismiss for failure to state a claim, arguing that Fuges had failed to take certain actions required under FCRA (such as contacting Southwest and asking for a copy of her property report) and also arguing that Fuges could not prove that the report caused PNC to deny her credit application.  On July 15, 2009, the District Court dismissed most of Fuges's claims because she had failed to take actions required by FCRA, but the Court granted Fuges leave to amend her complaint.  She then filed an amended complaint, and Southwest again filed a motion to dismiss, which the District Court denied.

On August 1, 2011, Southwest moved for summary judgment.  It argued that its reports are not subject to FCRA, and that, even if they were, it was not liable because it did not willfully violate FCRA under the standard articulated in *Safeco*, 551 U.S. at 69-70.[4]  Southwest also asserted that it

---

the bank had provided the credit insurance when she read her banking statement several months after she submitted her credit application, and PNC never notified her of its decision. PNC did not approve the increase in the line of credit.

[4] In *Safeco*, the Supreme Court held that "a company

could not be held liable for any negligent violation of FCRA because PNC ultimately gave Fuges the credit insurance for which she had applied, and she did not suffer any injury as a result of Southwest's conduct.[5]

On November 21, 2011, the District Court issued an opinion and order granting the motion for summary judgment. The Court did not address whether Southwest's conduct fell within the scope of FCRA, or whether there was evidence of FCRA violations.  Rather, it determined that no reasonable jury could find that Southwest had acted willfully because Southwest's reading of FCRA as not being applicable to its

---

subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  551 U.S. at 69.  *See infra* Part II.B.

[5] Fuges testified that, initially, all she wanted from PNC was the credit insurance, but that "since [she] was reapplying, [she] just asked for the increase" in the credit line. (App. at 428.)  According to the statement of undisputed facts that Southwest submitted in support of its motion for summary judgment, because "[s]he obtained this insurance even though her [credit] application was denied[,] ... [s]he explicitly testified that she suffered no damage other than the allegedly inaccurate information reported to PNC." (App. at 257.)  In her brief in opposition to Southwest's motion for summary judgment, Fuges elected to pursue only her claim for willful violations and not to press her claim for negligent violations of FCRA.

business was not unreasonable. In particular, the Court said, "a reasonable jury could not conclude that Southwest *willfully*, i.e., *knowingly or recklessly*, violated ... FCRA, because Southwest reasonably interpreted its activities to fall outside the scope of the Act, in light of the less-than-clear statutory text and absence of meaningful judicial or FTC guidance." [6] (App. at 13.) In reaching that conclusion, the District Court reasoned that Southwest's interpretation of FCRA was "objectively reasonable" because the Fuges property report contained four sections – deeds, mortgages, parcel number and taxes, and lien information – that "more closely relate to a particular parcel of property than to a particular consumer." (App. at 10.) The Court also considered it significant that Southwest's report did not contain "Fuges'[s] social security number, payment history on various debts, or previous addresses, all of which one might expect to see on a typical credit report from a CRA." [7]

---

[6] The Federal Trade Commission ("FTC") has enforcement responsibility for certain FCRA provisions. *See Safeco*, 551 U.S. at 70.

[7] The District Court, like other courts, appears to have equated the term "consumer report," which is defined in FCRA, *see* 15 U.S.C. § 1681a(d)(1), with a "credit report," a term that is commonly understood to refer to a report like those prepared by one of the nationally recognized CRAs. *See also Cortez v. Trans Union, LLC*, 617 F.3d 688, 707 n.23 (3d Cir. 2010) ("We use 'consumer report' and 'credit report' interchangeably. The report referred to as a 'consumer report' in the statute is more commonly known as a 'credit report.'"). We note, however, that the two are not necessarily the same, as demonstrated by the fact that a report may constitute a "consumer report" when its purpose is not the

(*Id.*)   Thus, it determined that "Southwest's reading of FCRA's CRA definition, i.e., that Southwest's reports are 'on properties' not 'on consumers,' and therefore Southwest is not a CRA, has a foundation in the statutory text, which suggests that Southwest acted reasonably, not recklessly, with respect to FCRA."  (*Id.*)

Fuges filed a timely notice of appeal.

---

securing of credit or other financial services.  *See* 15 U.S.C. § 1681a(d)(1)(B), (C) (providing that purpose may be eligibility for employment or other purposes set forth in § 1681b).   Information other than credit data may also render a report a "consumer report" covered by FCRA.  *See* 15 U.S.C. § 1681a(d)(1) (providing that "*any* information ... bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" constitutes a consumer report (emphasis added)).

## II.   Discussion[8]

### A.   *FCRA*

FCRA "require[s] that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information ... with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b).[9]  The statute imposes

---

[8] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.  We have jurisdiction under 28 U.S.C. § 1291.  "We exercise plenary review over the [D]istrict [C]ourt's grant of summary judgment, applying the same standard ... ."  *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010).  "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving person is entitled to a judgment as a matter of law."  *Celotex v. Catrett,* 477 U.S. 317, 322 (1986) (internal quotation marks omitted).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9] The "reasonable procedures" required by FCRA include maintaining a system to provide fraud alerts to the consumer (15 U.S.C. § 1681c-1); maintaining an internal compliance system to ensure the accuracy of consumer information (*id.* § 1681e); providing disclosure of all information in a consumer's file on demand by the consumer (*id.* §§ 1681g, 1681h); and maintaining procedures to allow a

civil liability on "[a]ny person who ... fails to comply with any requirement imposed" by the statute. *See id.* §§ 1681n, 1681o.  A person who negligently fails to comply is liable to the affected consumer for actual damages. *Id.* § 1681o(a)(1). A person who willfully fails to comply is liable to the affected consumer for actual damages, or statutory damages ranging from $100 to $1,000, as well as punitive damages and attorney's fees. *Id.* § 1681n(a).

The enactment of FCRA "was prompted by congressional concern over abuses in the credit reporting industry." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996) (internal quotation marks omitted).  Congress wanted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco*, 551 U.S. at 52.  In support of FCRA, Congress found that

> [a]n elaborate mechanism [had] been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers[;] [] [that] [c]onsumer reporting agencies [had] assumed a vital role in assembling and evaluating consumer credit and other information on consumers; [and that] [] [t]here [was] a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

---

consumer to dispute and to correct inaccurate information (*id.* § 1681i).

15 U.S.C. §1681(a).

FCRA only applies to CRAs. The statute defines a "consumer reporting agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer[10] credit information or other information on consumers for the purpose of furnishing consumer reports to third parties … ." *Id.* § 1681a(f).

Moreover, for a report to be covered by FCRA, it must be a "consumer report," defined as

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for –
>
> > (A) credit or insurance to be used primarily for personal, family, or household purposes;
> > (B) employment purposes; or
> > (C) any other purpose authorized under section 1681b of this title.

---

[10] FCRA defines "consumer" as "an individual." 15 U.S.C. § 1681a(c).

*Id.* § 1681a(d)(1).[11]

Taken together, these definitions establish statutory markers against which the reasonableness of any reading of the applicability of FCRA must be measured.  One marker is that, for the preparer of a report to qualify as a CRA, the preparer must regularly engage in gathering information "on consumers" with the purpose of preparing and furnishing "consumer reports."  Another marker is that, for a report to be subject to FCRA, it must both be a "consumer report" and have been prepared by a "consumer reporting agency," as those terms are defined in the statute.

---

[11] The defined term "consumer report" is subject to a number of statutory exclusions.  These include:  reports containing information relating solely to transactions or experiences between the consumer and the person making the report or communications between commonly-controlled or affiliated parties, 15 U.S.C. § 1681a(d)(2)(A); notifications of the extension of credit by credit card companies, *id.* § 1681a(d)(2)(B); and reports containing the decision of a person who has been requested by a third party to extend credit to a consumer, provided that the consumer is informed of the request for the report, *id.* §1681a(d)(2)(C). Communications relating to prospective employment, including investigative reports, are also excluded.  *Id.* § 1681a(d)(2)(D), 1681a(o), 1681a(y).  FCRA does not specifically except "property reports" or any similar reports from the definition of "consumer reports," and we neither express nor imply any opinion on whether property reports of the kind at issue here are covered by FCRA.

B.    *Liability Standard Under* Safeco

The Supreme Court's landmark decision in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), set the framework that the District Court here relied on in granting summary judgment to Southwest.  *Safeco* involved insurance companies that relied in part on credit scores to set auto insurance premiums.  Because of unfavorable credit scores, some new applicants were quoted insurance rates that were higher than the best rates available.  The applicants argued that they had been subjected to an "increase" in rates (even though they had not previously enjoyed the lower rates) and so had suffered "adverse action" based on their credit reports, which required notice under § 1681m(a) of FCRA.  *Id.* at 54-55.  The insurance companies argued that they did not have to comply with FCRA's notice requirement because the failure to offer the preferred rates to new customers could not constitute an "increase" in rates in the absence of prior dealing.  *See id.* at 69.  The plaintiffs sought statutory and punitive damages, which required that they prove that the failure to give notice was "willful."  The Supreme Court held that it was not.  Although the Court disagreed with the insurance companies' interpretation of "increase," it concluded that the interpretation was "*not objectively unreasonable*, and so falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability."  *Id.* at 70 (emphasis added).  The Court thus established a safe harbor against liability for willfulness.  A company cannot be said to have willfully violated FCRA if the company acted on a reasonable interpretation of FCRA's coverage.

The Court derived this "reasonable interpretation" test by deconstructing the word "willfully." FCRA imposes civil liability where the defendant "willfully fails to comply" with the statute. 15 U.S.C. § 1681n(a).[12] The Court noted, however, that "'willfully' is a word of many meanings" and that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco*, 551 U.S. at 57 (citations and internal quotation marks omitted). Drawing on the "essence of recklessness at common law," the Court said that "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69 (internal quotation marks omitted). A defendant's conduct is reckless only if it was "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time." *Id.* at 69-70 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Thus, even when a court disagrees with a party's reading of FCRA, it may not impose liability for a reckless, and therefore willful, violation of the statute unless that party's reading is "objectively unreasonable." *See id.* at 69 (noting that the Court did not agree with Safeco's analysis and that its reading of FCRA was "erroneous").[13]

---

[12] FCRA also imposes liability for negligent violations. 15 U.S.C. § 1681o. However, Fuges elected to pursue only her claim for willful violations and not to press her negligence claim.

[13] Although the analysis that yielded the *Safeco* "reasonable interpretation" test followed from the common

In short, the *Safeco* test is one of "objective reasonableness," and the Court explicitly rejected the argument that subjective bad faith must be taken into account in determining whether a defendant has acted recklessly, and therefore willfully, under FCRA. In deciding that subjective bad faith is irrelevant, the Court said that, "[w]here … the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco*, 551 U.S. at 70 n.20.

Fuges argues in this appeal that Southwest is not entitled to the *Safeco* "reasonable interpretation" defense, both because Southwest had not actually interpreted FCRA

---

law definition of recklessness, knowing noncompliance also, of course, constitutes a willful FCRA violation. *See Safeco*, 551 U.S. at 57; *see also Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir. 1997) (acknowledging that an investigative policy could constitute a willful FCRA violation if adopted either "knowing that policy to be in contravention of the rights possessed by consumers pursuant to ... FCRA or in reckless disregard of whether the policy contravened those rights"). Fuges suggests that this may represent an alternative basis on which we may find willful violations on the part of Southwest. (*See* Appellant's Opening Br. at 26 (noting that "recklessness is not the only way for a plaintiff to prove an [sic] FCRA violation was willful" and that "knowing noncompliance may *also* constitute a willful FCRA violation").) However, the record contains no evidence that Southwest knew that it was in violation of FCRA, and Fuges did not make that argument in the District Court.

before concluding the statute did not apply to its activities and because Southwest's interpretation of FCRA was not objectively reasonable.[14]  We take each of those arguments in turn.

