IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MICHAEL T. DREHER,

    Plaintiff,

v.                                                    Case No. 3:11-cv-00624-JAG

EXPERIAN INFORMATION SOLUTIONS, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on the defendant's motion for partial summary judgment on the plaintiff's class claims.[1] The plaintiff, Michael T. Dreher, has brought suit against the defendant, Experian Information Solutions, Inc. ("Experian"), for alleged violations of the Fair Credit Reporting Act ("FCRA"). 15 U.S.C. §§ 1681 *et seq.* Dreher's class claims allege that Experian violated the FCRA "willfully," thus entitling successful plaintiffs to actual, statutory, and punitive damages. 15 U.S.C. § 1681n. Willfulness, as interpreted by the Supreme Court, encompasses both knowing and reckless violations, but the evidence in this case requires the Court to consider only the possibility of the latter. To establish a willful FCRA violation, the plaintiff must show that Experian's actions were not simply erroneous but also "objectively unreasonable."

The parties focus on the statutory language "sources of the information" in a credit

---

[1] Since the defendant's motion for summary judgment only challenges the plaintiff's class claims, the Court makes no judgment as to the plaintiff's individual claims (Counts IV through X of the Second Amended Complaint).

report. 15 U.S.C. § 1681g(a). This section of the FCRA imposes a duty on Experian to "clearly and accurately disclose to [Dreher] . . . [t]he sources of the information" found in his consumer credit report. Throughout the course of a dispute about certain information in Dreher's credit report, Experian consistently cited either "Advanta Bank" or "Advanta Credit Cards" as the sole source of the information. The record discloses, however, that the main, if not exclusive, supplier of the disputed information was another entity known as CardWorks. Since CardWorks is clearly one of the "sources" of Experian's information, a jury could find that Experian's disclosure was objectively unreasonable. Accordingly, the Court denies the defendant's motion for partial summary judgment.

## I. BACKGROUND

An identity thief victimized Michael Dreher in late 2008, though he did not discover this fact until 2010. In that year, the federal government, while processing Dreher's security clearance, advised him that its investigator had discovered a delinquent account on his credit reports. The account appeared in Dreher's credit report under the name "Advanta Credit Cards." According to Dreher, the government investigator told him that he needed to prove payments on the account in order to save his security clearance from ruin. But Dreher had not applied for a credit card or account with any such "Advanta" entity. In fact, he had never heard of Advanta before. He came to know of its existence only when the government informed him of the delinquent account.

After discovering the account, Dreher contacted Experian to request his credit report. He received several credit reports between November 2010 and November 2011, and in each one Experian listed "Advanta Credit Cards" in the trade lines associated with this account. The credit reporting industry refers to this type of listing as a "subscriber code." In each credit

report, Experian also listed the Advanta account as carrying a past due balance and delinquent payment status.

Like many other banks, Advanta collapsed during the nationwide financial crisis that struck several years ago. Advanta Bank Corp. ("Advanta Bank"), a Utah-based company, issued credit cards until the state's Department of Financial Institutions shut it down and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver on March 19, 2010. Soon thereafter, Deutsche Bank, the Indenture Trustee of Advanta Bank, appointed CardWorks, Inc., and CardWorks Servicing, LLC, ("CardWorks") to serve jointly as the "Successor Servicer" to accounts originated by Advanta Bank Corp.[2] Def.'s Mem. Supp. Mot. Summ. J. (Def.'s Opening Brief) ¶¶ 13–15. As servicer, the CardWorks entities do not own the Advanta Bank-originated accounts. *Id.* ¶ 16. Instead, the servicer "is a type of agent that is responsible for all or some phases of the account lifecycle which may include communicating the lending decision based on the lender's criteria and handling consumer dispute verifications and corrections on behalf of the lender." Peter Henke Decl. ¶ 14. In other words, under normal circumstances, the lender exercises ultimate control over its accounts, but the servicer actually deals with borrowers and, from the latter's standpoint, calls the shots. Since October 2010—before Dreher first ordered a credit report from Experian—CardWorks has provided all servicing duties for the vast majority of Advanta Bank Corp. originated accounts.[3]

Dreher argues that Experian gave him willfully false information regarding the "sources

---

[2] The fact that CardWorks, Inc., and CardWorks Servicing, LLC, are two separate entities does not affect the outcome. Even if CardWorks, Inc., took part in the arrangement, CardWorks Servicing actually performed the servicing duties. *See* Peter Henke Decl. ¶ 13.
[3] After Dreher learned of the identity theft, Vion Holdings II, LLC, acquired the rights to the revenue associated with these accounts. The parties dispute who actually "owns" these accounts. As discussed below, however, the ownership of the accounts plays no role in the Court's decision.

