**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| MICHAEL T. DREHER,<br>*Individually and on behalf of a*<br>*class of similarly situated persons*<br><br>                    Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br>CARDWORKS INC., and CARDWORKS<br>SERVICING, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:11-cv-624 (JAG)<br><br>   Judge: The Hon. Judge A. Gibney,<br>   Jr. |

## EXPERIAN INFORMATION SOLUTIONS, INC.'S RULE 26(A)(2) REBUTTAL EXPERT WITNESS DISCLOSURE AND DESIGNATION

Defendant Experian Information Solutions, Inc. ("Experian"), by its undersigned counsel,

hereby discloses the following Rebuttal Expert Witness to testify at trial:

> Joel Winston
> 1020 19th Street NW
> Suite 700
> Washington, DC 20036
> (202) 327-9716

The opinions, qualifications, basis for the opinions and other disclosures required by

Federal Rule of Civil Procedure 26(a)(2) are contained in Experian's Rule 26(a)(2) Rebuttal

Expert Witness Report attached to this designation.

Dated:  October 4, 2013                    Respectfully Submitted,


                                           /s/ Joseph W. Clark
                                           Joseph W. Clark
                                           Virginia State Bar No. 42664
                                           JONES DAY
                                           51 Louisiana Avenue, N.W.
                                           Washington, DC  20001-2113
                                           Telephone:  (202) 879-3939
                                           Facsimile:  (202) 626-1700
                                           Email:  jwclark@jonesday.com

                                           *Counsel for Defendant*
                                           *EXPERIAN INFORMATION SOLUTIONS, INC.,*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System which will then send a notification of

such filing (NEF) to the following:

Leonard Anthony Bennett
Consumer Litigation Associates, PC
12515 Warwick Blvd., Suite 100
Newport News, VA 23606
Telephone:  757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@cox.net
*Counsel for Plaintiff*

Susan Mary Rotkis
Consumer Litigation Assoc PC
12515 Warwick Blvd., Suite 100
Newport News, VA  23606
Telephone: 757-930-3660
Facsimile: (757) 930-3662
Email:  srotkis@clalegal.com
*Counsel for Plaintiff*

Kristi Cahoon Kelly
Surovell Isaacs Petersen & Levy PLC
4010 University Dr., Suite 200
Fairfax, VA  22030
Telephone: 703-251-5400
Facsimile: 703-591-9285
Email: kkelly@smillaw.com
*Counsel for Plaintiff*

/s/ Joseph W. Clark
Joseph W. Clark
Virginia State Bar No. 42664
*Counsel for Experian Information Solutions, Inc.*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: 202-879-3939
Facsimile: 202-626-1700
Email: jwclark@jonesday.com



HUDSON COOK, LLP
1020 19TH ST. NW, 7TH FLOOR
WASHINGTON, DC 20036

## REPORT OF JOEL WINSTON

This report was prepared at the request of counsel for defendant Experian Information Solutions, Inc. ("Experian") in the case of *Dreher v. Experian Information Solutions, Inc.* pending in the U.S. District Court for the Eastern District of Virginia, Civil Action No. 3:11-CV-00624-JAG. Plaintiff Dreher filed a putative class action suit against Experian alleging that Experian violated the Fair Credit Reporting Act ("FCRA") by (1) failing to follow reasonable procedures to assure maximum possible accuracy in plaintiff's consumer report; (2) failing to provide the results of its reinvestigations in response to plaintiff's disputes, and (3) failing to clearly and accurately disclose the source of a particular trade line in plaintiff's report. I have been retained to provide my opinion on whether Experian acted reasonably in its identification of the source of that trade line on plaintiff's consumer report.

## I. QUALIFICATIONS

I am a partner with the law firm of Hudson Cook, LLP. For 37 years, my work has involved compliance issues under the federal consumer protection laws. Since 2000, that work has focused on compliance with the laws, including the Fair Credit Reporting Act ("FCRA"), that impact on the consumer financial services industry.

From 1976 – 2011, I was employed at the Federal Trade Commission ("FTC"), the primary federal agency responsible for enforcing federal consumer protection laws. The FTC has jurisdiction over the non-bank consumer financial services industry and, during my tenure at the agency, had direct responsibility for enforcing the FCRA. From 2000 – 2009, I headed the FTC's offices responsible for the FCRA program as Associate Director of the Division of Financial Practices (2000 – 2005) and of the Division of Privacy and Identity Protection (2005 – 2009). From 2009 – 2011, I served as the head of a reconfigured Division of Financial Practices without direct purview over the FCRA program, but remained involved in the FTC's enforcement and regulatory efforts in that area. Prior to 2000, I served for nearly 20 years as Assistant Director of the FTC's Division of Advertising Practices.

