**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____

**MICHAEL T. DREHER,**         )
*Individually and on behalf of a*     )
*class of similarly situated persons,*  )      **CIVIL NO.  3:11-cv-00624-JAG**
                               )
               **Plaintiff,**   )
                               )
**v.**                           )
                               )
**EXPERIAN INFORMATION**    )
**SOLUTIONS, INC.,**          )
                   **Defendant.**   )
_____

**PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, MICHAEL DREHER ("Mr. Dreher"), individually and on behalf of all other similarly situated, by counsel, and for his Memorandum in Support of his Motion for Partial Summary Judgment, he states as follows:

## OVERVIEW

This case arises from Defendant Experian Information Solutions, Inc.'s ("Experian") uniform violation of § 1681g(a)(2) of the Fair Credit Reporting Act ("FCRA"), which requires credit reporting agencies to "clearly and accurately to disclose to consumers…[t]he sources of information" in their credit files. 15 U.S.C. § 1681g(a)(2). In this instance, Experian consistently identified "Advanta Bank" or "Advanta Credit Cards" as the sole source of information in consumers' credit files despite Experian's unquestionable knowledge that it was CardWorks Servicing, LLC ("CardWorks")—and no one else—who supplied the information to Experian after August 2010. Instead of "clearly and accurately" disclosing CardWorks as a source of the information in Mr. Dreher and the class members' credit files, Experian allowed and facilitated CardWorks's effort to camouflage its role in the reporting of accounts.

Since no reasonable jury could conclude that Experian's omission of CardWorks as a source of information was "objectively reasonable," Mr. Dreher and the class members are entitled to summary judgment as a matter of law as to whether Experian willfully violated § 1681g(a)(2). As already noted by the Court in its Memorandum Opinion in May 2013, "Experian utterly disregarded the statute's plain language when deciding how to comply," and "Experian's chosen interpretation of 'sources of information' ha[d] no 'foundation in the statutory text.'" *Dreher v. Experian Info. Solutions,* 2013 WL 2389878, 2, 5 (E.D. Va. 2013) (internal citations omitted) (hereafter "*Dreher I*"). Experian's utter disregard for the statute's plain language makes its conduct objectively unreasonable as a matter of law and the Court's prior determination is now the law of the case on this issue—as was already noted by the Court at the class certification hearing. (Dreher Class Cert.

Hr'g Tr. 70:4-5, Apr. 17, 2014) ("THE COURT: I think that the last summary judgment motion… *pretty much decides the willfulness issue in this case.*") (emphasis added).[1]

Aside for the issue of liability for the class claim, Mr. Dreher also seeks partial summary judgment on the accuracy element of his individual claims for violations of § 1681i(a), a claim that requires Mr. Dreher to prove that the information in his credit file was inaccurate. Simply put, every fact established in this case demonstrates that Mr. Dreher never signed any application for credit with Advanta and never authorized anyone to do so. Instead, every piece of evidence from every potential source in this case demonstrates that "[w]ithout Dreher's permission, a scoundrel had opened a charge account in Dreher's name at Advanta Bank." *Dreher v. Experian Info. Solutions,* 20134WL 2800766, *1 (E.D. Va. 2014) ("*Dreher II*").  Accordingly, summary judgment in favor of Mr. Dreher is also appropriate with respect to the accuracy element of his individual claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56(B), Mr. Dreher states that the following facts are undisputed:

**A.    Mr. Dreher Discovers An "Advanta" Tradeline on His Credit Report.**

1.    In November 2010, Mr. Dreher's security clearance was being processed by the National Security Agency ("NSA"). During this process, an NSA investigator advised him that it had discovered a delinquent account on Dreher's credit reports. The tradeline was reporting under the name "Advanta Bank" and "Advanta Credit Cards". (Ex. 1, Dreher Decl. ¶ 6).

2.    As a result of the NSA investigation, Mr. Dreher contacted Experian to request his own copy of his full credit file. *Id*. at ¶ 14. The consumer reports furnished to Mr. Dreher by Experian pursuant to 15 U.S.C. § 1681g(a) are dated November 16, 2010, March 16, 2011, June 21, 2011 and

---

[1] *See, e.g.*, § 4478 Law of the Case, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.).The "Law of the Case" doctrine is "a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards."

November 3, 2011. (Attached as Exhibits 2, 3, 4, 5, respectively).

3.    In each and every report, Experian falsely represented that "Advanta Bank Corp" and/or "Advanta Credit Cards" were the "source of the information" in the tradelines actually supplied by CardWorks Servicing, LLC ("CardWorks").

4.    Mr. Dreher did not learn that CardWorks was the source of the information for the Advanta tradeline until after he filed this lawsuit. (Ex. 1, Dreher Decl. ¶ 25-26).

**B.    After Mr. Dreher Disputes the Account, Experian Continues to Identify "Advanta Bank" and "Advanta Credit Cards" as the Source of Information.**

5.    Dreher's efforts to dispute and obtain the removal of the inaccurate accounts began with the limited information Experian had provided. *Id*. at ¶ 14-15. Plaintiff had no previous relationship with any entity about the subject accounts – Advanta Corp, Advanta Bank or even CardWorks. *Id*. at ¶ 14.

6.    Over a year, he made multiple disputes to Experian in which he explained his lack of ownership or knowledge of the "Advanta Bank" and "Advanta Credit Cards" identified tradelines. *Id*. at ¶ 23-24.Throughout this dispute process, Experian continued to represent to Mr. Dreher that (a.) "Advanta Bank" and/or "Advanta Credit Cards" was the only source of the disputed tradelines; (b.) as part of its reinvestigation process, Experian contacted the "source of the information" in the tradeline, and (c.) that "Advanta Bank" had "verified" that Mr. Dreher was the person who applied for and owed the subject account.

7.    For example, in responding to one of Mr. Dreher's disputes on **July 5, 2011** (attached as Ex. 6), Experian summarized its dispute reinvestigation procedure and relevant results as follows:

> <u>Results</u>
> We completed investigating any items you disputed with ***the sources of the information*** and processed any other requests you made. Here are the results:
>
> <u>Outcome</u>
> ADVANTA BANK CORP                Remains

ADVANTA CREDIT CARDS          Deleted

**C.   Mr. Dreher also followed Experian's Instructions and Tried to Dispute Directly With "Advanta Bank" and "Advanta Credit Cards."**

8.   In March 2011, Mr. Dreher wrote to "Advanta Credit Cards" at the generic post office box address Defendant had provided. (Ex. 1, Dreher Decl. ¶ 11, 14). He disputed owning the Advanta accounts, requested some verification that he owed this debt and documentation that indicated that he had applied for credit with Advanta Bank or Advanta Credit Cards. *Id*. at ¶ 8-12; 15. He also informed Advanta Credit Cards that Experian was reporting the inaccurate information in his credit file. Mr. Dreher never received a response. *Id*. at ¶ 16.

9.   In April 2011, sending the same correspondence to "Advanta Credit Card," Mr. Dreher actually received a short response. *Id*. at ¶ 18. That response was unsigned and on letterhead labeled, "Advanta Credit Cards." No physical address or employee name or contact was provided.

10.  The "Letter" included a one-page computer printout of what the sender claimed to be some sort of screen print of an internet credit application (unsigned) and a billing statement, only in the name of Advanta, for March 2011. That billing statement and online application printout showed that the account owner was "Arnie's Bowling Rec." in Indiana. Mr. Dreher never lived or worked in Indiana and was never employed by or an owner of "Arnie's Bowling Rec." *Id*. at ¶ 23.