### C.    Safeco's Applicability Absent a "Reading" of FCRA

Fuges contends that the District Court erred by extending the "reasonable reading" defense articulated in *Safeco* to Southwest's conduct even though Southwest failed

---

[14] Fuges also argues that the District Court erred at the summary judgment stage by failing to consider evidence that Southwest's activities come within the ambit of FCRA, and that the District Court was required to consider evidence of willful violations prior to concluding that Southwest was, under *Safeco*, free from liability for such violations.  We disagree.  Evidence of knowing violations of FCRA is relevant to a claim of willfulness, *see supra* note 13, but then *Safeco*'s recklessness analysis would not apply.  *See Safeco*, 551 U.S. at 56-57 (noting that knowing violations of FCRA are willful by definition.)  When a plaintiff does not allege knowing violations of FCRA, however, the claim must be based on recklessness and *Safeco*'s "reasonable interpretation" test applies.  In those "recklessness" cases, whether a defendant has actually violated FCRA is simply not the issue.  *See id.* at 68 (noting that, even "if Safeco did violate the statute, the company was not reckless in falling down in its duty"); *id.* at 69 (noting that "Safeco's reading of the statute, albeit erroneous, was not objectively unreasonable"); *id.* at 70 ("Safeco's misreading of the statute was not reckless.").

to read or interpret FCRA in the first instance.  The District Court focused its analysis on the interpretation of the terms "consumer reporting agency" and "consumer report."  (*See* App. at 9 (discussing components of the CRA definition in 15 U.S.C. § 1681a(f)).)  The Court did not specifically address the question of whether Southwest had adopted a particular interpretation of those terms prior to preparing the Fuges property report or prior to the commencement of this lawsuit.

The timing, however, is not dispositive.  In *Long v. Tommy Hilfiger U.S.A.*, 671 F.3d 371 (3d Cir. 2012), we expressly rejected the argument that a defendant is required to have a pre-litigation "reading" of FCRA to avail itself of the *Safeco* "reasonable interpretation" defense.  671 F.3d at 377.  *Long* involved the interpretation of the phrase "expiration date" in a FCRA provision governing the disclosure of credit card information.  Like Fuges, the plaintiff in *Long* argued that the defendant "did not actually rely on *any* interpretation of [FCRA] and instead disregarded the statute altogether and is only now seizing upon a *post hoc* 'objectively reasonable' interpretation in order to shield itself from liability."  *Id.* (citation and internal quotation marks omitted).  That argument struck us as being, in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was "expressly foreclosed by *Safeco*," because such evidence "is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question."  *Id.* (citing *Safeco*, 551 U.S. at 70 n.20).

Fuges argues that *Long* and other cases in which defendants were found to have relied on a reasonable interpretation of FCRA may be distinguished from two post-*Safeco* cases in which there was "no evidence whatsoever of a

[FCRA] 'reading' by the defendant," and in which the *Safeco* defense did not apply. (*See* Appellant's Opening Br. at 40 (citing *Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006 (10th Cir. 2011); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008)).) However, in neither of those cases was the interpretation of specific FCRA terms at issue.[15]

Fuges also notes that in most of the post-*Safeco* cases, such as *Long*, *Shlatichman v. 1-800-Contacts, Inc.*, 615 F.3d 794 (7th Cir. 2010), and *Levine v. World Financial Network National Bank*, 554 F.3d 1314 (11th Cir. 2009), the "defendants acknowledged ... FCRA's regulatory existence, and attempted to comply with it on some level." (Appellant's Opening Br. at 40.) However, in each of those cases, the defendant also acknowledged that it was subject to FCRA, and the only disputed issue was the interpretation or

---

[15] The dispute in *Birmingham* was whether a CRA had willfully violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the accuracy of its consumer reports, and whether it had violated 15 U.S.C. § 1681i(a) because it did not adequately address a consumer's concerns about the accuracy of his credit file. *See Birmingham*, 633 F.3d at 1009. However, the defendant's reading of the relevant FCRA provisions was not at issue. The *Saunders* court did not apply the *Safeco* "reasonable interpretation" test because a jury had already found willful FCRA violations based on a pre-*Safeco* instruction that the defendant had to have acted "knowingly and intentionally." *See Saunders*, 526 F.3d at 151 & n.4 (noting that the jury instruction had placed a greater burden on the plaintiff than the *Safeco* test, and that he had met that burden).

applicability of a particular provision of FCRA. In the present case, based on its interpretation of the definitions of "consumer report" and "consumer reporting agency," Southwest has urged that it is not subject to FCRA at all.

In summary, Southwest does not lose the potential protection of the "reasonable interpretation" defense, even if it never actually interpreted FCRA prior to the commencement of this lawsuit. *Safeco* requires only that "the company's reading of the statute *is* objectively reasonable," *Safeco*, 551 U.S. at 70 n.20 (emphasis added), and that the interpretation that would allow the conduct in question is "an interpretation that could reasonably have found support in the courts," *id*. *Safeco* does not require that the defendant actually have made such an interpretation at any particular point in time.

D.      *Southwest's Liability Under the* Safeco *Test*

Fuges argues in the alternative that, even if Southwest is potentially entitled to shelter in *Safeco*'s safe harbor, the District Court erred in holding that no reasonable jury could find that Southwest had acted recklessly, and therefore willfully, in treating FCRA as inapplicable.[16] Fuges contends

---

[16] At the outset of her treatment of this issue, Fuges suggests that "no court has ever found that it is jury question whether a defendant had an objectively reasonable *reading* of FCRA statutory text" because "[j]uries focus on facts, not [on] the interpretation of statutory text, particularly ambiguous statutory text." (Appellant's Opening Br. at 50.) However, Fuges misapprehends the District Court in this regard. The District Court held only that a reasonable jury

that neither Southwest nor the District Court specifically identified any ambiguity in the statutory text,[17] and that any reading of FCRA as being inapplicable must be reckless.

---

could not find that Southwest had acted recklessly, and therefore willfully, based on the Court's own determination that the FCRA definitions of "consumer reporting agency" and "consumer report" were ambiguous, and that Southwest's interpretation was not objectively unreasonable. (*See* App. at 13 (emphasizing the "narrow scope of [the Court's] decision").)   After *Safeco*, a jury may be called on to determine whether violations of FCRA were willful or negligent, based on the facts surrounding defendants' adoption of a particular reading of the statute. *See Cortez*, 617 F.3d at 722 (considering the "jury's reasoned determination" that the defendant was "not merely careless" in determining that FCRA did not apply); *see also id.* (noting that "the verdict of this lay jury reveals an understanding of the distinction between negligent and willful"); *id.* at 723 (speculating that "[t]he jury may well have concluded" that the defendant deliberately risked violating FCRA because the offending consumer information "was a separate product that could be sold to customers at an additional cost").

[17] Fuges's argument misses the mark.  She takes pains to demonstrate that the text of the specific FCRA provisions for which she alleges violations (15 U.S.C. §§ 1681e(a), (b), (c), (d), 1681h(c)) is unambiguous, and that courts of appeals (including this Court) have already construed those provisions.   However, it was only the definitions of "consumer report" and "consumer reporting agency" in 15 U.S.C. § 1681a(d), (f) that the District Court concluded were unclear. (*See* App. at 12-13 (noting that these definitions add

To understand why Fuges is mistaken, it is helpful to consider why the "reasonable interpretation" test was met in *Safeco*. We noted in *Long* that there were three bases for the Supreme Court's decision in *Safeco*. First, FCRA gave no clear guidance on whether the auto insurers were required to view an initial rate offer as an "increase" in rates that would constitute adverse action and trigger a consumer notification requirement. *Long*, 671 F.3d at 376 (citing *Safeco*, 551 U.S. at 69-70).[18] Second, the insurers' proposed interpretation that their quotes were not an adverse action "had a 'foundation in the statutory text ... and a sufficiently convincing justification to have persuaded the District Court to adopt it.'" *Id.* (quoting *Safeco*, 551 U.S. at 69-70) (omission in original). And third, the insurers were interpreting the statute in the absence of any contrary authority on the meaning of "increase" because "'no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC.'" *Id.* (quoting *Safeco*, 551 U.S. at 70).

The District Court here was satisfied that conditions similar to those that had rendered Safeco's reading of FCRA "not objectively unreasonable" were present in this case. First, the Court decided that the statutory definitions of "consumer reporting agency" and "consumer report" were ambiguous as applied to "a company like Southwest that sells so-called 'current owner reports.'" (App. at 10.) Second, the Court determined that Southwest's reading of FCRA's CRA

---

"an additional layer of interpretive complexity," as applied to Southwest, not found in other FCRA cases).)

[18] The *Safeco* Court characterized the statutory text as "less-than-pellucid." *Safeco*, 551 U.S. at 70.

definition as not covering Southwest "has a foundation in the statutory text."[19]   (*Id.*)   Third, the Court found "an absolute dearth of judicial or agency guidance regarding whether ... FCRA" covers the activities of Southwest. (*Id.* at 11.)   The District Court thus concluded that Southwest did not act recklessly with respect to FCRA.

We agree with the District Court's analysis.   First,  the FCRA definitions of "consumer reporting agency" and "consumer report" are ambiguous as they relate to Southwest. The source of this ambiguity is the phrase "information on consumers" in the CRA definition, and the phrase "bearing on a consumer[ ]" in the definition of consumer report.   Fuges argues, in essence, that any information in the Southwest property report that relates to her is information "on" or "bearing on" her as a consumer.   But to take this argument to its limits, virtually any information gathered in connection with a consumer lending transaction can be characterized as information on, or bearing on, the individual applicant because it says something related to the applicant.   Thus, the unbounded nature of these definitions renders them ambiguous when one tries to figure out just how broadly a sensible definition should reach.

---

[19] The District Court focused on the requirement that an entity "assemble or evaluate '*consumer credit information* or other information *on consumers*'" to be covered by the FCRA definition of "consumer reporting agency." (App. at 9 (quoting 15 U.S.C. § 1681a(f)).)   The Court concluded that Southwest's reading of that language to exclude it from coverage as a CRA, "because it reports on properties, not consumers," *id.*, was not objectively unreasonable.

Second, Southwest's reading of the applicable provisions of FCRA has some foundation in the statutory text, and was therefore not objectively unreasonable. The definition of a CRA requires that a company "engage[ ] in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers." 15 U.S.C. § 1681a(f). Southwest could reasonably interpret that provision to exclude information that it assembles with regard to a subject property, because such information is not "on consumers." Likewise, the definition of "consumer report" encompasses only reports that contain "information [assembled] by a [CRA] bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). Southwest could reasonably interpret that provision to exclude its property reports, both because it interpreted the CRA definition to exclude itself,[20] and because the information on property

---

[20] This case differs from other post-*Safeco* cases where the defendants claimed the *Safeco* defense for alleged willful violations of FCRA. In those cases, the defendant was indisputably a CRA, and  the issue was whether the challenged conduct constituted a willful violation of a particular FCRA provision because the defendant had unreasonably interpreted that provision. *See, e.g.*, *Birmingham*, 633 F.3d at 1009 (considering whether a CRA had "reasonable procedures" to assure accuracy as required by 15 U.S.C. § 1681e(b)); *Levine*, 554 F.3d at 1318-19 (considering whether a CRA had complied with requirement for sale of consumer report for "account review" pursuant to 15 U.S.C. § 1681b(a)(3)); *Shannon v. Equifax Info. Servs., LLC*, 764 F. Supp. 2d 714 (E.D. Pa. 2011) (considering

encumbrances does not necessarily "bear on" any of the characteristics of an individual consumer's personal creditworthiness listed in that provision.

Third, there is no judicial or agency guidance that would suggest that Southwest's reading of FCRA is contrary to the intended meaning of the provisions in question.[21] Under *Safeco*, the inquiry is whether "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." 551 U.S. at 69; *see also Cortez v. Trans Union, LLC*, 617 F.3d 688, 723 (3d Cir. 2010) (finding recklessness where defendant "substantially risked acting in violation of [FCRA]"). The District Court correctly determined that Southwest was not

---

whether a CRA had "reasonable procedures" and conducted an investigation of allegedly inaccurate information as required by 15 U.S.C. §§ 1681e(b), 1681i(a), respectively). In this case, as the District Court noted, "Southwest disputed not only that its current owner reports fall within ... FCRA's definition of 'consumer reports,' but also that it even qualifies as a 'consumer reporting agency' in the first place." (App. at A12 (noting that "[t]his adds an additional layer of interpretive complexity").)