of the information" associated with the Advanta Bank account. Experian exclusively listed "Advanta Credit Cards," not CardWorks, in trade lines. In other communications, Experian similarly named Advanta as the sole source of the negative information, even though the entity with whom Experian actually communicated throughout this period was not Advanta but CardWorks. In fact, Experian decided on the "Advanta Credit Cards" subscriber code only after asking CardWorks what to put in the Advanta account-related trade lines going into consumer credit reports. CardWorks, in response, told Experian that it did "not want CWS or Cardworks mentioned in the trade line, just Advanta Credit Cards." Pl.'s Brief, Ex. O at 8; *see also id.*, Ex. A-1 at 2 (letter to Experian on CardWorks letterhead stating, "We would like for this new code to report on the consumers' trade line as Advanta Credit Cards.").

Dreher brings three class claims. In Count One, he alleges that Experian violated § 1681e(b) of the FCRA by failing to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding Dreher and the putative members of the class.[4] In Count Two, Dreher alleges that Experian violated § 1681i(a)(6) as to him and the putative class by failing to accurately provide the results of the reinvestigations required by this section of the FCRA. In Count Three, Dreher alleges that Experian violated § 1681g(a)(2) as to him and the putative class by failing to clearly and accurately disclose the source of the Advanta trade lines in their respective credit reports.

Dreher has proposed distinct but related classes for each one of these claims. Second Am. Compl. ¶ 21. The parties agree that the class claims hinge on one common feature: that each member of the proposed classes had a credit report with "Advanta" identified as the

---

[4] Dreher also complains that Experian failed to "establish" such procedures, but the FCRA does not require reporting agencies to establish such procedures. A court assesses objective reasonableness on a case-by-case basis, without regard for consistency from one situation to another.

4

"source" of a particular trade line, even after the bank went into receivership in March 2010.[5] *Id.*

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the movant establishes that there is no genuine dispute of any material fact and is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). After an adequate period of time for discovery, Rule 56(a) mandates a grant of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(a). The court resolves all genuine factual disputes and inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*).

Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88 (1986). The non-movant may not rest on claims within its pleading, but "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks & emphasis omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988) ("Mere unsupported

---

[5] Only Count III in the Amended Complaint deals with the definition of "sources of the information." Counts I and II deal, respectively, with Experian's alleged failure to follow procedures to insure the accuracy of its reports and to provide debtors with reports of reinvestigations of disputed claims. Neither of these claims appears to rest on the definition of "sources of the information." The parties' arguments, however, deal solely with the term "source." The Court's decision does not address the role of the definition of "source," as applied to Counts I and II of the Amended Complaint.

5

speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

### III. DISCUSSION

The Court must decide whether Experian not only erred but also may have been "objectively unreasonable" when it disclosed Advanta Credit Cards—and not CardWorks—as the sole source of the information in Dreher's credit report trade lines. Unless Dreher can show Experian's objective unreasonableness in doing so, he cannot establish the willfulness prong of his class claims, thereby entitling Experian to partial summary judgment.

This legal standard comes from the Supreme Court's decision in *Safeco Insurance Co. of America v. Burr*. 551 U.S. 47 (2007). There, the Court determined that "willfulness" under the FCRA covers both knowing and reckless violations. *Id.* at 59–60. Though Dreher attempts to argue that Experian knowingly violated the FCRA, the record contains no evidence that Experian knew its actions violated the statute when it decided on the content of the trade lines. Thus, the Court limits its analysis to an inquiry of whether Experian acted recklessly.

In *Safeco*, the Supreme Court went on to define recklessness "as conduct of an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." 551 U.S. at 68 (citations omitted). Stated differently, "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. In short, if Experian's "reading of the statute, albeit erroneous, was not objectively unreasonable," then it did not willfully violate the FCRA. *Id.* Arguments about a

6

defendant's subjective bad faith have no place in the willfulness analysis. *See id.* at 70, n.20.[6]

A recent Third Circuit case—*Fuges v. Southwest Financial Services, Ltd.*, ___ F.3d ___, 2012 WL 6051966 (3d Cir. Dec 6, 2012)—helpfully parses the *Safeco* analysis for claims of recklessness. *Fuges* does not extend *Safeco* in any way; rather, it merely provides a useful elaboration of the legal standard laid out by the Supreme Court.