Over the course of my tenure as head of the FTC's FCRA program, I became very familiar with how the consumer reporting industry functions and how the requirements of the FCRA impact on the industry. This period was a very active one for the credit reporting industry. Most significantly, the Fair and Accurate Credit Transactions Act ("FACT Act") was enacted in 2004, substantially amending the FCRA to add a number of new obligations on all

1

participants in the credit reporting business.  I played a significant role in creating the concepts and drafting the language that eventually were included in the FACT Act and served as a resource for members of Congress and their staffs.

The FACT Act directed the FTC (alone or in conjunction with sister agencies) to promulgate over 20 regulations, produce several reports to Congress, and carry out a host of other tasks.   Through a task force that I headed, the agency produced the required rules and reports, including the following:

- Risk-based Pricing Rule
- Furnisher Direct Dispute Rule
- Furnisher Accuracy Rule
- Free Annual Credit Report Rule
- Pre-screen Opt Out Notice Rule
- Red Flags Rule
- Address Discrepancy Rule
- Disposal Rule
- Affiliate Marketing Rule
- Medical Information Rule
- Circumvention Rule
- Credit Report Accuracy Studies
- Credit and Insurance Score Study
- Dispute Process Study
- Section 318 and 319 Report
- Affiliate Sharing Study

In addition, as head of the FTC's FCRA program, I was responsible for the agency's enforcement activities against businesses that violated the FCRA.  During that time, I participated in and supervised a number of FCRA enforcement actions, including cases against the three nationwide consumer reporting agencies ("CRAs").

During this period, I was also responsible for the FTC's efforts to provide formal and informal guidance to industry and the public, including our interpretations of the FCRA.  We provided this guidance frequently and with respect to virtually every section of the statute.  One of the ways in which we provided guidance was through speeches and presentations to industry and consumer groups and other organizations.  I personally presented on the FCRA on dozens of occasions.  I also helped develop consumers' awareness of their rights under the FCRA by drafting educational materials and through numerous interviews and appearances in major media, including every major television and radio network.

Further, during this period, I participated in drafting amicus briefs in various cases before the federal courts.  In particular, I played a central role in drafting the amicus brief of the Solicitor General ("SG") filed before the Supreme Court in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007).  The opinion in that case provided an interpretation of the term "willful" as used in the FCRA that was fully consistent with what we advocated in the SG brief.

2

Both during my tenure at the FTC and since, I have been involved with a number of outside organizations in the field of consumer financial services, including as a member of the advisory board for the professional publication, *Privacy & Security Law Report*, member of the advisory board for the American Bar Association's Antitrust Section, and a member of the ABA's Consumer Financial Services Committee.  I also was elected as a member of the American College of Consumer Financial Services Lawyers, which is "limited to those lawyers … who have achieved preeminence in the field of consumer financial services law and who have made repeated and substantial contributions to the promotion of learning and scholarship in consumer financial services through teaching, lecturing and published writings."  I served on a White House Task Force on identity theft, established by President George W. Bush, and was a principal author of the two Task Force reports.  I also have authored numerous articles in various publications and served as a co-author and editorial board member for a 2009 treatise published by the American Bar Association, *Consumer Protection Law Developments*, for which, among other things, I drafted the section on the FCRA.

During my career at the FTC, I received every major award available to attorneys and supervisors, including the Chairman's Award, the highest honor granted by the agency, the Louis Brandeis award for excellence in litigation, and the awards for excellence in supervision and law enforcement.  In 2008, I received a Presidential Rank Award of Meritorious Executive, a government-wide award granted to a small number of senior executives.

From 2011 to 2012, I served as Vice President and Chief Privacy Officer of ID Analytics, Inc., a private company that markets identity theft and credit risk solutions for businesses and consumers.  A substantial portion of my work during this time involved providing guidance to the company, which is CRA for part of its business, on complying with the FCRA.

Since May 2012, I have been in private practice as a partner in the law firm Hudson Cook, LLP, a leading firm in the field of consumer financial services.  A significant portion of my practice has been assisting a variety of consumer financial services companies in complying with the FCRA.  I continue to speak frequently at industry and legal conferences on the FCRA and other financial services topics.