11.  On May 23, 2011, Mr. Dreher wrote again to "Advanta Credit Cards" at the post office box Experian provided.  He never received a response.  *Id*. at ¶ 22. Until discovery had commenced in this litigation, Mr. Dreher never knew that "Advanta Bank" and "Advanta Credit Cards" did not exist. *Id*. at ¶ 26.

**D.   Experian Knew Advanta Closed in March 2010 and CardWorks Was Appointed As the Successor Servicer.**

12.  Experian's document production in this case confirms that it had knowledge of Advanta's closure as early as July 2010 and CardWorks's appointment as successor servicer no later

than August 2010.

13.  For example, on July 9, 2010, the Federal Deposit Insurance Corporation, as receiver for Advanta Bank, wrote to Experian's General Counsel's Office regarding the collapse of Advanta and the termination of contracts between Advanta and Experian. (Exhibit 7, at XP#00260). In particular, this letter states "[o]n March 19, 2010, Advanta Bank Corp. (the "Bank") was closed by the Utah Department of Financial Institutions and the [FDIC] was appointed as Receiver for the Bank (the "Receiver"). . . . This letter confirms that the terms of the letters between Advanta Bank Corp. and Experian referenced above expired on or about June 30, 2009, and have not been renewed or extended in any manner whatsoever and that Advanta Bank Corp. and the Receiver have no further obligations thereunder." *Id.*

14.  Moreover, Experian's employees, Peter Henke and James Kilka, confirmed Experian has understood since at least July 2010 that "Advanta Bank" was terminated and no longer an actual business entity. (Ex. 8, Henke Dep. Tr. 27:13-28:1, Nov. 8, 2012; Ex. 9, Kilka Dep. Tr. 27:19-22, Aug. 24, 2012) ("Q.  But there was no mystery or CardWorks wasn't hiding the fact that Advanta Bank was gone; right? A. No.")).

15.  This testimony is supported by, *inter alia*, e-mail correspondence dated **August 9, 2010**, Experian employee Edith Andrade requested her manager to transfer the CardWorks account to her, which was currently managed by Experian employee Mr. Kilka. (Ex. 10, at XP#30026). In response to the request, Mr. Kilka wrote "[t]he only reason this may have come up is that CardWorks just picked up a huge file to work from Advanta. They will [be] servicing those accounts." (Exhibit 10, at XP#30025).

16.  In response to this e-mail, Mr. Kilka's supervisor, Steve Ruffino wrote: "[m]y thoughts are identical to yours and as such I will decline the request." (Ex. 11, at XP#30027).

17.  Less than one month later, an employee with CardWorks, Maria Costa, e-mailed Mr.

Kilka requesting access to pull BullsEye reports[2] from the Advanta subscriber code. (Ex. 13, at XP#30793). When forwarding the request to another Experian employee, Mr. Kilka explained that CardWorks needed "to be able to field the disputes and handle other account mgnt functions for ADVANTA." *Id.*

18. Similar to the e-mails from Mr. Kilka, Experian's "Client Business Services Spreadsheet" from September 2010 states "Client Services was notified that Advanta will no longer be running the quarterly account review as client is in bankruptcy and liquidating assets." (Ex. 14, at XP#23983).

19. Moreover, on October 4, 2010, CardWorks's Vice President of Operational Risk, Brian Bennett, provided a letter to Experian indicating that CardWorks "[t]his letter will formally document the dissolution of Advanta Bank Corp (ABC) and the assumption of all servicing duties for the ABC originated accounts by Cardworks Servicing (CWS) effective 8/1/10. ABC was shut down by the State of Utah Department of Financial Institutions and the FDIC was appointed as Receiver in March 2010. . . . *CardWorks was selected to perform all aspects of servicing of this portfolio as ABC had previously done.*" (Ex. 15, at XP#000261) (emphasis added).

**E.     Experian Allowed CardWorks to Dictate Whether Experian Would Identify CardWorks as a "Source".**

20. During the setup up by Experian of CardWorks as the new credit reporting servicer in October 2010, Experian delegated total discretion to CardWorks as to what entity would be identified in the subject tradelines as the "source."

---

[2] Bullseye® is a feature marketed by Experian as a product that, "saves you the time an trouble of researching account histories." (Ex. 12).  Bullseye® reports allow a simple inquiry to display the current status of an account as stored in Experian's database, displays the entire tradeline with actual account status, verifies whether previously requested changes were applied, may indicate no change is needed at all, eliminates the need for researching account histories, and has a built-in security feature that guarantees subscribers access only their own tradelines.

21. In some of the accounts that CardWorks had previously serviced for non-Advanta information, CardWorks instructed Experian to report the "source" as both the originator and with "CWS" for CardWorks Servicing, for example "Spiegel/CWS." (Ex. 16) ("Today, your other subcodes show as 'Spiegel/CWS', to consumer and creditors.").

22. Thus, when CardWorks was setting up its reporting to Experian of the former Advanta accounts, Experian obligingly asked its customer, "Do you want the CWS on the end of the 'ADVANTA Credit Cards'?" *Id.*

23. To which, CardWorks instructed, "No, we would not want CWS or CardWorks mentioned in the trade line, just Advanta Credit Cards." (Ex. 17).

24. In fact, when Mr. Kilka originally e-mailed the Experian department responsible for creating new subcodes on October 5, 2010, he wrote: "I have a client that requires a new reporting subcode. CardWorks Servicing… ***Please use CardWorks Servicing as the name on the subcode***. Please label it internally as Advanta Portfolio." (Ex. 18, at XP#045132) (emphasis added).

25. Then, *less than two hours* after receiving the e-mail from CardWorks indicating that it did not want to be disclosed, Mr. Kilka wrote an e-mail requesting the Experian department to change to Advanta Credit Cards. (Ex. 19, at XP#044991). In particular, Mr. Kilka wrote: "Please change the name on subcode to 'Advanta Credit Cards.' We want all consumers to see this and creditors as well." *Id.*

**F.     Experian Believes and Understands That the "Source of the Information" is the Entity That Actively Controls the Reporting of a Credit Tradeline and to Whom Experian Will Forward a Consumer's Credit Reporting Dispute**.

26. In this litigation, Experian has tried to manufacture confusion and uncertainty where in real life it has expressed neither. Experian has always understood that the "source" of credit information is the "furnisher" who actually reported that information to the reporting agency. (*See, e.g.*, Ex. 8, Peter Henke Tr. 71:7-17).

8

27.  Not only does Experian understand the term "source of information," but a Data Release Agreement between Experian and CardWorks indicates that Experian chose to modify the standard language of its Data Release Agreement and, instead, deliberately omitted CardWorks as a source of information from reports revealed to consumers. (Ex. 20, at XP#000272) (" █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████") (emphasis added) (filed under seal).

28.  The language in its Data Release Agreement with CardWorks is in sharp contrast to its template language for its agreement, which indicates " ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████" (Ex. 21, at XP#015341) (emphasis added) (filed under seal). [3]

29.  This deviation shows that Experian not only knowingly decided to violate § 1681g(a)(2), but also that, in practice, Experian did not use the phrase "source of information" as it now posits. [4]

---

[3] These documents were not produced until November 2013—approximately six months after the Court's opinion in *Dreher I*, which found that "the record contains no evidence that Experian knew its actions violated the statute when it decided on the content of the trade lines." 2013 WL 2389878 at *2. Experian's diversion from its standard language that it ██████████████████████ to ████████████████████████████████████████ is direct evidence that Experian understood who was the source and knowingly failed to disclose CardWorks despite its statutory obligation. Thus, Mr. Dreher and the putative class respectfully request the Court to revisit its prior determination and conclude it was a knowing violation based on this new evidence.