[21] While the absence of contrary authority to a particular FCRA interpretation is persuasive as to the reasonableness of the adoption of that interpretation, it is not dispositive. "It merely establishes that the issue has not been presented to a court of appeals before. The credit agency whose conduct is first examined under that section of the [FCRA] should not receive a pass because the issue has never been decided." *Cortez*, 617 F.3d at 722.

reckless because Southwest did not run a "substantial risk" in adopting its interpretation of FCRA, in the absence of authority contrary to that interpretation. As the District Court noted, there does not appear to be any judicial or agency guidance as to whether FCRA covers companies like Southwest. Cases concerning the CRA status of companies that are not credit bureaus but that still assemble "information on consumers" have typically addressed employee background investigatory reports that have little in common with the property reports at issue here. *See, e.g.*, *Poore v. Sterling Testing Sys.*, 410 F. Supp. 2d 557 (E.D. Ky. 2006) (holding that a company that reports on criminal records of job applicants is a CRA); *Lewis v. Ohio Prof'l Elec. Network, LLC*, 190 F. Supp. 2d 1049 (S.D. Ohio 2002) (same). Moreover, those companies qualify as CRAs under part of the FCRA "consumer report" definition that specifically addresses employment eligibility reports. *See* 15 U.S.C. § 1681a(d)(1)(B). Unlike Southwest, companies that assemble such reports indisputably assemble "information on consumers," namely the employment candidates who are the subject of the reports.[22]

---

[22] FTC guidance on FCRA coverage is similarly scant. FTC guidance letters, like the judicial opinions noted above, are largely limited to employment eligibility reports. *See, e.g.*, FTC Staff Opinion 9-15-99 (addressing CRA status of law firm that researches criminal records of job applicants for its clients); FTC Staff Opinion 9-9-98 (addressing CRA status of company that provides information on prospective employees to fast food companies). *See also* Letter from Federal Trade Commission to Richard LeBlanc, Due Diligence, Inc. (June 9, 1998), *available at* http://www.ftc.gov/os/ statutes/fcra/ leblanc.shtml (confirming

The District Court's ably stated conclusion that Southwest cannot be held liable for willful violations of FCRA is consistent with our holding in *Long* and finds support in numerous other cases in which courts have applied *Safeco* and declined to hold defendants liable absent evidence of a reckless approach to FCRA compliance. *See, e.g.*, *Long*, 671 F.3d at 377-78 (finding no liability for willful FCRA violations despite the fact that the court rejected the defendant's interpretation of the statute); *Birmingham*, 633 F.3d at 1009 (finding no liability "because of the absence of evidence of intentional or reckless misconduct"); *Levine*, 554 F.3d at 1318-19 (finding no liability where defendant reasonably interpreted "account" as including a "closed account"). [23]

---

that company that performs background checks and assembles and sells reports containing the information is a CRA). Even if there were FTC staff letters that address the applicability of FCRA to companies like Southwest, "the Supreme Court has expressly declined to describe such letters as 'authoritative guidance.'" *Levine*, 554 F.3d at 1319 (citing *Safeco*, 551 U.S. at 70 n.19).

[23] Fuges principally relies on *Cortez, supra*, in support of her argument that Southwest acted recklessly in adopting its interpretation of FCRA. *Cortez* is, however, readily distinguishable from the present case in that the defendant's interpretation there was in direct opposition to published authority on the applicability of FCRA. In *Cortez*, the offending information was an erroneous notation in a consumer report that the plaintiff was on a Treasury Department list of terrorists and drug traffickers ineligible for credit. *See Cortez*, 617 F.3d at 704-05. The defendant claimed that the information did not "bear on" the consumer's

In summary, Southwest's interpretation of the FCRA definitions of "consumer reporting agency" and "consumer report" is not unreasonable, and Southwest "did not run 'a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Long*, 671 F.3d at 378 (quoting *Safeco*, 551 U.S. at 69). Fuges therefore has not stated a claim for a willful violation of FCRA.[24]

---

creditworthiness, and that it was therefore not subject to FCRA. However, Treasury Department regulations explicitly stated that information regarding a consumer's inclusion on the terrorist watch list was governed by FCRA when included in a consumer report. *Id.* at 722. Moreover, a Treasury Department website notified consumers that both FCRA and FTC regulations provided them with a remedy against a CRA that furnished incorrect information about their presence on the watch list. *Id.* Given this explicit contrary guidance, we concluded that the defendant "substantially risked acting in violation of the law," as it adopted an interpretation of FCRA that was objectively unreasonable. *Id.* at 723; *see also id.* at 721 ("[T]he fact that [a defendant's] actions rest upon a legal conclusion does not immunize it from liability for reckless conduct under ... FCRA.") In the absence of the sort of contrary guidance present in *Cortez*, we cannot say that Southwest was similarly reckless in believing that its activities are not covered by FCRA.

[24] Like the District Court, we "need not, and do not, decide whether Southwest's business model, including its ... report on Fuges, falls within ... FCRA's sphere." (App. at 13.) Because we have concluded that Southwest did not willfully violate FCRA, and because Fuges chose not to pursue her claim for negligent violations of the statute, *see*

### III.   Conclusion

For the reasons stated above, we will affirm the judgment of the District Court.

---

*supra* note 5, there is no sound reason to answer in this case whether Southwest negligently violated FCRA.

# Exhibit B

## Detailed Examination of "Facts" Asserted in Plaintiff's Opposition

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| 1. | Experian received a letter from CardWorks dated October 4, 2010, regarding the Advanta Bank Corp. Receivership and transfer of servicing duties to CardWorks. | II.A., page 2 | Undisputed | *See* EXPDREH000261 (Ex. A-1 to Pl.'s Opp.). In addition to being signed by a CardWorks' representative, the letter was signed by a representative of the FDIC as Receiver for Advanta Bank Corp. and a former Advanta Bank Corp. employee who was assisting the FDIC with the operational transition. *Id.* The inclusion of these additional signatures and the text of the letter itself demonstrate that CardWorks was not acting of its own accord, but on behalf of "the FDIC and the asset owners." *Id.* |
| 2. | Advanta Bank Corp. had ceased to exist; Advanta Bank Corp. no longer existed as a credit reporting entity. | II.A., page 2 | Disputed | Disputed to the extent Plaintiff asserts something beyond the fact that Advanta Bank Corp. was placed into receivership with the FDIC. As of March 19, 2010, the FDIC stepped into the shoes of Advanta Bank Corp. *Cf. O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994). When the FDIC is appointed as receiver for a failed insured depository institution, it succeeds by operation of law to all of the failed institution's rights, titles, powers, and privileges, and takes possession of the failed institution's assets and liabilities. *See* 12 U.S.C. § 1821(d)(2)(A)(i). In its capacity as receiver, the FDIC has the power to take over the assets and operations of the |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | failed institution and to conduct all of its business.  12 U.S.C. § 1821(d)(2)(B)(iii). The FDIC, as receiver for Advanta Bank Corp., instructed CardWorks regarding how to report the Advanta accounts to Experian. Ex. D (Nowell Dep. 106:1-107:4, 107:18-23); Clark Decl., Ex. C (CWS 1393-94). |
| 3. | Assertions regarding (1) Plaintiff's security clearance; (2) whether or not Plaintiff was a victim of identity theft; and (3) when Plaintiff learned about the Advanta account. | II.A.1., page 2 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. |
| 4. | Plaintiff's Experian credit file identified "Advanta Bank" and "Advanta Credit Cards" trade lines. | II.A.2., page 2 | Undisputed | *See* Exs. B-E to Pl.'s Opp. |
| 5. | Plaintiff's assertion regarding why he contacted Experian to request his consumer file. | II.A.2., page 3 | Immaterial | This assertion, whether true or false, does not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, this assertion is immaterial for purposes of this Motion for Partial Summary Judgment. |
| 6. | "In each and every report, Experian made | II.A.2., page 3 | Disputed | Plaintiff's assertion is factually inaccurate. |