*Fuges* identifies three factors to review to determine whether a defendant may benefit from the "safe harbor" of a "reasonable interpretation of FCRA's coverage." *Fuges*, slip op. at 14. All three factors deal with whether an FCRA defendant has clear notice of the statutory requirements. First, a court considers whether the FCRA gives "clear guidance" as to the meaning of particular statutory language, *id.* at 22, or instead contains "less-than-pellucid statutory text." *Safeco*, 551 U.S. at 70. The second factor, closely related to the first, asks whether the proposed interpretation "had a 'foundation in the statutory text.'" *Fuges*, slip op. at 22 (quoting *Safeco*, 551 U.S. at 69–70). Finally, a court asks whether the defendant was "interpreting the statute in the absence of any contrary authority on the meaning" of the statutory language in question "because 'no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC.'" *Id.* (quoting *Safeco*, 551 U.S. at 70). Even in the absence of such guidance, however, a defendant does "not receive a pass because the issue has never been decided." *Fuges*, slip op. at 25, n.21 (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 722 (3d Cir. 2010).

These factors do not support Experian's position in this case.

---

[6] The Supreme Court stated, "Respondent-plaintiffs argue that evidence of subjective bad faith must be taken into account in determining whether a company acted knowingly or recklessly for purposes of §1681n(a). To the extent that they argue that evidence of subjective bad faith can support a willfulness finding even when the company's reading of the statute is objectively reasonable, their argument is unsound." *Safeco*, at 70, n.20.

The first and second factors weigh heavily against Experian. The language of the FCRA gives "clear guidance" as to the meaning of particular statutory language. In relevant part, the FCRA states:

> Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer:
>
> . . .
>
> > (2) *The sources of the information*; except that the sources of information acquired solely for use in preparing an investigative consumer report and actually used for no other purpose need not be disclosed: Provided, That in the event an action is brought under this subchapter, such sources shall be available to the plaintiff under appropriate discovery procedures in the court in which the action is brought.

15 U.S.C. § 1681g(a) (emphasis added). The statute therefore required Experian to "clearly and accurately disclose to [Dreher] . . . [t]he sources of the information" found in his consumer file. This phrase comprises two components—"sources" and "information." The "information" at issue is *not* the institution at which Dreher's account originated, who owned the account, or who serviced the account, but rather is the actual content of the credit items listed in Dreher's personal report, just as that "information" appears. In this case, the information deals with whether Dreher had opened accounts through Advanta, and whether Dreher kept those accounts current. Under the statute, Experian must reveal the "sources" of this information. It attempted to do so by listing Advanta Credit Cards in the accompanying subscriber codes and by consistently telling Dreher in other communications that Advanta was the source of such information. In fact, the information came from CardWorks.

Although Experian posits that the word "sources" could have many meanings, in the context of this case and the FCRA, the term clearly embraces CardWorks. Whatever else it might mean, the term "sources of the information" certainly includes the entity that gave the

8

information to Experian.

As to the second factor, Experian's chosen interpretation of "sources of the information" has no "foundation in the statutory text." A jury could easily find that Experian's interpretation of the phrase to mean Advanta—and Advanta *alone*—was objectively unreasonable under the circumstances of this case. Experian contends that it was reasonable to list Advanta *instead of* CardWorks or any other potential source, but this position rests on a false dichotomy. Experian had no obligation to select only one single source; in fact, doing so directly conflicted with the FCRA's language, which compels parties to identify, not the "source," but the "sourc*es* of the information." 15 U.S.C. § 1681g(a) (emphasis added). An interpretation of the phrase "sources of the information" that omits not only the principal supplier of the information but also the entity determining the actual content of the credit items listed in the credit report, has little "foundation in the statutory text." *Fuges*, slip op. at 22 (quoting *Safeco*, 551 U.S. at 69–70). Thus, the first and second *Fuges* factors weigh against Experian.

Experian defends its interpretation by asserting that it actually tried to fulfill the FCRA's overriding purpose. As the Seventh Circuit has explained, . . .

> . . . [a] primary purpose[ ] of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under § 1681i. We conclude that the consumer reporting agency must do more than simply make an accurate disclosure of the information in the consumer's credit file. The disclosure must be made in a manner sufficient to allow the consumer to compare the disclosed information from the credit file against the consumer's personal information in order to allow the consumer to determine the accuracy of the information set forth in her credit file. In writing § 1681g(a)(1), Congress requires disclosure that is both "clearly and accurately" made. An accurate disclosure of unclear information defeats the consumer's ability to review the credit file, eliminating a consumer protection procedure established by Congress under the FCRA.