I litigated numerous cases while at the FTC, including some of the most significant consumer protection cases in the agency's history, returning hundreds of millions of dollars to victimized consumers. Although I have never litigated a case involving violations of the FCRA, I was involved in negotiating settlements in every FCRA case brought by the FTC over a ten-year period.  I have not previously served as an expert witness in a litigated proceeding.

I hold Bachelor of Arts and Juris Doctor degrees from the University of Michigan.  I am a member of the Michigan State Bar.

For my expert services in this matter, I am being compensated at a rate of $665 per hour.

I personally have never represented Experian Information Solutions on any matter.[1]

---

[1]  Members of my firm have represented Experian from time to time, but I have had no involvement in those matters.

## II.    MATERIALS CONSIDERED

1.    Plaintiff's Second Amended Complaint (Class Action)
2.    Defendant Experian Information Solutions, Inc.'s Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint (Class Action)
3.    Defendant Experian Information Solutions, Inc.'s Memorandum in Support of Its Motion for Partial Summary Judgment
4.    Plaintiff's Opposition to Defendant's Experian Information Solutions, Inc. Motion for Partial Summary Judgment
5.    Defendant Experian Information Solutions, Inc.'s Rebuttal to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment
6.    Memorandum Opinion denying Defendant's Motion for Partial Summary Judgment
7.    Plaintiff's Rule 26(a)(2) Expert Witness Report of Evan Hendricks (filed 8/29/13)
8.    Expert Report and Declaration of Elizabeth De Armond (filed 1/19/12)

## III.    FACTUAL BACKGROUND

My opinions are based on the factual outline below as extracted from the materials listed above.  I reserve the right to supplement my opinions based on receipt of additional information.

- The plaintiff alleges that the account at issue, a small business credit card account, was originated with Advanta by an identity thief impersonating him.  The account was later transferred to a related company.  Advanta serviced the account itself.
- Subsequently, Advanta went into receivership, and the FDIC was appointed as the receiver.
- The Indenture Trustee, Deutsche Bank Trust Co. Americas, with the consent of the FDIC, then appointed CardWorks as the successor servicer.  CardWorks did not own the accounts it was servicing.
- Vion Holdings II, LLC later became the owner of the revenue stream associated with Advanta's business card assets, including plaintiff's account.
- CardWorks' duties as servicer of the Advanta accounts include managing the credit reporting process for those accounts.  It employs First Data Resources ("FDR") to furnish the payment information to Experian and the other CRAs.
- With respect to data relating to the Advanta-originated/CardWorks-serviced accounts that was furnished to Experian, the source of the information furnished was identified by Experian on the consumer reports as Advanta.
- Plaintiff later filed a dispute with Advanta and received a response.

## IV.    LEGAL BACKGROUND

### A.    Purpose of the FCRA

4

The Fair Credit Reporting Act ("FCRA"), enacted in 1970, governs the collection, assembly, and use of consumer report information and provides the framework for the credit reporting system in the United States. Its purposes are (1) to protect consumers by preventing the misuse of their sensitive personal information and improving the accuracy of consumer report information; and (2) to promote the efficiency of the nation's banking and consumer credit systems.[2]

The FCRA regulates the practices of the three principal groups involved in the credit reporting system: CRAs, furnishers of consumer report information, and users of consumer reports. CRAs collect and compile consumer information into consumer reports for use by credit grantors, insurance companies, employers, landlords, and other entities in making eligibility decisions affecting consumers. Information included in consumer reports typically includes the consumer's credit history and payment patterns, as well as demographic, identifying, and public record information (e.g., arrests, judgments, and bankruptcies). The reports help businesses by enabling them to predict the risk of future nonpayment, default, or other adverse events.[3]

In enacting the FCRA, Congress recognized the value of the consumer reporting industry, finding that CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."[4] The FCRA "seeks to balance the needs of consumers and businesses" with respect to the use of consumer information.[5]

The primary enforcement agency for the FCRA since its enactment has been the FTC. From 1970 – 2010, the FTC brought 87 enforcement actions for violations of the FCRA.[6] Although it lacks rulemaking authority (other than that expressly granted by the FACT Act of 2003), the FTC has offered extensive interpretations and guidance over the years, including issuing over 430 opinion letters and eight formal interpretations and publishing a compliance manual.[7] In 1990, the FTC created a "Commentary," consolidating all of its guidance issued to that date. In July 2011, the Commentary was incorporated in large part along with other FTC formal and informal guidance and interpretations, in an FTC staff report, 40 Years of Experience with the Fair Credit Reporting Act Report.[8]