[4] For example, in its memorandum in support of its motion for summary judgment, Experian asserts "Experian attempts to be as accurate as possible in reporting the source of information in a consumer's file. While Experian does not have a written policy regarding the way a trade line's associated subscriber name appears in a consumer's report, Experian's common practice is to utilize a trade line containing the name of the credit grantor." (Dkt. No. 55 at 14). As reflected above by

30. Moreover, consistent with its use in its standard Data Release Agreement, Experian's own website defines the term "source" as "the business or organization that supplied certain information that appears on the credit report."[5]

31. Similarly, Kimberly Hughes, Experian's most frequent litigation employee-witness, testified that Experian "essentially relies" on its furnisher source to investigate the consumer's dispute. (Deposition of Kimberly Hughes Tr. 110:6-12 Jan. 28, 2008, in *Gorman v. Experian Info. Sols. Inc.* 1:07cv1846 RPP (S.D.N.Y. 2007)(Dkt #42-5))(Ex. 22). Regarding the Experian's investigation, she testified, "we do go to the reporting source," which is the data furnisher "the reporting source for the investigation" that has the subscriber relationship with Experian. *Id*. at 110:7-111:12.

32. In litigation, Experian (always represented by the same defense firm as in the case *sub judice*) has uniformly stated its knowledge and belief that the "source" of a tradeline is the entity that actually reported that credit data and to which Experian must send its dispute document, the ACDV (or CDV). The "source" is the "furnisher"[6] as governed by the FCRA. **On October 30, 2012**, Experian explained in an appellate brief: "**CRAs regularly receive information from various sources** around the country including banks, credit unions, automobile dealers, student loan providers, and others (**these sources are known as "Furnishers" within the credit reporting industry and under the FCRA**)[.] ... **Furnishers report credit information to the CRAs via electronic transmission on a monthly basis**. *Johnson v. Trans Union, LLC*, Brief of Defendant-

---

the variation in the Data Release Agreements, this is patently false—Experian frequently uses the phrase "source of information" consistent with its plain meaning, *i.e.*, as the entity that actually supplies the information to Experian.

[5] Available at http://www.experian.com/credit-education/glossary.html#s.

[6] "Furnisher means an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report."  12 C.F.R. § 222.41

Appellee Experian Information Solutions, Inc., 2012 WL 5396280 at 13-14 (7th Cir. Oct. 30 2012)(emphasis added); *see also Dennis, v. BEH-1, LLC & Experian Info. Sols., Inc*., Brief of Defendant-Appellee Experian Information Solutions, Inc., 2004 WL 3155937 at *20 (9th Cir. 2004) ("[A CRA] complies with the FCRA's reinvestigation requirements by reinvestigating disputed information with the source of the information to verify its accuracy.").

33.  Experian has also briefed for other courts that it knows of FTC guidance that the "information source" is the entity to which it sends the ACDV.  *Sarver v. Experian Info. Sols., Inc.*, Brief of Defendant-Appellee Experian Info. Solutions, Inc., 2004 WL 3760682, at 20-21 (7th Cir. 2004)("[S]*ee also* FTC Commentary to the FCRA, 16 C.F.R. Pt. 601, App. at 516 (2003)('If you tell a [credit reporting agency] that your file contains inaccurate information, the [credit reporting agency] must investigate the items (usually within 30 days) by presenting to its information source all relevant evidence you submit, unless your dispute is frivolous.'") (emphasis added)).

34.  Evan Hendricks is an FCRA and Privacy Rights expert. Hendricks was asked to and did serve on Experian's Consumer Advisory Council to offer  non-binding advice and discuss credit reporting, marketing and other privacy topics.  He explained, "When the phrase 'source of the information' has been used to describe the information in a credit report, in the credit industry and in regular use before Congress, the Federal Trade Commission, in testimony [and …] in seminars … the 'source' has always meant the "furnisher" who actually submitted the credit tradeline to the consumer reporting agency." (Ex. 23, Decl. of Evan Hendricks ¶¶ 3-5, 7-8). Hendricks stated that, "[T]his is the way that Experian has always used the term and phrase."  *Id*. at ¶ 9.

35.  Even during this pending litigation, Experian continues to acknowledge in its day-to-day operations that the source of the information is the furnisher of the credit information, not the originator creditor. As early as December 2012, in its website instructions explaining, "How to Dispute Credit Report Information," Experian represents that upon receipt of a consumer's dispute,

"A Notice is Immediately Sent" – not to the original creditor - but instead "to the Source of the Information." *See* Frequently Asked Questions, Learn More About the Dispute Process, (Attached as Ex. 24) (*see also* Hendricks Decl. ¶ 10-11, 14). [7]

**G.   Experian Treated CardWorks as the Source of Information.**

36.   Experian understands that the term "source of the information" describes the entity to whom consumer disputes are to be directed and who is responsible as a "furnisher" in the dispute process. The way in which Experian transmits a consumer dispute to its source is by Automated Consumer Dispute Verification, "ACDV." (Ex. 23, Hendricks Decl. ¶ 9, n.1).

37.   Every time Experian forwarded Mr. Dreher's disputes to its "source," it sent them to CardWorks. Each ACDV, not disclosed to Mr. Dreher until produced in the litigation, identifies only CardWorks, and never "Advanta." (Ex. 25, at XP 12-15). Professor De Armond explained:

> Given that Defendant directed its ACDVs to CardWorks, and not Advanta Bank Corp., and that nothing disclosed thus far indicates that Defendant sent any information about Plaintiff's dispute to Advanta Bank Corp., the now-defunct historical creator of the account, Defendant clearly treated CardWorks as the source of the information that Plaintiff disputed.   This treatment is consistent with Defendant's description of its dispute investigation process that it provides to consumers on its website.

(Declaration of Elizabeth De Armond at 15)(November 28, 2012)(Ex. 26).

38.   In each credit report, reinvestigation results and related disclosure Experian provided to

---

[7]   *See also*   http://www.experian.com/blogs/ask-experian/2011/04/27/what-if-social-security-number-variations-appear-on-report/ (stating "[v]ariations usually are not cause for concern. When a variation is reported, it is most often the result of the *source of the information* transposing or mis-entering digits. That is usually easy to recognize. You should be able to contact the *source of the information* and have them correct their records. On our consumer reports, Experian identifies the *source of the identifying information* so that you will know which of your accounts is associated with each variation.");http://www.experian.com/blogs/ask-experian/2010/08/18/notifying-experian-of-dispute-results-at-other-companies/ ("[i]n most cases, the item can only be updated by the *source of the information*. If the *source of the information*, usually a lender, changes information as a result of a dispute, the *source* is required to notify all consumer reporting companies to which it reported the information of the change.") (all links last visited on November 4, 2013).

Mr. Dreher, Experian explained its understanding that the "source of information" was the actual entity to who supplied Experian with the information. For example, in its November 16, 2010 (Ex. 5), and March 16, 2011 (Ex. 3), credit reports, Experian advised that if Mr. Dreher disputed the tradeline, "**We will contact the source of the information and ask them to check their records**." In a separate July 5, 2011, disclosure form, Experian explained its view of the FCRA to Mr. Dreher: "According to the Fair Credit Reporting Act (FCRA), a national consumer credit reporting company's role in the dispute process is to investigate information to determine the accuracy and completeness of any disputed item **by contacting the source of the disputed information and informing them of all relevant information regarding the consumer's dispute**." (Ex. 6).