|   | **ASSERTION** | **SECTION / PAGE IN PLAINTIFF'S OPPOSITION** | **RESPONSE** | **EXPLANATION / SUPPORT** |
|---|---|---|---|---|
|   | a materially false representation: that 'Advanta Bank Corp' and 'Advanta Credit Cards' were the 'source of the information' in the tradelines actually supplied by CardWorks Servicing, LLC." | | | Experian did not report "Advanta Bank Corp." on any of Plaintiff's consumer reports. *See* Exs. B-E to Pl.'s Opp.  Experian reported both "Advanta Bank" and "Advanta Credit Cards" on Plaintiff's June 21, 2010, consumer report.  Ex. D to Pl.'s Opp.  Experian only reported "Advanta Bank" on Plaintiff's November 16, 2010, March 16, 2011, and November 3, 2011,  consumer reports.  Exs. B, C, E to Pl.'s Opp. |
|   | | | | Furthermore, Experian denies Plaintiff's argument that "Experian made a materially false representation."  Listing "Advanta," the name of the credit card issuer, did not misrepresent the source of the information, nor did this act violate any provision of the FCRA.  Experian denies that "source of the information" is a defined term within the FCRA and further denies it is the subject of clear regulatory or decisional authority that would guide Experian's reporting of Advanta Bank Corp. originated accounts.  *See* Section II.C. of Experian's Rebuttal to Pl.'s Opp. |
| 7. | Assertions regarding the "last reported" dates on Plaintiff's consumer reports. | II.A.2., page 3; II.A.3, page 4 | Undisputed but immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. |
| 8. | "Defendant's internal documents confirm post-August 2010 reporting was solely accomplished by CardWorks." | II.A.2., page 3, n.1 | Disputed | Plaintiff misrepresents Experian's internal client relationship activity logs.  *See* Ex. M to Pl.'s Opp.  The first three pages of Exhibit M reference CardWorks' account activity and demonstrate that CardWorks was attempting to fulfill its duties as the servicer of Advanta Bank Corp. originated accounts.  EXPDREH000294-296 (see, specifically, entries dated 9/24/2010 through 10/27/2010).  The remaining eight pages of Exhibit M reference Advanta account activity and demonstrate that Experian was  still in contact with employees of Advanta Corporation or its affiliates after Advanta Bank Corp. went into receivership.  EXPDREH000297-304 (see, specifically, entries dated 3/26/2010 through 10/25/2010). |
| 9. | Assertions regarding Plaintiff's previous relationship with Advanta Corp., Advanta Bank, and CardWorks. | II.A.3., page 3 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Partial Summary Judgment. |
| 10. | Plaintiff's assertion that the disputed Advanta "account was never removed until he commenced this litigation." | II.A.3., page 3 | Disputed | Plaintiff's assertion is factually inaccurate. As Plaintiff admits on page 4 of his Opposition, Experian confirmed it had "deleted" the "Advanta Credit Cards" trade line in the August 5, 2011, dispute results Plaintiff received months before he filed this lawsuit. |
| 11. | Plaintiff's assertions regarding (1) his previous experience with disputing information in his credit file; (2) his contact with or information about "Advanta Bank" or "Advanta Credit Cards"; and (3) why or whether he followed Experian's instructions or relied on its representations. | II.A.3., page 4 | Unsupported and immaterial | Plaintiff does not have any support for these assertions.  Furthermore, these assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. |
| 12. | Assertions regarding Experian's use of the phrase "source of the information" in other contexts. | II.A.3., page 4; II.A.5.a., page 6; II.A.5.b., pages 6-9 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Plaintiff's argument is, "in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was 'expressly foreclosed by *Safeco*,' because such evidence 'is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question.'" *Fuges v. Sw. Fin. Servs., Ltd.*, No. 11-4504 (3rd Cir. Dec. 6, 2012) (quoting *Long v. Tommy Hilfiger U.S.A.*, 671 F.3d 371, 377 (3d Cir. 2012) and citing *Safeco*, 551 U.S. at 70 n.20).  Hence, the Court must disregard Plaintiff's arguments about other uses of the phrase "source of the information" and decide whether or not Experian's conduct was objectively unreasonable in light of clearly established authority.  Furthermore, the Court must disregard the declarations of Hendricks (Ex. H to Pl.'s Opp.) and De Armond (Ex. U to Pl.'s Opp.) to the extent they opine on Experian's subjective intent. <br><br> Notably, the examples Plaintiff cites do not exclude Experian appropriately forwarding a dispute to, or receiving data from, a servicer or agent authorized to act on behalf of the source of the information, such as was the case with CardWorks, the servicer of Advanta Bank Corp. originated accounts. |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| 13. | Assertion that in March 2011 Plaintiff wrote "Advanta Credit Cards" at the address Experian provided in Plaintiff's consumer report and that Plaintiff never received a response to his dispute letter. | II.A.4., page 5 | Disputed | Plaintiff's assertion is factually inaccurate and incomplete. On March 17, 2011, Plaintiff sent a letter to Advanta Bank, P.O. Box 844, Spring House, PA 19477, the address listed on his November 2010 Experian consumer report. Clark Decl., Ex. F (Pl.'s Fed. R. Civ. P. 26(a)(1) Disclosures at Dreher - 000083-84). Plaintiff disputed the delinquency attributed to him and requested validation of the debt. *Id.* Plaintiff sent substantially similar letters to Advanta Credit Cards, P.O. Box 9217, Old Bethpage, NY 11804 on March 17, 2011, and April 15, 2011. *Id.* at Dreher - 000037-40. On April 18, 2011, Advanta Credit Cards responded to Plaintiff and provided copies of an on-line credit application and a billing statement dated March 7, 2011. *Id.* at Dreher - 000042-45. |
| 14. | Assertions regarding whether Plaintiff lived or worked in Indiana and his affiliation with Arnie's Bowling and Rec. | II.A.4., page 5 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership. Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. |
| 15. | Assertions regarding when and whether Plaintiff knew "Advanta Bank" and | II.A.4., page 5 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | "Advanta Credit Cards" existed. | | | whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. <br><br> Furthermore, Experian disputes Plaintiff's assertion to the extent Plaintiff asserts something beyond the fact that Advanta Bank Corp. was placed into receivership with the FDIC.  *See* Response to Assertion No. 2, *supra*. |
| 16. | "Experian has always understood that the 'source' of credit information is the 'furnisher' who actually reported that information to the reporting agency." | II.A.5., page 6 | Unsupported and disputed | As support for this assertion, Plaintiff cites the following lines from the deposition of Peter Henke, Experian's Director of Membership: <br><br>     Q. The purpose for identifying the source of information of a trade line -- I'm sorry. Let me try it differently. Which entity in 2011 was actually furnishing credit information regarding the Advanta accounts to Experian? <br><br>     A. From my understanding, Cardworks Services was delivering the information on behalf of Advanta. |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Q. Okay. That's what your personal understanding was?<br><br>A. Yes.<br><br>Ex. E. (Henke Dep. 73:2-12).<br><br>This testimony does not support Plaintiff's assertion in any way whatsoever. In fact, instead of supporting Plaintiff's allegation, Mr. Henke's testimony supports Experian's repeated explanation that it treated CardWorks as a servicer working on behalf of Advanta. |
| 17. | Assertions under the heading "Experian knew that 'Advanta Bank' and 'Advanta Credit Cards' could not be the furnisher, subscriber and 'source of information' for the tradeline because Advanta Bank was dissolved before Mr. Dreher had discovered CardWork's [sic] inaccurate reporting and began disputing the tradeline." | II.A.6., pages 9-10 | Unsupported and disputed | As is the case for Assertion No. 16, *supra*, Plaintiff's citations do not support any of the assertions in Section II.A.6. of his Opposition. The documents and deposition testimony Plaintiff cites instead show that Experian knew that Advanta Bank Corp. went into receivership, and, subsequently, the FDIC, CardWorks, Vion Holdings, and Advanta Corp., at a minimum, were involved in the ownership and/or management of Advanta Bank Corp. originated accounts. *See, e.g.,* Ex. E.(Henke Dep. 29:6-22, 77:21-81:5); Ex. J. to Pl.'s Opp.(Kilka Dep. 45:20-49:23); Ex. M to Pl.'s Opp. EXPDREH000294-304. |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | As is the case for Assertion No. 8, *supra*, Plaintiff again misrepresents Experian's internal client relationship activity logs, which are attached as Exhibit M to Plaintiff's Opposition.  Plaintiff asserts: "When Defendant's employees remained unsuccessful in collecting payment from Advanta, they tried to contact the FDIC . . . ." *See* Pl.'s Opp. at 10 (citing EXPDREH000296).  The entry dated July 25, 2011, that Plaintiff quotes actually notes that the FDIC called Experian to discuss an invoice it received.  The citation Plaintiff provides does not support his assertion that Experian knew Advanta Bank could not be the source of credit information.  Instead, the citation demonstrates that, until at least July 2011, Experian operated as if the client relationship with Advanta Bank still existed. |
| 18. | Assertions under the heading: "Experian had actual knowledge and fully understood that CardWorks was the servicer and source of credit reporting as of August 2010 and was doing so for the new 'owner' of the accounts, Vion Holdings, II, LLC." | II.A.7., pages 10-12 | Unsupported and disputed | Without citing any evidence, Plaintiff asserts: "By [September 2010], the FDIC no longer controlled the former-Advanta accounts.  Advanta Bank was only the account servicer and these accounts were not Advanta Bank or FDIC-controlled assets."  Pl.'s Opp. at 11.  In fact, Advanta Bank was the original creditor, the account issuer, and the "Servicer" of the assets of the Advanta Business Card Master Trust.  Clark Decl., Ex. A (*Material Loss* |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | *Review* at 2); Clark Decl., Ex. B, (Underwriting Agreement, Section 1); Ex. D (Nowell Dep. 72:2-19).  Furthermore, the FDIC, as receiver for Advanta Bank Corp., instructed CardWorks regarding how to report the Advanta accounts to Experian.  Ex. D (Nowell Dep. 106:1-107:4, 107:18-23); Clark Decl., Ex. C at CWS 1393-94.<br><br>Plaintiff falsely asserts Vion Holdings II, LLC "served as 'creditor' and the principal to whom the servicer, CardWorks, was responsible."  Pl.'s Opp. at 11.  Vion Holdings was *not* the creditor, but the beneficiary of the revenue stream related to certain Advanta credit card accounts.  Ex. D (Nowell Dep. 62:17-63:7); *see also In re Muller*, 479 B.R. 508, 515-16 (Bankr. W.D. Ark. 2012) (overruling a debtor's objection that "Advanta Bank [wa]s not the party with the legal right to enforce the claim because the debt was sold to a securitized trust" and allowing Advanta Bank's claim in its entirety).  Moreover, Deutsche Bank Trust Company Americas, the Indenture Trustee of the Advanta Business Card Master Trust, was the entity that contracted with CardWorks to set up the servicing relationship, a fact Plaintiff admits.  *See* Pl.'s Opp. at 11 ("The credit card |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | portfolio trustee, Deutsche Bank, could not fire Advanta Bank (and the FDIC) as servicer and replace it with CardWorks until three months after the March 2010 dissolution."). Plaintiff's statement on page 11 of his Opposition regarding Deutsche Bank's ability to "fire Advanta Bank" three months after its dissolution also contradicts Plaintiff's continued assertion that Advanta Bank ceased to exist the moment it went into receivership with the FDIC on March 19, 2010. Logically, one organization cannot "fire" another organization if that second organization does not exist.<br><br>Plaintiff further misleads the Court by asserting that Experian "obtained from Vion Holdings as principal and CardWorks as agent, a signed contract for credit reporting." Pl.'s Opp. at 12. In fact, as Experian employee James Kilka testified, Experian attempted to effectuate a contractual relationship with Vion Holdings, but it was unsuccessful. Ex. J. to Pl.'s Opp. (Kilka Dep. 46:16-48:2.) |
| 19. | Assertions under the heading: "Experian treated CardWorks as its sole 'source' and furnisher." | II.A.8., page 12 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership. Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment.<br><br>Plaintiff's argument is, "in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was 'expressly foreclosed by *Safeco*,' because such evidence 'is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question.'" *Fuges*, No. 11-4504, slip op. at 18. Furthermore, the Court must disregard the declarations of Hendricks (Ex. H to Pl.'s Opp.) and De Armond (Ex. U to Pl.'s Opp.) to the extent they opine on Experian's subjective intent.<br><br>Notably, the dispute process Plaintiff describes does not exclude Experian appropriately forwarding a dispute to, or receiving data from, a servicer or agent authorized to act on behalf of the source of the information, such as was the case with CardWorks, the servicer of Advanta Bank Corp. originated accounts. |
| 20. | Assertions under heading: "Experian | II.A.9., page 12-13 | Unsupported | Plaintiff's assertions in Section II.A.9. on |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | allowed CardWorks to dictate whether the credit reporting agency would disclose the 'source' to consumers." | | and immaterial | page 12 are completely unsupported and do not contain a single citation. Furthermore, Plaintiff's argument in this section is, "in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was 'expressly foreclosed by *Safeco*,' because such evidence 'is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question.'" *Fuges*, No. 11-4504, slip op. at 18. |
| 21. | Assertions under heading: "Experian standard policy is to defer totally to its furnisher customers." | II.A.10., page 13 | Immaterial and disputed | Plaintiff's argument in Section II.A.10. is, "in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was 'expressly foreclosed by *Safeco*,' because such evidence 'is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question.'" *Fuges*, No. 11-4504, slip op. at 18.<br><br>Furthermore, Plaintiff misrepresents the testimony of Mr. Henke. As Mr. Henke explained, Experian's common practice is to display the client subscriber's name in reported trade lines, "unless the client has reason to alter it or to have a different name posted." Ex. E (Henke Dep. 44:6-14). Of course, what Plaintiff fails to point out to the Court is that the client subscribers linked to the subscriber codes in question were Advanta |

14

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Bank Corp. and Advanta Corp. *See id.* at 10:15-11:7; Henke Decl. ¶ 15. Thus, listing "Advanta" in the associated subscriber name field comported with Experian's common practice. Conversely, listing "CardWorks," as Plaintiff argues Experian should have done, would deviate from Experian's common practice, because CardWorks was not the client associated with the accounts in question. *See* Henke Decl. ¶¶ 10-16. Plaintiff's reliance on the unexecuted Agency Addendum listing Vion Holdings as the client and CardWorks as the agent is an admission on the Plaintiff's part that CardWorks was *not* the client subscriber. *See* Pl.'s Opp. at 12. |
| 22. | Assertions under the heading: "If following industry standards, Experian could have reported and disclosed CardWorks as the source, while identifying Advanta as the previous servicer." | II.A.11., pages 13-14 | Unsupported, disputed, and immaterial | Without any support, Plaintiff asserts: "Despite Experian's feigned interest in avoiding consumer 'confusion,' it did not report the tradeline in the manner the industry standards required." Pl.'s Opp. at 13. Plaintiff cannot cite any authority for this proposition because, assuming a particular format is technically possible, that format does not automatically become an industry requirement.<br><br>As discussed in the Response to Assertion No. 18, *supra,* Advanta Bank was much more than a simple servicer of credit accounts; it |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | was the original creditor, the account issuer, and the "Servicer" of the assets of the Advanta Business Card Master Trust.  Clark Decl., Ex. A (*Material Loss Review* at 2); Clark Decl., Ex. B (Underwriting Agreement, Section 1); Ex. D (Nowell Dep. 72:2-19.) <br><br> Plaintiff's argument in Section II.A.11. is, "in essence, an assertion about the defendant's intent or subjective bad faith, and, as such, it was 'expressly foreclosed by *Safeco*,' because such evidence 'is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question.'" *Fuges*, No. 11-4504, slip op. at 18. |
| 23. | Assertions under the heading: "Most consumers disputing credit reporting information do so because they do not recognize or 'own' the account." | II.A.12., page 14 | Immaterial | These assertions, whether true or false, do not affect the Court's willfulness inquiry – *i.e.*, whether it was objectively unreasonable to list "Advanta" as the source of information for Advanta Bank Corp. originated accounts after Advanta Bank Corp. went into receivership.  Thus, these assertions are immaterial for purposes of this Motion for Partial Summary Judgment. |
| 24. | Assertions under the heading: "The failure to identify the actual 'source' of a tradeline is a substantial obstacle for consumers making credit reporting disputes." | II.A.13., pages 14-15 | Disputed | Plaintiff did not encounter *any* obstacle in disputing the information in his consumer report, let alone a "substantial" one, as evidenced by his ability to contact the entity handling consumer disputes for Advanta Bank |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Corp. originated accounts and Plaintiff's receipt of a response to his dispute. *See* Clark Decl., Ex. F (Pl.'s Fed. R. Civ. P. 26(a)(1) Disclosures at Dreher - 000037-40, 42-45, 83-84). |
| | | | | As support for his assertions regarding consumers' ability to dispute accounts they claim are the result of identity theft, Plaintiff cites the testimony of Experian's Director of Membership, Peter Henke.  Pl.'s Opp. at 14-15 (citing Henke Dep. 72:17-73:1).  Besides not supporting his assertions, Plaintiff again misrepresents Mr. Henke's testimony. Plaintiff takes Mr. Henke's testimony out of context, as Mr. Henke testified that *no* name (whether current servicer or original creditor) would be useful to an identity theft victim. Ex. E (Henke Dep. 88:17-90:8).  What is most important is the consumer's ability to contact the party handling disputes for the account in question, which Plaintiff undisputedly was able to do.  *See* Clark Decl., Ex. F (Pl.'s Fed. R. Civ. P. 26(a)(1) Disclosures at Dreher - 000037-40, 42-45, 83-84). |
| 25. | Assertions under the heading: "Undisputed Facts, but immaterial or incomplete." | II.B.2., pages 15-16 n.5 | Immaterial, unsupported, disputed | The assertions contained in footnote 5 to Plaintiff's Opposition, on pages 15-16, are either (1) inconsequential additional information – see Plaintiff's response to |

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Experian's Undisputed Facts Nos. 19, 21, and 33; (2) unsupported arguments – see Plaintiff's response to Experian's Undisputed Fact No. 22;  (3) contradictory statements – see Plaintiff's response to Experian's Undisputed Facts Nos. 24-27[1]; or (4) immaterial assertions regarding Experian's subjective intent – see Plaintiff's response to Experian's Undisputed Fact Nos. 28-29. |
| 26. | Assertions under the heading: "Disputed Facts." | II.B.3., pages 16-19 | Immaterial and unsupported | Plaintiff's arguments in Section II.B.3. are, "in essence, [] assertion[s] about the defendant's intent or subjective bad faith, and, as such, [they were] 'expressly foreclosed by *Safeco*,' because such evidence 'is irrelevant when there is an objectively reasonable interpretation of the statute that would allow the conduct in question.'" *Fuges*, No. 11-4504, slip op. at 18.