*Gillespie v. Equifax Information Servs., LLC*, 484 F.3d 938, 941 (7th Cir. 2007). In other words,

some information, technically accurate but not useful to the consumer due to its lack of clarity, might not satisfy the law's purpose. If listing a "source" would make it more difficult for a person to deal with inaccurate information in his or her credit report, then a party in Experian's shoes might justifiably omit it from a credit report. But rather than helping Experian, *Gillespie* shows that Experian had fundamentally misplaced concerns about listing CardWorks.

To put it simply, one cannot reasonably argue that listing CardWorks would have made it *more* difficult for Dreher to remove inaccurate information from his credit report, given that CardWorks directly supplied the information in his credit report and actually responded to disputes regarding Advanta Bank accounts. As Experian concedes, consumers who contacted "Advanta Credit Cards" to contest information in their credit reports actually communicated with CardWorks representatives the whole time. Despite CardWorks' message of "Pay no attention to that man behind the curtain," Experian never had any doubt about the wizard's true identity. Experian thus takes an untenable position when it contends that listing CardWorks would have operated to Dreher's detriment, for CardWorks played an unmistakable role in resolving disputes stemming from Advanta Bank accounts.

If anything, disclosing CardWorks would have lifted the Advanta veil and brought Dreher one step closer to the resolution of his problems. And though it might initially surprise a consumer to see an unfamiliar name in his or her credit report, it would hardly hurt to learn the name of an entity primarily responsible for the presence of certain credit information, whether favorable or unfavorable. Consumers unquestionably want to know whom they can hold ultimately accountable for the content of their credit reports. In Dreher's case, this entity was CardWorks. Accordingly, disclosing CardWorks to Dreher would have made perfect sense, particularly as Dreher persisted in his efforts to have the negative history removed from his

credit report. Experian's attempt to seek refuge in the "purpose" of the FCRA does not shield Experian from liability.

Still, Experian considers its actions reasonable because, in its view, it faced an unusually difficult task. It says that "at least eight known entities [are] currently involved in the ownership and management of Advanta Bank Corp. originated accounts, including (1) the FDIC; (2) Wilmington Trust Company; (3) Deutsche Bank Trust Company Americas; (4) Vion Holdings II, LLC; (5) CardWorks, Inc.[;] (6) CardWorks Servicing, LLC; (7) FIS; and (8) FDR." Def.'s Opening Brief at 13. Given the number of entities "involved," Experian "reports a trade line's associated subscriber name . . . to aid the consumer in recognizing the obligation so that the consumer can correct any inaccuracies or lodge disputes, if necessary." *Id.* at 14–15. Experian's approach fails for at least two reasons.

First, as the Court mentioned earlier, the FCRA does not restrict Experian to giving just one source of the Advanta trade lines in Dreher's credit report. On the contrary, it mandates that Experian disclose the "source*s*" of such information. Thus, Experian utterly disregarded the statute's plain language when deciding how to comply. Just as importantly, Experian does not contest Dreher's position that the industry-standard format for listing subscriber codes is "Metro2," which specifically allows trade lines to identify both the previous servicer/issuer of the debt and the current servicer.[7] Industry-standard practices clearly bear on the reasonableness of Experian's decision to list only Advanta in Dreher's credit report, and yet nowhere does Experian offer a good reason for not utilizing this format. In fact, an email shows that Experian

---

[7] As Dreher explains, "The Industry standard 'Metro2' format even provides a field to identify the previous servicer or creditor. It also permits the disclosure of both the 'source' and any related name or entity. For example, this fact was evident in a number of [ ] legitimate tradelines in [his] June 21, 2011 Report: Citibank/Citgo; GE Capital/Home Design; HSBC/Yamaha Music; Dell Computer/Web Bank." Pl.'s Brief at 13–14, 23.

actually considered following this practice and using the trade line "Advanta/CWS" but instead deferred judgment to CardWorks, which said it "would not want CWS or CardWorks mentioned in the trade line, just Advanta Credit Cards." Pl.'s Brief, Ex. O. Again, Experian's subjective reasons for its decisions are irrelevant to the objective reasonableness of its interpretation, but this email does carry weight insofar as it reinforces the assertion that Metro2 constitutes an industry standard. In the Court's view, one could certainly deem Experian's unexplained deviation from this standard objectively unreasonable, particularly when the current servicer, CardWorks, fed Experian the information actually appearing in Dreher's credit report trade lines.