**B.       Section 609(a)(2)**

The FCRA gives consumers the right to access their consumer report information upon request[9] and to dispute the accuracy and completeness of any items of information in the report.[10] The consumer report generally includes identifying and demographic information about the

---

[2]   Federal Trade Commission, "40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations" (July 2011) ("40 Years Report"), at 1.
[3]   40 Years Report, at 1 – 3.
[4]   15 U.S.C. § 1681(a)(3).
[5]   S. Rep. No. 209, 103rd Cong., 2d Sess. (1993); *see also Stergiopoulos v. First Midwest Bancorp.,* 427 F.3d 1043 (7th Cir. 2005) (FCRA is an "attempt to achieve this balance between consumer privacy and the needs of a modern, credit-driven economy.")
[6]   40 Years Report, at 4.
[7]   40 Years Report, at 3-5.
[8]   40 Years Report, at 5 -7.
[9]   15 U.S.C. § 1681g(a).
[10]   15 U.S.C. § 1681i.

individual, certain public record information such as bankruptcies or arrests, and information about the consumer's credit and payment history on his/her accounts. Section 609 of the FCRA contains requirements on CRAs to disclose to a consumer, upon request, all information in his or her credit file.[11]  Subsection (a)(2) of that Section requires the disclosures to include "the sources of the information" in the file, including trade lines.

The Act does not define or elaborate on the meaning of "sources."  Viewing the term in light of the statutory purpose, however, suggests that CRAs have some latitude in designating the sources.  In order for consumers to take advantage of their right to dispute information that is inaccurate and incomplete, it is important that the information listed in the report be recognizable.  This means that the information is most useful if it is associated with a source with which the consumer is likely to be familiar.  For that reason, in situations where the creditor is not the entity that physically transmits the information, CRAs often identify the creditor – the entity that the consumer is most likely to be familiar with – as the source.

## V.   OPINIONS

I have been asked to render an opinion on the reasonableness of Experian's designation of Advanta Bank Corp as the source of information about the plaintiff's credit card account in his credit report.  It is my opinion that Experian acted reasonably when it did so.

The FCRA does not define the term "sources,"[12] and there is nothing in the Act to indicate that the source in a situation like this one must be the servicer, as opposed to (or in addition to) the original creditor or owner of the account on whose behalf the servicer acts.  Given the lack of clarity in what "sources" means in this context, I considered Experian's actions in light of the purpose of this section and of the FCRA as a whole.  As discussed above, Section 609 gives consumers the ability to obtain a copy of their credit report, a right that is critical to enabling them to ensure the accuracy and completeness of the information in that report.  Section 609(a)(2), by requiring the CRA to identify the sources of the different items of information, is designed to help consumers recognize the trade line, evaluate its accuracy, and dispute inaccurate or incomplete information.  Consumers cannot evaluate a trade line if they do not recognize where it came from.  Thus, in this case, by associating the trade line with the original creditor, which is likely to be familiar to the consumer, rather than the servicer on the account, which the consumer is unlikely to recognize, Experian helped protect consumers' fundamental right to an accurate report, consistent with the statutory purpose.

It is true that, in this case, the plaintiff may not have been familiar with Advanta because the account allegedly was opened by an identity thief.  The purpose of the source identification requirement is broader than the extraordinary circumstances of this case, however.  In the vast majority of cases, where the individual did in fact open the account and was not an identity theft victim, it is the creditor's name that is most familiar, and most useful, to that individual, and identifying the servicer in lieu of or in addition to the creditor is of little value to the individual.  Even in cases of identity theft, moreover, the name of the creditor is likely to be more useful than

---

[11] 15 U.S.C. § 1681g.
[12] The use of the plural "sources" in Section 609(a)(2) merely reflects the fact that the report will include multiple items of "information," each of which may have one or more "sources."

the name of the servicer.  While the consumer may not recognize either as a company with which it has done business, the name of the creditor in many cases is likely to be at least generally familiar, making it easier for the consumer to ascertain whether s/he has an account with that creditor.  The name of the servicer, on the other hand, is unlikely to be recognizable at all.

It is my understanding that plaintiff contends that (1) CardWorks should have been identified as the source of the information at issue, because it was the entity that furnished that information to Experian; and (2) Experian's decision to identify Advanta was based on an objectively unreasonable interpretation of the FCRA.  I disagree with these contentions.  In my opinion, it was completely reasonable for Experian to designate Advanta rather than CardWorks as the source of the information about plaintiff's payments on his Advanta credit card.  CardWorks is neither the original creditor nor owner of the accounts; it is merely an agent that services the accounts on the behalf of the owner(s).[13]  It was reasonable for Experian to identify the principal, and not the principal's agent, as the source of the information about the consumer's account with that principal.

Second, even if plaintiff were correct that Experian should have identified the source as the furnisher of the information, that entity would be FDR and not, as plaintiff asserts, CardWorks.  Indeed, it is common for there to be multiple service providers in the chain between the creditor and the consumer.  For example, creditors and account servicers frequently subcontract out various functions, such as payment processing, customer service, and (as in this case) furnishing to CRAs.  It would be of little value to consumers and likely to confuse them to identify all of these different entities, which have no relevance to consumers, as the sources of the trade line information.  In determining whom to identify, the one distinguishing factor, and the factor that is most consistent with the statutory purpose, is which entity is the one with which the consumer is most likely to be familiar.  Typically, that is the original creditor.  Both FDR and CardWorks are agents in this case, and it was reasonable for Experian to identify the principal rather than one or both of the agents.

I am aware that the Metro 2 format by which furnishers typically submit information to CRAs permits the identification of both the original creditor and the current servicer on the account.  This fact does not mean that the CRA necessarily must identify both as the source of the information on a consumer report.  Section 609(a)(2) does not tie the CRA's obligation to identify the source to any particular information that the furnisher provides on Metro 2.

It is my further opinion that, even if Experian violated Section 609(a)(2) by identifying Advanta as the source of the information, that violation was not willful.  Under the *Safeco* decision, a violation is not willful unless it was clearly unlawful at the time it occurred, *i.e.,* it was "objectively unreasonable" in light of "legal rules 'clearly established' at the time."[14]  Those rules can emanate from the statutory text if it is "pellucid," or from "authoritative" interpretations of the text by the courts of appeals or the responsible federal agency.[15]  Conduct is not willful "unless the violation is not only a violation under a reasonable reading of the

---

[13] I understand that there is some dispute about who currently "owns" the accounts and that there are multiple parties that may have some ownership interest.
[14] *Safeco*, 551 U.S. at 69-70 (quoting *Saucier v. Katz*, 553 U.S. 194, 202 (2001)).
[15] *Safeco,* 551 U.S. at 70.

statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."[16]

In this case, the statutory text is the antithesis of "pellucid;" the meaning of "sources" is at best ambiguous. Nor has there been any authoritative interpretation of the text or "legal rules clearly established" – or even proposed – interpreting the meaning of "sources." There is no case law on point, nor has the government issued any formal or informal guidance on this issue, including during my tenure as head of the FTC's FCRA program. In particular, the FTC's 40 Years Report, a compendium of FTC guidance and interpretations issued since 1970, provides no guidance on the meaning of "source." Thus, in my opinion, Experian's conduct was not "objectively unreasonable."

I have reviewed the Expert Report and Declaration of Elizabeth De Armond dated November 28, 2012 ("De Armond Report"). Professor De Armond, based in large part on the dictionary definition of "source," concludes that "[t]hus it appears that Congress intended 'source' to mean the information's generator, its supplier," which she interprets to mean the furnisher of the information.[17] I disagree with Professor De Armond's opinion for several reasons.

First, it should be noted that Professor De Armond's report provides her legal opinion on the meaning of a section of the FCRA, under the guise of an expert opinion. Her legal opinions are outside the province of an expert witness, and, in any event, she has not been qualified as a legal expert on the interpretation of the FCRA.

Second, even if her legal opinions could be considered in this case, they are unpersuasive. They are based on speculation about Congressional intent and an unsupported interpretation of the meaning of "sources," an interpretation that is contrary to the underlying purpose of the FCRA generally, and Section 609(a)(2) specifically.

Professor De Armond's reliance on selective definitions of "source" as found in Webster's Dictionary is misplaced.[18] Those definitions do not show that "source" means the entity that physically supplied the information, as opposed to the entity who originated it. These definitions ("the point of origin of a stream of water: FOUNTAINHEAD … a generative force or stimulus: CAUSE, INSTIGATOR … a point of origin or procurement: FOUNTAIN SUPPLIER ….") have little relevance to the use of "sources" in the specific context of the FCRA. In any event, the definitions could apply with equal force to Advanta or CardWorks (or, for that matter, FDR, following Professor De Armond's logic).

Professor De Armond also argues that Experian's identification of Advanta as the source of the information is contrary to the purpose of this section of the FCRA. But, as explained above, the purpose of the source identification requirement is to help the consumer recognize the trade line so that s/he can evaluate its accuracy, and in the vast majority of cases that purpose is far better served by associating the account with the company whose name is on the credit card

---

[16] *Safeco*, 551 U.S. at 69.
[17] De Armond Report, at 9–10.
[18] De Armond Report, at 9-10.

8

and with whom the consumer engaged, rather than a servicer that would likely be unknown to most consumers.

Finally, Professor De Armond cites to a single phrase in a 2004 FTC report to Congress as indicating the FTC's view that the source of information is its furnisher.[19] Her assertion is entirely without merit. I headed the FTC's FCRA program at the time that report was prepared and transmitted to Congress and was directly involved in the drafting, review, and approval of the report. I did not contemplate, nor, to my knowledge, did any other FTC official involved in preparing this report contemplate, that *anything* in the report, much less the passage quoted by Professor De Armond, would be construed as an interpretation of the word "sources" as it is used in Section 609(a)(2). Professor De Armond has extracted a single, ambiguous phrase, out of context, from an 86 page document to support a point that was never intended or even contemplated by the authors of the report.

I also have reviewed the "Expert Witness Report" of Evan Hendricks, filed August 29, 2013 ("Hendricks Report") in this case. Mr. Hendricks, like Professor De Armond, performs a legal (and linguistic) analysis to conclude that the source of the information in this case was CardWorks. Again, Mr. Hendricks is offering legal opinions under the guise of expert testimony for which he has not been qualified. In any event, I believe those opinions are meritless.

First, he, like Professor De Armond, asserts that Experian's identification of Advanta as the source "frustrated the Fair Credit Reporting Act's goals of accuracy, transparency and fairness."[20] As explained above, however, Experian's identification of Advanta as the source of the information, in fact, *furthered* the FCRA's goals, because it identified the company with which the vast majority of holders of Advanta cards were mostly likely to be familiar, thereby facilitating the identification of possible errors in their credit reports.

Second, Mr. Hendricks, as did Professor De Armond, excerpts isolated phrases out of context from various documents and asserts that they support his interpretation that the entity that furnishes the information is the source. These excerpts are at best ambiguous and were not intended for the purpose Mr. Hendricks uses them.  For example, Mr. Hendricks cites another passage from the FTC's 2004 report to Congress ("[F]urnishers [were] the original source of the information ….") as support for his assertion that "source" means the furnisher of the information.[21] Again, it was not the intent of the drafters of this report to opine on the meaning of "sources" as used in Section 609(a)(2). This passage merely reflects the typical situation, where the creditor (the original source of the information) is also the furnisher. It says nothing whatsoever about the issue here, where the original creditor and the company that actually transmits the information to the CRA are different entities.

Similarly, Mr. Hendricks excerpts various phrases that include the word "source" from various Experian public-facing materials. For example, he quotes Experian's description on its website of what happens after a consumer files a dispute: "A Notice is Immediately Sent to the

---

[19]   De Armond Report, at 11 ("…recogniz[ing] that furnishers -- the original source of the information -- have a critical role to play ….")
[20]   Hendricks Report, at 1.
[21]   Hendricks Report, at 3.

*Source* of the Information … Generally within 30 days the *source* must verify your account data …." (emphasis in the report).[22] This statement accurately describes the role played by the "source" of the disputed information, but says nothing about who the source is in a situation like the instant case with an original creditor, account owner(s), and a third party servicer.

Finally, Mr. Hendricks states that Experian's identification of Advanta as the source was contrary to the standard practice amongst CRAs.[23] He provides no basis for this statement. Through my supervision of the credit reporting industry over a nearly ten-year period, I am knowledgeable about how the credit reporting system operates, including the process by which CRAs report credit trade lines. In my experience, it is common for CRAs to identify the creditor as the source of the information, rather than the servicer, because this designation is likely to be more useful to consumers. Thus, contrary to Mr. Hendricks' assertion, Experian conformed to the standard industry practice when it identified Advanta as the source.

## VI.   CONCLUSIONS

For the reasons discussed above, it is my opinion that, in designating Advanta as the source of plaintiff's Advanta credit card account information, Experian acted reasonably and in a manner consistent with industry practice, the interests of consumers, and the underlying purpose of the statute.

_____

Joel Winston

Date: October 2, 2013

---

[22] Hendricks Report, at 2.
[23] Hendricks Report, at 3.