39. Then, in the July 5, 2011, and August 5, 2011, reinvestigation results and dispute response, Experian wrote, "We completed investigating any items you disputed with the sources of the information and processed any other requests you made." (Exs. 6, 27).

**H.   Experian's Failure to Identify CardWorks as a "Source" Was Contrary to Industry Standards.**

40. Despite Experian's claimed interest in avoiding consumer "confusion," it did not report the tradeline in the manner that its own industry standards required. It could have identified the actual source, CardWorks, while also disclosing that the previous servicer was Advanta. (Ex. 8, Henke Dep. Tr. 41:24-42:6) (Q"[I]f requested this, Experian following its procedures could have furnished the trade line as Advanta Credit Cards/Cardworks Servicing, right? … A. That's correct."); see also (Ex. 16) ("Today, your other subcodes show as 'Spiegel/CWS', to consumer and creditors."); (Ex. 23, Hendricks Decl. ¶ 29) ("If Experian wanted to do as it claims, its system is already set up to identify in the tradeline both entities – Advanta and CardWorks.").

41. The Industry standard "Metro2" format even provides a field to identify the previous servicer or creditor. *Id*. at ¶¶ 28-29. It also permits the disclosure of both the "source" and any related

13

name or entity. For example, this fact was evident in a number of Mr. Dreher's legitimate tradelines in the June 21, 2011, Report: Citibank/Citgo; GE Capital/Home Design; HSBC/Yamaha Music; Dell Computer/Web Bank. (Ex. 4, at XP 69-75).

**J.    All Evidence Obtained by the Parties in this Lawsuit Shows That Todd Apfel Opened the Advanta Account Without Mr. Dreher's Permission.**

42.  Experian's need for some sort of legal defense forces it to maintain the untenable position that Mr. Dreher applied for and opened a credit card account with Advanta even though the Advanta credit card application, Mr. Dreher's testimony, documents subpoenaed from the states of Indiana and Michigan, and the alleged perpetrator of the identity theft, Todd Apfel, confirm that Mr. Dreher did not know about this account until November 2010 – two years after his cousin in Indiana took this account out in his name.[8]

43.  Mr. Dreher did not then and does not now have personal knowledge regarding the opening of the Advanta credit card account or the mechanics as to how it was opened. (Ex. 1, Dreher Decl. ¶ 21). All of the information he now knows about this loan was obtained from his own contacts which he believed to be Advanta, from the documents provided in this case or through the information obtained by his attorneys. *Id*. at ¶ 21, 23, 25. All of these documents confirm that Mr. Dreher was a victim of identity theft by Mr. Apfel.

44.  For example, in accordance with Experian's instructions, Mr. Dreher wrote to Advanta at the generic post office box address Experian had provided to dispute the account. *Id*. at ¶ 15.

45.  After receiving no response to his first letter, Mr. Dreher actually did receive a response to a second letter, which was unsigned and on letterhead labeled, "Advanta Credit Cards." (Attached as Ex. 29). No physical address or employee name or contact was provided. *Id*. The "Letter"

---

[8] Experian's untenable position goes as far as refusing to admit that Todd Apfel is untruthful. (Experian's Response to Plaintiff's First Set of Requests for Admissions, RFA Nos. 58 & 59, attached as Ex. 28).

included a one-page computer printout of what the sender claimed to be an internet credit application from July 2008 and a billing statement, only in the name of Advanta, from March 2011. *Id.*

46. The internet document provided by "Advanta" was not signed by Mr. Dreher. The application screen-print only lists Mr. Apfel's business and cell phone. *Id.* Further, the online application that was purportedly filled out doesn't even list Mr. Dreher's correct address—listing Byrd Avenue instead of Byrd Drive—not a mistake that would be made if Mr. Dreher was involved with the application. *Id.*

47. All account statements were mailed to 1251 Pine Lake Indiana, La Porte, Indiana, 46350. Moreover, Mr. Dreher never made any payments whatsoever on the account and third-party discovery produced in this litigation confirms that all payments were made from a Horizon Bank account in the name of "Arnie's Bowling Rec." (Ex. 30).

48. This was not the only fraudulent account opened by Mr. Apfel at this time. Around the same time he opened the account in Mr. Dreher's name, Mr. Apfel admitted that he took out a business account in the name of his own father and that his own father subsequently filed a fraud complaint with the issuing creditor, Chase. (Ex. 31, Apfel Dep. 49:2-23, Dec. 12, 2013). The subpoena response from Chase also reflects Mr. Apfel's unquestionable involvement in the opening and use (both personal and business) of this account. (Ex. 32).

49. Moreover, in order to cover up the fraud, Mr. Apfel fraudulently sent a letter on "Thunderbird Lanes" letterhead purportedly from his father, which indicated his father and Mr. Dreher were officers of the company and that his father was confused after he initially discovered the fraud. (Ex. 33). This is in direct conflict with the documents provided by Mr. Apfel to the United States Bankruptcy Court, such as the Statement of Financial Affairs, where Mr. Apfel swears under oath that him and his business partner, Louise Lesser, are the only two officers and owners of the company. The Summary of Schedules submitted by Mr. Apfel also omits any reference to the

15

Advanta account in violation of federal bankruptcy laws. (Experian's Response to Plaintiff's Second Set of Requests for Admissions, RFA Nos. 102-103, attached as Ex. 34).

50.  Worse yet, in his deposition in this case, Mr. Apfel actually admitted to perjury before the United States Bankruptcy Court. (Ex. 31, Apfel Dep. 125:5-18).

51.  Even in this litigation, Mr. Apfel signed two separate and inconsistent statements under oath. (*Id*. at 65:4-19; 81:7-82:7; 84:13-86:13). For example, he has provided a sworn declaration in which he testified that he knew that Mr. Dreher did not open, apply for or use the account. (Ex. 35, Apfel Decl. ¶¶ 7-9, Sept. 8, 2013). In contrast, likely when threatened with prosecution, he had earlier provided a contradictory declaration to CardWorks's attorneys. (Ex. 36, Apfel Aff., Oct. 25, 2012, ¶¶ 6-8). And aside from his word, Mr. Apfel further admitted there is no documentation or any evidence to support his testimony. (Ex. 31, Apfel Dep. 171:22-172:5).

52.  Not even CardWorks, a former defendant in this lawsuit and subscriber of Experian, has been able to produce a credit card application signed by the Plaintiff; a charge slip attributed to him; or a single bill addressed to his home address that contradicts his testimony. In fact, CardWorks settled its case early in this litigation. (Dkt No. 52).

53.  On the other hand, Mr. Dreher has allowed subpoenas to his employer that provided Experian with the opportunity to read every work email – Plaintiff's primary e-mail account - he had sent or received, dug through his finances, reviewed his tax returns and subpoenaed and delved into his personnel file with the federal government in an attempt to find some sort of smoking gun. Experian has left no stone unturned—but its efforts only prove what Mr. Dreher has stated from the moment of he discovered the account— that he never signed, authorized the use of, nor agreed to pay the Advanta credit card that is the subject of this litigation.

## SUMMARY JUDGMENT STANDARD

Partial summary judgment shall be granted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the new Rule 56, the movant must support its factual position by citation to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A).

Under the new version of Rule 56(c)(1)(B), the movant may demonstrate that there is no dispute of a material nature, including by showing that a non-movant cannot produce admissible evidence to establish or controvert a fact. This is consistent with the established case law, for example, when the non-moving party will bear the burden of proof at trial, the moving party's burden can be met by "pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett.* 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

In certain cases, resolution of the two issues in this motion are one best suited for summary judgment. For example, the United States District Court for the Eastern District of Pennsylvania recently granted a similar motion for summary judgment in an FCRA class action on the issue of liability (albeit under a different section of the FCRA) after finding that the defendant's conduct was objectively unreasonable as a matter of law. *See Reardon v. ClosetMaid Corp.*, 2013 WL 6231606 (E.D. Pa. 2013). In doing so, the court concluded that the defendant's form "was contrary

to the law as Congress enacted it, and [the defendant] proceeded anyway." *Id*. at 11. Similarly, in a case with weaker accuracy facts than the instant case, Judge Dohnal granted the consumer-plaintiff's motion for partial summary judgment (albeit in a §1681s-2(b) case) the issue of accuracy because there were no disputed facts whether plaintiff was or was not obligated on the subject indebtedness. *Alabran v. Capital One Bank*, 2005 WL 3338663 (E.D. Va. Dec. 8, 2005). The results in this case should be no different as Experian's conduct was unquestionably contrary to the plain language of § 1681g(a)(2) as Congress enacted; and the material facts conclusively establish Mr. Dreher was a victim of identity theft by Mr. Apfel.

## LEGAL ARGUMENT

I.   **MR. DREHER AND THE CLASS MEMBERS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLASS CLAIM BECAUSE NO REASONABLE JURY COULD FIND THAT IT WAS OBJECTIVELY REASONABLE FOR EXPERIAN TO KNOWINGLY OMIT CARDWORKS AS A "SOURCE OF INFORMATION."**

Section § 1681g(a)(1) requires that reporting agencies, upon any request by a consumer, "clearly and accurately disclose to the consumer . . . [a]ll information in the consumer's file at the time of the request," as well as "[t]he sources of the information." 15 U.S.C. § 1681g(a)(1) & (2). By giving consumers the right to access the information in their files—and to know where it came from—this requirement serves several important purposes: it allows consumers to confirm that the information is accurate, and it tells them who to contact if it's not. Indeed, Congress "felt that it was necessary to give consumers a specific statutory right to acquire such information on sources" because in some cases it "may be the only way in which the consumer can effectively" correct mistakes. 116 Cong. Rec. 35,940 (1970).[9]

---

[9] *See also Gillespie v. Equifax Info. Servs., L.L.C.*  484 F.3d 938, 941 (7th Cir. 2007) ("A primary purpose of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information *via* the grievance procedure established under § 1681i.").

A.    The *Safeco* Legal Standard.

The Supreme Court held in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) that "willfulness" under § 1681n encompasses both "knowing" and "reckless" violations of the FCRA. *Id*. at 68. The *Safeco* Court did not apply the "knowing" prong of "willfulness", but instead determined that the "recklessness" component of "willfulness" comports with the common law understanding, stating that, "the term recklessness is not self-defining," the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. To that end, the Supreme Court held that a reckless violation of the FCRA is not willful merely because it is erroneous, but rather it must be "objectively unreasonable." *Id*. at 69.

In determining "willfulness" under this objective standard, this Court and others across the country have used a three-pronged analysis first articulated by the Third Circuit in *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241 (3rd Cir. 2012), which focuses on the three bases for the Supreme Court's decision in *Safeco*. *See Dreher I*, 2013 WL 2389878 at *5 (analyzing willfulness through three-prong test established in *Fuges*); *Boyd v. CEVA Freight, LLC*, 2013 WL 6207418 (E.D. Va. 2013). First, the *Fuges* court looked to determine whether the FCRA itself gave guidance as to what was required by the statutory provision in question or instead contained "less-than-pellucid statutory text." *Fuges*, 707 F.3d at 251 (citing *Safeco*, 551 U.S. at 69-70). Second, according to *Fuges*, a court should examine whether the defendant's interpretation of the FCRA statutory provision "had a foundation in the statutory text." *Id.* (citing *Safeco*, 551 U.S. at 69-70). And third, whether the defendant was interpreting the statute in the absence of any guidance from other courts or the FTC. *Id.* (citing *Safeco*, 551 U.S. at 70).

As more fully explained below and in the Court's Memorandum Opinion denying Experian's

motion for summary judgment, Experian's "interpretation"[10] of § 1681g(a)(2) was objectively unreasonable under the three-prong test in *Fuges*.

    **B.**    **The Doctrine of the Law of the Case and Any Objectively Reasonable Reading of the Plain Statutory Language Warrants An Award of Partial Summary Judgment in Favor of the Plaintiff and the Class Members on the Issue of Willfulness.**

As "most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (internal quotation marks omitted). "When the question is a court's revisitation of an issue previously decided by the same court, the doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Ins. Co. of N. Am., v. Dynamic Const. Co.*, 1997 WL 14417, at *4 (6th Cir. 1997) (unpublished) (citing *Christianson.*, 486 U.S. at 817). "Thus, a court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Dynamic Const. Co.*, 1997 WL 14417, at *4 (citations omitted). Moreover, while the law of the case doctrine does extend to questions actually decided as well as those decided by necessary implication, "it does not reach 'questions which might have been decided

---

[10] During this lawsuit, Experian has tried to manufacturer several "interpretations" of § 1681g(a)(2) to shield itself from liability. In reality, Experian has always understood that a "source" of credit information is the entity that actually supplies the information to the credit-reporting agency. Not only is this the definition of source from Merriam-Webster's, but it is also the definition used by Experian on its own website. *See* Merriam-Webster's Dictionary defining "source" as "one that supplies information" (available at http://www.merriam-webster.com/dictionary/source); *Compare* with Experian's Glossary of Credit Terms defining "source" as "the business or organization that supplied certain information that appears on the credit report." (available at http://www.experian.com/credit-education/glossary.html#s).

but were not.'" *Sejman v. Warner–Lambert Co., Inc.,* 845 F.2d 66, 69 (4th Cir. 1988) (quoting *Copra, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316 (5th Cir. 1978)).

This is, *sub judice*, not a technical or process-only argument.  The Court's reasoned decision on Defendant's Motion for Summary Judgment occurred after extensive litigation and briefing. (*See* Dkt Nos. 46-48, 76, 81, 84). In fact, the case was bifurcated just so that Experian could raise this issue at the stage it determined most just and appropriate. (Dkt. No. 37). And even that date was pushed back on multiple occasions.  (Dkt. Nos. 40 & 41). Further, the Parties' extensive class certification briefing was built on the Court's summary judgment decision, as was the Court's ruling granting class certification. (Dkt. Nos. 141, 145, 151, 155, 156, 159, 163, 166). And of course, Experian's advancement of such class certification arguments and framing of the case were summarily rejected by the Fourth Circuit on September 2, 2014, without the Fourth Circuit even providing Experian with an opportunity to file a Reply brief. *Experian Info. Solutions v. Dreher*, Case No. 14-325 (4th Cir. 2014) (Dkt. Nos. 15-16).[11]

Plainly there are no extraordinary circumstances, clear error or manifest injustice by the Court and its decision.  Only denial by Experian.  The law of the case is properly and correctly set.

### 1. Experian's Conduct Was Objectively Unreasonable As a Matter of Law Because It "Utterly Disregard the Plain Language" of § 1681g(a)(2).

---

[11] And as would be expected, the Court's detailed and reasoned summary judgment decision has already been confirmed and adopted outside of this District:

> Defendant correctly points out that *Dreher* is not binding on this Court. The *Dreher* court's reasoning, however, is illustrative regarding the meaning of "sources" within the context of the FCRA and specifically with regard to Section 1681g(a)(2). The *Dreher* court's analysis is particularly useful because it relied heavily on a Third Circuit opinion in discussing whether a jury could find that the defendant in that case committed a willful violation of the FCRA because of its allegedly reckless conduct.

*Dennis v. Trans Union, LLC*, No. CIV.A. 14-2865, 2014 WL 5325231, at *7 (E.D. Pa. Oct. 20, 2014).

The law of the case doctrine warrants an award of partial summary judgment in this case because the issues in this motion were already specifically argued and decided in *Dreher I,* which decided the issue of willfulness as recognized by the Court at the class certification hearing. (Dreher Class Cert. Hr'g Tr. 70:4-5, Apr. 17, 2014) ("THE COURT: I think that the last summary judgment motion… ***pretty much decides the willfulness issue in this case.***") (emphasis added). In particular, in its memorandum in support of its motion for summary judgment, Experian argued at length that the statutory text of § 1681g(a)(2) was less than pellucid; therefore, Experian's interpretation of Advanta Bank as the source was objectively reasonable. (Dkt. No. 55 at 10). After hearing oral argument from the parties on this issue, the Court issued its Memorandum Opinion on May 30, 2013, denying Experian's for summary judgment. In doing so, the Court addressed and rejected this precise argument, finding:

> [T]he phrase at issue comprises two components—'sources' and 'information. The 'information' at issue is not the institution at which Dreher's account originated, who owned the account, or who serviced the account, but rather the actual content of the credit items listed in Dreher's personal report, just as that 'information' appears. . . . Although Experian posits that the word 'sources' could have many meanings, in the context of this case and the FCRA, the term clearly embraces CardWorks. Whatever else it might mean, the term "sources of information" certainly includes the entity that gave the information to Experian.
> …
> Thus, Experian utterly disregarded the statute's plain language when deciding how to comply.

*Dreher I*, 2013 WL 2389878 at *5, 7. This reasoning should govern this same issue on the summary judgment motion by Mr. Dreher now before the Court. The Court's Memorandum Opinion could not be more clear—Experian utterly disregarded the plain language of § 1681g(a)(2). Such an utter disregard cannot be objectively reasonable under the willfulness standard established by *Safeco*. Simply put, no reasonable person could find that Experian's conscious and intended omission of CardWorks as one of the sources of information was objectively reasonable when the plain language

of § 1681g(a)(2) mandates Experian to "clearly and accurately" disclose the "sources of information" in consumer's files.

### 2. Experian's *Post Hoc* Interpretation Has No Foundation in the Statutory Text, and, Therefore, is *Per Se* Objectively Unreasonable.

The second *Fuges* factor examines whether the proposed interpretation "had a 'foundation in the statutory text.'" *Fuges*, 707 F.3d at 251 (citing *Safeco*, 551 U.S. at 69-70). In this case, Experian has primarily asserted two reasons why its identification of Advanta Bank as the sole source of information was objectively reasonable. First, without any evidence to support its position, Experian argues that identifying CardWorks as the source of information would only confuse consumers. (Dkt. No. 55 at 1, 10, 14). The Court resoundingly rejected this argument, finding that "Experian had no obligation to select only one single source; in fact, doing so directly conflicted with the FCRA's language, which compels parties to identify, not the 'source,' but the sources of information." *Dreher I*, 2013 WL 2389878 at *5.[12] The Court continued "though it might initially surprise a consumer to see an unfamiliar name in his or her credit report, it would hardly hurt to learn the name of an entity primarily responsible for the presence of certain credit information, whether favorable or unfavorable. Consumers unquestionably want to know whom they can hold ultimately accountable for the content of their credit reports." *Id.* at 6. Thus, it "would have made perfect sense" for Experian to disclose CardWorks as a source of information, especially when the

---

[12] In *Dennis*, the court recognized this distinction also, finding "A liberal reading of Section 1681g(a)(2) allows for a definition of 'sources' like that suggested by Plaintiff, which does not limit Defendant's, nor any CRA's, 'sources' to only the original source of information. Defendant's proposed definition, and its reading of 'sources' as excluding the possibility of multiple sources for one piece of information, are too narrow in light of the 'remedial scheme.' Congress intended and the fact that Congress wrote Section 1681g(a)(2) using the plural "sources" rather than the singular "source." As the plain language of Section 1681 g(a)(2) does not limit 'sources' in any way, the Court will not impose a limitation on the number of sources a CRA could have, and therefore be required to disclose, for a particular piece of information." 2014 WL 5325231 at 7 (citations omitted).

23

industry standard format, "Metro2," allows for identification of the issuer of the debt and the servicer and Experian actually considered the tradeline "Advanta/CWS" before allowing CardWorks to camouflage its identity. *Id*. at 6-7.[13]

Second, Experian further argues that it was not objectively unreasonable to identify Advanta—and Advanta only—when multiple entities were involved in the ownership and management of Advanta Bank accounts. *Id*. at 13-16. Once again, the Court resoundingly disagreed with these arguments and held that "Experian's chosen interpretation of 'sources of the information' ha[d] no foundation in the statutory text." *Dreher I*, 2013 WL 2389878 at *5. As the Court noted, "just because a number of entities are 'connected to' Advanta accounts in some manner or another, it does not logically follow that they also qualify as "sources of the information" whose names Experian must disclose to consumers with Advanta accounts. " *Id*. at 7. Despite Experian's self-serving obfuscation of the entities, the evidence in the case is uncontroverted: only CardWorks reported information on the Advanta tradelines after August 2010. Moreover, Experian communicated consumers' disputes directly to CardWorks. Experian actually sent ACDVs that listed the source subscriber as CardWorks and never mentioned "Advanta" anywhere in the communication. Experian's every action in this case confirms its understanding that CardWorks was the supplier, the furnisher and the source. Thus, the omission of the "most logical 'source of the

---

[13] Experian's stated policy of avoiding confusion is not only contrary to the pellucid language of § 1681g(a)(2), but it is also patently false. As detailed in Plaintiff's statement of facts, Experian does not have a stated or disclosed policy for compliance with § 1681g(a)(2). Instead, just as it did in this case, Experian defers entirely to its paying clients to decide the tradeline label. It does not even ask or inquire as to the basis for the source's selection of a tradeline—it just obliges to the request as it did for CardWorks's request for the new code to report as "Advanta Credit Cards". The e-mail correspondence between Mr. Bennett and Mr. Kilka on October 21, 2010, confirms that Experian did not inquire as to the basis of CardWorks's selection. Less than two hours after instructing Mr. Kilka that CardWorks wanted the new tradeline to read just "Advanta Credit Cards," Mr. Kilka sent in the request and no other questions were asked. (Exs. 16, 17, 19).

information' at issue… bar none" was unjustifiably high risk that was known or so obvious that it should have been known; therefore, was objectively unreasonable as a matter of law.

### 3. Guidance from Other Courts and Agencies Demonstrates that Experian's Interpretation Was Objectively Unreasonable.

Finally, there is an abundance of indirect guidance from other courts or agencies that make clear that Experian's chosen interpretation was objectively unreasonable. But before addressing these other sources, Plaintiff first notes that the lack of an appellate court or regulatory agency opinion defining the precise scope of "sources of information" is not surprising given the statute's plain and cognizable language. *Boyd*, 2013 WL 6207418 at *7 ("When, as here, a statute presents a clear, cognizable command, the fact that courts have not troubled themselves to parse its meaning does not act as an indictment of the statute's ambiguity. In the instant case, § 1681b(b)(2) does not present a complicated exercise in statutory interpretation; asserting that the lack of judicial discussion concerning the statute's meaning—more than 20 years after its passage—indicates its textual uncertainty or ambiguity is illogical."). To that end, the fact that § 1681g(a)(2) has not been interpreted by an appellate court (or a district court other this Court in *Dreher I*) in more than 45 years since its enactment does not benefit Experian in this case, but rather demonstrates the clarity of the language used by Congress.

Furthermore, while there has been little need given its clarity for judicial examination of § 1681g(a)(2) itself, numerous appellate court have interpreted the phrase "source of the information" in a credit report to mean the entity that furnished and supplied that data and to whom a CRA must forward a consumer's dispute. *See, e.g.*, *Cushman,* 115 F.3d at 225 ("'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial *source* of information'"); (emphasis added); *Dalton*, 257 F.3d 409, 416-17 (4th Cir. 2001) (the Fourth Circuit clearly identified the "source" of the disputed information as the clerk, and not the creator of the

original underlying record). In fact, appellate courts uniformly use the term "source of information" in a credit report in the manner herein described, including decisions involving this very Defendant. *Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006, 1011-12 (10th Cir. 2011) ("Experian's procedures for ensuring the accuracy of credit entries were described in affidavits from two employees: Kimberly Hughes, a Consumer Affairs Specialist Consultant, and Kathleen M. Centanni, a Compliance Manager. Both stated that … If a consumer requests an investigation into an item listed on his report … Experian contacts the source of the disputed information and describes the dispute. The source must research the information reported and respond regarding the accuracy of the information. Depending on the answer, Experian leaves the item as is, deletes it, or changes it in a manner specified by the source.").[14] Based on this guidance, it was objectively unreasonable to fail to identify CardWorks as a source because it was undoubtedly the entity that Experian contacted to describe the dispute and who responded to Experian regarding the accuracy of the tradeline.[15]

---

[14] In *Dennis*, the court acknowledged the lack of binding precedent specifically addressing the meaning of the term "sources of information," however, the court held that "numerous courts within [the Third] Circuit have read other sections of the FCRA with an understanding that there can be more than one source for a single piece of information, including the original source of information or the source the CRA actually used, original or not. 2014 WL 5325231, *10, n. 4 (citing *Cushman,* 115 F.3d at 225 (observing that the "grave responsibility" imposed by FCRA section concerning reinvestigation "must consist of something more than merely parroting information received from other sources."); *Shannon v. Equifax Info. Servs., LLC,* 764 F.Supp.2d 714, 724 (E.D.Pa.2011) (discussing factors set forth by the Third Circuit in *Cushman* for when a CRA should go beyond the original source during a reinvestigation, including when the CRA knows or should know that the source is unreliable); *Dixon–Rollins v. Experian Info. Solutions, Inc.,* 753 F.Supp.2d 452, 458, 465 (E.D.Pa.2010) (discussing a CRA's obligation as including going beyond "the original source" in order to verify the accuracy of "its original source" or "its initial source" in case concerning reinvestigation requirements under FCRA)). Based on this guidance, the court concluded that the Third Circuit had "demonstrated an understanding that the meaning of 'sources'" was not as narrow as the defendant proposed. *Id.*

[15] The uniformity of guidance on this issue forms the basis of Professor Elizabeth De Armond's expert opinion in this case that "Defendant's withholding of the identity of CardWorks violated its obligation to clearly and accurately disclose the source of information regarding the disputed debt pursuant to 15 U.S.C. § 1681g(a)(2). Furthermore, it would be objectively unreasonable to construe

Because all three factors weigh overwhelmingly against Experian, the Court should enter summary judgment in favor of the Plaintiff and the putative class as did the United States District Court for the Eastern District of Pennsylvania in *Reardon* when presented with similar legal issues. 2013 WL 6231606 (E.D. Pa. 2013). In *Reardon*, the plaintiffs filed a class action alleging that the defendant willfully violated the FCRA by obtaining and relying on consumer reports without providing the appropriate disclosures required by § 1681b(b)(2)(A), which requires in pertinent part, that an employer provide a "clear and conspicuous" disclosure to applicants prior to obtaining their consumer reports that appears "in a documents that consists solely of the disclosure." *Id.* at *1, 5. (emphasis added). More specifically, plaintiffs alleged, *inter alia*, that the defendant's authorization form violated § 1681b(b)(2)(A)(i) because it contained a waiver of rights provision in the authorization form rendering it a document that consisted of more than just the disclosure. *Id.* at 5.

In response, the defendant argued that the waiver language was not such a great distraction and pertained directly to the applicant's authorization to obtain the report, a provision that is expressly allowed to co-exist in the same form as a disclosure pursuant to § 1681b(b)(2)(A)(i)(ii). *Id.* at 8. The defendant bolstered this argument by citing to a recent district court opinion that had decided this precise issue in its favor. *Id.* at 10 (citing *Smith v. Waverly Partners,* LLC, 3:10–CV–00028–RLV, 2012 WL 3645324, at *6 (W.D.N.C. Aug.23, 2012).

While *Reardon* considered a different FCRA section, the court's analysis is instructive regarding whether to grant a plaintiff summary judgment on willfulness where a defendant's statutory interpretation is "objectively unreasonable." Relying on the three-prong analysis articulated in *Fuges*, the court entered summary judgment on the issue of willfulness after finding

---

15 U.S.C. § 1681g(a)(2) as permitting such withholding." (De Armond Decl. at 12). As Professor De Armond concluded, prior to this case, Experian, the courts, the regulators all agree on the meaning of "source." *Id.* at 8-9.

that the first and second factors weighed against the defendant. *Id*. at 10. First, the court determined that the defendant's conduct "directly conflicted" with the FCRA's plain language that clearly prohibits any employer's inclusion of any additional provisions in the disclosure form except for the authorization itself. *Id*. As to the second prong, the court concluded that there "is simply nothing in the statutory text that would validate [the defendant's] interpretation that it is proper to include a waiver of rights provision, even one as narrowly tailored to [the defendant's] procurement of the applicant's authorization for the consumer report, in a disclosure form." *Id*. And finally, the court found that there was guidance from the FTC on the issue. *Id*. Thus, the court held that the defendant's notice was objectively reasonable as a matter of law because it was "contrary to the law as Congress enacted it." *Id*. at 11.

The results in this case should be no different than *Reardon* because, just like that case, the first and second factors weigh conclusively against Experian. Moreover, as in *Boyd*, this case does not present "a complicated exercise in statutory interpretation;" and, the lack of such guidance over a 45-year period speaks to the clear and cognizable language of § 1681g(a)(2). Simply put, Experian knowingly omitted CardWorks as a "source of information" even though "in the context of this case and the FCRA, the term ***clearly*** embraces CardWorks." *See Dreher I*, 2013 WL 2389878 at *5 (emphasis added). This decision, which was made due to the request of CardWorks after Experian asked if the tradeline should be listed as "Advanta/CWS," was objectively unreasonable.

## II.    THE COURT SHOULD AWARD SUMMARY JUDGMENT TO THE  PLAINTIFF ON THE ELEMENT OF ACCURACY WITH RESPECT TO HIS INDIVIDUAL CLAIMS FOR VIOLATION OF THE FCRA.

### A.    Summary Judgment is Appropriate in Determining Accuracy as an Element of a § 1681i Claim.

Section 1681i sets forth the responsibilities of credit reporting agencies when a consumer disputes the completeness or accuracy of any item of information contained in the consumer's file with the CRA. Subsection (a) states, in relevant part:

(a) Reinvestigations of disputed information.

   (1) Reinvestigation required.

     (A) In general. … if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, …, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file [.].

15 U.S.C. 1681i(a)(1)(A). The legislative history of § 1681i characterizes the dispute and correction process as "the heart of… efforts to ensure the ultimate accuracy of consumer report." *See* Committee Report, S. Rep. No. 185, 104th Cong. 1st Sess., at 43 (Dec. 14 1995). Mr. Dreher alleges that Experian violated this provision.

FCRA cases based on a credit reporting agency's failure to investigate and correct credit information nearly always required proof of the same narrow set of liability elements: (1) Was an "investigation" conducted? (2) Was the investigation "reasonable?" (3) Was the disputed information "inaccurate?" (4) Did the credit reporting agency correctly respond to the dispute after the investigation process? While some of these questions remain jury questions, one of the four elements – accuracy – is not a jury question because there is no doubt that the disputed information was correctly and/or incompletely reported.[16] Accordingly, summary judgment on this core element with facts that are not and cannot be disputed will reduce the large range of evidence and otherwise uncontestable issues that currently confront the Court and the Parties for trial.

---

[16] Certainly Experian will not contest this explanation as it repeatedly argued this point in its other litigation in this same Court. *See, e.g., Thach v. Equifax Info. Servs.,* Case No. 3:14-cv-00070(HEH) (E.D. Va. 2014) (Dkt. No. 112).

**B. Experian's credit reporting was inaccurate. Mr. Dreher did not apply for the Advanta account and was never legally responsible to pay the amounts owed on it.**

After Mr. Dreher initiated a dispute, Experian repeatedly verified that Mr. Dreher was the person responsible for opening and paying the subject credit card. Although there is no doubt that Experian failed to conduct a meaningful investigation, this would not matter if what was ultimately "blindly" verified was accurate regardless of the quality of the investigation. Whether a credit reporting agency gets the correct answer by "dumb luck" or through lawful investigation, an accurate answer precludes a consumer from prevailing in an § 1681i case. Thus, a consumer must show (either as a liability or a damage element – courts see it both ways) that the challenged reporting was, in fact, inaccurate. *Beattie v. Nations Credit Fin. Services Corp.*, 69 F. App'x 585, 591 (4th Cir. 2003) (stating "[a]lso, as we have stated previously, the information Nations Credit reported to the credit bureaus was accurate … [t]herefore, the Beatties have failed to show that the FCRA provides an actionable duty[.]").

Such a decision is one best suited for summary judgment. In *Alabran*, Judge Dohnal granted the plaintiff's motion for partial summary judgment (albeit in a §1681s-2(b) case) arising from a wife's unauthorized use of her husband's identity (they were estranged as of the date the case was filed). In such a fact pattern, which is weaker than the one now before the Court, the Court held:

> The court concurs that there are no disputed material facts remaining after resolution of the Defendant's motion concerning whether the Plaintiff was or was not obligated on the subject indebtedness such that the resolution of the issue of the accuracy of the information is a question of law that would have to be resolved by the court anyway at some point.

*Alabran*, 2005 WL 3338663 (E.D. Va. Dec. 8, 2005).[17]

---

[17] In *Mullins v. Equifax Information Services, LLC*, Judge Payne granted the consumer-plaintiff's *motion in limine* and request for a jury instruction advising the jury that: "***Trans Union reported that Ms. Mullins was contractually responsible for the credit card accounts in dispute here. You are instructed that Trans Union was inaccurate in reporting that Ms. Mullins was contractually responsible for these accounts.***" 3:05-cv-888, Jury Instruction 16.

There is no reasonable question in this case that Defendant's reporting was not accurate. It is a simple question – did Mr. Dreher apply for and agree to pay for the credit card? The answer is simple: No, he did not. Mr. Dreher does not again need to restate the same details identified in his Statement of Facts, *supra*. But the simplest accuracy facts are these: Mr. Dreher – by affidavit and discovery in this case – provided unqualified testimony that he never signed, nor agreed to pay the credit card which is the subject of this litigation. Experian has had over <u>three</u> years to rebut this evidence, but it cannot (and will not) find a single witness or document that states otherwise.

On the contrary, documents supplied by third parties, notably, the credit card application, billing statements, reflect that the account was taken out in the name of Arnie's Bowling Rec. and associated with an address and telephone numbers in Indiana, where Mr. Dreher never lived or worked. Moreover, Mr. Apfel's bankruptcy documents, the business entity documents produced by the state of Indiana, and Mr. Dreher's emails all confirm that he was never involved in Arnie's Bowling Rec. or any other company owned and operated by Mr. Apfel. These documents confirm— that "[w]ithout Dreher's permission, a scoundrel had opened a charge account in Dreher's name at Advanta Bank." *Dreher II,* 20134WL 2800766, *1. A scoundrel who has a history of dishonesty, including also stealing his own father's identity for the purpose of opening credit for the same business, admitted perjury to the United States Bankruptcy Court for Indiana, and inconsistent statements under oath in this case. Thus, Defendant's credit reporting was objectively inaccurate. It is factually impossible for Mr. Dreher to have been delinquent or in default on a credit card that he never applied for. Therefore, Mr. Dreher is entitled to summary judgment on this important element of his § 1681i claim.

Respectfully submitted,

**MICHAEL T. DREHER,**
***on behalf of himself and others***
***similarly situated***

31

_____/s/_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY & CRANDALL, PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile:  (703) 591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Susan M. Rotkis, Esq., VSB#40693
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd, Ste 1-A
Newport News, VA  23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email:  lenbennett@clalegal.com
Email: srotkis@clalegal.com

Matthew J. Erausquin, VSB No. 65434
Consumer Litigation Associates, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone:     (703) 273-7770
Facsimile:     (888) 892-3512
Email: matt@clalegal.com
*Counsel for Plaintiff Michael T. Dreher*

## CERTIFICATE OF SERVICE

I certify that this 31st day of October, 2014, I filed the foregoing pleading using the ECF system which will then send a notice of electronic filing (NEF) to the following:

Joseph W. Clark, Esq.
Hilary K. Perkins, Esq.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: 202-879-3939
Facsimile: 202-626-1700
Email: jwclark@jonesday.com
Email: hperkins@jonesday.com
*Counsel for Defendant Experian*
*Information Solutions, Inc.*

Daniel J. McLoon, admitted *Pro Hac Vice*
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071-2300
Office +1.213.243.2580
Fax +1.213.243.2349
Email djmcloon@jonesday.com
*Counsel for Defendant Experian*
*Information Solutions, Inc.*

David N. Anthony, Esq.
TROUTMAN SANDERS LLP
1001 Haxell Point
Richmond, Virginia
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
david.anthony@troutmansanders.com
*Counsel for Defendant Experian Information*
*Solutions, Inc.*

_____/s/_____
Kristi C. Kelly, Esq., VSB #72791
KELLY & CRANDALL, PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyandcrandall.com
*Counsel for Plaintiff Michael T. Dreher*