Of Defendant's list of 35 facts, Plaintiff only "disputes" four items – Paragraphs 11, 18, 20, and 32.  Three of the four challenges are not disputes at all, but disagreements with word choice or characterization.  *See* Pl.'s Opp. at 17-18.  Plaintiff attempts to discredit the declaration of long-time Experian employee |

---

[1] Plaintiff denies the FDIC's "role in the ownership or servicing" of Advanta accounts, but admits the FDIC controlled the assets of Advanta Bank Corp.

| | ASSERTION | SECTION / PAGE IN PLAINTIFF'S OPPOSITION | RESPONSE | EXPLANATION / SUPPORT |
|---|---|---|---|---|
| | | | | Peter Henke in an effort to dispute Paragraph 32.  Pl.'s Opp. at 18-19.  Yet none of the testimony Plaintiff cites contradicts the assertion that "Experian's common practice is to use an associated subscriber name that will aid the consumer in recognizing the obligation so that the consumer can correct any inaccuracies or lodge disputes if necessary." *Cf.* Ex. E (Henke Dep. 83:4-21, 84:13-18, 84:22-85:3, 86:25-87:11) (explaining Mr. Henke's personal knowledge of Experian's goal of consumer recognition). |

# Exhibit C

# Federal Cases Filed Since March 19, 2010 in Which Advanta Bank Corp. Was a Party

| CASE NAME | DOCKET NO. | COURT | FILING DATE | ROLE OF ADVANTA BANK CORP. |
|---|---|---|---|---|
| Jack v. FDIC | 1:10-cv-00724-LJM-MJD | S.D. Ind. | 6/11/10 | Defendant |
| U.S. v. Molen | 2:10-cv-02591-MCE-KJN | E.D. Cal. | 9/23/10 | Defendant |
| Advanta Bank Corp. v. Damron | 1:10-cv-00725-LY | W.D. Tex. | 10/1/10 | Plaintiff |
| Choi v. Advanta Corp. | 4:10-cv-04504-DMR | N.D. Cal. | 10/5/10 | Defendant |
| Toby's Painting, LLC v. Advanta Bank Corp. | 2:10-cv-14096-GCS-MKM | E.D. Mich. | 10/12/10 | Defendant |
| Brimeyer v. Advanta Bank Corp. | 2:10-cv-01028-JSS | N.D. Iowa | 10/29/10 | Defendant |
| Lans v. Advanta Bank Corp. | 2:10-cv-06214-CCC-JAD | D.N.J. | 11/20/10 | Defendant/Cross-Defendant |
| Advanta Bank Corp. v. McCowin | 4:11-cv-00867 | S.D. Tex. | 3/9/11 | Plaintiff |
| Wolff v. Advanta Bank Corp. | 8:11-cv-00703-JST -MLG | C.D. Cal. | 5/9/11 | Defendant |
| Stevens v. Cardworks Servicing, LLC | 1:11-cv-00397-LY | W.D. Tex | 5/13/11 | Defendant |
| Mostofi v. Equifax Inc. | 8:11-cv-02011-DKC | D. Md. | 7/21/11 | Defendant |
| Mnatsakanyan v. Advanta Bank Corp. | 2:12-cv-01554-JFW-MAN | C.D. Cal. | 2/23/12 | Defendant |
| Dagliyan v. Advanta Bank Corp. | 2:12-cv-08775-CBM-PJW | C.D. Cal. | 10/12/12 | Defendant |

# Exhibit D

THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

---------------------------------------x

MICHAEL T. DREHER, Individually and on

behalf of a class of similarly situated

persons,

                Plaintiffs,

       -against-

EXPERIAN INFORMATION SOLUTIONS, INC.,

CARDWORKS, INC., and CARDWORKS SERVICING,

LLC,

                Defendants.

Civil Action No. 3:11cv00624(JAG)

---------------------------------------x

                135 Crossways Park Drive
                Woodbury, New York

                July 26, 2012
                2:08 p.m.


        Videotaped Deposition of MICHAEL

NOWELL, taken pursuant to the Federal Rules

of Civil Procedure, held at the

above-mentioned time and place, before Linda

A. Schilt, a Notary Public of the State of

New York.

```
 1   A P P E A R A N C E S:

 2       CONSUMER LITIGATION ASSOCIATES, P.C.

 3       Attorneys for Plaintiffs

 4           763 J. Clyde Morris Boulevard

 5           Suite 1-A

 6           Newport News, Virginia 23601

 7   BY:   LEONARD A. BENNETT, ESQ.

 8         SUSAN M. ROTKIS, ESQ.

 9         (Via telephone)

10

11       SUROVELL ISAACS PETERSEN & LEVY, PLC

12       Attorneys for Plaintiffs

13           4010 University Drive, Second Floor

14           Fairfax, Virginia 22030

15   BY:   KRISTI CAHOON KELLY, ESQ.

16         (Via telephone)

17

18       JONES DAY

19       Attorneys for Defendant

20       Experian Information Solutions

21           51 Louisiana Avenue NW

22           Washington, D.C. 20001

23   BY:   JOSEPH W. CLARK, ESQ.

24         BENJAMIN KATZ, ESQ.

25         (Via telephone)
```

Page 3

1

2   A P P E A R A N C E S: (Continued.)

3

4        TROUTMAN SANDERS LLP

5        Attorneys for Defendants

6        CardWorks, Inc and CardWorks

7        Servicing,  LLC

8              P.O. Box 61185

9              222 Central Park Avenue, Suite 2000

10             Virginia Beach, Virginia 23462

11   BY:   JOHN C. LYNCH, ESQ.

12             ETHAN G. OSTROFF, ESQ.

13             (Via telephone)

14

15       HALEY E. OLAM, ESQ.

16       Attorney for CardWorks Servicing, LLC

17             101 Crossways Park West

18             Woodbury, New York 11797

19

20   ALSO PRESENT:

21       James Sepulveda, Videographer

22

23

24

25

1          IT IS HEREBY STIPULATED AND

2    AGREED by and among counsel for the

3    respective parties hereto, that the filing,

4    sealing and certification of the within

5    deposition shall be and the same are hereby

6    waived;

7          IT IS FURTHER STIPULATED AND

8    AGREED that all objections, except to the

9    form of the question, shall be reserved to

10   the time of the trial;

11          IT IS FURTHER STIPULATED AND

12   AGREED that the within deposition may be

13   signed before any Notary Public with the

14   same force and effect as if signed and sworn

15   to by the Court.

16

17

18

19

20

21

22

23

24

25

1     Q.    And it was terminated as the

2  servicer of that credit card portfolio?

3     A.    They are no longer the servicer,

4  correct.

5     Q.    And who replaced Advanta Bank as

6  the servicer of that portfolio?

7     A.    CardWorks was chosen as the

8  successor servicer for the Advanta Bank

9  Corp. credit card portfolio.

10    Q.    Who or what entity owns the

11 Advanta Bank credit card portfolio today?

12    A.    The accounts -- my understanding

13 is the accounts are still owned by Advanta

14 Bank Corp., which is in receivership with

15 the FDIC.  There has been no transition of

16 the actual ownership of the accounts.

17    Q.    Who is Vion Holdings?

18    A.    My understanding is that they are

19 the owner of the cash flow associated with

20 the master trust.

21    Q.    What does that mean?

22    A.    Basically they're receiving the

23 financial benefit of the ongoing revenue

24 stream from the Advanta Credit Card

25 portfolio.

 1        Q.     How did they come -- how did Vion

 2    Holdings come to be in that position to

 3    receive the revenue stream from the credit

 4    card portfolio?

 5        A.     They bid on it and won it and

 6    were chosen as the -- as the, you know, the

 7    beneficiary of it.

 8        Q.     What is the actual name of the

 9    owner of the credit card portfolio?

10        A.     Please repeat the question.  I

11    mean, are you talking about the accounts or

12    are you talking about -- or are you talking

13    about the cash flow?  That can go multiple

14    ways.

15        Q.     Accounts.

16        A.     My understanding, as stated

17    before, is that they continue to be owned by

18    Advanta Bank Corp., which is in receivership

19    with the FDIC.  There has been no change in

20    terms of the ownership of the accounts

21    themselves.

22        Q.     If you can take a look at Exhibit

23    2, please.

24        A.     Yes, I am there.

25        Q.     There is a -- there's an E-mail

1    from the FDIC and there is a document

2    attached to it from Deutsche Bank, do you

3    see that?

4         A.    I do.  The "Notice of Termination

5    of Advanta Bank Corp. As Servicer and

6    Appointment of Successor Servicer," is that

7    the document you're referring to?

8         Q.    Yes.

9         A.    Okay.

10        Q.    What is this document?

11        A.    A document prepared by Deutsche

12   Bank stating a change in successor and

13   identifying the successor servicer.

14        Q.    But if the FDIC was the owner or

15   if Advanta Bank owned this portfolio, then

16   how is Deutsche Bank involved?

17        A.    I cannot comment on the

18   relationship with Deutsche Bank.  I'm not

19   the expert here.

20        Q.    Okay.

21              Well, so you don't even know

22   whether or not Advanta Bank Corp. owns any

23   of these credit cards or ever owned any of

24   these credit cards, right?

25        A.    As I stated before, my

1        A.    I'm not sure what you're asking.

2        Q.    Well, you're very decisive about

3    some facts and uncertain and not an expert

4    on others.  So you were very decisive in

5    saying that FDR communicates to the credit

6    bureaus on behalf of the owner.

7        A.    Which is correct, they do.  They

8    send the files on a monthly basis.

9        Q.    A-ha.  And who controls what FDR

10   reports to the credit bureaus?

11       A.    Who controls?

12       Q.    Yes.  What company exercises

13   day-to-day or operational control over the

14   information that FDR transmits to the credit

15   bureaus?

16       A.    CardWorks Servicing as servicer

17   for the account owner manages that process

18   and reports based on the direction of the

19   account owner.

20       Q.    And again, who do you believe --

21   I recognize you're not an expert, but who do

22   you believe is the actual today the account

23   owner?

24       A.    As I stated before, there has

25   been no change.  Advanta Bank Corp. is the

1    account owner.

2         Q.    And I want to try to understand

3    how you come to that belief, that factual

4    belief that Advanta Bank Corp. has ever been

5    anything but a servicer.

6              Who told you that Advanta Bank

7    Corp. was ever the owner?

8         A.    On the cardholder agreement, it

9    again says the account is issued by Advanta

10   Bank Corp. or some variation of.

11        Q.    So that's why you believe that

12   they were the owner?

13        A.    Yes.

14        Q.    Is there any other reason you

15   believe that?

16        A.    Because they're the issuer of the

17   account.  I don't know what else you're

18   needing from me, but the answer is they were

19   the issuer.

20        Q.    I'm asking why you believe that

21   Deutsche Bank and the FDIC were wrong in

22   representing that it was Wilmington Trust

23   and the Advanta Bank Credit Card Trust was

24   the actual issuer of the accounts?

25        A.    I was not a part of preparing

1    those documents.

2          MR. OSTROFF:   One second,

3    Mr. Nowell.

4          THE WITNESS:   I'm sorry, Ethan,

5    go ahead.

6          MR. OSTROFF:   Objection to the

7    form of the question.  Argumentative

8    and I don't know that it accurately

9    represents out of the testimony of

10   Mr. Nowell previously what the document

11   says.

12         You can go ahead, Mr. Nowell,

13   thank you.

14   A.    Again, I was not a part of the

15   conversations between the FDIC and Deutsche

16   Bank and the preparation of those documents,

17   so I cannot comment on them.

18   Q.    So do you know sufficient to

19   swear under oath, to testify under oath who

20   the owner of the portfolio is?

21   A.    I'm prepared.

22         MR. OSTROFF:   The question, it's

23   argumentative and you're badgering the

24   witness, Len.

25         MR. BENNETT:   All right.  Then

1    portfolio to Experian, the credit bureau?

2         A.    Define "source," please.

3         Q.    Sure.  Hold on.  One that

4    supplies information.

5         A.    The supplier of the files is FDR.

6         Q.    Is FDR acting as an agent or is

7    it acting on its own?

8         A.    It is acting based on the

9    settings within the system.

10        Q.    Okay.  All right.

11              So FDR is the source of the

12   information then, in your view?

13        A.    FDR sends the files to Experian.

14        Q.    FDR is the -- would be like the

15   post office mailing a letter or transmitting

16   a letter from person A to person B, correct?

17        A.    No.

18        Q.    I'm sorry?

19        A.    I said no.

20        Q.    Why is that analogy

21   inappropriate?

22        A.    Because they're not

23   transporting the -- they're not transporting

24   the tapes.

25        Q.    What does that mean?

1      A.     They're not transporting the

2   tapes.

3      Q.     They're not conveying the data

4   received from CardWorks to the credit

5   reporting agencies?

6      A.     I'm sorry, I do not know what

7   you're wanting me to answer.

8      Q.     I want you to answer the truth --

9      A.     Which I'm --

10     Q.     -- is what I'd like you to do.

11            Where does the data that FDR

12   sends the credit reporting or payment

13   histories that FDR conveys to the credit

14   bureaus, where does that information come

15   from?

16     A.     The system of record, which is --

17   which are the systems at FDR.

18     Q.     Who oversees the payment and

19   account histories for the Advanta portfolio?

20     A.     I'm sorry, what do you mean by

21   "oversee"?

22     Q.     Who has the discretion to change

23   any credit reporting information regarding

24   Advanta portfolio accounts?

25     A.     Most of the processes are

Page 81

1   automatic and based on payments that are

2   received and posted to the system, so all

3   that process is automatic.  There's not an

4   ongoing change of information.  It's based

5   on receiving payments and those payments

6   being posted to accounts.

7        Q.    Sure.  And who posts the payments

8   to the accounts?

9        A.    Our -- I mean, our lockbox

10  provider.

11       Q.    Who is that?

12       A.    FIS.

13       Q.    And they receive payments and

14  they input it into a computer?

15       A.    They post the payments and send

16  files to FDR.

17       Q.    So CardWorks isn't even involved

18  in that process?

19       A.    We -- I mean, they are a servicer

20  on our behalf.

21       Q.    FDR is a servicer on behalf of

22  CardWorks?

23       A.    I didn't state that, no.  I said

24  FIS was.  FDR is our system of record in

25  which we -- which CardWorks services the

Page 82

1    accounts off of on behalf of our clients.

2         Q.    Can you turn to page 2 of

3    Exhibit 1?

4              MR. OSTROFF:   Len, I think this

5         is a good time to take a break.

6              MR. BENNETT:   How long do you

7         need to take a break, Ethan?

8              MR. OSTROFF:   I think we should

9         take a 15-minute break.

10             MR. BENNETT:   Well, I'd like to

11        get back on the record at 4:00 p.m.  We

12        have a lot of work to do.

13             MR. OSTROFF:   Unless Mr. Nowell

14        would like longer.

15             THE WITNESS:   No, that's fine.

16        I have no issue.

17             MR. OSTROFF:   4 o'clock, thank

18        you.

19             THE VIDEOGRAPHER:   The time is

20        3:48, we're off the record.  This ends

21        tape number two.

22             (Recess taken.)

23             THE VIDEOGRAPHER:   The time is

24        4:02.  This is tape number three, we're

25        on the record.

4    the owner of this portfolio, then why would

5    you want to change the reporting from

6    Advanta Bank Corp. into Advanta Credit

7    Cards?

8         A.    Because the client had made the

9    decision to change the reporting from

10   Advanta Bank Corp. to Advanta Credit Card.

11   We were the servicer and then needed the

12   ability to communicate directly with

13   Experian on behalf of our clients to make

14   that change that the client requested.

15        Q.    All right.

16              Well, let's -- that's a good way

17   to put it.  The client had told you to make

18   the change, right?

19        A.    Correct.

20        Q.    That's what you're testifying

21   under oath to?

22        A.    That is correct, yes.

23        Q.    What employee, what human being

24   actually communicated to you on behalf of

25   this client that told you to change the

1    names?

2         A.    The FDIC, because Advanta Bank

3    Corp. was under the receivership of the

4    FDIC.

18        Q.    And what person at the FDIC spoke

19   with you and made those instructions?

20        A.    There were many people who we

21   spoke with, but the lead at the FDIC at the

22   Horsham site, which I interacted with on a

23   regular basis, was Tom Wineland.

24        Q.    And he's a nice man, right?   Tom

25   Wineland seems -- is a nice person to deal

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


| | |
|---|---|
| MICHAEL T. DREHER,<br>Individually and on<br>behalf of a class of<br>similarly situated<br>persons,<br><br>         Plaintiff,<br><br>    vs.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.,<br>CARDWORKS, INC., and<br>CARDWORKS SERVICING,<br>LLC.,<br><br>         Defendants.<br>_____ | )<br>)<br>)<br>)<br>) Case No.<br>) 3:11-cv-00624-JAG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

          The videotaped 30(b)(6) deposition of
EXPERIAN INFORMATION SOLUTIONS, INC., by
PETER HENKE, called for examination, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before JENNIFER L.
BERNIER, CSR No. 84-4190, a Notary Public within and
for the County of Cook, State of Illinois, and a
Certified Shorthand Reporter of said state, at Jones
Day, Suite 3500, 70 West Wacker Drive, Chicago,
Illinois, on November 8, 2012, at 9:39 a.m.

```
 1   APPEARANCES:

 2        CONSUMER LITIGATION ASSOCIATES, INC.
          BY:  MR. LEONARD A. BENNETT
 3        763 J. Clyde Morris Boulevard
          Suite 1-A
 4        Newport News, Virginia  23601
          Phone: (757) 930-3660
 5        E-mail:  lenbennett@clalegal.com

 6        SUROVELL ISAACS PETERSEN & LEVY, PLC
          BY:  MS. KRISTI CAHOON KELLY  (Telephonically)
 7        4010 University Drive
          2nd Floor
 8        Fairfax, Virginia  22030
          Phone:  (703) 277-9774
 9        E-mail:  kkelly@siplfirm.com

10             On behalf of the Plaintiffs

11        JONES DAY
          BY:  MS. PATRICIA SIMONE CRUZ
12             MR. JOSEPH W. CLARK  (Telephonically)
          51 Louisiana Avenue, N.W.
13        Washington, D.C.  20001-2113
          Phone:  (202) 879-3939
14        E-mail:  pscruz@jonesday.com

15             On behalf of the Defendants

16   ALSO PRESENT:

17        MR. MICHAEL MOORE, Videographer

18

19

20

21

22

23

24

25
```

09:45 1       Q.    Okay.  So besides the lawyers that

2     handled this -- are handling the litigation of this

3     case, who did you speak with to obtain the factual

4     knowledge that form the basis of this declaration?

5             A.    That was it.  To the best of my

09:45 6       knowledge, I didn't speak to anybody else regarding

7     the content of this declaration.

8             Q.    Okay.  And what documents did you review

9     in creating this declaration?

10            A.    In creating it?

09:45 11      Q.    Well, by the substance, in order to

12    obtain what you believe -- what you have sworn under

13    oath is your own personal knowledge, what documents

14    did you review --

15            A.    See --

09:46 16      Q.    -- for this declaration?

17            A.    I reviewed agreements.

18            Q.    What agreements?

19            A.    Between Experian and Advanta.  I'm not

20    sure if this counts as documentation, but I reviewed

09:46 21      content within our Siebel system, which is our

22    tracking system.

23            Q.    What tracking system is that?

24            A.    It's our internal tracking system.

25            Q.    What is it called?

Page 10

09:46   1        A.      Siebel.

        2        Q.      How do you spell that?

        3        A.      S-I-E-B-E-L.

        4        Q.      And what is the purpose of that tracking

        5    system?  What is it used for?

09:46   6        A.      It's used for tracking our performance

        7    with regards to customer service and retaining

        8    contracts and things along those lines.

        9        Q.      And what information relevant to your

        10   declaration was in that Siebel?

09:47   11       A.      Well, it's a system that has the account

        12   in question within this declaration.

        13       Q.      Okay.  So what type of -- let me --

        14   sorry, Jennifer.  Withdraw that.

        15              Who were the parties -- or, rather,

09:47   16   who was the subscriber for the account in

        17   question?

        18       A.      The client, is that what you mean by

        19   "subscriber"?

        20       Q.      Sure.  I mean -- no.  Let me withdraw

09:48   21   that.  I mean subscriber -- subscriber the way that

        22   Experian uses it, subscriber the way that the CDIA

        23   uses it, subscriber the way that it's used in the

        24   credit reporting industry.  Who was the subscriber

        25   for the account in question?

Page 11

09:48  1          A.     That would be Advanta.

       2          Q.     Advanta.  What is the actual business

       3     name of Advanta?

       4          A.     I believe there's multiple business names

       5     under the Advanta umbrella.  There is Advanta

09:48  6     Corp. and there's Advanta Bank Corp.  Those are two

       7     that I know for sure.

       8          Q.     Okay.  And did you look at the Siebel

       9     records for any other subscribers besides Advanta

      10     Corp. or Advanta Bank Corp.?

09:49 11          A.     Not with regards to this declaration.

      12          Q.     Mm-hmm.  And what types of -- or

      13     categories of information are contained within this

      14     tracking database with respect to this account as

      15     you've described it?

09:49 16          A.     Well, like I said, it's a repository for

      17     documents; so contracts, letters.

      18          Q.     All right.  Now, does CardWorks also have

      19     a separate -- CardWorks or CardWorks Servicing have

      20     a separate Siebel record or file?

09:49 21          A.     Yes.  I believe CardWorks would have an

      22     account with -- within Siebel.

      23          Q.     And did you review that in preparing your

      24     declaration?

      25          A.     I've reviewed the CardWorks account, but

09:50   1   I don't recall reviewing it for the purpose of this

        2   declaration.

        3        Q.    Well, then why would you have reviewed

        4   the CardWorks account?

        5        A.    I would have been on the account for

09:50   6   other purposes, such as if we received a request for

        7   contracts or so on.

        8        Q.    Do you know that I have a Sears credit

        9   card?  Do you know that?

        10       A.    I did not know that.

09:50  11        Q.    I do.  I got it to purchase a

        12   refrigerator for -- a freezer, actually, for an

        13   older couple that watches our child.  Did you know

        14   that?

        15       A.    I was unaware.

09:50  16        Q.    Do you have a Sears credit card?

        17       A.    No, not that I'm aware of.

        18       Q.    You are the director of management for

        19   Experian, right?

        20       A.    I'm sorry.  Did you say director of

09:51  21   membership or director of management?

        22       Q.    I'm sorry, membership.

        23       A.    Yes.  I'm the director of membership.

        24       Q.    Are you the only director of membership?

        25       A.    Yes.

10:16  1    which a client of Experian's is permitted to buy a

2    credit report or a score or related product from

3    Experian, right?

4        A.    That's correct.

5        Q.    All right.  And then -- and that, in

10:17  6    fact, is where Experian makes most of its money,

7    right?

8        A.    Yes.

9        Q.    But these subscriber or client

10    agreements, they also govern the relationship with

10:17  11   the client and the client's role as a furnisher and

12    the client's role furnishing credit information

13    about consumer's trade lines to Experian, right?

14       A.    Correct.

15       Q.    So in this case, there was an account

10:17  16   that had originated, in however fashion -- through

17    trust, through servicing, whatever -- from Advanta

18    Bank.  You understand that, right?

19       A.    I'm sorry.  Could you repeat that again?

20    I'm sorry.

10:18  21      Q.    Sure.  There was an account regarding

22    Mr. Dreher that, at some point, had originated prior

23    to Advanta shutting down, had originated through

24    Advanta Bank -- through the trust, or through

25    Advanta Bank, or whatever, right?

10:18   1        A.    That's my understanding.

        2        Q.    All right.  And there was a trade line

        3    for that?  You're aware of that, that Advanta had a

        4    trade line in my client's credit report?

        5        A.    Yes.  That's my understanding.

10:18   6        Q.    All right.  And then Advanta shut down.

        7    Advanta Bank Corp. was shut down by government

        8    regulators in '09?  You're aware of that, right?

        9        A.    That's my understanding.  I believe it

       10    was October of 2010.

10:19  11        Q.    Well --

       12        A.    I'm not exact on the date, but Advanta

       13    Bank Corp. was -- went into receivership is what I

       14    understood.

       15        Q.    Are you as confident in that as you are

10:19  16    in the additional information you provided in your

       17    declaration?

       18        A.    Am I as confident in the Advanta Bank

       19    Corp. going into receivership?

       20        Q.    In October of 2010.

10:20  21        A.    I don't recall the specific date.  No,

       22    I'm not specific on the date right now.

       23        Q.    Okay.  But then at some point CardWorks

       24    contacted Experian to obtain bulls-eye's on these

       25    Advanta accounts, right?

10:20  1        A.      I'm not familiar with the bull's-eye

       2   request.

       3        Q.      All right.  Well, then let me help you

       4   out.  Why don't we go to -- let's start with

       5   Exhibit 3.

10:20  6               Exhibit 3 through 8 are e-mail chains

       7   that either Experian -- I think all of them might

       8   have been Experian.  These are e-mail chains that

       9   Experian has provided between Experian and

      10   CardWorks, so -- and have you ever seen e-mail

10:21 11   chains printed out before?

      12        A.      I have.

      13        Q.      And so this -- in these circumstances,

      14   just explaining for the record, if nothing else, the

      15   earliest of the e-mail, in a particular chain, will

      16   be at the end of the document typically.  In this

      17   case, it really takes us to page 4 is when the

      18   substance starts.

      19        A.      I'm sorry.  Is that page 4 or Exhibit 4?

      20   Page 4, I see.

10:21 21        Q.      Exhibit 3.

      22        A.      I understand.

      23        Q.      At the bottom right, Experian has, in

      24   really small numbers, given you a number.  That's

      25   called a Bates number.  It's how lawyers keep track

Page 43

10:53   1    discussion where Mr. Kilka is asking CardWorks,

        2    Experian is asking CardWorks, how CardWorks wants

        3    the trade lines for their new subscriber code to

        4    show, right?

        5        A.     They're asking CardWorks how they want

10:53   6    the subscriber name to display on this account,

        7    that's correct.

        8        Q.     That's right. And Exhibit 172 on page --

        9    I'm sorry. Exhibit 42, on page 172, Mr. Kilka asks,

     10    "Today your other subscriber codes show as

10:53 11    Siebel/CWS to consumers and creditors. Do you want

     12    CWS on the end of Advanta credit cards." Do you see

     13    that?

     14        A.     I do.

     15        Q.     So, I mean, in theory, if CardWorks

10:54 16    requested this, Experian, following its procedures,

     17    could have furnished the trade line as Advanta

     18    Credit Cards/Cardworks Servicing, right?

     19        A.     Are you saying we could have displayed it

     20    that way?

10:54 21        Q.     Yes, you could have.

     22        A.     That's correct.

     23        Q.     Why didn't you?

     24        A.     Because we relied on the -- this

     25    individual at CardWorks to provide us with the best

Page 44

10:54   1   name.

2        Q.    So, in your declaration, you have -- you

3   referenced the procedure, the general unwritten

4   policy, about -- you know, that governs the way a

5   trade line is displayed.

10:55   6              Would it be a fair description of that

7   policy to state that Experian's policy for how a

8   trade line is to be displayed is to defer to the

9   furnisher's, the subscriber client's, decision as to

10   how to display that trade line?

10:55  11        A.    I wouldn't refer to it as a policy.  I

12   would say, as a practice, we would enter the

13   entity's name unless the client has reason to alter

14   it or to have a different name posted.

15        Q.    That's right.  But it is not a policy of

10:55  16   Experian's that the client state the reason or

17   provide the explanation for why it wants a

18   particular name displayed as the trade line, right?

19        A.    It is not a policy.

20        Q.    And so, in this instance, it appears --

10:56  21   from this e-mail, in fact -- Experian never even

22   asked why CardWorks didn't want its own name shown

23   anywhere in the trade line, right?

24        A.    It doesn't appear that we asked that

25   question in this e-mail chain.

10:56 1      Q.    And that is not -- that manner of

2      determining the trade line that would be displayed

3      to consumers, that is the ordinary process by which

4      Experian would make that determination, right?

5      A.    I'm sorry.  Could you repeat that

10:57 6      question?

7      Q.    Sure.  In this e-mail chain, it

8      demonstrates a process that Experian used to

9      determine what it would list in the trade line as

10      the identity of the subscriber or the furnisher,

10:57 11      right?

12      A.    In this e-mail?  Yes.

13      Q.    Yes.

14      A.    Yes.

15      Q.    And the -- there is nothing in here that

10:58 16      is particularly out of the ordinary or surprising to

17      you as the way in which that trade line identity

18      would be determined, right?

19      A.    I would say, no, there is nothing

20      surprising in this e-mail.

10:58 21      Q.    And this is the manner in which -- this

22      is fairly typical of the manner in which Experian

23      would determine what the name of the furnisher or

24      how the name of the furnisher or subscriber would be

25      displayed in a trade line, correct?

Page 71

11:49  1          Q.    And are you aware of any agency

       2    relationship agreement, rather, between Advanta Bank

       3    Corp. and CardWorks Servicing?

       4          A.    I don't recall that agreement.

       5          Q.    Are you aware that Advanta Bank was,

11:49  6    itself, only a servicer of this credit card

       7    portfolio?

       8          A.    I was aware they serviced.  I didn't know

       9    they were only a servicer.

       10         Q.    Only a servicer.  Well, you discuss,

11:50 11    don't you, the trust in your declaration?

       12         A.    I'm sorry?

       13         Q.    Well -- well, so I'm looking at your

       14    declaration now.  You actually -- you don't have any

       15    personal knowledge as to whether Advanta Bank Corp.

11:50 16    actually was an original credit grantor as opposed

       17    to a servicer, do you?

       18         A.    No.

       19         Q.    And you don't actually know who the

       20    actual owner of these accounts that Experian labeled

11:51 21    as Advanta credit card accounts, you don't actually

       22    know who the owner of those accounts is, do you;

       23    you, personally?

       24         A.    I was under the understanding that

       25    Advanta was.

11:51  1      Q.    And where did you get that understanding

2  from?

3      A.    Because we engaged with Advanta for our

4  agreements.

5      Q.    Okay.  Now, if Advanta Bank Corp. was not

11:51  6  the owner of the accounts and was, instead, only a

7  servicer, when servicing was transferred to

8  CardWorks Servicing, what should the trade line have

9  stated?

10      A.    That would depend on what the client felt

11:52  11  was -- would cause less confusion to the consumer.

12      Q.    Right.  Well -- all right.  Do you know

13  that my client was an identity theft victim who

14  never actually applied for any account with Advanta?

15  Are you aware of that?

11:52  16      A.    I was told that, yes.

17      Q.    Mm-hmm.  So given that he had no previous

18  relationship with Advanta, how would including the

19  name Advanta have helped a consumer, an identity

20  theft victim, such as my client?

11:52  21  MS. CRUZ:  You should answer the question if

22  you have knowledge of the information.

23  BY THE WITNESS:

24      A.    Yeah.  I'm not sure.  Not having been an

25  identity theft victim, I don't know how it would

Page 73

11:53   1    help him.

        2      Q.     The purpose for identifying the source of

        3    information of a trade line -- I'm sorry.  Let me

        4    try it differently.

        5      Which entity in 2011 was actually

11:53   6    furnishing credit information regarding the Advanta

        7    accounts to Experian?

        8      A.     From my understanding, CardWorks Services

        9    was delivering the information on behalf of Advanta.

     10      Q.     Okay.  That's what your personal

11:53 11    understanding was?

     12      A.     Yes.

     13      Q.     All right.  And, again, where did you get

     14    the knowledge, the belief, that Advanta continued to

     15    own these accounts after 2000 -- after just October

11:54 16    2010?

     17      A.     Again, it would be because our agreements

     18    were with Advanta.

     19      Q.     But the only reason you think that the

     20    agreement that governed this account was with

11:54 21    Advanta was because your Siebel system listed this

     22    account with Advanta's company ID, right?

     23      A.     This is correct.

     24      Q.     You don't actually know or have knowledge

     25    as to whether or not that was an error or mistake to

Page 74

11:54   1    attach that company ID to these accounts, right?

        2        A.    Correct.

        3        Q.    And you didn't have any personal

        4    knowledge about Advanta until the lawyers in this

        5    lawsuit asked you to prepare your declaration,

11:55   6    right?

        7        A.    That's right.

        8        Q.    Now, if you want to take a look at

        9    Exhibit 5, again -- that's where we were -- and,

        10   now, we can go -- I previously have taken you to

11:55  11    Bates No. 217.  Let's pop up a page to 216.

        12       A.    I'm there.

        13       Q.    And, by the way -- and, now, in the

        14   middle of this page, you have Experian's employee

        15   communicating with a CardWorks employee, Gina

11:56  16    Bennett, and telling her that the updates and new

        17   subscriber code changes have been made in accordance

        18   with the below, which is referring to his previous

        19   e-mail of 2/17, right?

        20       A.    That's what it appears he's saying, yes.

11:56  21        Q.    So, in this instance, if Mr. Kilka, on

        22   behalf of Experian, was representing that he

        23   understood and that Experian had intended that the

        24   new subscriber code actually should be connected to

        25   the CardWorks company ID, not the Advanta company

12:00 1    provided to Maria at the beginning of this all."

2               And then right above it, Mr. Kilka

3    then -- Experian, then says, "You mentioned a trust.

4    Do you have a contact at whomever -- whomever that

5    truly is?"  And you understand that, right, those

12:01 6    exchanges?

7         A.    I see them, yes.

8         Q.    Now, if you'll turn to the very top page

9    with that context, Bates No. 217 of Exhibit 5, can

10   you read the e-mail from CardWorks back to

12:01 11   Experian's employee, James Kilka, at the bottom?

12        MS. CRUZ:  To clarify, Len, are you referring

13   to Bates No. 213 or 217?

14        MR. BENNETT:  213, sorry.

15        MS. CRUZ:  Okay.

12:01 16 BY THE WITNESS:

17        A.    The November 4th e-mail.

18        Q.    Yes.

19        A.    It says, "James, the owner of the Advanta

20   accounts is Vion Holdings II, LLC.  Thanks.  Gina."

12:01 21        Q.    So with that knowledge, how would that be

22   material to Experian's existing practice or

23   procedure for reporting the source of information of

24   the trade line?

25        A.    Based on this content?

Page 78

12:02 1        Q.    Yes.

2        A.    I would say we would try to obtain an

3     agreement with Vion Holdings and move -- or obtain

4     an agency addendum for CardWorks as an agent for

5     Vion Holdings.

12:02 6        Q.    And, in fact, you've seen the subsequent

7     exhibit, Exhibit 7, which you can turn to now, two

8     exhibits later.

9        A.    I'm on 7.

10        Q.    And, apparently, there was now an

12:03 11     agreement that Vion was asked to sign but then had

12     edited a separate membership agreement, right?

13        A.    It appears that way, yes.

14        Q.    Now, if you could then turn to Exhibit 8,

15     there is a document attached to this e-mail, a

12:03 16     couple of documents.  Can you explain these to me?

17        A.    The first document is --

18        Q.    Sure.

19        A.    -- an application for an authorized agent

20     or third-party processor, and it's completed by

12:03 21     CardWorks Servicing.

22        Q.    What is this document used for?

23        A.    This would be used for an agent or a

24     third-party processor that wants to apply to become

25     an authorized agent or third-party processor.

12:04    1        Q.     What is the third-party processor as

         2   opposed to an agent?  What's the difference?

         3        A.     Typically, a third-party processor would

         4   look more like a software vendor or a pass-through,

         5   whereas an agent would handle the data with regards

12:04    6   to reporting.  For instance, a processor, a data

         7   processor, may pass the data to Experian, but would

         8   not handle disputes, whereas an agent would handle a

         9   dispute on behalf of the client.

        10        Q.     And then there are two more pages that

12:04   11   follow.

        12        A.     Let's see.  59 is an agency addendum to

        13   the standard terms and conditions, and 260 is also

        14   an agency addendum to the standard terms and

        15   conditions.

12:05   16        Q.     And the second one was provided by Vion

        17   Holdings apparently?

        18        A.     That's correct.  260 appears to have been

        19   completed by Vion Holdings as the client with

        20   CardWorks, I believe, as the agent.

12:05   21        Q.     If you could take a look at Exhibit 10 --

        22        A.     Okay.

        23        Q.     -- what is this document?

        24        A.     Pages 271 and 272 are the business

        25   information services schedule, and then pages 273

Page 80

12:06  1    and 274 are the Experian standard terms and

2    conditions.

3        Q.    And this governs your relationship with

4    CardWorks, correct?

5        A.    This would govern the sale of business

12:06  6    information to CardWorks.

7        Q.    And then what is Exhibit 11?

8        A.    The pages 140 and 141 are the standard

9    terms and conditions with Advanta Corp.; and the

10    consumer services schedule is page 142, also with

12:06  11    Advanta Corp.

12        Q.    And this says, "Effective date,

13    10/12/10."  Do you see that?

14        A.    I do.

15        Q.    Do you know who signed this document

12:07  16    supposedly for Advanta?

17        A.    It appears Jodi Plavner.

18        Q.    Do you know who that is?

19        A.    I do not know Jodi.

20        Q.    Was Experian even in the business -- I'm

12:07  21    sorry -- Advanta Bank Corp. of signing documents in

22    that time period?

23        A.    I'm not sure I understand.  Is Advanta

24    Bank Corp. signing which documents?  And by time

25    period, do you mean on this date?

Page 81

12:07  1        Q.    Yes.

       2        A.    I'm not aware --

       3        Q.    October 12, 2010.

       4        A.    I'm not familiar with an agreement that

       5   they signed on that date.

12:08  6        Q.    And if you'll take a look at

       7   Exhibit 12 -- I'm sorry.  Let's go straight to 15.

       8        A.    Okay.  I'm at 15.

       9        Q.    We went through this before.  This is the

       10  code 1681g, the U.S. code.  And the requirement, if

12:09  11  you'll recall, simplified is that Experian shall,

       12  upon request, clearly and accurately disclose to the

       13  consumer all information in the consumer's file at

       14  the time of the request and the sources of that

       15  information.  And you now understand that's what

12:09  16  this section says, right?

       17       A.    I do.

       18       Q.    You have not been a victim of identity

       19  theft yourself, right?

       20       A.    I have not, not that I'm aware of.

12:10  21       Q.    You believe -- and I'm now flipping back

       22  and forth.  You don't have to follow me here, but

       23  I'm going to go to your declaration.  And you or

       24  whoever did your declaration says, "Experian's

       25  ultimate goal with regard to the manner in which it

12:10  1   reports a trade line's associated subscriber name is

       2   to aid the consumer in recognizing the obligation so

       3   that the consumer can correct any inaccuracies or

       4   lodge disputes if necessary."  Did you type that

       5   sentence?

12:10  6        A.    I did not type it.

       7        Q.    Did you dictate it to somebody else to

       8   type?

       9        A.    I wouldn't say I dictated it.

      10        Q.    Did you read it and then simply say, "I

12:11 11   believe that's true so therefore I will agree that

      12   that's true"?

      13        A.    I don't believe so.  I believe I was

      14   asked.

      15        MS. CRUZ:  I'm sorry.  We're clarifying that

12:11 16   the client -- the witness is not being asked to

      17   testify to communications between his attorney and

      18   himself.

      19        MR. BENNETT:  I'm very hopeful that an

      20   attorney did not put this in front of him and

12:11 21   ask the witness to swear under oath this was his

      22   personal knowledge if he did not participate in

      23   its drafting.  So I didn't -- it didn't come to my

      24   mind that it could be that this was simply drafted

      25   by an attorney for him to sign under penalty of

12:11  1    perjury.

       2    BY MR. BENNETT:

       3        Q.    Mr. Henke, how do you know that

       4    Experian's ultimate goal with regard to the manner

       5    in reporting its trade lines is to aid consumers in

12:12  6    recognizing the obligations so that they can correct

       7    inaccuracies and lodge disputes?

       8        A.    That would be what we attempt to do in

       9    our department when we create the subscriber code is

      10    to --

12:12 11        Q.    And how did you come to have that as your

      12    ultimate goal as opposed to --

      13        MS. CRUZ:  I'm sorry.  Len, he was in the

      14    middle of an answer.

      15    BY MR. BENNETT:

12:12 16        Q.    I'm sorry.  So that's what's in your

      17    department.  You can continue.  I didn't know you

      18    weren't finished.

      19        A.    It was to put the most recognizable name

      20    to the consumer on the subscriber codes for the

12:12 21    purposes of benefitting the consumer.

      22        Q.    Right.  But did you come to that

      23    personally, Peter Henke's personal goal, or is it

      24    some corporate policy?

      25        A.    I would say that's our departmental

1    objective on subscriber codes and it's --

2        Q.    And how did you learn --

3        THE REPORTER:  I'm sorry.

4    BY MR. BENNETT:

5        Q.    -- that was your department's objective?

12:13 6    MS. CRUZ:  Len, the court reporter is asking

7    for a moment.

8        THE REPORTER:  I just believe he cut the

9    witness off on his answer.

10       MS. CRUZ:  Peter, do you have anything more to

12:13 11    say regarding the prior question?

12    BY THE WITNESS:

13       A.    I was just saying that it's been our

14    objective for a long time is to essentially to

15    protect the consumer and, as part of that,

12:13 16    portraying a recognizable name on the sub -- I'm

17    sorry -- on the subscriber name field as part of

18    that.

19       Q.    I understand that is what you believe,

20    right?  That's what you believe?

12:13 21       A.    That's correct.

22       Q.    Why do you believe that is Experian's

23    goal?

24       A.    I would say that it started with my

25    initial training, that that was one of our

12:14  1   objectives.  Maybe not in those specific words, but

2   with the intent of protecting the consumer and so

3   on.

4        Q.   Well, then why don't you include both

5   Advanta and CardWorks Servicing in the trade line if

12:14  6   that's your ultimate goal?

7        A.   We -- we would in instances if this

8   subscriber felt that that was the best way to

9   portray the inquiry line.  To a large degree, we

10   rely on our client to understand that trade line

12:14 11   relationship with the consumer.

12        Q.   Well, that's a different goal.  If your

13   ultimate goal is to client satisfaction, that's not

14   the same goal as the ultimate goal is making sure

15   the consumer has all of the information they need to

12:15 16   make a dispute and correct inaccuracies.

17        A.   I'm sorry.  Maybe I misphrased that.  The

18   goal wasn't client satisfaction.  It is we rely on

19   the client to be able to communicate the best way to

20   display a subscriber name since they are the ones

12:15 21   that would have the relationship with the consumer.

22   So, in other words, we use the client as a means to

23   obtain the best name for the consumer to recognize.

24        Q.   But your assumption is, noble intentions

25   by all of your customers, right?

12:16  1        A.    That's correct.  We -- we do operate that

2    our clients are operating with integrity.

3        Q.    And circumstances like this one where

4    CardWorks just didn't want anyone to know who they

5    were, because they didn't want to get calls at their

12:16  6    home office, if that were the case, you don't --

7    there is no procedure at Experian that would exist

8    to sort of check to CardWorks' conduct, right?

9        MS. CRUZ:  Len, to the extent you're asking

10    information that he personally has, he may answer

12:16 11    the question.  But if you're asking about what

12    CardWorks does or assumes, he's not qualified to

13    answer that question.

14    BY MR. BENNETT:

15        Q.    I'm asking what check, if any, is there

12:16 16    on -- to make sure that your client creditor

17    customers are -- also have, as their ultimate goal,

18    helping consumers collect inaccurate credit

19    reporting and make disputes?

20        A.    I'm not familiar with any formal

12:17 21    procedure, but let's say we have areas that receive

22    consumer disputes and complaints and they went

23    through each one, well, yeah, that would my -- to my

24    knowledge.

25        Q.    Well, when you say this is your ultimate

12:17   1   goal and I asked you why you believe that and the

2   answer that you provided is that it was from your

3   training, what training was provided to you that

4   addressed Experian's goal with respect to naming a

5   trade line?

12:18   6       A.    When I initially started in the

7   membership department, I went through my training as

8   an analyst, which would have -- part of that would

9   have been the communication of the purpose and why

10   we do what we do -- in other words, our mission --

12:18   11   as well as how to create the subscriber code.

12       Q.    And so, in this case, our client alleges

13   that he was an identity theft victim.  What other

14   types of inaccuracy -- well, let me -- let me try

15   this differently.

12:19   16            In this case, our client alleged that he

17   was not the person responsible to pay or he did not

18   open the account that CardWorks was reporting in his

19   credit report.  You are aware that was his

20   obligation, right?

12:19   21       A.    Yes.

22       Q.    And if my client made a theft dispute to

23   say, "Not my account," are you aware of what

24   Experian would have done?  What code it would have

25   used to convey a dispute?

12:19  1       A.    That's a little bit out of my realm of

2       responsibilities with regards to the consumer

3       disputes.

4       Q.    In fact, when you suggest that the

5       ultimate goal is to help consumers make disputes,

12:20  6       you personally are not familiar with the

7       investigation and dispute process that is actually

8       followed by Experian, are you?

9       A.    I do not have the details on the dispute

10      process when we received them.

12:20 11       Q.    And you don't have any personal knowledge

12      as to what would help versus hurt consumers trying

13      to make credit reporting disputes for accounts they

14      claim they never opened, do you?

15      A.    I would say I don't have knowledge of any

12:20 16      specific instance.

17      Q.    All right.  Well, then let me just ask

18      you -- you, Peter -- you've never been an identity

19      theft victim.  But if you pulled your credit

20      report -- you're a consumer who doesn't have access

12:21 21      to the internal database at Experian -- you pull

22      your credit report and you see a trade line, a

23      credit account -- a credit card account trade line

24      reported in your file, what use would you have for a

25      trade line that was identified by the name of the

```
12:21  1   original creditor as opposed to or compared to the

       2   name of the company that was actually doing the

       3   current credit reporting?

       4       A.   I would say if I -- if I personally

       5   opened the account, it would help me to recognize

12:22  6   the loan.  But if it was an account that I did not

       7   open, then I don't think I would recognize any name.

       8       Q.   And so if you were told the identity of

       9   the entity that was currently doing the credit

      10   reporting, you would agree that that would be more

12:22 11   useful to you than the historic --

      12       MS. CRUZ:  Len, I believe

      13   you're mischaracterizing --

      14   BY MR. BENNETT:

      15       Q.   -- name of the entity that first opened

12:22 16   the account, right?

      17       MS. CRUZ:  Objection.  Mischaracterization of

      18   the witness's testimony.

      19   BY MR. BENNETT:

      20       Q.   Sir?

12:22 21       A.   I'm sorry.  Can you repeat that?

      22       Q.   Sure.  Your most common dispute at

      23   Experian is the dispute where a consumer says an

      24   account is not his or hers.  You don't know that,

      25   but it's true.
```

12:23   1           For consumers who make such a dispute

        2   where their dispute is on an account that they did

        3   not open, as a long tenured Experian employee, you

        4   would agree that it would be more useful of that

        5   consumer to know the identity of the entity that was

12:23   6   currently doing credit reporting, correct?

        7       A.   I don't think the name of any entity

        8   would help.

        9       Q.   Well, are you aware that, when a consumer

       10   makes a dispute, Experian responds by telling the

12:23  11   consumer to contact the source of the information?

       12       A.   Yes.

       13       Q.   Are you aware of that?

       14       A.   Yeah.  I believe we express to the

       15   consumer to contact the client.

12:24  16       Q.   But, actually, they use the source of the

       17   information?

       18       A.   Okay.

       19       Q.   They don't use the word client.  Do you

       20   know that?

12:24  21       MS. CRUZ:  Len, if you -- I just want to make

       22   sure you're not testifying for the witness.  If you

       23   have a question, Mr. Henke can answer it.

       24       MR. BENNETT:  What time is it right now,

       25   Patricia?

```
12:24   1        MS. CRUZ:  It's 12:25 in Chicago.

        2        MR. BENNETT:  Are you testifying or are you

        3   stating a reality?

        4        MS. CRUZ:  We can continue with the

        5   questioning, if you have a question for the witness.

12:25   6   BY MR. BENNETT:

        7        Q.   Well, how about we turn to Exhibit 21?

        8   This is a 2012 Experian document telling identity

        9   theft consumers what to do in the event that they

       10   believe they are a victim of fraud or identity

12:25  11   theft.  And if you could go ahead and turn to page

       12   17 of this --

       13        MS. CRUZ:  I'd like to ask for a moment for

       14   the witness to review the exhibit as he hasn't seen

       15   it before this moment.

12:26  16        MR. BENNETT:  Sure.  You might, also, if you

       17   want to, you can look at that exhibit and, if you'd

       18   like, you can also look at Exhibits 15 and 17.

       19   BY THE WITNESS:

       20        A.   Which other ones should I be looking at?

12:26  21        MS. CRUZ:  Could you repeat the list of

       22   exhibits that he should be looking at?

       23   BY MR. BENNETT:

       24        Q.   Sure.  Page -- generally, Exhibit 21,

       25   but, more specifically, page 17.
```