Second, the simple fact that many different companies play some role in the existence of these accounts does not mean that each one qualifies as a plausible "source" of the information in a consumer credit report. Experian admits, in fact, that listing some of the entities involved in the ownership and management of Advanta accounts would have made no sense. As *Gillespie* suggests, some might be actual, but obviously unhelpful, sources of the information.[8] Others might have an ownership or management duty related to Advanta accounts and yet have no connection to the information appearing in individuals' credit reports. For example, Vion Holdings, II LLC, purchased the rights to the revenue stream associated with Advanta accounts. This business entity entered the picture only after Advanta went bankrupt and entered receivership, and Vion Holdings II stands altogether downstream from the consumer-servicer relationship. Accordingly, it has little, if any, interaction with either Experian or the consumers

---

[8] For instance, Experian itself writes, "Of these entities, FDR is the technical 'source' of information that appears in consumer reports regarding Advanta Bank Corp. originated accounts. FDR is the system of record that automatically sends the electronic files to Experian and other credit reporting agencies on a periodic basis. No one asserts, however, that trade lines regarding Advanta Bank Corp. originated accounts should list FDR as the source of the information. No one would make such an argument because most trade lines in consumer credit reports would have the same source, FDR, creating confusion and rendering the reports virtually useless." Def.'s Opening Brief at 13–14.

from whose accounts it earns money, and one could not reasonably argue that it counts as a source of the information in Dreher's credit report. In short, just because a number of entities are "connected to" Advanta accounts in some manner or another, it does not logically follow that they also qualify as "sources of the information" whose names Experian must disclose to consumers with Advanta accounts.

Ultimately, if Experian had chosen one interpretation among a set of arguably reasonable alternatives, one might conclude that it acted in an objectively reasonable manner, and the Court would have to grant Experian summary judgment. Instead, Experian expressly decided not to list CardWorks as a "sourc[e] of the information" in Dreher's credit report, even though (1) the FCRA compelled it to disclose the "*sources* of the information," (2) the Metro2 industry-standard format specifically provides for disclosure of the current servicer, (3) nearly all the other entities "involved" with Advanta accounts would have been nonsensical substitutes for either Advanta or CardWorks, (4) the only source listed (*i.e.*, Advanta) no longer existed independently and played, at most, a passive role in providing the information in Dreher's credit report, and, most importantly, (5) the current servicer, CardWorks, chiefly, if not solely, supplied the actual content of the trade lines at issue in Dreher's credit report. For these reasons, the Court cannot hold, as a matter of law, that Experian's interpretation of the FCRA arose from a reasonable reading of the FCRA.

The final *Fuges* factor requires the Court to consider the degree of guidance from other courts or agencies for the meaning of "sources of the information." Experian correctly points out that neither an appeals court nor a regulatory agency had spoken definitively regarding the appropriate scope of "sources of the information." *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1334 (9th Cir. 1995) (recognizing the "paucity of case law interpreting" the

phrase "sources of the information").

This absence of authority does not, however, end the analysis. The *Fuges* court explained:

> While the absence of contrary authority to a particular FCRA interpretation is persuasive as to the reasonableness of the adoption of that interpretation, it is not dispositive. "It merely establishes that the issue has not been presented to a court of appeals before. The credit agency whose conduct is first examined under that section of the [FCRA] should not receive a pass because the issue has never been decided."

*Fuges*, slip op. at 25, n.21 (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 722 (3d Cir. 2010)). As *Fuges* says, a court must still ask whether a defendant ran an unjustifiably high risk of violating the statute through its interpretation. *Id.* at 26–27; *see also Safeco*, 551 U.S. at 68–69. A defendant does "not receive a pass because the issue has never been decided." *Fuges*, slip op. at 25, n.21 (quoting *Cortez*, 617 F.3d at 722).

Here, Experian was not "merely careless" but "substantially" more culpable when it disclosed Advanta as the sole source of the information at issue. *Safeco*, 551 U.S. at 69. Quite simply, Experian decided to omit CardWorks, the most logical "sourc[e] of the information" at issue in Dreher's credit report—bar none. That the Advanta website, mailing address, and phone number continued to function, thereby allowing consumers to address any inaccuracies in their Advanta accounts, cannot unsettle this basic reality. For behind the website, address, and phone number—not to mention the Advanta trade lines in Dreher's credit report, which represent "the information" that *actually* matters in this case—stood none other than CardWorks. As a result, a reasonable jury could decide that Experian's exclusion of CardWorks represents an inordinate risk toward Dreher's statutory right to "clearly and accurately" know the "sources of the information" in his credit report.

14

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Court denies the defendant's motion for partial summary judgment as to Counts I, II, and III of the complaint.

The Court will enter an appropriate order.

Date: <u>May 30, 2013</u>
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge